# Exhibit 1

Page 1

```
 1                  CAUSE NO. DC-18-17902
 2   LOUIS PAPA,                      )IN THE DISTRICT COURT
                                      )
 3              Plaintiff,            )
                                      )
 4              vs.                   )44th JUDICIAL DISTRICT
                                      )
 5   PANINI AMERICA, INC. AND         )
     BECKETT COLLECTIBLES, INC.       )
 6   D/B/A BECKETT GRADING SERVICES,  )
                                      )
 7              Defendants.           )DALLAS COUNTY, TEXAS
     _____
 8
                      ORAL DEPOSITION OF
 9
                        JEROMY MURRAY
10
                      FEBRUARY 12, 2020
11   _____
12
13
14
15          ORAL DEPOSITION of JEROMY MURRAY, produced
16   as a witness at the instance of the Plaintiff, and
17   duly sworn, was taken in the above-styled and
18   numbered cause on the 12th of February, 2020, from
19   10:09 a.m. to 12:25 p.m., before Karen L. Shelton,
20   RDR/CRR/CSR in and for the State of Texas, reported
21   by machine shorthand at the offices of Condon Tobin
22   Sladek Thornton, 8080 Park Lane, Suite 700, Dallas,
23   Texas, pursuant to the Texas Rules of Civil
24   Procedure and any provisions stated on the record or
25   attached hereto.
```

**Page 2**

```
1            APPEARANCES
2
3  FOR THE PLAINTIFF:
4     MR. K. PATRICK BABB
       FOX ROTHSCHILD, LLP
5      Two Lincoln Centre
       5420 LBJ Freeway
6      Suite 1200
       Dallas, Texas 75240
7      (972) 991-0889
       (972) 404-0516 (fax)
8      pbabb@foxrothschild.com
9
   FOR THE DEFENDANT PANINI AMERICA, INC.:
10
      MR. JOSEPH A. UNIS, JR.
11     LOCKE LORD, LLP
       2200 Ross Avenue
12     Suite 2800
       Dallas, Texas 75201
13     (214) 740-8448
       (214) 740-8668 (fax)
14     junis@lockelord.com
15
   FOR THE DEFENDANT BECKETT COLLECTIBLES, INC.
16 D/B/A BECKETT GRADING SERVICES:
17    MR. KENDAL B. REED
       CONDON TOBIN SLADEK THORNTON
18     8080 Park Lane
       Suite 700
19     Dallas, Texas 75231
       (214) 265-3800
20     (214) 691-6311 (fax)
       kreed@ctstlaw.com
21
22
23
24
25
```

**Page 3**

```
1                I N D E X
2                              Page
3  Appearances                   2
4  JEROMY MURRAY
5    Examination By Mr. Babb     4
6  Signature and Changes         93
7  Reporter's Certificate        95
8
9              E X H I B I T S
10 No.     Description          Page
11 Exhibit 1   Emails             10
            PANINI_0000111 - 113
12
      Exhibit 2   Printout from The Official   24
13         Panini America Blog
            PLAINTIFF 000089 - 95
14
      Exhibit 3   Summary Notes              32
15          PLAINTIFF 000014 - 16
16    Exhibit 4   Email                      50
            PANINI_0000119
17
      Exhibit 5   Emails                     78
18          PANINI_0000026 - 31
19    Exhibit 6   Emails                     79
            PANINI_0000046 - 50
20
21
22
23
24
25
```

**Page 4**

1  JEROMY MURRAY
2  having been first duly sworn, testified as follows:
3            E X A M I N A T I O N
4  BY MR. BABB:
5      Q.  Mr. Murray, I know we just met, but could
6  you say your name for the record?
7      A.  Sure.  My name is Jeromy Murray and it's
8  J-E-R-O-M-Y, last name M-U-R-R-A-Y.
9      Q.  And do you have any nicknames you go by?
10     A.  I don't.
11     Q.  Have you ever gone by any other names than
12 Jeromy Murray?
13     A.  I have not.
14     Q.  Again, we introduced ourselves.  I'm
15 Patrick Babb.  You understand who I am and that I
16 represent the plaintiff in this suit, Lou Papa, who
17 has sued your company, Beckett?
18     A.  I do.
19     Q.  Okay.  Have you ever given a deposition
20 before?
21     A.  I have.
22     Q.  How many depositions have you given?
23     A.  This is my second one.
24     Q.  Okay.  Welcome back to the party.
25         When did you give the other deposition?

