IN THE U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALT SPORTS CARD FUND GP LLC, § <br> as the General Partner of Alt Sports Card § <br> Fund, L.P.; ALT PLATFORM, INC. § <br> § <br> Plaintiffs § <br> § <br> v. § <br> § <br> BECKETT COLLECTIBLES LLC § <br> § <br> Defendant § | No. 3:22-CV-2867 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS AMENDED COMPLAINT**

The Plaintiffs, Alt Sports Card Fund GP, LLC, in its capacity as the general partner of Alt Sports Card Fund, L.P., and Alt Platform, Inc. (collectively "Alt"), hereby submit this Response in opposition to Defendant, Beckett Collectibles, LLC ("Beckett")'s Motion to Dismiss Amended Complaint (Dkt. 18).

**INTRODUCTION**

**a. Beckett's Grading of Sports Trading Cards is Directed to Subsequent Purchasers.**

By its own account, Beckett launched Beckett Grading ("BGS") in the late 90s because it saw a need for "a trusted, unbiased third-party grading service" to protect subsequent purchasers from "unscrupulous individuals [who] were altering the condition of cards in an *attempt* to make them appear to be in better condition then [sic] they were and raising their value." Am. Compl., ¶ 41 (Dkt. 14).

Ever since, Beckett has intended, and has known, that its grading service has been directed toward subsequent purchasers (or "Collectors). *Id.* ¶¶ 40, 43. Without Collectors of sports trading cards, there would be no BGS, and no need for BGS' grading. *Id.* ¶ 43.

1

BGS' entire business model, and marketing strategy, has been directed towards convincing subsequent purchasers of sports trading cards to rely on its grading. *Id.* ¶ 40. When BGS brags about being the "most trusted" or "most reliable" grading service in the industry, it is referring to the trust of non-client Collectors who purchase the sports trading cards it grades. *Id.* By cultivating subsequent trading card purchasers' trust and reliance on its grading, BGS can claim that its grading "increases the value of your cards compared to raw card prices, while making your valuable assets easier to sell." *Id.* ¶ 42.

BGS takes affirmative steps to encourage and facilitate subsequent purchasers' reliance on its grading. *Id.* ¶ 45. For instance, BGS seals all the cards it grades into "tamper proof" slabs, so the card and its grading become an inseparable item:



*Id.* ¶ 23. BGS does this to prevent "foul play" and assure the subsequent purchaser that its grading corresponds to the same card that BGS graded. *Id.* ¶ 25.

BGS also encourages subsequent purchasers to rely on its grading through its card lookup feature. *Id.* ¶ 45. For any card that BGS has graded, a potential purchaser can query BGS' website using the Card's serial number, and BGS will provide information about the characteristics of the card. *Id.*

### a. Beckett's Negligent Misrepresentations to Alt About the Steph Curry Card.

On or around October 31, 2020, Alt was interested in purchasing the Steph Curry Rookie Card that BGS had graded. *Id.* ¶ 54. Before it did so, Alt queried information from Beckett about its grading of the Card based on its serial number. *Id.* In response to that query, BGS represented to Alt that the Card was in 9.5 "Gem Mint" condition. *Id.*

On October 31, 2020, Alt relied on BGS's certification that the Steph Curry Rookie Card was authentic and unaltered, and in 9.5 "Gem Mint" condition, and purchased the Card for $168,000. *Id.* Had BGS identified the Steph Curry Rookie Card as having been trimmed or altered, Alt never would have purchased the Card, as it would have been clear to Alt that the Card was worth nowhere near the $168,000 that Alt paid. *Id.*

### MOTION STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a Rule 12 motion, "(1) the complaint is construed in the light most favorable to the plaintiff, (2) its allegations are taken as true, and (3) all reasonable inferences that can be drawn from the pleading are drawn in favor of the pleader." 5B Charles A. Wright, Federal Practice & Procedure § 1357 & n.11 (3d ed.) (Rule 12(b)(6)); *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007).

## ARGUMENT

Beckett does not dispute that Alt has pled each element required to state a claim for negligent misrepresentation. MTD at 5. Instead, Beckett *only* challenges whether Alt is a member of the "limited group" of indirect recipients it intended or knew would receive its grading of the Steph Curry Card. *See* MTD at 5-9; Restatement (Second) of Torts § 552(2)(a). But Beckett is wrong – and its Motion to Dismiss should be denied – for two reasons.

First, since Beckett communicated its misrepresentations about the condition of the Steph Curry Card ***directly*** to Alt in October 2020, there is no question Beckett can be liable to Alt under Texas law.

Second, Beckett can also be liable for its indirect negligent misrepresentations to Alt because Beckett intended and knew that its grading of the Steph Curry Card would be supplied to, and relied upon by, its subsequent purchaser, which turned out to be Alt. Beckett's argument that it could not have ascertained Alt's specific identity in 2016 does not preclude liability.

