IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| ALT SPORTS CARD FUND GP LLC, as the General Partner of Alt Sports Card Fund, L.P.; and ALT PLATFORM, INC., <br><br>Plaintiffs, and <br><br>CHRISTOPHER LADD, <br><br>Intervenor <br><br>v. <br><br>BECKETT COLLECTIBLES, LLC, <br><br>Defendant. | Case No. 3:22-CV-02867-N |

## ANSWER IN INTERVENTION AND CROSS-CLAIM

COMES NOW Defendant-Intervenor Christopher Ladd ("Intervenor" or "Ladd") and answers as follows:

## ANSWER TO PLAINTIFFS' COMPLAINT

To the extent Ladd is required to answer the allegations asserted against him by Plaintiffs, Ladd incorporates fully by reference his Answer and those defenses filed in the Civil Action Western District of Wisconsin No. 3:23-CV-00752 on January 15, 2024 as though fully set forth herein.

## CROSS-CLAIM

NOW COMES Defendant-Intervenor, Christopher Ladd, and asserts claims for relief against Defendant Beckett Collectibles LLC ("Beckett"), and for such respectfully pleads as follows:

## VENUE, JURISDICTION, AND PARTIES

1.  Intervenor is an individual resident of and citizen of the state of Wisconsin.

2. Plaintiff Alt Sports Card Fund GP, LLC ("Alt SCFGP") is the general partner of Alt Sports Card Fund, L.P., a Delaware corporation, and has standing to bring claims in this suit on behalf of Alt Sports Card Fund, L.P. For purposes of diversity jurisdiction, Alt SCFGP is a citizen of the state of Delaware and/or California.

3. Plaintiff Alt Sports Platform, Inc. ("Alt Platform", and collectively with Alt SCFGP, "Plaintiffs") is a Delaware corporation with its headquarters in San Francisco, California. For purposes of diversity jurisdiction, Alt Platform is a citizen of the state of Delaware and/or California.

4. Defendant Beckett Collectibles LLC ("Beckett") is a North Carolina limited liability company authorized to operate in the State of Texas and is headquartered at 2700 Summit Ave, Ste 100, Plano, TX 75074. Beckett's manager, Christopher Herwig, is also a citizen of North Carolina. For purposes of diversity jurisdiction, Beckett is a citizen of the state of North Carolina and/or Texas.

5. There is complete diversity of the parties.

6. The amount in controversy in this action exceeds $75,000.00.

7. This Court has jurisdiction over this action pursuant to 28 U.S.C. 1332(a).

8. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).

## STATEMENT OF FACTS

a. **Sports Trading Cards Market**

9. Sports trading cards are collectors' items and can have significant value on the secondary market.

10. The market value of a sports trading card is based on a number of factors, which may include, without limitation, the athlete (*e.g.,* his/her popularity, performance, achievements,

legacy, etc.), the year the card was issued, the marker/series of the card, inclusion of autograph(s) and/or jersey fragments, and the condition of the card.

    b. **Beckett's Certifications, Representations, Grading, and Encapsulation of Sports Trading Cards**

11. Beckett operates a professional sports trading card grading service called Beckett Grading ("BGS").

12. Beckett not only holds BGS out as *expert* in sports trading card grading, but claims to be "[t]he #1 Card Grading Service in the Industry" and "the most accurate and trusted grading in the collectibles industry" on the Beckett website.

13. BGS is one of four major graders of sports trading cards. The other three are: Professional Sports Authenticator, a division of Collectors Holdings, Inc. ("PSA"), SGC, LLC ("SGC"), and International Sports Authentication, LLC ("ISA").

14. Beckett encourages subsequent purchasers of sports trading cards it grades to rely on its grading ("Beckett Grading provides collectors with the finest, most thorough, consistent and accurate grading efforts available in the industry.").

15. Since the grading of a sports trading card by a reputable third-party – like BGS – is promoted as – and perceived to be – a thorough, consistent and accurate analysis of the card's material characteristics, a card that is graded higher will have a significantly higher market value.

16. Once Beckett grades a card, it creates a label that will go into the encapsulation with the card to display its grades and then Beckett places the card into a tamper-proof "slab."

17. Beckett creates the tamper-proof plastic slabs by using an ultrasonic machine that applies an ultrasonic frequency to parts of the holder that welds the plastic completely.

18. Once a card is placed in Beckett's tamper-proof slab, it is impossible to non-destructively break open the slab. This ensures that anyone purchasing a sports trading card encased in Beckett's tamper-proof slab can know – with certainty – that the card is in the same

condition it was when Beckett graded it. Beckett represents on its website that "we take no chances when it comes to potential foul play. Once your card is graded and slabbed, you can trust us to uphold its integrity. Our tamper-proof holders provide peace of mine by guaranteeing evidence of tampering in the case that someone tries to open or damage your item."

