# Exhibit 3

```
 1
 2            IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF TEXAS
 3
 4   ALT SPORTS CARD FUND GP, LLC, as)
     the General Partner of Alt      )
 5   Sports Card Fund, L.P.; ALT     )
     PLATFORM, INC.,                 )
 6                                   )
                 Plaintiffs,         )
 7                                   )
        vs.                          ) No. 3:22-CV-2867
 8                                   )
     Beckett Collectibles, LLC,      )
 9                                   )
                 Defendant.          )
10
11           Videotaped 30(b)(6) deposition of
12   KEVIN ISAACSON, taken before Traci Elice Bourbeau,
13   C.S.R., pursuant to the Federal Rules of Civil
14   Procedure for the United States District Courts,
15   pertaining to the taking of depositions, taken
16   remotely via Zoom, commencing at 10:30 a.m. on the
17   6th day of March, 2024.
18
19
20
21
22
23
24
```

```
 1        A.   I don't recall.
 2        Q.   Okay.
 3        A.   Perhaps.
 4        Q.   Did you have any personal involvement
 5   with the Curry card that is at issue in this case?
 6        A.   I am not sure what you mean by personal.
 7        Q.   Before -- well, when did you become the
 8   CEO of Beckett Group?
 9        A.   May of 2023.
10        Q.   Okay.  Before May of 2023, did you have
11   any personal knowledge of the -- Beckett's grading
12   of the Curry card that is at issue in this
13   litigation?
14             MS. CAMPBELL:  Object to form.
15   BY THE WITNESS:
16        A.   No.
17   BY MR. HAMMERVOLD:
18        Q.   So all of the information about Beckett's
19   grading of the Curry card at issue in this case
20   you learned since this case was filed, right?
21             MS. CAMPBELL:  Object to form.
22   BY THE WITNESS:
23        A.   I am not sure that I would define it as
24   all of the information because I am familiar with
```

1  grading of sports cards, Curry rookie cards and
2  other things associated with the industry.
3  BY MR. HAMMERVOLD:
4      Q.  You're -- you're familiar with general
5  background information but not about the specific
6  facts at issue in this case, right?
7      A.  Correct.
8      Q.  What did you do to prepare for the
9  deposition today?
10     A.  I spoke with counsel, I believe it was
11 yesterday.
12     Q.  Did you review any documents to prepare
13 for this deposition?
14     A.  I reviewed the -- what's the word,
15 interrogatories briefly.
16     Q.  Other than the interrogatories, did you
17 review any other documents in preparation for this
18 deposition?
19     A.  I reviewed some items that were part of
20 discovery at some point recently, I am not sure
21 when.
22     Q.  Okay.  Are you able to identify them with
23 any more particularity than the response you just
24 gave?

1  Q.  So if a card is more than one notch short
2  of the expected dimensions, it would be considered
3  to measure short and would not be graded and
4  slabbed by Beckett?
5  A.  Correct.
6  Q.  Okay.  And there is essentially a
7  bright-line determination, right, whether it is
8  above or below that notch, right?
9  MS. CAMPBELL:  Object to form.
10 BY THE WITNESS:
11 A.  I am not sure that I understand the
12 reference.
13 BY MR. HAMMERVOLD:
14 Q.  If graders are measuring properly and
15 Beckett has a defined tolerance, could two
16 reasonable, well-trained Beckett graders disagree
17 about whether a card measures short?
18 MS. CAMPBELL:  Object to form.
19 BY THE WITNESS:
20 A.  I think almost anything in this world is
21 possible.  If -- if -- if the question is, is it
22 likely, my answer to be no.
23 BY MR. HAMMERVOLD:
24 Q.  Do you know who at Beckett graded the

```
 1    BY MR. HAMMERVOLD:
 2        Q.   Okay.  And here there is two data points
 3    that both indicate that the card was trimmed,
 4    right?
 5            MS. CAMPBELL:  Object to form.
 6    BY THE WITNESS:
 7        A.   The card measured short and the -- the
 8    top cut was beveled differently than the other
 9    three.
10    BY MR. HAMMERVOLD:
11        Q.   But that's two pieces of information that
12    corroborate each other about it being trimmed,
13    right?
14        A.   It is two pieces of information, I agree.
15        Q.   Okay.  Are you aware of anyone that
16    thinks that this card is not trimmed as of 2020 --
17    2022?
18            MS. CAMPBELL:  Object to form.
19    BY THE WITNESS:
20        A.   I am not aware of what everybody in the
21    world would think.
22    BY MR. HAMMERVOLD:
23        Q.   But you don't know -- you can't -- you
24    can't -- you're not aware of anyone that -- that
```

