# Exhibit 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ALT SPORTS CARD FUND GP LLC, as the General Partner of Alt Sports Card Fund, L.P.; ALT PLATFORM, INC., <br><br>   Plaintiffs, <br><br> v. <br><br> BECKETT COLLECTIBLES, LLC, <br><br>   Defendant. | <br><br><br><br><br><br><br> No. 3:22-cv-02867-N |

**DEFENDANT BECKETT COLLECTIBLES, LLC'S**
**EXPERT WITNESS DISCLOSURES**

Defendant Beckett Collectibles, LLC ("Beckett"), by and through undersigned counsel, makes the following expert disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure.

**I.   DESIGNATION OF RETAINED EXPERT WITNESSES**

Beckett expects to call the following individual as a retained expert witness at trial:

**Steven Bloedow**
Collect Auctions
815 W Fulton St. #8
Waupaca, WI 54981

Mr. Bloedow is expected to provide expert testimony concerning the trading card industry, grading trading cards, and the valuation of trading cards. Mr. Bloedow is expected to provide expert testimony concerning and rebutting Plaintiffs' experts' opinions and alleged damages in this action. Mr. Bloedow's opinions are more fully contained in the Expert Report of Steven Bloedow attached hereto and incorporated by reference. The Bloedow report contains the following:

a. a complete statement of all opinions the expert will express and the basis and reasons for them;

b. the facts or data considered by the expert in forming the opinions;

c. any exhibits that will be used to summarize or support them;

d. a curriculum vitae, resume, or other listing of Mr. Bloedow's qualifications;

e. a list of all publications authored by Mr. Bloedow in the last 10 years;

f. a list of all other cases in which Mr. Bloedow testified as an expert or by deposition in the previous 4 years;

g. a statements of the compensation to be paid for the study and testimony in this case.

Mr. Bloedow's opinions and rebuttal opinions of Plaintiffs' experts and alleged damages will be based on his education, background, experience, and training. Mr. Bloedow's testimony will also be based on his review of the documents produced, reports offered, and testimony obtained in this litigation as well as publicly available information.

## II. DESIGNATION OF NON-RETAINED EXPERT WITNESS

Beckett expects to call the following individual as a hybrid fact and non-retained expert witness:

**Kevin Isaacson**
Beckett Collectibles, LLC
c/o Kendal Reed and Abigail Campbell
Condon Tobin Sladek Thornton Nerenberg
8080 Park Ln. Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800

Mr. Isaacson is the CEO of Beckett and is familiar with the sports trading card industry, general sports trading card grading policies and procedures, and valuations of trading cards. Mr. Isaacson is expected to offer expert opinion and testimony about the sports trading card industry, sports trading card grading policies and procedures, and valuations of trading cards. Mr. Isaacson may also offer testimony to rebut Plaintiffs' experts' opinions.

Mr. Isaacson's expert opinions include:

1) Sports trading card grading is a subjective opinion. Two different graders, regardless of what grading company they work for, can and have analyzed the same trading card but assigned different grades, both as the overall card grade or subgrades (ex. centering). Though grading card companies generally follow standardized procedures and their grades are used to value trading cards on the market, the grade assigned is a professional opinion dependent on the grader's subjective view. This is why many individuals or companies will resubmit a graded card to the same grading company or a different grading company (cross-grading) to try to get a better grade.

2) There are no guarantees on a raw trading card. A trading card that is not in a protective slab or holder is called a "raw" card, meaning there is no grade assigned to it. It is impossible to determine what has happened to a raw card, when or by whom, when it is not in your possession. When a previously graded card is broken out of or removed from its protective slab, no matter who previously graded the card, it is returned to a raw card with no assigned grade. Raw cards carry no guarantees, no grades, and must be reevaluated when submitted to a grading card company. Thus, it is well known in the sports trading card industry that removing a card from its slab carries a risk that the card will not achieve its previously assigned grade or will not be damaged while outside of the slab.