**Page 5**

1      A.  It was a couple months ago.
2      Q.  And was that for the litigation with Leaf?
3      A.  It is.
4      Q.  Okay.  That's all I need to know.  I won't
5  go any further into it.  Don't worry.
6          Well, so you're well versed.  Kendal is a
7  great attorney, so I know he's prepped you already.
8  But just to go back over the ground rules, Madam
9  Court Reporter is taking down everything we say, so
10 answer out loud.  If you ever want to take a break,
11 let me know.  We're on your time.  The only caveat
12 is if there's a question pending, if you'll agree to
13 answer that question before we take that break.
14     A.  Okay.
15     Q.  Okay?  You understand that you've been
16 sworn in and you're under oath?
17     A.  I do.
18     Q.  Okay.  So that means your testimony today
19 is the same as if we were in front of a judge and
20 jury.
21     A.  Correct, yes.
22     Q.  If you don't understand a question, let me
23 know.  I'll be the first to tell you I'm not the
24 best deposition taker in the world, so I'm going to
25 ask some bad questions.  If you don't understand,

Page 6

1  just let me know.  Okay?
2      A.   Okay.  Will do.
3      Q.   Did you review any documents in
4  preparation for your deposition?
5      A.   The only thing that I reviewed were the
6  documents my attorney provided to me --
7      Q.   Okay.
8      A.   -- for the case.
9      Q.   And did you use those documents to refresh
10 your memory?
11     A.   I did.
12     Q.   And were they documents that Beckett had
13 produced to your attorney before?
14     A.   Yes.
15     Q.   Okay.  And you currently work for Beckett?
16     A.   I do.
17     Q.   And how long have you worked there?
18     A.   I will be 20 years in September.
19     Q.   So then September 2000?
20     A.   2000, yes.
21     Q.   And what's your job title?
22     A.   I'm the vice president of the grading and
23 authentication divisions.
24     Q.   Has that always been your title with
25 Beckett?

Page 7

1      A.   It has not.
2      Q.   When did that become your title?
3      A.   From what I recall, it was about three
4  years ago.
5      Q.   So around 2016, '17?
6      A.   Yeah, as I recall, it was -- that's about
7  the time it was.
8      Q.   And what were you doing for Beckett before
9  that?
10     A.   Before this position, I was operations
11 director handling the daily flow of work.  Before
12 that was in sales and customer service.
13     Q.   Do you remember about year wise when you
14 were doing your work as operations director?
15     A.   It was right before becoming vice
16 president, so I would say three, three years ago,
17 four years ago, somewhere in that zone.  And I was
18 that for probably three years as well, yeah.
19     Q.   And then prior to that you were sales and
20 customer service?
21     A.   Sales and customer service, yes.
22     Q.   And so we've gone over all your jobs
23 for -- your job titles for Beckett?
24     A.   That's correct, yeah, and duties.
25     Q.   So as vice president for grading and

Page 8

1  authentication, what are your general duties?
2      A.   Generally, working budgets, plans,
3  business development plans, growth of the business,
4  opportunities for the company.  That's the basic
5  things.  A little bit on the day-to-day operations,
6  helping out with some of our team there, but
7  otherwise just looking for growth of the business.
8      Q.   Okay.  As vice president do you have any
9  control or say in quality assurance for Beckett?
10         MR. REED:  Objection, form.
11     A.   Not necessarily.  For the grading side of
12 the business, we have leaders in each of the areas
13 that sort of handle that role.  If I need to be
14 brought in for some reason or the other, I am, but
15 not day-to-day or anything like that do I have any
16 sort of quality assurance or anything that I deal
17 with.
18     Q.   So, in other words, you haven't developed
19 a guideline or set of rules for graders with trading
20 cards?
21     A.   Not me per se.  Our grading managers have
22 a -- have a plan and a procedure book that they have
23 together for their training and learning, but I had
24 nothing to do with that.
25     Q.   So in this case you understand we're here

Page 9

1  about my client's Tom Brady 2000 Playoff Contenders
2  trading card?
3      A.   Correct, yes.
4      Q.   And in this case you were obviously looped
5  in at some point because your name appears in
6  several emails.
7      A.   I was.
8      Q.   Okay.  Why were you -- if it's not part of
9  your day-to-day operations, why were you looped into
10 this situation?
11     A.   This situation for a couple of reasons.
12 Number one, the value of the card in question.  When
13 it gets up to -- if there's a value that's
14 associated with a new product purchase or in this
15 situation a card of this value, they loop me in just
16 so I'm aware of that.
17         And then number two, just the relationship
18 that we have with Panini, the guys that work over
19 there.  It just sort of looped me into it since we
20 have that type of business relationship.
21     Q.   And just so we're clear on the record, as
22 far as Beckett Grading Services goes, they're in the
23 business of grading trading cards, right?
24     A.   Correct, yeah.  We give an opinion on a
25 card based on its condition.