### I. Beckett Can be Liable to Alt for Negligent Representations that it *Directly* Communicated to Alt in October 2020.

Beckett's Motion to Dismiss should be denied because Beckett can clearly be liable for the negligent misrepresentations it *directly* communicated to Alt in October 2020.

The Restatement (Second) of Torts § 552(2)(a),[1] "limits the class of plaintiffs that can recover [for negligent misrepresentation] to (1) direct recipients of material misstatements; and (2) the limited group of persons who the defendant knows will receive the material misstatements from the direct recipients." *New York City Emples. Ret. Sys. v. Valeant Pharms.*

---

[1] Texas has adopted this section of the Restatement. *See* MTD at 5 ("Texas has adopted the tort of negligent misrepresentation as described in the Restatement (Second) of Torts § 552) (citing *McCamish v. F. E. Appling Interests,* 991 S.W.2d 787, 791 (Tex. 1999)) .

4

*Int'l, Inc.*, 2018 U.S. Dist. LEXIS 165818, *14 (D.N.J. Sept. 26, 2018).[2]

Alt most clearly satisfies this requirement because Beckett directly communicated its negligent misrepresentations about the Steph Curry Rookie Card to Alt on or around October 31, 2020, just before Alt purchased the Card. Am. Compl. ¶ 54 ("Beckett represented and confirmed to Alt that the Card was in 9.5 'Gem Mint' condition, thereby also conveying that the card was unaltered (and not trimmed)."). *Id.* Beckett's representation to Alt was made through its Graded Card Registry, which Beckett maintains and makes available for the specific purpose of "encourag[ing] and facilitat[ing] subsequent purchasers [like Alt] to rely on its grading. . ." *Id.* ¶ 45.

Beckett's Motion to Dismiss simply ignores this allegation. MTD at 5-9. But this key fact moots the entirely of Beckett's argument for dismissal because none of Becketts' cited authorities provide any basis for dismissing a negligent misrepresentation claim where the defendant has directly communicated the negligent misrepresentation at issue *directly* to the plaintiff. *McCamish* is the only case cited by Beckett where the defendant *directly* communicated the misrepresentation at issue to the plaintiff. 991 S.W.2d at 790.[3] But there, the court permitted the plaintiff's claim to continue. *Id.* at 795 (reversing order granting defendant summary judgment).

---

[2] *See also e.g., Warranty Gold, Ltd. v. KPMG LLP*, 2006 U.S. Dist. LEXIS 94382, *31, n. 5 (W.D. Tex. Jul. 25, 2006) ("[A] claim for negligent misrepresentation does not require a *direct* communication between the defendant and the plaintiff, so long as the defendant knows the plaintiff is part 'of a limited group of persons for whose guidance and benefit [the defendant] … knows that the [direct] recipient intends to supply' the information.") (quoting Restatement (Second) of Torts § 552(2)).

[3] *See Grant Thornton LLP v. Prospect High Income Fund,* 314 S.W.3d 913, 930 (Tex. 2008) ("It is undisputed that the Funds had no direct communications with Grant Thornton.); *Tara Capital Partners I, LP v. Deloitee & Touche, LLP*, 2004 Tex. App. LEXI 4577, *9 (Tex. App. 5th 2004).

> **II. Beckett Can also Be Liable to Alt for its *Indirect* Negligent Misrepresentations because Beckett Intended and Knew that its Grading of the Steph Curry Card Would be Supplied to and Relied Upon by its Subsequent Purchaser, Which Turned Out to Be Alt.**

Even if Beckett had only misrepresented the characteristics of the Steph Curry Card to Alt *indirectly* – as Beckett incorrectly assumes in its Motion to Dismiss – Beckett can still be liable to Alt for negligent misrepresentation because Alt has pled facts demonstrating that Beckett knows its grading of sports trading cards is directed towards subsequent purchasers, and specifically intends for subsequent purchasers to rely on its grading. Beckett's argument that it could not have been aware that Alt would be the subsequent purchaser in 2016 does not serve to limit its liability.

A defendant can be liable for an indirect negligent misrepresentation "so long as the defendant knows the plaintiff is part 'of a limited group of persons for whose guidance and benefit [the defendant] … knows that the [direct] recipient intends to supply' the information." *Warranty Gold, Ltd.*, 2006 U.S. Dist. LEXIS 94382, *31, n. 5 (quoting Restatement (Second) of Torts § 552(2)). Whether a plaintiff is a member of such a "limited group" depends on two underlying factors:

1. Whether "the maker of the representation knows that his recipient intends to transmit the information to [the plaintiff or] a similar person, persons or group," Restat 2d of Torts, § 552, comment g; and

2. "intends, or knows that the recipient intends, to influence [the transaction at issue], or [] a substantially similar transaction," *id.*, comment j.