19. When BGS receives a sports trading card for grading, it follows a routine process that is detailed on its public website and is well-known in the sports trading card industry.

20. Before BGS will grade a sports trading card, BGS first evaluates the card to verify that the card is authentic and unaltered.

21. Based on its expertise – and claims about that expertise – BGS can and should be able to detect when a card is not authentic or has been altered.

22. If BGS deems a card to be altered or not authentic, it will either send the card back to the customer with a note stating what the alteration is, or if the customer insists that BGS nonetheless encapsulate the card, BGS will clearly label the card as "Authentic-Altered."

23. BGS adds a clear label identifying any altered card it encapsulates as "Authentic-Altered" in order to alert third parties to this fact. As a result, third parties know that any card graded and encapsulated by BGS that is not labeled "Authentic-Altered" has been verified to be authentic and unaltered by BGS.

24. While there are elements of subjectivity inherent in the process of grading sports trading cards, this subjectivity is generally limited to assigning an exact grade within a reasonable range.

c. Card "Trimming"

25. "Trimming" a sports trading card is a type of alteration, where an edge or portion of an edge of a card is cut or removed to attempt to either remove wear and/or to make the centering of the card appear better than it is.

26. Beckett markets BGS as having the expertise to reliably determine when a sports trading card is not authentic or has been altered, including by trimming.

27. Beckett specifically represents and has encouraged the perception in the sports trading card market that cards graded and encapsulated by BGS – without an "Authentic- Altered" label – are worth much more because buyers know those cards have not been altered or trimmed.

### d. Beckett Specifically Intends for Subsequent Purchasers of the Sports Trading Cards it Grades to Rely on its Grading.

28. BGS specifically intends for subsequent purchasers of sports trading cards it grades to benefit from, and rely on, its grading.

29. One key aspect of BGS's self-described "reliability" is subsequent purchasers' ability to count on BGS to identify (and refuse to grade) sports trading cards that have been trimmed. According to its BGS' own account of its origin story, Beckett launched BGS in the late 90s in part because "unscrupulous individuals were altering the condition of cards in an attempt to make them appear to be in better condition than they were and raising their value. Trimming off portions of a card, rebuilding worn down corners and removing creases are just a few of the types of doctoring being preformed [sic] on cards in order to deceive buyers."

30. By cultivating subsequent trading card purchasers' trust and reliance on its grading, BGS can claim that its grading "increases the value of your cards compared to raw card prices, while making your valuable assets easier to sell." BGS encourages card owners to "compare the secondary market prices of your favorite cards in raw and graded forms" for the proof that they have succeeded in convincing subsequent purchasers of sports trading cards to trust and rely upon its grading and to pay more for cards graded by BGS.

31. The primary purpose of BGS' sports card grading is directed towards card owner clients getting a higher price for cards it grades from a subsequent purchaser. BGS affirmatively markets its grading as a service "that helps you get the most for your cards." In an alternate universe

where subsequent purchasers could not reasonably rely on BGS' grading, there would be no reason to submit cards to BGS for grading at all.

32. To encourage subsequent purchasers of cards to rely on its grading (and to pay higher values for cards it grades), Beckett makes the following guarantee on its website: "Beckett Grading Services will provide collectors with the finest, most thorough, consistent and accurate grading efforts available in the industry."

33. BGS takes affirmative steps to encourage and facilitate subsequent purchasers' reliance on its grading, including its card lookup feature. When BGS grades a card, it assigns it a serial number, which is displayed on the BGS label with BGS' grades. Subsequent purchasers can thereafter access and verify BGS' representations about the authenticity and material characteristics of the card directly from BGS on BGS' website.

34. As a result of BGS' efforts, subsequent purchasers reasonably rely on BGS' grading and pay more for cards graded by BGS (compared to raw cards). BGS is well-aware of this and actively promotes the value of its grading services as "increas[ing] the value of your cards compared to raw card prices".

### e. Beckett Grades a 2009 Steph Curry Rookie Card as Unaltered in October 2016.

35. In or around October 2016, BGS received a 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 card for grading (hereinafter: the "Steph Curry Rookie Card" or "Card").

36. Upon information and belief, at the time that BGS received the Steph Curry Rookie Card for grading, it had been trimmed and was short on the top.