1  BY THE WITNESS:
2      A.   No, because the sequential numbers were
3  not included in the data set until a period
4  starting somewhere between 18 and 36 months ago.
5  BY MR. HAMMERVOLD:
6      Q.   Were you aware before just right now that
7  Beckett had graded multiple cards from the same
8  limited series Steph -- of Steph Currys and found
9  two previous times that Keith Koenig had submitted
10 a trimmed Steph Curry card before the Steph Curry
11 card at issue in this case?
12     A.   Could you repeat your question?  I want
13 make sure I answer it correctly.
14     Q.   We just went through that submission
15 history that showed there had been two previous
16 occasions where Keith Koenig had submitted a card
17 from the same limited 50 card series that had
18 resulted in a finding that the card was trimmed
19 before the Beckett grader ultimately graded the
20 card at issue in this case as a 9.5.
21              Were you aware of that submission
22 history before just now in this deposition?
23     A.   Specifically, no; generally, yes.
24     Q.   Okay.  Have you done anything to

1  investigate whether that was the same card?
2     A.   The information is not available in the
3  data set.
4     Q.   Okay.
5     A.   The sequential numbering isn't available,
6  I would have no way of knowing.
7     Q.   There is nothing you could do to
8  investigate to rule out that that was the same
9  card submitted three times?
10    A.   The data set does not contain the
11 sequential numbering, and it is not uncommon in
12 this industry for an enthusiast to be focused on a
13 certain type of card, a certain player or a
14 certain sequential numbering set.
15         I know of some people who try to
16 acquire all of the sequential numbers in a set.
17    Q.   Do those people you know have the same
18 type of submission rate of trimmed cards as Keith
19 Koenig?
20         MS. CAMPBELL:  Object to form.
21 BY THE WITNESS:
22    A.   Some of those don't -- I -- I -- I think
23 that's a question where I -- I would have to
24 assess everybody who has a collection profile

```
 1   BY MR. HAMMERVOLD:
 2       Q.   Number 12 says, plaintiffs' claims are
 3   barred from recovery, in whole or in part, by
 4   assumption of risk.
 5            What is the factual basis for that
 6   defense?
 7            MS. CAMPBELL:  Object to form.
 8   BY THE WITNESS:
 9       A.   I am not able to answer that question.
10   BY MR. HAMMERVOLD:
11       Q.   All right.  I will mark this next
12   exhibit, this is defendant Beckett Collectibles'
13   expert witness disclosure.
14            Do you see that?
15       A.   I do.
16       Q.   Okay.  Have you reviewed this document
17   before?
18       A.   I am seeing only the first page of it.
19       Q.   The pages 2 through 5 are about opinions
20   attributed to you.  Have you reviewed that portion
21   of this document before?
22       A.   I believe I have.
23       Q.   Okay.  Did you prepare this document --
24   this portion of the document that's about you?
```