Rather than removing a card from its protective slab and submitting it for grading as a raw card, a card holder can cross-grade the card. Cross-grading is when a trading card, in its protective slab, is submitted to a different grading company for evaluation by its graders of whether the card could achieve a higher grade. If the graders determine the card could achieve a higher grade, they can professionally remove it from the slab, grade it, and reslab it with the

new grade label. If the graders determine the card will not achieve a higher grade, the customer has the option of having the card returned to them in its original slab, as is.

3) Plaintiffs' conclusion that Beckett negligently graded the Steph Curry Card in 2016 is not supported by any evidence. Plaintiffs currently hold a raw Curry Card allegedly graded by Beckett in 2016. It is unclear how many individuals or companies held the Card between 2016 and 2020. In 2020, Plaintiffs allegedly purchased the Curry Card from Goldin Auctions. At some point between 2020 and September 2022, Plaintiffs attempted to have PSA cross-grade the Curry Card, but Plaintiffs have not provided any information regarding this attempt at cross-grading. In August or September 2022, Plaintiffs evaluated the risk of cracking the Curry Card out of its protective slab to resubmit it for grading to PSA as a raw card. Plaintiffs decided it was worth the risk and proceeded to crack the Card's protective slab. Plaintiffs produced a video of them cracking open the Beckett slab that held the Card, but the video does not show the cutting of the internal plastic sleeve or removal of the card. There is no evidence of the complete removal process or what happened to the raw Curry Card after the video was shut off. For example, at some point, Plaintiffs noticed surface scratches on the Curry Card that were not there before and could not be removed. Not only does this affect the value of the Card and its possible grade, a fact that Plaintiffs ignore, but it exhibits how a raw card can easily be damaged and why prior grades or guarantees do not apply to raw cards.

4) Plaintiff's valuation of the Curry Card as of September 2022 is incorrect and unreliable. First, Plaintiffs fail to acknowledge that the raw Curry Card, as they held it in September 2022, had (and continues to have) scratches on its surface, which reduces the Card's ability to achieve a 9.5 grade. Second, Plaintiffs' valuation that the Curry Card could have been sold in September 2022 for $300,000 to $350,000 is not supported by the market. Specifically,

this price range goes beyond the single highest price for this card, which was $336,000 in August 2022. Additionally, there is no evidence to support that the Curry Card was sold for $575,000 on February 3, 2022 or $550,000 on December 20, 2021, as cited to in Plaintiffs' experts' reports. Moreover, it appears that Plaintiffs merely cherry picked what prices to consider in valuing what they could have sold the Curry Card for in 2022 rather than consider the full market, which would be the proper way to determine valuation or a sale price.

### III.   RESERVATION OF RIGHTS

Beckett reserves the right to call and elicit testimony (either through records, by deposition, or live at trial) from experts disclosed or designated by other parties to this suit.

Beckett further reserves the right to supplement and/or amend this expert designation with additional designations of experts or additional opinions from its currently designated experts within the time limits imposed by the Court and/or any alterations of same by subsequent Court order and/or agreement of the parties, and/or pursuant to the Federal Rules of Civil Procedure and Federal Rules of Evidence.

Beckett further reserves the right to call any and all undesignated rebuttal expert witnesses whose testimony cannot be reasonably foreseen until the presentation of evidence.

Beckett further reserves the right to withdraw the designation of any expert witness and to aver positively that such previously designated expert will not be called as an expert witness at trial and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

Dated: December 11, 2023

Respectfully submitted,

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/ Abigail R.S. Campbell*_____

        Aaron Z. Tobin
Texas State Bar No. 24028045
Kendal B. Reed
Texas State Bar No. 24048755
Abigail R.S. Campbell
Texas State Bar No. 24098959
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
atobin@condontobin.com
kreed@condontobin.com
acampbell@condontobin.com

*Attorneys for Defendant*
*Beckett Collectibles, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendant Beckett Collectibles, LLC's Expert Witness Disclosure has been served upon the following counsel of record on December 11, 2023:

Mark Hammervold, Esq.
Hammervold Law
155 S. Lawndale Ave.
Elmhurst, IL 60126
mark@hammervoldlaw.com