Veritext Legal Solutions
800-567-8658                                                      973-410-4098

Page 10

1    Q.  And you're familiar with the 2000 Playoff
2  Contenders Tom Brady rookie ticket that my client's
3  bringing this lawsuit about?
4    A.  I am.
5    Q.  And for the rest of the deposition, I'm
6  going to refer to it as "the card."  You understand
7  that unless I refer to it -- refer to some other
8  specific card, when I say "the card" that's what I'm
9  talking about?
10   A.  Perfect.  That's great.
11   Q.  And this 2000 Playoff Contenders Tom Brady
12 rookie ticket card that my client's brought this
13 lawsuit about, that card is altered, correct?
14       MR. REED:  Objection, form.
15       MR. UNIS:  Object to form.
16   A.  In our opinion, it is an altered card.
17       (Exhibit 1 marked)
18       MR. BABB:  Joe, you're going to love me
19 today.
20       MR. UNIS:  Thank you very much.
21       MR. REED:  No copy for me?
22       MR. BABB:  You're right there.
23       MR. REED:  It's the witness copy.
24       MR. BABB:  Come on.
25   Q.  So I've handed you and your attorney what

Page 11

1  I've marked as Exhibit 1, and I'll represent to you
2  that it's a series of emails between -- well,
3  between yourself and Nate, who's my client -- Nathan
4  Nichols, who is my client's representative, J.J.
5  Arredondo with Beckett, Nick Matijevich at Panini,
6  and Robert Springs at Panini.
7       And principally what I want to look at is
8  the email beginning on the second page there.  At
9  the bottom you'll see -- bottom right it'll read
10 PANINI_0000112.  And you'll see that beginning about
11 one third up the page, it's an email and it looks
12 like it's from you.  Do you see that?
13   A.  I do.
14   Q.  Okay.  And it looks like it was sent
15 Tuesday, August 14th of 2018.  And it looks like
16 you're sending that to my client's representative,
17 Nathan Nichols.  Would you agree with that?
18       MR. REED:  Objection, form.
19   A.  Yes, it did go to Nathan.  There were
20 others copied on the email.
21   Q.  Sure.  And so you cc'd J.J. Arredondo,
22 Nick at Panini, and Rob at Panini, right?
23   A.  Correct, yes.
24   Q.  And I just want to point to the first
25 paragraph here.  It reads, "Thanks for letting us

Page 12

1  spend a little extra time on this Brady card.  I
2  know this isn't an ideal situation for anyone but
3  was ideal for us to spend a little more time on this
4  and talk with the guys from Panini.  After looking
5  more at this card, we are all in agreement here that
6  the top edge appears to be altered in some way."
7  Did I read that correctly?
8    A.  It does, yes.
9    Q.  Okay.  And so just so we're clear, you
10 said it's Beckett's opinion that the card is
11 altered, and that's what you're talking about,
12 right?
13   A.  Correct.
14       MR. REED:  Objection, form.
15       Give me some time to object.
16       THE WITNESS:  Okay.  Sorry.
17   Q.  And as you sit here today, is it still
18 your opinion that the card is altered?
19   A.  Yes.
20       MR. REED:  Objection, form.
21   A.  In our graders' opinion, it is.
22   Q.  And in your experience, can an altered
23 card have an affected value as a result?
24       MR. REED:  Objection, form.
25   A.  It can in some situations, yes.