To illustrates how these factors work, the Restatement outlines the following relevant examples of circumstances when a defendant will be liable:

> A, wishing to sell his car to B, writes to C, an expert mechanic, asking him to inspect the car and forward to A a letter stating its condition, in order that A may give the letter to B, who, as A tells C, is a prospective purchaser. Nothing is said about using the information only for B. C may be found to have supplied the

6

> information for the guidance of B only, or for the guidance either of B or of any other purchaser whom A may find. *Id.* at Comment g, Illustration 8.
>
> . . .
>
> A negligently furnishes to a title insurance company a letter praising its facilities and operation, for the purpose of aiding it in selling title insurance. The company exhibits the letter to B, who relies on it in taking out title insurance with the company, and is also induced by the letter to purchase stock in the company. The company proves to be insolvent and B suffers pecuniary loss. A is subject to liability to B for his loss on the title insurance but not for his loss on the purchase of the stock. *Id.* at Comment j, Illustration 13.

Here, Alt has alleged facts demonstrating that Beckett intends and knows that its grading will be provided to subsequent purchasers in connection with a purchase of the cards it grades.

Beckett's sports trading card grading is primarily directed towards subsequent purchasers, not Beckett's direct client. *Id.* at ¶¶ 41, 43. In BGS' origin story, Beckett acknowledges that the primary purpose and value of its grading is for subsequent purchasers to have verification of what they are buying. *Id.* ¶ 41. Beckett still expressly markets the primary value of its grading as "help[ing] [sellers] get the most for your cards." *Id.* ¶ 43; *see also id.* ¶ 42. Beckett's "slabbing" of sports trading cards further exemplifies how Beckett's grading is directed towards subsequent purchasers. Beckett seals every card it grades into a "tamper-proof slab" to eliminate the possibility of any "foul play" by its direct client, so that the subsequent purchaser can be assured that Beckett's grades correspond to the same card that Beckett graded, in the same condition that Beckett graded it. *Id.* ¶ 25.

Beckett not only directs its grading towards subsequent purchasers – it goes to great lengths to convince Collectors that they should rely on its grading, and pay more for cards it has graded. *Id.* ¶ 40. For example, Beckett repeatedly claims in its marketing materials that "reliability and consistency are the hallmarks of Beckett Grading Services." *Id.* Beckett also trumpets itself as "the most trusted name in the industry for grading." *Id.* Beckett also markets a

"guarantee" that it "provides collectors with the finest, most thorough, consist and accurate grading efforts available in the industry." *Id.* ¶ 44.

Beckett's business model *depends* on convincing subsequent purchasers to rely upon its grading, so they will pay more for the sports trading cards it has graded, and Beckett has been successful in this respect. *Id.* at ¶ 40. BGS brags on its website that its grading "increases the value of your cards compared to raw card prices" and that "7 out of the 10 top selling cards are graded by BGS." *Id.* ¶¶ 42, 46.

Beckett argues that since Alt was a "potential purchaser" – and anyone could have purchased the card – Alt is not be part of the "limited group" to whom it can be liable as a matter of law. MTD at. 6-8. But this argument fails for two reasons.

First, whether a plaintiff is a member of the "limited group" that a defendant intended or knew would receive and rely on its representations is a question of fact that is generally inappropriate to resolve as a matter of law at the motion to dismiss stage. *See In re Chambers Dev. Sec. Litig.,* 848 F. Supp. 602, 626 (W.D. Pa. 1994) (rejecting defendant's argument that plaintiff was not part of the "limited group" under Restatement § 552 because "[a]t this stage of the proceedings, this Court cannot say there is no set of facts upon which the plaintiffs will be able to prove negligent misrepresentation."); *Steiner v. Southmark Corp.,* 734 F. Supp. 269, 879-280 (N.D. Tex. 1990) ("In the present case the court cannot conclude at this stage of the litigation that plaintiffs have failed to state a claim under § 552.").[4]

---

[4] Indeed, Beckett primarily relies on summary judgment cases where courts decided the issue with a full evidentiary record. *See* MTD at 5-9; *Grant Thornton LLP*, 314 S.W.3d at 921; *Tara Capital Partners,* 2004 Tex. App. LEXIS 4577, *9; *see also Troice v. Willis of Colo.,* 2014 U.S. Dist. LEXIS 203867, *15-16 (N.D. Tex. Dec. 15, 2014) (Godbey, J.) ("The Court rejects BMB's arguments at this stage because they seek to dispose of factual questions inappropriate for resolution on a motion to dismiss. A number of decisions BMB cites were based on motions for summary judgment and necessarily resolved factual questions in reaching their decisions.").