37. Upon information and belief, when BGS evaluated the Steph Curry Rookie Card, it negligently and incompetently determined that the Card was unaltered and graded the Card as

being in 9.5 "Gem Mint" condition overall and as being in 9.5 "Gem Mint" condition with respect to the Card's centering, edges, corners, and surface.

38. BGS then certified that the Steph Curry Rookie Card was authentic and unaltered, created a label to reflect that the Card was in 9.5 "Gem Mint" condition and then encapsulated the card in its tamper-proof slab:



39. BGS did not label the Card as being "Authentic-Altered."

**f. Ladd Reasonably Relies on BGS' Certification of the Steph Curry Rookie Card as Unaltered and Being in 9.5 "Gem Mint" Condition.**

40. In or around December 2016 a third party listed the Steph Curry Rookie Card for sale. The Card was pictured in BGS's tamper-proof slab with BGS' label describing the Card as being in 9.5 "Gem Mint" condition and effectively representing that the Card was unaltered (because it was not labeled as "Authentic-Altered"). The Card was marked with BGS serial number 9494248.

41. On or around December 22, 2016, Ladd, relying on the represented condition of the Steph Curry Rookie Card by BGS through its grading certificate, purchased the Steph Curry Rookie Card.

42. When Ladd received the Steph Curry Rookie Card, it was still encapsulated in BGS' tamper-proof slab. This ensured that the Card was still in the exact same condition as when BGS verified and labeled the Card as unaltered and as being in 9.5 "Gem Mint" condition.

43. After receiving the Steph Curry Rookie Card, Ladd kept it secure in the protective slab provided by Beckett, and did not open the tamper-proof slab at any point in time. Accordingly Intervenor did not know, and could not through the exercise of reasonable diligence discover, that BGS had inaccurately and negligently graded the Card by failing to note its "trimmed" condition.

**g. Ladd Sells the Steph Curry Rookie Card on Goldin Auctions on October 31, 2020 and Again Relies on BGS's Representations of the Card's Condition.**

44. On or around October 31, 2020, Ladd elected to sell the Steph Curry Rookie Card through Goldin Auctions, LLC ("Goldin") an online sports trading marketplace.

45. In working with Goldin, Intervenor provided the BGS grading information which accompanied the Card in the tamper-proof slab. Accordingly, the auction listing information touted Mr. Curry's sports accomplishments and demeanor, and included the information most

likely to be of interest to prospective buyers: the Card's grading information. The auction listing specified that the Card was "[g]raded GEM MINT 9.5 by BGS. A distinguished Rookie Card. The card's ideally balanced BGS condition report: Centering: 9.5, Corners: 9.5, Edges: 9.5, Surface: 9.5. The limited-edition piece is serial-numbered '26/50.' Gem Mint condition."

46. On October 31, 2020, the auction ended with a final price of $168,000. Upon information and belief, Alt Platform and Alt Sports Card Fund, L.P. were the successful bidders and purchased the Steph Curry Rookie Card from Intervenor.

**h.  Plaintiffs Determine the Steph Curry Rookie Card was Trimmed.**

47. While in the care, custody, and control of Plaintiffs, the Steph Curry Rookie Card was removed from the protective slab provided by Beckett on or about August 30, 2022.

48. Plaintiffs perceived an even greater increase in value of the Steph Curry Card, and thus wanted PSA to grade and encapsulate the Card because PSA's grading is more valued in the secondary market for sports trading cards than BGS, and would increase the value of the Card.

49. Shortly thereafter, PSA notified Plaintiffs that the Steph Curry Rookie Card was "Authentic/Altered" because it was noticeably short, or trimmed, top to bottom. PSA then returned the Card to Plaintiffs.

50. After receiving the Steph Curry Rookie Card back from PSA, Plaintiffs then sent the Card to be evaluated again by BGS on or around September 14, 2022.

51. On or about September 16, 2022, BGS confirmed PSA's evaluation of the Steph Curry Rookie Card, acknowledging that "the card was deemed altered by our graders."

52. On or about September 8, 2023, Plaintiffs informed Intervenor that the Steph Curry Rookie Card – which had been sealed in Beckett's tamper-proof slab during the entire period Intervenor owned the Card – had been misgraded due to its "trimmed" condition. Intervenor did not know, and lacked the means to reasonably discover, the alleged inaccuracy in Beckett's grading

as Beckett had encapsulated the Card in the tamper-proof slab. Rather, Intervenor had at all times relied upon Beckett's representations that it accurately and reliably grades cards, that the Card was in "Gem Mint 9.5" condition, and was authentic and unaltered.