1  A. I did not directly prepare it.
2  Q. You're aware that Beckett has designated
3  you as an expert witness?
4  A. Yes, we have discussed that a couple
5  times today.
6  Q. And did you review any case materials in
7  connection with forming expert witness opinions in
8  this case?
9  A. I am not sure I -- I understand the
10 question. I have reviewed case materials, and I
11 have 25 years of involvement in the industry.
12 Q. And in these opinions, you're applying
13 your experience in the industry to information
14 from case materials you've learned through this
15 case?
16 A. I am not sure I understand the question.
17 Q. Okay. Are all of your opinions based on
18 both case materials and your experience?
19     MS. CAMPBELL: Object to form.
20 BY THE WITNESS:
21 A. I am not sure I understand the question.
22 I have a lot of opinions on a lot of things, many
23 of which have nothing to do with this case.
24

```
 1   BY MR. HAMMERVOLD:
 2        Q.   Okay.  What materials did you review in
 3   connection with forming expert opinions in this
 4   case?
 5        A.   I have 25 years of experience in the
 6   industry.
 7        Q.   Okay.  Did you re -- did you review any
 8   case materials in connection with forming expert
 9   opinions in this case?
10             MS. CAMPBELL:  Object to form.
11   BY THE WITNESS:
12        A.   I have reviewed some materials that were
13   provided in the discovery process.
14   BY MR. HAMMERVOLD:
15        Q.   Okay.  What materials was that?
16        A.   I don't have a list.
17        Q.   Okay.  Is there any list provided in your
18   disclosure?
19        A.   I would have to review the disclosure.
20        Q.   Okay.  Do you want to -- do you want to
21   do that?
22        A.   I am happy to.
23        Q.   All right.  Let me know when you want me
24   to go to the next page.
```

```
 1                    (Witness viewing document.)
 2    BY THE WITNESS:
 3        A.    Okay.
 4              Okay.
 5              Yeah, I think we were here already.
 6              Okay.
 7              Okay.
 8    BY MR. HAMMERVOLD:
 9        Q.    Okay.  Does this report identify what
10    materials you reviewed?
11        A.    I don't think it is an exhaustive list,
12    no.
13        Q.    All right.  Can you tell me what
14    materials you reviewed?
15              MS. CAMPBELL:  Object to form, asked and
16    answered.
17    BY THE WITNESS:
18        A.    I don't have a complete list.
19    BY MR. HAMMERVOLD:
20        Q.    Okay.  Well, this is my one opportunity
21    to depose you, and I think I am entitled to know
22    what your opinion is based on.
23              Are you able to describe in any way
24    what you relied on from case materials to form the
```

1    opinions?
2            MS. CAMPBELL:  Object to form, asked and
3    answered multiple times.
4    BY THE WITNESS:
5        A.   25 years in the industry and a selection
6    of materials that were involved in the discovery.
7    BY MR. HAMMERVOLD:
8        Q.   Who chose the materials, you?
9            MS. CAMPBELL:  Object to form.
10   BY THE WITNESS:
11       A.   I am not sure what you mean my choice.
12   There was discovery from both parties.
13   BY MR. HAMMERVOLD:
14       Q.   Did you review discovery -- the discovery
15   that both parties -- from both parties?
16       A.   I am really not sure.
17       Q.   Okay.  Did you select which documents to
18   review or were they selected for you by someone
19   else?
20           MS. CAMPBELL:  Object to form.
21   BY THE WITNESS:
22       A.   I selected documents that I reviewed.
23   BY MR. HAMMERVOLD:
24       Q.   In order to select the documents that you

```
 1   reviewed, were you first given a universe of
 2   documents by someone else?
 3            MS. CAMPBELL:  Object to form.
 4   BY THE WITNESS:
 5        A.   Counsel provided a -- access to
 6   documents, and I reviewed some of them.
 7   BY MR. HAMMERVOLD:
 8        Q.   And you pick and -- picked and choose
 9   which of those documents to review?
10        A.   I selected them, yes.
11        Q.   You didn't review all the documents the
12   that were provided to you from your counsel?
13        A.   I am -- I am not sure I recall exactly
14   what I did or didn't do.  It is entirely possible
15   that I reviewed some of them more than once.
16        Q.   Okay.  All right.  So this first
17   paragraph you say, sports trading card is a
18   subjective opinion.
19                 Okay.  Can you explain that opinion
20   to me?
21        A.   Yes, Beckett provides an opinion on four
22   subsets and an ultimate aggregate number of
23   quality of the trading cards submitted.
24        Q.   Okay.
```

1   opinions aren't supported by any evidence, right?
2            MS. CAMPBELL:  Object to form and
3   misstates testimony.
4   BY THE WITNESS:
5       A.   Could you restate the question, please,
6   or repeat the question.
7   BY MR. HAMMERVOLD:
8       Q.   If you can't say that -- you -- you -- if
9   you can't say that you reviewed everything that
10  the plaintiffs' experts' reviewed, you can't
11  really say that their -- their opinions aren't
12  supported by evidence, can you?
13      A.   I did not go through a line item process
14  in reviewing the documents so I cannot
15  affirmatively say I reviewed every document in any
16  kind of sequence or order.
17      Q.   Now, here where you're talking about the
18  plaintiffs' purchase of the Curry card and the
19  attempt to cross-grade the Curry card with PSA.
20  Your -- your -- those opinions are all based on
21  review of case materials, not personal knowledge,
22  right?
23      A.   That's correct.
24      Q.   Okay.  Now, you reviewed the plaintiffs'