        */s/ Abigail R.S. Campbell*
        Abigail R.S. Campbell

# Expert Report of
# Steven Bloedow

Prepared on behalf of Defendant Beckett Collectibles, LLC
in the matter of

*Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P. and Alt Platform, Inc. v. Beckett Collectibles, LLC*
Case No. 30:22-cv-02867-N, in the Northern District of Texas

December 11, 2023

28165645v1 92001.031.00

## SCOPE

My name is Steven Bloedow. I was asked by counsel for Beckett Collectibles, LLC ("Beckett") to render opinions regarding issues raised in Plaintiffs' Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P. and Alt Platform, Inc. (together, "Plaintiffs") Amended Complaint relating to the sports trading card industry, including sports trading card alterations, grading, and valuations. This document sets forth and explains those opinions. In preparation for this report, I have reviewed documents that were provided to me as well as publicly available information in order to arrive at the conclusions and rationale contained herein. I have also relied upon my training and professional experience in evaluating this information and offering these opinions. My opinions are based upon my analysis of the information available as of the date of this report and are not contingent upon the outcome of this case. I reserve the right to amend or supplement this report based upon any future information or additional facts or documents that may become known in connection with this matter.

## BACKGROUND AND QUALIFICATIONS

I have bachelors' degrees in marketing and finance from the University of Wisconsin-Whitewater. My entire 30-year professional career has been spent in the sports trading card industry. I have led pricing staff, launched several magazines focused on the trading industry, launched a graded card division, and spearheaded new product and online auction house coverage.

While employed by F+W Media, Inc., I was responsible for all new issues of sports cards, including writing about them in company magazines, cataloging them, publishing books by utilizing the company database and coordinating the pricing of all sports trading cards. I launched and held the position of Operations Manager of Sports Collectors Digest (or SCD Authentic), a sports trading card grading business for F+W Media. This included launching, designing, and overseeing the database, systems of operations, designing products and logos, marketing, hiring and card grading techniques. I further worked with outside contributors to launch a separate memorabilia authentication business, where I designed the product, logos, marketing, and pricing structure. I then held the position of Pricing Director and Web Editor and was responsible for the pricing staff for SCD and Tuff Stuff, an online magazine that publishes prices for sports trading cards and other collectibles. This included managing the company's pricing staff and assigning prices to all new basketball and football products, as well as teaching new employees how to gather and interpret pricing data in order to assign prices to new products and adjust pricing for past products. Next, I launched, ran, and took the position of Director of Auctions for Collect.com, an auction house focused on sports cards and memorabilia. My responsibilities included securing consignments, all promotional materials, and managing auction house operations.

I currently own and run Collect Auctions, an online auction house selling sports trading cards and memorabilia, entertainment and political autographs, as well as other types of Americana. I am responsible for all aspects of the Collect Auctions business, including working with consignors, grading companies, authentication companies, budgeting, marketing, and pricing.

My history of employment encompasses pricing of sports trading cards and launching a card grading company, both of which help me to run an auction house efficiently. As part of my

**Expert Report of Steven Bloedow**  Page 1
28165645v1 92001.031.00

daily routine, I determine what trading cards should be graded from the collection on consignment and provide estimates of what these items are worth when they go to auction. I've been trained to look for trimmed or altered sports trading cards, as well as card conditions so that I submit the right cards to grading companies to maximize the return.

## BACKGROUND FACTS

1. Plaintiffs allege that in 2016 Beckett graded a 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 card (the "Curry Card") as a 9.5 "Gem Mint", created a label reflecting this grade, and encapsulated the card in a tamper-proof slab. Am. Compl. ¶¶ 47, 51.

2. Plaintiffs allege that around October 31, 2020, Plaintiffs purchased a 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 from an online sports trading marketplace called Goldin Auctions for $168,000. Am. Compl. ¶ 54.

3. Plaintiffs allege the Curry Card purchased by Plaintiffs was encapsulated in a Beckett slab with a label identifying the card as being graded in a 9.5 "Gem Mint" condition. Am. Compl. ¶ 55.