Page 13

1    Q.  And it can be affected negatively, right?
2        MR. REED:  Objection, form.
3    A.  In most situations, yes.
4    Q.  Now, as far as you know, did Beckett ever
5  reach a conclusion as to who trimmed this card?
6        MR. UNIS:  Object to form.
7        MR. REED:  Objection, form.
8    A.  No.  We -- we don't ever offer that type
9  service.  There's no way we could tell that.
10   Q.  Sure.  And as far as you know, did Beckett
11 ever reach a conclusion as to when the card was
12 trimmed?
13       MR. UNIS:  Object to form.
14       MR. REED:  Objection, form.
15   A.  No, absolutely not.
16       MR. UNIS:  Patrick, just so I'm not
17 speaking over Kendal, can we agree that his
18 objections to form are --
19       MR. BABB:  You want joint objections?
20       MR. UNIS:  Yeah.
21       MR. BABB:  That's fine.
22       MR. UNIS:  I think that's in the interest
23 of clarity.  Thanks.
24   Q.  ==Are you aware of any other instances that==
25 ==Beckett has received a complaint about one of its==

4 (Pages 10 - 13)

| | |
|---|---|
| Page 14 | Page 16 |
| 1  graded cards having being trimmed? | 1    MR. UNIS:  Object to form. |
| 2    A.  There have been a few instances, but it's | 2    A.  There's a possibility.  But -- but based |
| 3  very, very rare. | 3  on what we're seeing and based on what they're |
| 4    Q.  Sure.  When -- other than obviously my | 4  saying, this is the card that went into their -- |
| 5  client's claim, when is the last time you recall | 5  that product. |
| 6  someone making a claim that their graded card | 6    Q.  So as you sit here today, do you have any |
| 7  through Beckett had been trimmed? | 7  bit of information that suggests to you that this is |
| 8    A.  It's a tough question to answer because | 8  not the card that Panini put in their product? |
| 9  there's a lot of claims that come in from customers, | 9    MR. REED:  Objection, form. |
| 10  emails, calls, things like that that are -- there's | 10    A.  I don't have any information that says it |
| 11  nothing proven or hard fact of that. | 11  would or would not be. |
| 12    So there's -- there's claims that come in | 12    Q.  In the last 20 years that you've been |
| 13  through our customer service.  I don't necessarily | 13  working for Beckett, have you worked for any other |
| 14  deal with customer service.  Last time I've dealt | 14  company? |
| 15  with a situation like this was six or seven months | 15    A.  I have not. |
| 16  ago. | 16    Q.  And prior to joining Beckett in 2000, what |
| 17    Q.  And I guess what I'm curious about then is | 17  were you doing for work? |
| 18  I understand there are going to be claims and not | 18    A.  I worked for my dad at the World Trade |
| 19  necessarily all of them have merit. | 19  Center here in Dallas selling Christmas items |
| 20    A.  Sure. | 20  wholesale, like a wholesale Christmas retail. |
| 21    Q.  Some people are just upset about their | 21    Q.  How long did you do that? |
| 22  grade, I'm sure.  But the -- I guess the last | 22    A.  For a year. |
| 23  time -- I'm asking about the last time that Beckett | 23    Q.  Prior to working for Beckett, did you have |
| 24  acknowledged that one of the graded cards had been | 24  any other experience working with a company involved |
| 25  trimmed. | 25  in trading cards? |
| Page 15 | Page 17 |
| 1    MR. REED:  Objection, form. | 1    A.  No. |
| 2    A.  I truly don't -- I don't know that.  That | 2    Q.  Prior to working for Beckett, did you |
| 3  would have been something that a customer service | 3  collect trading cards personally? |
| 4  rep or something like that might have gotten that. | 4    A.  I did when I was at junior high, |
| 5  But for us to admit it, I don't know exactly when | 5  elementary age. |
| 6  that would have been. | 6    Q.  And you stopped -- so you stopped |
| 7    Q.  And so this is a truly unique situation. | 7  collecting trading cards around high school? |
| 8    MR. UNIS:  Object to form. | 8    A.  I -- I didn't -- it would have been in the |
| 9    MR. REED:  Objection, form. | 9  early Nineties, so probably right before high |
| 10    A.  Yeah, it's a very, very rare situation for | 10  school. |
| 11  something like this. | 11    Q.  Do you still have any trading cards that |
| 12    Q.  Are you personally aware of any other | 12  you've collected? |
| 13  instances in which Panini has placed a trimmed card | 13    A.  I have a few trading cards but I'm not a |
| 14  into one of its series? | 14  collector or anything like that, just stuff that I |
| 15    MR. UNIS:  Object to form. | 15  had still when I was younger. |
| 16    A.  I don't know of any situation like that. | 16    Q.  So it's maybe some of the cards that you |
| 17    Q.  Not even this situation? | 17  liked that you collected when you were younger? |
| 18    MR. REED:  Objection, form. | 18    A.  Yeah.  The ones I can think of right now |
| 19    A.  This situation, if this -- if this is | 19  are a CBA basketball team from Wichita Falls, so |
| 20  indeed the card that went into their product, then I | 20  that's not a -- not a whole lot of value there. |
| 21  guess -- I guess that it would. | 21    Q.  Do you currently have any cards that you |
| 22    Q.  Okay.  And so you're saying if this is | 22  do think hold significant financial value? |
| 23  indeed the card that went into the product.  You're | 23    A.  Not that I can think of, no. |
| 24  suggesting that maybe this is not the card that | 24    Q.  Where did you go to high school? |
| 25  Panini actually placed in the product? | 25    A.  I went to Wichita Falls High School in |