Second, both the Texas Supreme Court and the Fifth Circuit have expressly acknowledged that a "potential purchaser" may be part of a "limited group" depending on the facts of the particular case. *See Grant Thornton LLP*, 314 S.W.3d at 921 ("Like the Fifth Circuit, we do not suggest that a potential purchaser can never be a member of a 'limited group,' but the facts here do not support such a determination") (quoting *Scottish Heritable Trust, PLC v. Peat Marwick Main & Co.*, 81 F.3d 6060, 624 (5th Cir. 1996).

In *Clauer v. Heritage Lakes Homeowners Ass'n*, the court rejected nearly the same argument for dismissal now presented by Beckett, and declined to dismiss an analogous claim for negligent representation. 725 F. Supp. 2d 668, 675 (E.D. Tex. 2010). In that case, a trustee defendant signed and filed an affidavit in connection with the foreclosure of a house that falsely attested the homeowner was not an active-duty service member. *Id.* at 672. That defendant "did not know [the plaintiff] at the time of execution of the affidavit[,]" but the defendant's reason for executing the affidavit was to "influence a group of persons that were potential purchasers to let them know that the requirements of SCRA were satisfied." *Id.* at 675. In reliance on that affidavit, the plaintiff purchased the home and later sued the defendant for negligent misrepresentation. *Id.* The defendant sought dismissal for the same reason that Beckett does now and argued that the plaintiff's "sweeping claims that [his] liability extends to any and all persons who may be potential purchasers of the property are insufficient as a matter of law." *Is.* At 674. But the court declined to "adopt a bright line rule that a potential purchaser could never be part of a limited group for purposes of a negligent misrepresentation claim" and denied defendant's motion to dismiss. *Id.* at 675.

Beckett also argues that Alt could not have been part of the "limited class" of plaintiffs

9

whom it intended and knew would rely on its grading of the Steph Curry Card in 2016 because Alt "did not exist in 2016," so Beckett could not have even been "aware of Alt in 2016." MTD at 5, 7. But Beckett was not required to be "aware of Alt in 2016" for Alt to be part of the "limited group." Rather, as the commentary to the Rest. 2d of Torts §552(2) explains:

> <u>Under this Section, as in the case of the fraudulent misrepresentation (see § 531), it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words,</u> **<u>it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied</u>**<u>. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group.</u> **<u>It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given.</u>** It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

Restatement (Second) of Torts § 552, comment h (emphasis added). *See also Clauer*, 725 F. Supp. 2d at 675 (denying defendant's motion to dismiss where it was "uncontested that [defendant] did not know [plaintiff] at the time of execution of the affidavit. . .").

Finally, the purpose of narrowing a defendant's potential liability for negligent misrepresentations to a "limited group" of non-client plaintiffs is to strike a balance between redressing harm caused by a defendant's negligent representations, but also protecting the defendant against "unlimited liability." *McCamish*, 991 S.W.2d at 793. But this concern is substantially mitigated in a case like this because Beckett "[can] be held liable only to the one person or persons who owned the [Steph Curry Card] at the time [Beckett's negligent grading] was discovered and a dispute arose." *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236

(Tex. App. 1985) (contrasting a case like this from claims of "future purchasers of shares of stock attempting to hold an accountant liable [such as *Grant Thornton LLP*]"). A ruling that Beckett can be liable to subsequent purchasers of sports trading cards who reasonably relied on Beckett's negligent grading of those cards will not unreasonably burden the sports trading card grading business.[5] *See id.* In fact, PSA – Beckett's main competitor – has voluntarily adopted a policy whereby it will reimburse subsequent purchasers under circumstances analogous to those pled by Alt in this case.[6] Ironically, if Beckett's Motion to Dismiss argument prevails, it may ultimately be bad for its business. *See* Am. Compl. ¶ 43.

## CONCLUSION

For the foregoing reasons, this Court should deny Beckett's Motion to Dismiss in its entirety.

**RESPECTFULLY SUBMITTED,**

**s/Mark Hammervold**
Mark Hammervold, IL #6320744
Hammervold Law
155 S. Lawndale Ave.
Elmhurst, IL 60126
(T) 405.509.0372
(F) 615.928.2264
mark@hammervoldlaw.com

---

[5] While Beckett has graded over 15 million sports trading cards, it has only failed to recognize that a card had been trimmed in a "few instances." Am. Compl. ¶ 39.
[6] *See* **Exhibit 1**. *Available at:* https://www.psacard.com/about/financialguarantee

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 24, 2023, a true and correct copy of the foregoing filing was served upon all counsel of record in this proceeding through the ECF:

>Aaron Z. Tobin (atobin@condontobin.com)
>Taryn Ourso (tourso@condontobin.com)
>Condon Tobin
>8080 Park Lane, Suite 700
>Dallas, Texas 75231
>*Attorneys for Defendant*

>>*/s/ Mark Hammervold*