### i. Plaintiffs Sue Ladd in Wisconsin Federal Court

53. On or about October 27, 2023, Plaintiffs filed suit against Intervenor in the Western District of Wisconsin alleging causes of action arising from the auction listing of the Card as "[g]raded GEM MINT 9.5 by BGS. A distinguished Rookie Card. The card's ideally balanced BGS condition report: Centering: 9.5, Corners: 9.5, Edges: 9.5, Surface: 9.5. The limited-edition piece is serial-numbered '26/50.' Gem Mint condition." By Plaintiffs' claims, they seek to recover from Intervenor damages arising from Plaintiffs' purchase of the Card in "trimmed" condition as opposed to the condition represented by BGS and communicated in the auction listing.

## COUNT I – NEGLIGENT MISREPRESENTATION

54. Intervenor incorporates the previous paragraphs as if set forth herein.

55. BGS made multiple representations, in the course of its business and/or a business-related transaction where it had a pecuniary interest, about the Steph Curry Rookie Card being authentic, unaltered, and in 9.5 "Gem Mint" condition (both overall and with respect to each of the four industry-standard subcategories by which sports trading cards are graded).

56. BGS's purpose in certifying the Steph Curry Rookie Card as authentic and unaltered, grading the Card as being in 9.5 "Gem Mint" condition, and making that information available for direct verification was for subsequent purchasers and sellers, like Intervenor and Plaintiffs, to be able to rely on those representations.

57. BGS's representation that the Steph Curry Rookie Card was unaltered and in 9.5 "Gem Mint" condition was false because the Card had been trimmed and was short, as PSA later determined, and which BGS later confirmed, in September 2022.

58. BGS failed to exercise reasonable care or competence when it first evaluated the Steph Curry Rookie Card in October 2016 because Beckett holds BGS out as an expert capable of determining that the card had been "trimmed," but BGS failed to do so with respect to the Card. BGS further failed to exercise reasonable care or competence in communicating the grading of the Card by failing to identify and label the Card as "Altered-Authentic" or otherwise note its altered condition.

59. Intervenor justifiably and reasonably relied on BGS' representations that the Steph Curry Rookie Card was authentic, unaltered, and in 9.5 "Gem Mint" condition when he purchased the Card for $10,600.00 in 2016, despite the Card being virtually worthless in its "trimmed" condition.

60. Ladd further justifiably and reasonably relied on BGS' representations that the Steph Curry Rookie Card was authentic, unaltered, and in 9.5 "Gem Mint" condition when he submitted the Card to Goldin in October 2020, and conveyed in the listing information that the Card had been graded by BGS in such condition and was still in such condition (particularly as it had not been removed from Beckett's tamper-proof slab). Intervenor has accordingly further been damaged by its reliance on BGS's misrepresentations in the form of claims for damages asserted against it by Plaintiffs based upon Intervenor's sale of the Card in the condition BGS represented the Card to be in.

61. As a result of BGS' negligent certification of the Steph Curry Rookie Card as being unaltered and in 9.5 "Gem Mint" condition – when it was actually "trimmed" and unsalable – Ladd suffered significant financial losses that he otherwise would have avoided. BGS' negligence was the proximate cause of Ladd's damages because it is entirely foreseeable that a third-party buyer would pay a higher value for a trimmed Card that is misrepresented by an apparent expert like BGS as being unaltered and in 9.5 "Gem Mint" condition, and that the purchaser of a graded card

would resell the graded card using the grading information supplied by BGS provided that the card remained in BGS's tamper-proof slab.

62.  As a result of BGS' negligence, Intervenor suffered financial losses and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Intervenor Christopher Ladd respectfully requests that, following notice and hearing, this Court enter judgment in his favor and against Defendant Beckett for Intervenor's damages proximately caused by his reasonable reliance on Defendant's negligent misrepresentations, costs of court, pre- and post-judgment interest as provided by law, and all such other and further relief to which Intervenor may be justly entitled.

DATED: January ___, 2024

Respectfully submitted,

KESSLER COLLINS, P.C.

By: _____
ANTHONY J. BARBIERI
State Bar No. 24025235
abarbieri@kesslercollins.com
LISA C. TULK
State Bar No. 24047004
ltulk@kesslercollins.com

500 N. Akard Street, Suite 3700
Dallas, Texas 75201
(214) 379-0722 - Telephone
(214) 373-4714 - Facsimile

**ATTORNEYS FOR INTERVENOR CHRISTOPHER LADD**

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on January ____, 2024, a true and correct copy of the foregoing was served on all counsel of record by electronic submission through the automated ECF system for the U.S. District Court of the Northern District of Texas.

_____
LISA C. TULK