1   experts' valuation of the Curry card, right?
2        A.   As I have answered previously, I reviewed
3   a number of documents, many multiple times.
4        Q.   Okay.  Now, you didn't come up with your
5   own valuation of the Curry card, did you?
6        A.   I reviewed -- I reviewed a number of
7   inputs in regard to the card, and I do remember
8   sharing my thoughts on valuation and fluctuations
9   in the market.
10       Q.   And this -- I am not -- and I am not
11  asking about your communications with counsel.
12  Did -- did you disclose an opinion about what you
13  believed the market value of the Curry card was?
14       A.   Disclose to whom?
15       Q.   In this, to me.
16       A.   I did not.
17       Q.   Okay.  And when you were conducting this
18  analysis of the value of the Curry card, did you
19  rely on any documents or information?
20            MS. CAMPBELL:  Object to form.
21  BY THE WITNESS:
22       A.   My assessment of value of anything in
23  this industry is based on 25 years of experience.
24  Very often individuals will cite one transaction

1  as evidence of value when a more appropriate
2  process is to look at a number of transactions
3  over time and also sometimes understanding the
4  background of that transaction.
5           One -- one sale is not a -- in my
6  view is not an acceptable data point even if the
7  card is a 1 of 1, there still may be other
8  extenuating circumstances that are behind that
9  sale.
10 BY MR. HAMMERVOLD:
11    Q.   In order to appropriately value an asset
12 like the Curry card, you would need to look at all
13 of the market data, right?
14    A.   I don't know that you -- you need to look
15 at all the market data.
16    Q.   You would -- you would need to look at
17 some market data, right?
18    A.   I think that would be healthy, but very
19 honestly the value of any asset is the -- the --
20 is -- is the result of the transaction and
21 agreement between a buyer and a seller.
22    Q.   Before this case, did you have any
23 personal knowledge as to what the value of the
24 Curry card was at any time?

1       A.   No.
2       Q.   And it seems to me here that you
3  primarily criticized the plaintiffs' experts
4  because they considered the sales of the Curry
5  card for $575,000 on February 3rd and $550,000 on
6  December 20th, '21?
7       A.   Supposed sales.
8       Q.   Yeah, you -- you crit -- you criticized
9  the -- those -- them for considering those sales
10 because you say there was no evidence that those
11 sales occurred?
12      A.   There is a -- I think it is an Instagram
13 post announcing that there was a sale that
14 occurred, but there is no resulting transactional
15 data at PWCC.  Based on experience in this
16 industry, there are often -- not often.  There are
17 occasionally sales that are quote, reported,
18 unquote, but never transacted.
19      Q.   Did you do anything to attempt to
20 determine whether those sales transacted?
21      A.   There is a data set -- me -- me
22 personally, the answer is no.
23      Q.   If PWCC had released a public statement
24 that the $575,000 was paid for the Curry card,

```
1    UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF TEXAS      ) SS.
2    STATE OF ILLINOIS               )
     COUNTY OF COOK                  )
3
```

4          I, TRACI ELICE BOURBEAU, Certified

5    Shorthand Reporter, do hereby certify that KEVIN

6    ISAACSON was first duly sworn by me to testify to

7    the whole truth and that the above videotaped

8    deposition was reported stenographically by me and

9    reduced to typewriting under my personal

10   direction.

11         I further certify that the said

12   deposition was taken at the time and place

13   specified and that the taking of said deposition,

14   taken remotely via Zoom on the 6th day of March,

15   A.D., 2024, at 10:30 a.m..

16         I further certify that I am not a

17   relative or employee or attorney or counsel of any

18   of the parties, nor a relative or employee of such

19   attorney or counsel, nor financially interested

20   directly or indirectly in this action.

21

22

23

24

1          In witness whereof, I have hereunto set
2     my hand of office at Chicago, Illinois, this
3     12th day of March, A.D., 2024.
4
5
                    /s/ *Traci Elice Bourbeau*
6                   TRACI ELICE BOURBEAU, CSR
                    C.S.R. No. 084-004281
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24