4. Plaintiffs allege when they received the Curry Card in October or November 2020, they put it in a safe. Am. Compl. ¶ 56.

5. In or around August 2022, Plaintiffs discussed the risk associated with cracking open the Curry Card's slab and submitting it for grading as a raw card to Professional Sports Authenticator ("PSA") in order to get a better grade and increase the card's value in the sports trading card market. Plaintiffs found that their "cost basis on the card is so low ($168k)" that they felt "good about the gamble" of cracking open the slab. Pls.' 12.4.23 Production, Slack Conversation.

6. At some point prior to August 2022, Plaintiffs submitted the Curry Card to PSA for cross-grading. Plaintiffs have not provided any information on that submission or the result but confirmed with PSA that if the card doesn't meet the minimum grade established by the submitted card at that time, PSA's system defaults to a code indicating it must be kept in the current holder and have to examine the card again. Pls.' 12.4.23 Production, Slack Conversation.

7. Plaintiffs allege that in August 2022, Plaintiffs cracked open the slab containing the Curry Card. Am. Compl. ¶ 63.

8. At that time, Plaintiffs examined the Curry Card "and was never given any reason to measure [the Card] while inspecting the edges of the card since there was no evidence of trimming." Pls.' 12.4.23 Production, Slack Conversation.

9. Plaintiffs then sent the raw card to PSA for grading. Am. Compl. ¶ 63.

10. PSA determined that the Curry Card had been altered because it was trimmed on the top edge of the card and offered to slab the card as "authentic altered." Plaintiffs requested the

Curry Card be returned to them raw, or in other words, without being slabbed. Pls.' 12.4.23 Production, Slack Conversation.

11. When Plaintiffs received the raw Curry Card back from PSA, the Curry Card had surface issues with scratches that were not present prior to sending it to PSA for grading. 12.4.23 Production, Slack Conversation.

12. In September 2022, Plaintiffs submitted the Curry Card to Beckett for re-slabbing without informing Beckett that PSA had identified the card as trimmed, instead requesting Beckett just reslab the card with the 9.5 grade. Beckett Resp. to Interrogatory No. 4.

13. Beckett's policy requires Beckett to grade raw cards that are submitted to them rather than just putting a raw card into or back into a slab with a label and grade. Thus, Beckett examined the Curry Card rather than reslab it as Plaintiffs requested. Beckett Resp. to Interrogatory No. 4.

14. Beckett identified the Curry Card as altered because the top edge of the card had been trimmed. BECKETT 1088-1091

15. Plaintiffs requested the Curry Card be returned to them and Beckett did so. Pls.' 7.13.23 Production.

16. Plaintiffs later again requested that Beckett put the Curry Card back into the Beckett slab with the 9.5 grade, which Beckett did not do. BECKETT 845.

17. Plaintiffs have brought this lawsuit against Beckett alleging that Beckett should have identified the Curry Card as trimmed or altered when it was graded in 2016 instead of labeling the card as a 9.5 "Gem Mint."Am. Compl. Plaintiffs further allege that as a result of Beckett's negligent grading of the Curry Card in 2016, they paid an inflated price of $168,000 for the card in the 2020 online auction because an altered card is worth less than a 9.5 "Gem Mint" graded card. Am. Compl. Plaintiffs also allege that if the Curry Card were a 9.5 "Gem Mint" card, it could have sold it in September 2022 for $300,000 - $350,000. Pls.' Expert Reports.

SUMMARY OF OPINIONS

1. **Sports trading card grading is a subjective opinion.**

Based on my professional experience in the trading card industry, sports trading card grading entails rendering a subjective opinion about the card at issue. Two different graders (whether both from the same grading company or different grading companies) can look at the same trading card; one grader's opinion could be that the card is Mint (numerical grade "9") but the other grader's opinion is that the same card is NM (numerical grade "7").

Differing grading opinions has been happening since people started assigning grades to trading cards and that is why the grading industry has exploded. While the grading companies

provide more standardized, professional opinions of a trading card's condition, it is still an opinion dependent on the grader's subjective view.