Page 42

1  A.  Tough question to answer because my mind
2  immediately goes back to how it's stamped on the
3  card.  But you could have -- you could have a point
4  there that it could be labeled like that if it was
5  in the checklist, a publicly available checklist.
6  Q.  Sure.
7  A.  There's a possibility.
8  Q.  Turning to the second page, that second
9  paragraph reads, "Flew to the National Sports
10  Collectors Convention on 8/3/2018 and arrived in
11  Cleveland late that night/early morning of
12  8/4/2018."  Do you see that?
13  A.  I do.
14  Q.  Okay.  So we're at the collectors or we're
15  at the national now.  And that's the national in
16  Cleveland that you were talking about, correct?
17  A.  Right.
18     MR. REED:  Objection, form.
19  A.  Correct.
20  Q.  Three paragraphs below that, it begins,
21  "Around 5 p.m. I was once again called by PSA on my
22  phone to come back to their booth to discuss the
23  card.  Devin Carrillo then informed me that their
24  graders had determined the card was trimmed and was
25  below measurement tolerance despite all of the cards

Page 43

1  being naturally short from the factory.  They
2  informed me that they would be willing to slab the
3  card as 'Authentic' and grade the autograph only,
4  but they would not give the card itself a numerical
5  grade.  I then took possession of the card,
6  immediately contacted J.J. Arredondo at BGS, walked
7  the card over to their booth, and submitted the card
8  with him for a second opinion.  He indicated that
9  one grader thought it was okay and another wasn't
10  sure and they were unwilling to authenticate/grade
11  the card with a numerical grade at that time."
12     Did I read that correctly?
13  A.  You did.
14  Q.  And so this sounds like it's about the
15  time where you start coming into this because he --
16  Nate has now brought the card to the Beckett booth
17  for a second opinion.  Does that sound fair to you?
18     MR. REED:  Objection, form.
19  A.  Yeah, it sounds like this is probably when
20  I was brought in the situation.
21  Q.  And do you recall Nathan bringing this
22  card back to the booth for a second opinion?
23  A.  I don't.  I don't know when -- if it was
24  for the second opinion or the first time.  I don't
25  know that.

Page 44

1  Q.  And he mentions two graders here, one
2  grader that thought it was okay and another wasn't
3  sure.  Do you recall who those -- who the graders
4  would have been at that time?
5  A.  I don't recall who the graders would have
6  been.
7  Q.  Okay.  Do you have a belief as to who they
8  may have been?
9     MR. REED:  Objection, form.
10  A.  I don't.  I mean, probably in a situation
11  like this it would have gone to one of our senior
12  guys to take a look at it, but I don't know
13  specifically who saw it the first time.
14  Q.  How many graders does Beckett take to the
15  national?
16     MR. REED:  Objection, form.
17  A.  It varies from year to year, but in most
18  situations it's seven or eight graders.
19  Q.  Would there be a way of Beckett finding
20  out who all they sent as graders to the national in
21  2018?
22     MR. REED:  Objection, form.
23  A.  Yes, we could find that out.
24  Q.  And it says that they were unwilling to
25  authenticate/grade the card at that time.

Page 45

1  Why -- what's your understanding as to why
2  Beckett was unwilling to issue a numerical grade at
3  that time?
4     MR. REED:  Objection, form.
5  A.  I think it's what we talked about before.
6  They thought the card appeared altered in the one
7  touch Panini -- or, yeah, Panini case.
8  Q.  ==And is it Beckett's policy to not grade
9  altered cards?==
10     MR. REED:  Objection, form.
11  A.  ==We do not put a numeric grade on a card
12  that we deem is altered.==
13  Q.  ==So if I see a card in a graded Beckett
14  slab, it's safe for me to assume that that card is
15  not altered?==
16     ==MR. REED:  Objection, form.==
17  A.  ==Yes, you can assume that.==
18  Q.  On the last page, the first paragraph
19  reads, "On or about 8/7/2018, I received the card
20  via FedEx overnight service and immediately took
21  scans of the card front/back.  I then took the card
22  over to BGS and gave the card directly to J.J.
23  Arredondo at BGS for them to review.  I also gave
24  him explicit instructions that the card was not to
25  be taken out of the PSA holder it was in."