Each trading card grading company has its own grading standards. However, humans are grading these cards and even within the same company, there are variances between grader opinions and assigned grades. This is why grading companies allow customers to submit their cards for re-grading, cross-grading (meaning asking a company to grade a card previously graded by a different company), and why card holders will crack open protective slabs to submit them for re- or cross-grading as a raw card—because different graders have different opinions.

2. **Cracking open a sports trading card slab returns the card to "raw" form, meaning it can no longer be guaranteed to be in the same form it was when previously graded.**

Based on my experience in the sports trading card industry, the same trading card can and will receive different grades from different grading companies. The same trading card can also often receive a different grade when resubmitted to the same grading company.

In the sports trading card industry, it is not uncommon to be disappointed with the grade your card receives or believe a card you hold could receive a higher grade than labeled. Typically, the better grade the card receives, the more money it is worth or higher price point it can sell. In this instance, the plaintiff deemed the Gem Mint grade from PSA (PSA 10) would carry more value than a Gem Mint grade from BGS (BGS 9.5).

In an attempt to change a trading card's grade, a card can be submitted for "cross-grading." This is when a previously graded card is submitted to a different grading company, still in the protective slab, for the other grading company to evaluate. The other grading company evaluates the card while in the protective slab to determine whether the card could be graded at the same or a higher grade. If the grader determines an equal or higher grade could be obtained, it can remove the card from the protective slab, grade the card, and then reslab it with that company's grade assigned. If the grader determines an equal or higher grade could not be obtained, the card owner can decide whether they want the card to be opened and graded or returned as is. In an attempt to change a trading card's grade or the holder it's graded in, there are also individuals and companies that will crack open a card's protective slab on their own and resubmit the same card to a different grading company or even the same grading company in "raw" form. Either process may happen multiple times until the customer either gives up or gets the grade they want.

A card that is not in a protective slab or holder is called a "raw" card, meaning there is no protective case and no grade assigned to it. When a previously graded card is removed from its holder, the card returns to being a raw card without any protection, label, or grade. It is impossible for anyone to know what happens to a raw card outside of their possession. Those involved in the sports trading card industry are well aware that cracking a card out of its slab or holder is a risk. There is a risk that the card could be damaged, that it will not grade as well as desired, and that the previous grade no longer applies. Plaintiffs acknowledge this huge risk in their own correspondence. Pls.' 12.4.23 Production, Slack Conversation. There are not and cannot be any guarantees or expectations that one grader or grading company will give a trading card the same or better grade as another grader or grading company, nor that a raw card will receive the same or

**Expert Report of Steven Bloedow**  Page 4

better grade from the same grading company. Because it is impossible to determine what happens to a raw card while not in a grading company's possession, grading companies disclaim all guarantees regarding their grading of a card when it is returned to raw form.

3. **There are multiple reasons a sports trading card can measure "short."**

Sports trading cards are measured from top to bottom and right to left to determine their measurements. Further analysis of a trading card includes measuring the thickness of a card and centering of a card. Almost all modern cards measure 2.5" x 3.5" with slight variations and need to be measured with a very detailed measuring device. The cards are cut from sheets. While recent modern methods have reduced the variations in card sizes size, such variations still exist.

Despite the manufacturer information regarding a card's size, sports trading cards can vary slightly in size. There are instances in which the manufacturer printed cards that are slightly shorter, a card gets bent or warped over time, or a card is purposefully trimmed. In fact, in the trading card industry, there are individuals or companies that will trim or alter a card in order to receive a better grade.

The difference between a card being graded and not meeting the minimum size to be graded can be so small that it is often a subjective opinion, based on the eyes of the person grading the card. Consequently, if a card measures slightly small, it is important to inspect the edges and borders to determine if the edge appears original or that it has been tampered with. For example, a tampered border looks wavy. In Plaintiffs' own opinion, the Steph Curry Card showed no evidence of alterations or trimming. Pls.' 12.4.23 Production, Slack Conversation.