Page 54

1  touch for the Honors program, so the card is
2  absolutely good." Do you see that?
3      A. I do.
4      Q. Okay. And so can you explain what Beckett
5  breaking a slab means?
6          MR. REED: Objection, form.
7      A. In this situation it means that we removed
8  those cards that they're referring to from a graded
9  case, a sealed graded case. You mentioned before it
10 was PSA and BGS, so I don't know which one it --
11 what it was referring to.
12     Q. Are the slabs that Beckett places their
13 graded cards in, are they tamperproof?
14         MR. REED: Objection, form.
15     A. As far as I know, yes, they are.
16     Q. And do you know how they're tamperproof?
17 Is it a patented process that Beckett has, or is it
18 just glue around an edge?
19         MR. REED: Objection, form.
20     A. It is a patented process. There's no glue
21 involved there. It's -- we have several -- some
22 security measures in place that it can't be tampered
23 with, as far as I know.
24     Q. And are you aware of any way they could be
25 tampered with without Beckett being able to tell?

Page 55

1      A. Personally, no, I'm not aware of that.
2      Q. Does Beckett break cards out of slabs for
3  Panini often?
4          MR. UNIS: Object to form.
5      A. I'm not involved with -- with that, so I
6  can't tell you for sure how many they do or if it's
7  a common practice.
8      Q. Are you aware of whether they've --
9  whether Beckett has broken cards out of slabs for
10 Panini other than in the 2016 Honors collection?
11     A. I can't say for a hundred percent that
12 that's -- that has or has not happened. I can
13 assume that it has, but I have nothing that shows it
14 for sure.
15     Q. Do you know if Beckett breaks cards out of
16 its grading slabs for any other card manufacturers
17 or distributors?
18     A. Not specifically for -- for other
19 manufacturers. I mean, it's a process that we do.
20 I don't know for sure if it's for manufacturers or
21 not.
22     Q. Do you know if Beckett was ever asked to
23 inspect the cards for the 2016 Honors collection
24 after they broke them out of the Beckett slab?
25         MR. UNIS: Object to form.

Page 56

1          MR. REED: Objection, form.
2      A. As far as I know, we did not look at them.
3      Q. Prior to it going back to Panini?
4      A. Yeah, once we removed it from the graded
5  cases, as far as I know we did not look at those
6  cards again.
7      Q. Do you know if Beckett has ever opted to
8  inspect cards from other manufacturers that it broke
9  out of its slabs?
10         MR. REED: Objection, form.
11     A. Not that I'm aware of. If they did, they
12 would put the cards back through the grading process
13 just like any other customer would.
14     Q. And that's kind of what you were talking
15 about earlier, what may have prevented this, right?
16         MR. UNIS: Object to form.
17         MR. REED: Objection, form.
18     A. Yes, we could have looked at the cards
19 again and had an inspection when the card was
20 removed, yeah.
21     Q. Now, hindsight 20/20, but do you believe
22 Panini should have requested Beckett inspect these
23 cards to ensure their condition before advertising
24 them as unaltered?
25         MR. UNIS: Object to form.

Page 57

1          MR. REED: Objection, form.
2      A. Just my opinion? I don't think they
3  needed to. For due diligence they could have, but
4  in my personal opinion I think that was -- it wasn't
5  necessary in their opinion.
6      Q. Do you know about how much that would have
7  cost Panini?
8      A. The price for the grading service depends
9  on how quickly you want it done. So if they would
10 have said we need it done immediately, it could have
11 ranged $40 or $50 up to a hundred dollars per card
12 if they needed it done immediately. We have five or
13 six different service levels that they could have
14 chosen from.
15     Q. And what would the lowest level be?
16     A. A month service where it would have cost
17 $7 to $10.
18     Q. So anywhere from $7 to $50 per card?
19     A. That's a good -- a good range.
20     Q. Do you know approximately how many cards
21 acquired by Panini through buybacks for the Honors
22 collection in 2016 were encased in a Beckett slab
23 when they were brought to Beckett to be broken out?
24         MR. REED: Objection, form.
25     A. I do not know that.