Additionally, it is worth pointing out that the Curry Card would have received much more scrutiny in 2022 than it would have when it was allegedly graded in 2016. At both PSA and Beckett, when they received the raw Curry Card in 2022, graders likely questioned: "Why is this card not in a holder already?…What is wrong with it?." Card grading and scrutiny has also been refined and improved in the seven years that have passed since 2016.

4. **Plaintiffs' conclusion that Beckett negligently graded the card in 2016 is an improper conclusion not supported with any evidence.**

Based on my review of this case, Plaintiffs hold a raw Curry Card allegedly graded by Beckett in 2016. At some point prior to removing the Curry Card, Plaintiffs attempted to have PSA cross-grade the Card but Plaintiffs have not produced or provided any information regarding this attempt at cross-grading. Pls.' 12.4.23 Production, Slack Conversation. Plaintiffs have produced a video of them cracking open the Beckett slab, but not cutting the internal plastic sleeve to remove the Card, a tedious and risky process. There is no evidence of the complete removal process or what happened to the raw Curry Card after the video was shut off.

Plaintiff sent the raw Curry Card to PSA for grading. After the Curry Card was returned to Plaintiffs and while preparing to send it to Beckett, Plaintiffs noticed surface scratches and smudges on the Curry Card that were not noticed before. Where did the surface scratches and smudges come from? PSA has graded 40 million cards in their history so they no doubt know how

to handle cards of this nature without damaging them, yet there were new scratches on the Card. This leads me to believe that the Curry Card was mishandled internally by Plaintiffs. Regardless of the source, the fact that the Curry Card now has scratches that were not present before, is an indication that the Curry Card was mishandled and, at the very least, not in the same condition it was when it was allegedly graded by Beckett in 2016. Further, the new scratches affect the condition of the Curry Card, which in turn, affect the Card's worth and sale price, a fact both Plaintiffs' experts' reports ignore.

Additionally, it is not uncommon for cards in slabs or holders to become damaged. Trading cards that are mishandled, even within slabs or holders, can still sustain damage.

Overall, there is no way to know exactly what happened to the Curry Card after it was graded by Beckett in 2016, either before or after it came into Plaintiffs' possession. Because of this, it is unreasonable for Plaintiffs to reach the conclusion that Beckett negligently graded the card in 2016 and that conclusion is not support by any evidence.

### 5. Plaintiffs' valuation of the Curry Card as of September 2022 is incorrect and their method is unreliable.

Pricing sports trading cards is not an exact science because you need to look at trends, economic conditions, and time ranges. In pricing, you cannot simply take the highest price a card sold for and use that to value the card at issue. The best way to know what a card is worth and could sell for in the market, is to look at past results, with emphasis on the most recent sales. It's important to find sales of the exact same card at issue. To do this, individuals or companies should look at publicly available information showing the sales prices for the exact same card over the past five years.

The sports trading card market exploded during the pandemic, meaning that many trading cards sold for inflated prices in 2021 and most of 2022. However, that explosion has since tempered down. This is an important consideration in looking at the sale prices of any sports trading cards over the past five years. As an example of market fluctuation, a similar card, the 2003 Topps Chrome LeBron James Gold Refractor with a BGS 9.5 grade fluctuated significantly since just January 2022. On January 8, 2022, this card sold for $900,000, on February 6, 2022, the same card sold for $792,000, on May 21, 2022 it sold for $540,000, then on March 30, 2023 the sale price fell to $204,000, and most recently on October 28, 2023, the card sold for just $160,000.[1] Many similar examples exist in the new card market, which fluctuates wildly from the start of the pandemic until now.

The Curry Card, (for the purposes of valuation, meaning other 2009 Topps Chrome Curry Gold Refractors), in BGS 9.5 or similar condition sold for prices ranging from $10,000 to $336,000 in the past five years.[2]

---

[1] VCP Price Guide, 2003 Topps Chrome #111 LeBron James.
[2] VCP Price Guide, PSA Auction Prices.