15 (Pages 54 - 57)

Page 78

1 threatened personally. I don't know if legal
2 situations were ever mentioned in emails between
3 Nathan and Panini or J.J. So me personally, I've
4 never felt threatened by Nathan.
5     Q. Did you ever feel as though he was overly
6 confrontational?
7     A. Personally, no, not with me.
8         (Exhibit 5 marked)
9     Q. Handing your attorney what I've marked as
10 Exhibit 5. I'll represent to you these are emails
11 that were produced by Panini. And if you'll turn to
12 the fourth page is what I'm going to be looking at.
13         Halfway down the page begins an email from
14 my client, Lou Papa, Jr., to Nick at Panini, Rob,
15 D.J., and another attorney with our firm is cc'd on
16 it as well. Do you see that email?
17     A. I do.
18     Q. Okay. Turning to the next page, the first
19 paragraph at the top is what I want to point to.
20         That paragraph reads, "One would think
21 that both Panini in combination with either PSA or
22 BGS would love the press coverage of this card being
23 pulled and have it in fact be graded and slabbed
24 exactly how your company's website indicates the
25 card on its checklist as there are no other Tom

Page 79

1 Brady rookie ticket auto buybacks in existence."
2         Do you agree that there are no other Tom
3 Brady rookie ticket auto buybacks in existence?
4         MR. UNIS: Object to form.
5     A. Personally I don't know that. I don't
6 know what other manufacturers have put in their --
7 in their products that are considered buybacks.
8     Q. But personally are you aware of any other
9 Tom Brady rookie ticket auto buybacks?
10        MR. REED: Objection, form.
11    A. I'm personally not aware of any other
12 ones.
13    Q. Now, my client indicates a customer should
14 never have to question whether a card in a new
15 product release has been trimmed or altered in any
16 way. Would you agree with that statement?
17        MR. REED: Objection, form.
18    A. In my opinion, I agree with that.
19    Q. And you agree that a customer should never
20 have to question whether a card is trimmed if it's
21 in a graded Beckett slab?
22        MR. REED: Objection, form.
23    A. I agree. In my opinion, they shouldn't.
24        (Exhibit 6 marked)
25    Q. Handing your attorney what I've marked as

Page 80

1 Exhibit 6. I'll represent to you these are more
2 emails that were produced by Panini in this
3 litigation. If you'll turn two pages, at the bottom
4 left it should say PANINI 48.
5         Right near the top of the page begins an
6 email from you to Nick at Panini, J.J. at Beckett,
7 and then you've cc'd Rob Springs. And that's
8 August 23rd, 2018, at 9:29 a.m. Do you see that
9 email?
10    A. I do.
11    Q. Okay. That email states, "I'm out of the
12 office today, but I can have a call tomorrow night.
13 Initial thoughts. Do you have an image of back of
14 card? We are not going to change our stance on this
15 card. We don't like the auto and think the card is
16 currently altered. What did the owner say to you
17 guys? Why not stand by what we all agreed on? This
18 card has been out of your hands for two years."
19 Do you see all that?
20    A. I do.
21    Q. With that last question you asked, "Why
22 not stand by what we all agreed on," who are you
23 referring to when we say "we all agreed on"?
24    A. I would -- I would assume there, and being
25 that it was in 2018, talking about our staff in the

Page 81

1 grading room, possibly, what we had talked to Nick
2 and Rob about before, about saying this has been out
3 of our possession.
4     Q. And do you recall when that agreement was
5 reached?
6     A. It would have been between this email on
7 August 23rd and when the card was brought back to
8 Beckett for another review. I think it was early
9 August. I don't remember the exact date, but in
10 August sometime, early August.
11    Q. And would it have been via email?
12        MR. REED: Objection, form.
13    A. I don't know for sure. There were
14 probably phone conversations in here as well. The
15 only thing I have are the emails here.
16    Q. I'll represent to you that I don't have an
17 email that shows any agreement between Beckett and
18 Panini that the card's been out of your hands for
19 two years so you shouldn't be responsible for it.
20 So that's why I ask if it would have been email
21 or -- you're saying it could have been phone calls?
22        MR. REED: Objection, form.
23    A. Could have very well been a phone call.
24 In some of the other emails that were produced, we
25 gave situations why we -- it's been out of our hands