**Expert Report of Steven Bloedow**                                                           **Page 6**

Curry Cards sold in the past 5 years:

| Date | Price | Grade | Auction |
|---|---|---|---|
| 4/24/2017 | $4,000.00 | PSA 8 | eBay |
| 8/15/2018 | $10,000.00 | BVG 9.5 | eBay |
| 8/31/2018 | $8,000.00 | PSA 9 | eBay |
| 1/18/2019 | $25,000.00 | PSA 10 | eBay |
| 6/22/2020 | $31,000.00 | BVG 9 | eBay |
| 11/2/2020 | $168,000.00 | BVG 9.5 | Goldin |
| 1/19/2021 | $167,177.00 | BVG 9.5 | eBay |
| 2/1/2021 | $492,000.00 | BVG 10 | Goldin |
| 5/21/2022 | $204,000.00 | PSA 8 | Goldin |
| 8/6/2022 | $108,000.00 | BVG 7.5 | Goldin |
| 8/18/2022 | $336,000.00 | BVG 9.5 | PWCC Premier |
| 10/20/2022 | $138,000.00 | BVG 9 | PWCC Premier |
| 11/6/2022 | $120,000.00 | BVG 9 | Goldin |
| 11/26/2022 | $204,000.00 | BVG 9.5 | Goldin |
| 1/19/2023 | $138,000.00 | BVG 9.5 | PWCC Premier |
| 10/1/2023 | $125,523.00 | BVG 9.5 | Goldin |

Two of the Curry Cards were sold in 2023 for $138,000 and $125,523. The single highest price for this Card at a 9.5 grade was $336,000 in August 2022, which is $132,000 higher than the second highest sale price for this card, which was $204,000. Thus, the $336,000 price appears to be an outlier and does not support a conclusion that in September 2022, the Curry Card would have sold for $300,000-$350,000.

Plaintiffs' expert cites to "the sale of two other copies of this exact asset for $550,000 on December 20, 2021, and $575,000 on February 3rd, 2022. Both of these sales took pace via the PWCC platform." Levine Report, p. 13. Similarly, Plaintiff's expert Mohan states that there was a direct sale for a 9.5 of the Curry Card "in February of 2022 at $575,000." Mohan Report, p. 13. I have reviewed reputable information regarding the sale of the Curry Card in 2021 and 2022, including PWCC's website, and have found no evidence of the Curry Card selling for $550,000 or $575,000.[3] In fact, PWCC's website shows that no Stephen Curry cards of any kind were sold at those price points in or around those dates.[4] Thus, outside of one fluke reported sales price of $336,000, there is no basis for thinking that the Curry Card would have sold for between $300,000-$350,000 in September 2022. Moreover, the fact that the Curry Card, as of September 2022 had new surface scratches, this reduces the value and possible sales price of the Curry Card, which would have probably resulted in a "6" or "7" grade if they card hadn't been rejected as altered.

Additionally, in looking at the sales trends above, it is my opinion that Plaintiffs overpaid for the Curry Card in November 2020 and then missed the peak of the market for its sale.

---

[3] PWCC Sales History.
[4] Curry PWCC Sales History.

**Expert Report of Steven Bloedow**                                                              Page 7

28165645v1 92001.031.00

## COMPENSATION

I am being compensated at a rate of $175 per hour for my time.

## MATERIALS CONSIDERED

1. Amended Complaint, Exhibits, and website pages linked.
2. Plaintiffs' Rule 26 Expert Witness Disclosures
3. Expert Report of Kaushik Mohan
4. Expert Report of Matthew Levine
5. Documents produced by Plaintiffs
6. Documents produced by Beckett
7. Videos produced by Plaintiffs
8. Beckett's Responses to Plaintiffs' First Set of Interrogatories.
9. Vintage Card Prices – publicly available at vintagecardprices.com
10. PSA Auction Prices – publicly available at psacard.com/auctionprices
11. PWCC Sales History – publicly available at pwccmarketplace.com

## LIST OF PUBLICATIONS

I have not had any publications in the last 10 years.

## TESTIMONY

I have not testified as an expert or by deposition in the previous 4 years.

DATED: DECEMBER 11, 2023

_____
STEVEN BLOEDOW