# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

ALT SPORTS CARD FUND GP LLC, as the
General Partner of Alt Sports Card Fund, L.P.,
ALT PLATFORM, INC.,

    Plaintiffs,

v.

    No. 3:22-cv-02867-N

BECKETT COLLECTIBLES, LLC,

    Defendant.

### APPENDIX IN SUPPORT OF BECKETT COLLECTIBLES, LLC'S BRIEF IN SUPPORT OF MOTION TO STRIKE AND EXCLUDE PLAINTIFFS' EXPERT MATTHEW LEVINE

| Exhibit No. | Document | Appendix Range |
|---|---|---|
| Exhibit 1 | Affidavit of Abigail R.S. Campbell in Support of Motion to Strike and Exclude Plaintiffs' Expert Matthew Levine | 1-3 |
| Exhibit 1A | Defendant's Amended Responses to Plaintiffs' First Set of Interrogatories | 4-12 |
| Exhibit 1B | Goldin Invoice | 13-15 |
| Exhibit 1C | August 30, 2022 Slack Messages | 16-26 |
| Exhibit 1D | PSA Submission Form | 27-32 |
| Exhibit 1E | 9.22.22. email | 33-34 |
| Exhibit 1F | 11/10 Levine Report | 35-51 |
| Exhibit 1G | 1/5/24 levine report | 52-66 |
| Exhibit 1H | 9.20.22 email | 67-68 |
| Exhibit 1I | 9/1 Slack messages | 69-71 |
| Exhibit 1J | PWCC Sales history | 72-74 |
| Exhibit 2 | Excerpts from Deposition of Darius Sadeghi | 75-92 |

| Exhibit 3 | Excerpts from Deposition of Matthew Levine | 93-154 |
| Exhibit 4 | Excerpts from Deposition of Jonathan Euston | 155-163 |
| Exhibit 5 | Excerpts from the Deposition of Alexander Liriano | 164-167 |

Dated: March 12, 2024                    Respectfully submitted,

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/ Abigail R.S. Campbell*_____
Aaron Z. Tobin
Texas State Bar No. 24028045
Kendal B. Reed
Texas State Bar No. 24048755
Abigail R.S. Campbell
Texas State Bar No. 24098959
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
atobin@condontobin.com
kreed@condontobin.com
acampbell@condontobin.com

*Attorneys for Defendant*
*Beckett Collectibles, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, the foregoing was electronically submitted to the clerk of court for the United States District Court for the Northern District of Texas using the Court's electronic filing system and that all counsel of record were served electronically or as authorized by the Federal Rules of Civil Procedure.

*/s/ Abigail R.S. Campbell*_____
Abigail R.S. Campbell

28240440v2 92001.031.00

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **ALT SPORTS CARD FUND GP LLC,** | § | |
| **as the General Partner of Alt Sports** | § | |
| **Card Fund, L.P. and ALT** | § | |
| **PLATFORM, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Case No. 3:22-CV-02867-N** |
| **v.** | § | |
| | § | |
| **BECKETT COLLECTIBLES, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT OF ABIGAIL R.S. CAMPBELL IN SUPPORT OF MOTION TO STRIKE**
**AND EXCLUDE PLAINTIFFS' EXPERT MATTHEW LEVINE**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Abigail R.S. Campbell, who being by me duly sworn, upon her oath stated as follows:

1.      I am an attorney with the law firm of Condon Tobin Sladek Thornton Nerenberg PLLC, attorneys for Defendant Beckett Collectibles, LLC ("Beckett").

2.      I submit this affidavit in support of Beckett's Brief in Support of Motion to Strike Plaintiffs' Expert Matthew Levine.

3.      Attached hereto are the following exhibits and reports served and produced in this litigation:

| | |
|---|---|
| **A** | Beckett's Amended Responses to Plaintiffs' Interrogatories |
| **B** | Goldin Auctions Invoice |
| **C** | August 30, 2022 Slack Messages |
| **D** | September 2022 PSA Submission Form |

1

| **E** | September 22, 2022 Email |
| **F** | November 10, 2023 Expert Report of Matthew Levine |
| **G** | January 5, 2024 Reply/Supplemental Report of Matthew Levine |
| **H** | September 20, 2022 Email |
| **I** | September 1, 2022 Slack Messages |
| **J** | PWCC Sales History |

FURTHER, AFFIANT SAYETH NOT.

DATED the 12th day of March, 2024

By: _____

    BEFORE ME, the undersigned authority, on this day personally appeared Abigail R.S. Campbell who being by me duly sworn on her oath deposed and said that every statement contained herein is within her personal knowledge and is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME on this 12th day of March, 2024, to certify which witness my hand and official seal.

CYNTHIA D NAVARRO
Notary ID #10012167
My Commission Expires
December 7, 2026

Notary for the State of _Texas_

Print Name: _Cynthia D. Navarro_

My Commission Expires: _12/7/26_

2

28240220v1 92001.031.00

**3**

# EXHIBIT 1A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

ALT SPORTS CARD FUND GP LLC, as the
General Partner of Alt Sports Card Fund,
L.P., ALT PLATFORM, INC.,

   Plaintiffs,

v.

BECKETT COLLECTIBLES, LLC,

   Defendant.

No. 3:22-cv-02867-N

---

### DEFENDANT'S AMENDED RESPONSES TO
### PLAINTIFFS' FIRST SET OF INTERROGATORIES

**To:** **Plaintiffs Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P., and Alt Platform, Inc., by and through their attorney of record, Mark Hammervold, Hammervold Law, 155 S. Lawndale Ave., Elmhurst, IL 60126, mark@hammervoldlaw.com.**

Pursuant to Fed. R. Civ. P. 34, Defendant Beckett Collectibles, LLC, by and through its undersigned counsel, hereby submits the following Amended Responses to Plaintiff Alt Sports Card Fund GP, LLC, as the General Partner of Alt Sports Card Fund, L.P., and Alt Platform, Inc. ("Plaintiffs") First Set of Interrogatories.

Dated: November 22, 2023        Respectfully Submitted,


**CONDON TOBIN SLADEK THORNTON
NERENBERG, PLLC**

_/s/ Abigail R.S. Campbell_____
Aaron Z. Tobin
State Bar No. 24028045

atobin@condontobin.com
Kendal B. Reed
State Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
State Bar No. 24098959
acampbell@condontobin.com
8080 Park Lane, Suite 700
Dallas, Texas 75231
*Telephone*: (214) 265-3800
*Facsimile*: (214) 691-6311

**ATTORNEYS FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of Defendant's Amended Responses to Plaintiff's First Set of Interrogatories has been served upon the following counsel of record on November 22, 2023:

Mark Hammervold, Esq.
Hammervold Law
155 S. Lawndale Ave.
Elmhurst, IL 60126
mark@hammervoldlaw.com


*/s/ Abigail R.S. Campbell*
Abigail R.S. Campbell

**AMENDED RESPONSES**

**INTERROGATORY NO. 1:**  Who submitted the Steph Curry Card to Beckett for grading in October 2016?

**ANSWER:**  Beckett objects to this Interrogatory because it seeks confidential information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 1, Beckett states that the card was originally submitted by Keith Koenig.

**INTERROGATORY NO. 2:** Describe each step of the process Beckett used to take possession of, evaluate, grade, and "slab" the Steph Curry Card in or around October 2016 and Identify who at Beckett was involved in each step.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information that is not relevant to the claims and defenses of the parties and not reasonably calculated to lead to the discovery of admissible evidence. Beckett further objects to this Interrogatory because it is multifarious. In response to Interrogatory No. 2, Beckett states that it received the Steph Curry Card in or around October 2016 after it was submitted by Keith Koenig. The Card was then given to one of BGS's graders to evaluate the physical condition of the card. Based on the grader's opinion, the Card was graded as being 9.5 Gem Mint condition, with 9.5 grades for centering, corners, edges, and surface. The Card was then slabbed in a tamper-proof case with a label reflecting the assigned grades. Beckett operates a "blind" grading process, meaning any number of BGS associates could have been involved in each step.

**INTERROGATORY NO. 3:** Explain the basis for Beckett grading the Steph Curry Card in or around October 2016 as being 9.5 "gem mint" condition, with 9.5 grades for each of centering, corners, edges and surface.

**ANSWER:** Beckett states that in October of 2016 the card at issue met the conditions necessary for such a grade based upon the grader's opinion of the physical condition of the card at the time.

**INTERROGATORY NO. 4:** Describe each step of the process Beckett used to take possession of, evaluate, grade, and slab the Steph Curry Card in or around September 2022, and identify who at Beckett was involved in each step.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Beckett further objects to this Interrogatory because it is multifarious. In response to Interrogatory No. 4, Beckett states that this interrogatory assumes facts that are not in evidence or true. Further, Beckett states that it received the Steph Curry Card at issue in the normal course of business when Alt resubmitted the card. Beckett received the Card out of its slab, along with the original grading label included in the shipping package. Alt asked BGS to "reslab it" without informing Beckett that the card had been identified as trimmed by PSA. However, it is BGS policy to independently grade any card that is not slabbed. After the grading process was executed, BGS informed Alt that the card had been trimmed and that BGS would not be grading or slabbing it. Beckett operates a "blind" grading process, meaning any number of BGS associates could have been involved in each step.

**INTERROGATORY NO. 5:** What was Beckett's evaluation of the Steph Curry Card in or around September 2022 and how did it make that determination.

**ANSWER:** Beckett objects to this Interrogatory on the basis that it seeks disclosure of Beckett's confidential and proprietary business information. Beckett further objects to this Interrogatory because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 5, Beckett's evaluation of the Steph Curry Card in or around September 2022 deemed the card to be altered. Beckett made this

DEFENDANT'S AMENDED RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES                                    PAGE 4

determination because the card measured short and the top edge was inconsistent with the others graded by BGS.

**INTERROGATORY NO. 6:** If you contend that the Steph Curry Card Alt submitted to Beckett for evaluation in September 2022 was a different card than the Steph Curry Card Beckett previously graded in October 2016, explain the basis for that contention.

**ANSWER:** Beckett has not made this contention at this time but reserves the right to do so as discovery progresses in this matter.

**INTERROGATORY NO. 7:** Does Beckett have the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, speculative, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 7, Beckett states that it has the ability to opine on when a sports trading card has been altered but does not have control over a third party's opinion regarding the reliability of Beckett's opinions.

**INTERROGATORY NO. 8:** Does Beckett market itself as having the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, speculative, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 8, Beckett states that it does not currently have such a marketing campaign.

**INTERROGATORY NO. 9:** Identify the "few instances" where Beckett has failed to recognize that a card graded had been trimmed. *See* Am. Compl. ¶ 39, Ex. 1 at 13:24-14:3.

**ANSWER:** Beckett objects to this Interrogatory because it is overly broad, vague, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 9, Beckett refers Plaintiff to the Deposition testimony that Plaintiff cites in its Amended Complaint.

**INTERROGATORY NO. 10:** What is the purpose of Beckett grading sports trading cards?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, ambiguous, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 10, the purpose of Beckett grading sports trading cards is to provide only its contracted customers with paid for services.

**INTERROGATORY NO. 12:**   Identify any relationship or agreement between Alt and Beckett that you content is relevant to Alt's claims or Beckett's defenses in this case.

**AMENDED RESPONSE:** Beckett objects to this Interrogatory because it is vague, ambiguous, and fails to identify with reasonable particularity the information sought. In response to Interrogatory 12, Beckett states that Alt accessed or used Beckett's website as alleged, and expressly accepted the terms and conditions of the Terms of Service Agreement located at https://www.beckettmedia.com/terms-of-service.

**INTERROGATORY NO. 13:** Identify any employee or agent of Beckett who will offer any testimony as to the value of the Steph Curry Card at any time (anyone other than a retained expert witness). For any such person, summarize the expected opinion testimony and the basis for same.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information protected by the work-product, attorney-client, and consulting expert privileges. In response to Interrogatory No.

13, Beckett will disclose its trial witnesses in accordance with the Federal and Courts' local rules.

**INTERROGATORY NO. 14:** Explain the factual basis for Beckett's statement – posted on Beckett.com/grading – that "Once your card is graded and slabbed, you can trust us to uphold its integrity. Our tamper-proof holders provide peace of mind by guaranteeing evidence of tampering in the case that someone tries to open or damage your item."

**ANSWER:** Beckett objects to this Interrogatory because it is vague and ambiguous. In response to Interrogatory No. 14, Beckett believes that the statement on the website speaks for itself and that when cards are removed from a Beckett slab, the card returns to being classified as a raw card for which Beckett makes no guarantees.

## VERIFICATION

STATE OF ___Texas___ §
§
COUNTY OF ___Dallas___ §

     BEFORE ME, the undersigned authority, on this date, personally appeared, and is personally known to me, Kevin Isaacson, and first being duly sworn according to law, upon her oath deposed and said:

     1.    "My name is Kevin Isaacson.  I am over eighteen (18) years of age.  I am fully competent to make this Verification."

     2.    "I have reviewed **DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** and the factual statements contained therein are true and correct."

     FURTHER AFFIANT SAYETH NOT.

     Signed this __21st__ day of __November__, ~~2020~~. 2023

     Print Name: _Kevin Isaacson_

STATE OF ___Texas___ §
§
COUNTY OF ___Dallas___ §

     SUBSCRIBED AND SWORN TO BEFORE ME on this __21st__ day of __November__, ~~2020~~ 2023, by _Kevin Isaacson_, to certify which witness my hand and official seal.

_Darla Strittmatter_
Notary Public

DARLA STRITTMATTER
Notary Public, State of Texas
Comm. Expires 07-23-2025
Notary ID 126963384

Page 1 of 1

28145562v1 92001.031.00

# EXHIBIT 1B

Goldin Auctions
160 E. Ninth Avenue, Suite A
Runnemede, NJ  08078
TEL: 856 767 8550
info@goldinauctions.com

| Invoice #: | 00750032 |
| Invoice Date: | 02 November 2020 |
| Invoice Due: | 12 November 2020 |
| Tracking #: | |
| Ship Date: | |

**Bill To:**

Leore Avidar
Alt
7118 Long Bridge St
Apt 1402
San Francisco, CA  94158
(415) 596-5947
accounts@onlyalt.com

**Ship To:**

Alt Platform
Alt
7118 Long Bridge St
Apt 1402
San Francisco, CA  94158

## 2020 October Legends Closing Oct 31 & Nov 1

| Lot | Description | Final Bid |
|---|---|---|
| 4 | 68319 - 2011 Bowman Chrome (Superfractors) #175 Mike Trout Rookie Card (#1/1) – PSA GEM MT 10 | $180,000.00 |
| 6 | 67936 - 2003/04 Topps Chrome (Gold Refractors) #111 LeBron James Rookie Card (#37/50) – BGS GEM.. | $260,000.00 |
| 88 | 68595 - 2009/10 Topps Chrome Gold Refractor #101 Stephen Curry Rookie Card (#26/50) – BGS GEM MINT. | $140,000.00 |

goldin
auctions

Goldin Auctions
160 E. Ninth Avenue, Suite A
Runnemede, NJ  08078
TEL: 856 767 8550
info@goldinauctions.com

| | |
|---|---|
| Invoice #: | 00750032 |
| Invoice Date: | 02 November 2020 |
| Invoice Due: | 12 November 2020 |
| Tracking #: | |
| Ship Date: | |

Thank you for bidding in our October Legends 2020  Auction and congratulations on your win! Please find your invoice attached.  You may also view your invoice by logging into www.goldinauctions.com and clicking on "my account"

Please note that payment is due 10 days from the date of the invoice. Invoices may be paid via cash, check, credit card, money order, bank check or wire transfer.  The Buyer's Premium will be 20% if payment is made by cashier's check, cash, money order, wire transfer, or check within 10 days of the date of invoice.  The Buyer's Premium will be 23% if payment is made using a credit card and/or is not paid within 10 days of date of invoice. Please note that invoices paid via personal check will be held for 5-8 business days prior to shipping.

Please log into your account and ensure that the shipping address on file is correct once you receive your invoice.

Make checks payable to: Goldin Auctions.  Credit card payments over $7,500 must have prior approval.
To pay with credit card, after you log in click 'pay invoice' and it will allow you to pay with your credit card on file or enter a new credit card. If you wish to send a WIRE, please email see instructions at the bottom of your invoice. Please note, wire transfers less than $1,000.00 will be subject to a $15.00 processing fee.

Look for our Goldin-Sotheby's joint auction opening for bidding on November 20th and our Holiday 2020 Auction opening for bidding on November 23rd, 2020.

We are still accepting consignments for the our End 2020 with a Bang  Auction and Winter 2021 Auction. Please contact us if you have any items you are interested in consigning. If you have premium items you wish to consign we can apply them towards your current invoice as an advance if you wish (this requires advance approval of items and amount).

If you wish to wire your payment please see instructions below:

Bank Name: TD BANK
Bank Address: 101 Springdale Road
Bank City, State, Zip: Cherry Hill, NJ  08003
Swift Address/ ABA #:  031201360
Beneficiary Name: Goldin Auctions LLC
Beneficiary Address:  160 E. Ninth Ave, Suite A
Beneficiary City, State, Zip: Runnemede, NJ  8078
Account #/ IBAN #:  4327996033

Please email Ken@goldinauctions.com and frank.dinote@goldinauctions.com once your wire has been initiated.

THANK YOU FOR YOUR BUSINESS!

SAVE $17,400.00! If you pay in full via wire transfer, cash, check or money order, then your Buyer's Premium will be discounted by 3%. Your order total after the discount is $699,021.10.

| | |
|---|---|
| Lot Total(3 Lots) | $580,000.00 |
| Buyers Premium | $133,400.00 |
| Shipping and Handling | $21.10 |
| Tax ID: 206990720-00001 | $0.00 |
| Insurance | $3,000.00 |
| Total | $716,421.10 |
| Total Amount Paid | $0.00 |
| Total Due | $716,421.10 |

# EXHIBIT 1C



2261 Market Street #4019
San Francisco, CA 94114

**Slack Messages**





**17**



2261 Market Street #4019
San Francisco, CA 94114

---

56 replies

**yang**  11 months ago
oh lord

**Alexander Liriano**  11 months ago
@Darius Took a look at the Curry...I don't see
how this card would not Gem. I think percentage
wise we're looking at an 85% chance it Gems.

**Darius**  11 months ago
Ohhhh boy @Leore Avidar should we send it?!

**Leore Avidar**  11 months ago
@yang do you have the stomach for it? I'm down
to try. @Alexander Liriano if we do this I want to
video it @Mere Keller

💯 2   😀

**yang**  11 months ago
@Sean Kapul 's decision :P

**yang**  11 months ago
This is warehouse right

**Darius**  11 months ago
No this is a fund card

**yang**  11 months ago
Lol, this is about taking risk right

**yang**  11 months ago
Likelihood it won't regrade to a 9.5 is low I'm
guessing?

**18**

# ∧LT

2261 Market Street #4019
San Francisco, CA 94114

---

 **yang**  11 months ago
Likelihood it won't regrade to a 9.5 is low I'm guessing?

 **Darius**  11 months ago
I wouldn't say that, Alex says there's basically zero flaws, the likelihood it regrades with the same subgrades might be lower though

 **yang**  11 months ago
hmm

 **yang**  11 months ago
what's the price upside from going from 9.5->10?

 **Darius**  11 months ago
Its very big, 9.5 is like 325k a PSA 10 would be at least double probably closer to 750k

 **Darius**  11 months ago
BGS 9.5 is pop 14 vs pop 2 for psa 10

 **yang**  11 months ago
oh shit

 **yang**  11 months ago
hmm okay, so let's fill this in: EV = p(PSA10)*750k + p(current_grade) * 325k + p(lower_grade) * [VALUE]

 **yang**  11 months ago
i assume this is probably a positive EV play though given the 2x on PSA 10, probably decen

19



2261 Market Street #4019
San Francisco, CA 94114

---

**Thread** 🗑 grading-escalation-squad (archived)                    ✕


**yang**  11 months ago
i assume this is probably a positive EV play
though given the 2x on PSA 10, probably decen
tprobability there and current_grade probability
is reasonable also right


**Alexander Liriano**  11 months ago
I'm all for whatever you guys want to do 


**Darius**  11 months ago
This is being very conservative based on Alex's
inspection, as well as being conservative on the
regrade prob so I don't think we can lose here

image.png ▾

| Prob | Value | Outcome |
|------|-------|---------|
| 25% | $750,000 | $187,500 |
| 50% | $325,000 | $162,500 |
| 25% | $200,000 | $50,000 |
|  |  | $400,000 |

**yang**  11 months ago
so 23% edge basical~~ly yeah that's pretty good~~

👍 📺 🏄 😀 🔖 :

**yang**  11 months ago
and we're okay with a 1 in 4 chan~~ce~~        More actions
125k for this

**yang**  11 months ago
that's your value at risk



2261 Market Street #4019
San Francisco, CA 94114

**Thread** 🗑 grading-escalation-squad (archived)    ✕

 **yang**  11 months ago
that's your value at risk

 **yang**  11 months ago
basically flip 2 coins, if u get 2 tails u lose 125k

 **Darius**  11 months ago
@Leore Avidar is the ultimate decision maker,
our cost basis on the card is so low ($168k) I
think we feel good about the gamble

 **yang**  11 months ago
sunk cost

 **yang**  11 months ago
your decision profile is basically:
- 23% EV on the action based on above (+75k
  EV)
- 25% chance of -125k (-38%)

if we're willing to take that loss odds, we should
do it

 **yang**  11 months ago
that's basically tldr - cost basis is (mostly)
irrelevant in this

 **Darius**  11 months ago
Yeah for sure was mainly just saying even in the
worst scenario we still wouldn't be underwater
on this at all. But yeah not to factor into decision
making

 **yang**  11 months ago

**21**



2261 Market Street #4019
San Francisco, CA 94114

 **yang** 11 months ago
we would have lost 125k 🙂



 **Leore Avidar** 11 months ago
We are a go here boyz!!!! If it comes back a 9,
send it to BGS 🙂



 **yang** 11 months ago
okay, done, this is an EV bet

 **Leore Avidar** 11 months ago
its math



 **Leore Avidar** 11 months ago
we've already won in my head since the EV is
positive. We just need to make more bets

 **Leore Avidar** 11 months ago
@Alexander Liriano should I crack my lebron
9.5?

 **yang** 11 months ago
i mean 1/4 chance of -38% is not insignificant,
but i agree with u that it's generally better to
make the EV bet

 **Darius** 11 months ago
LFGGGG 🙏🏼 

**22**



2261 Market Street #4019
San Francisco, CA 94114

**Thread** 🗑 grading-escalation-squad (archived)                    ✕

---

 **Darius**  11 months ago
LFGGGG 🙏🏼💪🏼

❤️ 2   😀+

 **yang**  11 months ago
oh

 **yang**  11 months ago
how much is the grading cost...

 **yang**  11 months ago
we never factored that in

 **Leore Avidar**  11 months ago
@Alexander Liriano I need this on camera so
work with @Mere Keller to make sure it gets
documented correctly

👍 2   😀+

 **Alexander Liriano**  11 months ago
The centering is my only true concern. It is
55/45 ..which still gems. Truly up to you
@Leore Avidar

 **Leore Avidar**  11 months ago
everything else you think is good?

 **Alexander Liriano**  11 months ago
From what I see through the slab, yes

 **Darius**  11 months ago
The pics look immaculate too. Don't see any
white on the back

**23**

# ΛLT

2261 Market Street #4019
San Francisco, CA 94114

 **Darius**  11 months ago
The pics look immaculate too. Don't see any white on the back

 **Leore Avidar**  11 months ago
 @Darius for the lebron?

 **Darius**  11 months ago
Oh sorry I was just talking curry missed your comment about the lebron.

 **Sean Kapul**  11 months ago
Just catching up on this. In the outcomes, is the idea that if it comes back a PSA 9, you send it back to BGS to either regain the 9.5 (50%)? And that the 25% of $200k is a BGS 9 outcome value?

 **Darius**  11 months ago
Correct

 **Sean Kapul**  11 months ago
nice! looks like an amazing spot

 **Mere Keller**  11 months ago
@Alexander Liriano i'll message you & loop in jordan for the content capture

 👍 1 

 **Darius**  11 months ago
Oh wait just before we set this in motion I just thought of one very important thing- I need to check with Jackie to see if they retain grades.

**24**



2261 Market Street #4019
San Francisco, CA 94114

 **Darius**  11 months ago
Oh wait just before we set this in motion I just
thought of one very important thing- I need to
check with Jackie to see if they retain grades +
serials for cards that are attempted to cross- we
tried to cross this card once so if they do keep
those grades then they won't grade it since it's
already been graded before. Will call Jackie
tomorrow to confirm and get back in here

 1   😊

 **Matt**  11 months ago
@Darius any update on this ^ Alex is ready to go
we just discussed in grading meeting. cc;
@Ghazi also if we do this would need malca
involved. (edited)

 1   👍 2   😊

 **Brendan Kirbach**  11 months ago
Please keep me updated as well s           More actions
fill out the form



 **Darius**  11 months ago
Will update as soon as I hear back, I've been
chasing Jackie from PSA down via email and
phone since Thursday to no avail. Hopefully will
hear back today

 **Darius**  11 months ago

**25**



2261 Market Street #4019
San Francisco, CA 94114



# EXHIBIT 1D

**This package label includes submission number: 10988862.**

**EXHIBIT**

**5**

D. Sadeghi (Case# 3:22-cv-02867



PSA 1 S 25 V     826357



- Cut along the dotted lines.
- Adhere this label to the outside of your package.
- Do not obscure the barcode with packing tape.

 

# REGULAR CARDS PSA SUBMISSION FORM    PSA COPY #1

**FORM NOT VALID AFTER**
9/24/2022

*If you are printing this submission form for a quarterly special, please make sure that the package is postmarked by the last day of the calendar quarter.

SUBMISSION # **10988862**

Submission Date:
8/25/2022

Customer #
1232341

**PACKAGE INFORMATION:** (CUSTOMER MUST PROVIDE)

TOTAL NUMBER OF ORDERS INCLUDED IN THIS PACKAGE:

_____

TOTAL NUMBER OF COLLECTIBLES INCLUDED IN THIS PACKAGE (ALL ORDERS):

_____

## RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**
**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**    Pick Up

## PSA USE ONLY                                              V

Order # _____
PKG # _____
Date Received _____
Verified By _____
Code _____

# SUBMISSION SUMMARY - #10988862

## Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

## Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| Pick Up | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXXX6124 |

| LN# | QTY | SPEC# | SPORT | DESCRIPTION | DECLARED VALUE TOTAL |
|---|---|---|---|---|---|
| 1 | 1 | W606000056 | Basketball Cards | 2009 Topps Chrome 101 Stephen Curry Gold Refractor | $249,999.00 |
| | | | | **Grand Total Declared Value** | **$249,999.00** |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

# REGULAR CARDS PSA SUBMISSION FORM   PSA COPY #2

FORM NOT VALID AFTER
9/24/2022

\* If you are printing this submission form for a quarterly special, please make sure that the package is postmarked by the last day of the calendar quarter.

SUBMISSION # **10988862**

|||||| || | || ||| || ||| ||| ||| || ||| ||

Submission Date:
8/25/2022

Customer #
1232341

## PACKAGE INFORMATION: (CUSTOMER MUST PROVIDE)

TOTAL NUMBER OF ORDERS INCLUDED IN THIS PACKAGE:

_____

TOTAL NUMBER OF COLLECTIBLES INCLUDED IN THIS PACKAGE (ALL ORDERS):

_____

### RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**
**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**    Pick Up

### PSA USE ONLY

V

Order # _____
PKG # _____
Date Received _____
Verified By _____
Code _____

## SUBMISSION SUMMARY - #10988862

### Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

### Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| **Pick Up:** | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXXX6124 |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

FORM NOT VALID AFTER
9/24/2022

# REGULAR CARDS PSA SUBMISSION FORM   PSA ITEM LIST

## CUSTOMER #  1232341   SUBMISSION #  10988862

| LN# | QTY | SPEC# | SPORT | DESCRIPTION | DECLARED VALUE TOTAL |
|-----|-----|-------|-------|-------------|----------------------|
| 1 | 1 | W606000056 | Basketball Cards | 2009 Topps Chrome 101 Stephen Curry Gold Refractor | $249,999.00 |
| | | | | **Grand Total Declared Value** | **$249,999.00** |

# REGULAR CARDS PSA SUBMISSION FORM   CUSTOMER COPY

FORM NOT VALID AFTER
9/24/2022

\* If you are printing this submission form for a quarterly special, please make sure that the package is postmarked by the last day of the calendar quarter.

SUBMISSION # **10988862**

Submission Date:
8/25/2022

Customer #
1232341

---

RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**

**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**     Pick Up

---

## SUBMISSION SUMMARY - #10988862

### Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

### Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| **Pick Up:** | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXX6124 |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

# EXHIBIT 1E

| | |
|---|---|
| **From:** | Josh Downer <josh@alt.xyz> |
| **Sent:** | Thursday, September 22, 2022 7:59 PM |
| **To:** | Jeromy Murray |
| **Cc:** | sroskine@beckett.com; Aram Munoz; Leore Avidar; Darius Sadeghi; Carson Monson |
| **Subject:** | Loss to ALT Due to Inconsistent Ratings |

You don't often get email from josh@alt.xyz. Learn why this is important

Dear Jeremy,

We haven't been introduced. I'm Josh Downer, General Counsel of ALT. ALT's CEO Leore Avidar is copied here.

You may not have been made aware of a discussion taking place right now between our team and ALT's account executive with you, Aram Munoz. **In short, a card was previously rated by BGS and purchased by ALT, that was later returned for a second rating, and was judged to be tampered with**. ALT has clearly documented visuals and concurrent communications showing the processing of the item between ratings, establishing that **if any tampering took place it occured before the original rating**.

ALT believes it is important as a legal matter, and for BGS's integrity in the industry, that BGS makes ALT whole on this card, either by putting the card back in the original rating case or paying ALT the FMV difference.

If you have any questions or concerns with this resolution, I suggest we get on a call (to include Leore and I and you and your General Counsel) to discuss further.

Sincere Regards,
Josh Downer

OTXMZF %X3%T \ SJW
Ljsjwfd@tzsxjq

**EXHIBIT**

**15**

Avidar; Case# 5:21-cv-00806

1

# EXHIBIT 1F

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

Expert Report of

Matthew Levine


In the matter of

*Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P. and Alt Platform, Inc.*

*v.*

*Beckett Collectibles LLC*


November 10, 2023

**EXHIBIT**

**2**

M. Levine- Case# 3:22-cv-02867

exhibitsticker.com

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

## Introduction

1.        My name is Matthew Levine. I am currently employed as the Senior Pricing Analyst for Alt Platform, Inc ("Alt"). I have worked in this role for Alt since March 1, 2022. My current responsibilities at Alt include appraising assets for various use cases such as auction cash advances, Alt's dealer team, VIP portfolios, and other critical business functions. In addition to my expertise in pricing, I have extensive training and knowledge in a wide range of collectibles. Over the past 18 months, I have graded over 25,000 unique assets, encompassing a diverse selection of items. These include but are not limited to high-end modern sports cards, Pokemon and other trading card games, as well as vintage sports collectibles. Before joining Alt, I had already established myself as a respected figure in the industry since 2010. This involved not only running my own successful eBay business, but also serving as a trusted bulk grading submitter for others. Additionally, I actively engaged in personal trades that exceeded five figures in value. In the year 2021 alone, my grading business submitted over 1,000 assets to be graded by PSA, which by many is considered the leading grading authority. The values of these assets ranged from $20 to $10,000, illustrating the depth of my experience in evaluating collectibles.

2.        Prior to joining Alt, I had the opportunity to run my own successful card business called Flawlesscardtraders LLC. This business flourished during the Covid pandemic, with annual sales exceeding 1 million dollars over a span of three years, from 2019 to 2021. One of core components that contributed to the success of this business was the dedicated grading division. This includes both the submission of my personal assets to Professional Sports Authenticator (PSA) for thorough evaluation and grading. This strategic decision allowed me to maximize profits by ensuring that my inventory was achieving maximum margins and could command higher prices in the secondary sports card market via trade shows, eBay, and various other auction platforms. Moreover, recognizing the demand for such services, I expanded my offerings to include grading

1

**37**

services for external submissions as well. I implemented a fee structure that was based on the asset's value and the desired level of grading service, thus enabling me to cater to a diverse range of customer needs.

3.      I graduated from Rutgers University with a Bachelor's degree in Economics in 2021.

4.      I will testify on behalf of Alt as an expert witness regarding the sports trading card industry, including with respect to the grading and the market value of sports trading cards and the Steph Curry Card at issue in this case. Specifically, I have been asked to provide an opinion about whether Beckett was negligent when it graded 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 as being in "9.5 Gem Mint condition" in 2016. I have also been asked to determine the difference in value between the 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 as graded by Beckett and as trimmed. I have been asked to determine this difference in value as of August 2022 because this was the time that Alt was looking to crossover the card (from BGS to PSA) and to sell it.

5.      I am an employee of Alt and I am not receiving any additional compensation for providing these opinions beyond my normal compensation as an employee of Alt. I have not previously testified as an expert witness in any previous case. I have not authored any publications within the past 10 years.

6.      This Report reflects my preliminary analysis and opinions based on a mix of my own personal knowledge, professional experience, and the materials I considered (identified in Appendix A). I will likely further supplement this report consistent with this case's expert disclosure deadline and/or as other materials become available through discovery.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

## Beckett's Grading of Sports Trading Cards

7.      Beckett operates a professional sports trading card grading service called Beckett Grading ("BGS").[1]

8.      There are only a few main graders of sports trading cards. Professional Sports Authenticator (PSA) is considered the #1, BGS is considered the #2, Sports Grading Company (SGC) is the #3.

9.      Each of these grading companies evaluate sports trading cards using a similar industry-standard lexicon and criteria, resulting in a grade on a scale of 0-10 for each of the following four (4) sub-categories: "centering," "corners," "edges," and "surface," as well as a 0-10 grade of the card's "overall condition." Beckett states on their labels the specifics of what each of these criteria were judged at by their independent experts, whereas PSA withholds this information publicly and only expresses the overall final grade. The other major difference between the two companies is their Gem Mint grade, where Beckett uses a 9.5 to determine a card to be Gem Mint, whereas PSA uses a 10 to indicate this same condition level.  The industry-standard 0-10 scale correspond to the following:

        1 – Poor
        1.5 – Fair
        2 – G (Good)
        2.5 – G+
        3 – VG (Very Good)
        3.5 – VG+
        4 – VG-EX (Very Good-Excellent)
        4.5 – VG-EX+
        5 – EX (Excellent)
        5.5 – EX +
        6 – EX-NM (Excellent-Near Mint)
        6.5 – EX-NM+
        7 – Near Mint
        7.5 – Near Mint +
        8 – Near Mint-Mint

---

[1] Beckett's Answer to the Amended Complaint, ¶ 17.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

8.5 – Near Mint-Mint +
9 – Mint
Beckett 9.5 – Gem Mint
PSA 10 - Gem Mint
Beckett 10 – Pristine

10.     Grading of sports trading cards is meant to provide a reliable, objective, and expert assessment of a card's authenticity and condition. The grading companies, including BGS, market all their grading as being objective and highly reliable. For example, Beckett claims that it "provides collectors with the finest, most thorough, consistent and accurate grading efforts available in the industry."[2] Beckett also claims that "[it is] the most-recognized name in the industry for our objective grading services."[3]

11.     When Beckett receives a card for grading, it follows a routine process that is detailed on its public website[4] and is generally known within the sports trading card industry. There are various service levels from which submitters can choose that will impact the price charged for the service, as well as the turn-around time for the items to be returned to the submitter.

12.     Before BGS will assess the condition of a card, and assign the card grades on the 0-10 scale, the "card is examined first to determine its authenticity and that is has not been altered."[5] If BGS determines that a card has been altered or trimmed, BGS will not assign a numeric grade to the card.[6] Indeed, in its submission rules and instructions, Beckett indicates: "your cards will be given a numeric grade unless they are deemed to be altered (trimmed, recolored, etc.)."

---

[2] *See* Beckett's Website; Beckett's Response to Alt's Interrogatory #10; Beckett 009; Beckett's Response to Interrogatory #11.
[3] https://www.beckett.com/grading?ref=ppcb
[4] https://www.beckett.com/news/walking-bgs-process/
[5] https://www.beckett.com/news/walking-bgs-process/
[6] https://www.beckett.com/news/walking-bgs-process/

4

13.     A determination and representation that a sports trading card is authentic and unaltered is a representation of objective fact. While there may be some element of subjectivity in the process of assigning a numeric grade for the overall or component of the condition of a sports trading cards, whether a card is trimmed, or measures short, is an objective fact, not an in-the-eye-of-the-beholder assessment.

14.     Once Beckett grades a sports trading card, it will seal the card, along with a label reflecting its grades in a tamper-proof slab.[7] Once a card is placed in Beckett's tamper-proof slab, it is impossible to non-destructively break open the slab without evidence of tampering.[8] This ensures that anyone purchasing a sports trading card encased in Beckett's tamper-proof slab can know – with certainty – that the card is in the same condition as it was when Beckett graded it. Beckett represents on its website that "we take no chances when it comes to potential foul play. Once your card is graded and slabbed, you can trust us to uphold its integrity. Our tamper-proof holders provide peace of mind by guaranteeing evidence of tampering in the case that someone tries to open or damage your item."[9]

15.     BGS makes it known that it will not grade and slab a card that it has deemed altered, without adding a clear label identifying that flags the card as "Authentic- Altered." BGS does this to alert third parties to the fact that the card has been altered. Because BGS does this, third parties know that any card graded and encapsulated by BGS – and not labeled "Authentic-Altered" – has been verified to be authentic and unaltered by BGS.

---

[7] Beckett's Answer, ¶¶ 23-25.
[8] Beckett's Answer, ¶¶ 23-25.
[9] https://www.beckett.com/grading

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

16.     Jeromy Murray – when he was Beckett's Vice President of its Grading and Authentication Divisions – testified that a subsequent purchaser can reasonably assume that a sports trading card graded in a Beckett slab has not been trimmed or otherwise altered:

> Q: And is it Beckett's policy to not grade altered cards?
> A: We do not put a numeric grade on a card that we deem is altered.
>
> Q: So if I see a card in a graded Beckett slab, it's safe for me to assume that that card is not altered?
> A: Yes, you can assume that.
>
> . . .
>
> Q: And you agree that a customer should never have to question whether a card is trimmed if it's in a graded Beckett slab?
> A: I agree. In my opinion, they shouldn't.[10]

17.     "Trimming" a sports trading card is a type of alternation, where an edge or portion of an edge of a card is cut or removed to attempt to either remove wear and/or to make the centering of the card appear better than it is. Trimming is detected by a card measuring short.

18.     When a card is trimmed or measures short, it drastically reduces the value of the card, and most often for modern sports cards makes the asset too toxic to move.

**Beckett's Grading of the Steph Curry Card in October 2016**

19.     In October 2016, Keith Koenig shipped ninety-one sports trading cards to BGS for grading.[11] One of those cards was a 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50 (hereinafter: the "Steph Curry Card"), which is the card at issue in this case.

20.     Of the batch of ninety-one cards that Keith Koenig submitted to Beckett for grading, Beckett identified four of those cards as being trimmed (not including the Steph Curry

---

[10] Deposition of Jeromy Murray 45:8-17; 79:19-23.
[11] Beckett 004-008.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

Card). This is a high number and should have been a red flag to BGS, most orders should be returned with 0 items with questionable authenticity in the absence of foul play.

21.     Beckett graded the Steph Curry Card as being unaltered and 9.5 "Gem Mint" condition overall and as being in 9.5 "Gem Mint" condition with respect to the Card's centering, edges, corners, and surface.[12]

22.     BGS then certified that the Steph Curry Rookie Card was authentic and unaltered, created a label to reflect that the Card was in 9.5 "Gem Mint" condition, with all 4 subgrades achieving 9.5 which is known in the industry as a "true gem", where none of the asset's characteristics fell below the gem mint standard and then encapsulated the card in its tamper-proof slab:



23.     BGS did not label the Steph Curry Card as being "Authentic Altered."

---

[12] *See* Pictures of the Steph Curry Card in BGS' Case produced by Alt.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-6AC-63913421510C

## Alt's Purchase of the Steph Curry Card in October 2020

24.     In or around October 2020, a Christopher Ladd[13] listed the Steph Curry Rookie Card for sale through an online sports trading marketplace called Goldin Auctions.[14] The Card was pictured in BGS's tamper-proof slab with BGS' label describing the Card as being in 9.5 "Gem Mint" condition and effectively representing that the Card was unaltered (because it was not labeled as "Authentic-Altered").[15]

25.     When considering whether to purchase the Steph Curry Card, Alt reasonably relied on BGS' grading of the card as being unaltered and in Gem 9.5 Mint condition.

26.     On October 2, 2020, Alt conducted a valuation analysis of the Steph Curry Card. Alt determined that if it purchased the card for $168,000, it could realize a 43.8% rate of return and sell the card for around $500,000 within 3 years.[16]

27.     Alt ultimately purchased the Steph Curry Card for $168,000 on or around October 31, 2020.[17]

28.     When Alt received the Steph Curry Rookie Card, it was still encapsulated in BGS' tamper-proof slab, without any indication of tampering.[18] This ensured that the Card was still in the same condition as when BGS verified and labeled the Card as unaltered and as being in 9.5 "Gem Mint" condition.[19]

---

[13] The seller/consignor was unknown to Alt at the time but has been identified by Goldin in this litigation  following a subpoena.
[14] Alt's Response to Interrogatory #1.
[15] Goldin Auction's Listing of the Card, produced by Alt.
[16] Stephen Curry 2009 Valuation Analysis.
[17] Alt's Response to Interrogatory #; Invoice from Goldin Auctions to Alt.
[18] Alt's response to Interrogatory #1.
[19] *See* Alt's response to Interrogatory #1; Beckett's Answer ¶¶ 23-25.

29.     After receiving the Steph Curry Card, Alt kept it in its secure vault. That vault is a highly secured location: cards are stored within safes and cabinets inside of the vault, with the higher-dollar assets, like the Curry Card, secured within a coded safe.[20]

### Alt Looks to Crossover and Sell the Steph Curry Card in 2022, But Discovers that the Card was Trimmed

30.     In the summer of 2022, the Warriors unexpectedly won the NBA championship and Steph Curry was selected as the NBA Finals MVP. Steph Curry was also named Sports Illustrated's Sportsperson of the Year in 2022. This boosted Steph Curry's legacy, as well as the value of the Steph Curry Card.

31.     Shortly thereafter, Alt sought to capitalize on this, by crossing over the Steph Curry Card from BGS to PSA and selling it.[21]

32.     "Crossing over" a card means switching the grading and encapsulation from one grader to another. This is fairly common in the sports trading card industry and there are several reasons to do it. With the main two being to achieve an increased market value or for personal preference as to the aesthetics of the different slab designs.

33.     Alt was looking to crossover the Steph Curry Card from BGS to PSA because PSA is a more reputable grader and Alt was hoping that PSA might grade the Steph Curry Card's condition as a 10.0, rather than a 9.5.[22]

34.     On August 30, 2022, Alt cracked the slab on the Steph Curry Card and sent it to PSA for grading.[23]

---

[20] Alt's Response to Interrogatory #1.
[21] *See* intra-Alt Slack communications produced by Alt.
[22] *See* intra-Alt Slack communications produced by Alt.
[23] *See* Alt's Response to Interrogatory #1; Affidavit of Alexander Liriano; Affidavit of Jon Euston; video of same produced by Alt.

35. PSA thereafter determined that the Steph Curry Card had been trimmed because it measured short, and PSA declined to grade and slab the card.[24] Specifically, PSA's grader "determined that the card exhibited characteristics of being altered and designated it as an N1 (Evidence of Trimming) in [PSA's] database."[25]

36. After Alt received the Steph Curry Card back from PSA, Alt sent the card to BGS on September 13, 2022 to be re-evaluated.[26] Beckett re-evaluated the Curry Card in September 2022 and confirmed that the Curry Card had been trimmed and was short on top.[27] On September 16, 2022, Aram Munoz – a Senior Account Executive for Beckett – informed Darius Sadeghi (Alt Employee) via text message that "The [Curry] card was deemed altered by our graders. It measures short on the top edge [which] is inconsistent with the others" and "After inspecting [the Curry Card] it appears to have been tampered with and cannot put a numeric grade on it anymore."[28]

**<u>Beckett's Failure to Identify the Steph Curry Card as Trimmed in 2016 was Negligent</u>**

37. In October 2016, when BGS graded the Steph Curry Card, the card had been trimmed and would have measured short.

38. Both PSA and BGS have now confirmed that the Steph Curry Card was trimmed and measures short, so there is no reasonable dispute about that.[29]

---

[24] Alt's Response to Interrogatory #3; Jackie Curiel letter to Alt Platform, Inc., dated October 28, 2022.
[25] Jackie Curiel letter to Alt Platform, Inc., dated October 28, 2022.
[26] *See* Alt's Response to Interrogatory #1; Affidavit of Alexander Liriano; Affidavit of Jon Euston.
[27] Alt's Response to Interrogatory #3; Beckett's Response to Interrogatory #4 and #5.
[28] Alt's Response to Interrogatory #3; text messages between Aram Munoz and Darius Sadeghi.
[29] Jackie Curiel letter to Alt Platform, Inc., dated October 28, 2022; Beckett's Response to Interrogatory #4 and #5.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

39.     It is implausible and nonsensical that someone would have trimmed the Steph Curry Card *after* BGS graded it in October 2016, but *before* PSA and BGS confirmed that the same card was trimmed for several reasons:[30]

     a.  First, from October 2016 until August 30, 2022, the Steph Curry Card was sealed in BGS' tamper-proof slab, with no indication of any tampering, so it was obviously not trimmed during that time.[31]

     b.  When Alt cracked the slab and submitted the Steph Curry Card to PSA for grading on August 30, 2022, they filmed the process and the individuals involved have provided sworn testimony about how the card was handled.[32]

     c.  We also know – with certainty – that the Steph Curry Card Alt submitted to PSA and BGS in 2022 was the same card graded by BGS in October 2016 because the card is labeled #26/50. It is one of a kind. There is no other 2009 Topps Chrome #101 Stephen Curry Gold Refractor 26/50.[33]

     d.  It would also make absolutely no sense for Alt to purchase the Steph Curry Card in 9.5 Gem Mint condition for $168,000, only to entirely destroy its value by thereafter trimming it.

40.     In October 2016, BGS and its grader(s) were negligent when they did not identify the Steph Curry Card as measuring short and as being trimmed and in certifying that the Steph Curry Card was unaltered and in 9.5 Gem Mint Condition for multiple reasons.

---

[30] Beckett has not taken the position otherwise. *See* Beckett's Response to Interrogatory #6 and Answer.
[31] Alt's Response to Interrogatory #1; Beckett's Answer, ¶¶23-25.
[32] Alt's Response to Interrogatory #1; Affidavit of Alexander Liriano; Affidavit of Jon Euston; video of same produced by Alt.
[33] Beckett has not attempted to assert otherwise. *See* Beckett's Response to Interrogatory.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

41.     There are fifty 2009 Topps Chrome #101 Stephen Curry Gold Refractor cards. By October 2016, Beckett knew or should have known the exact measurements for these cards and should have been able to determine that the Steph Curry Card measured short. Each time that Beckett grades a card, it records data from the card.[34] By the time Beckett graded the Steph Curry Card in October 2016, it had previously graded at least thirteen other 2009 Topps Chrome #101 Stephen Curry Gold Refractor cards.[35]

42.     Beckett has marketed itself as having the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming. Beckett has also admitted – in this lawsuit – that it has the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming.[36]

43.     According to Beckett, BGS has graded over 15 million sports trading cards, but has failed to recognize that a card had been trimmed in only a "few instances."[37]

44.     Based on its expertise, BGS can and should have been able to determine that the Steph Curry Card was trimmed and measured short in October 2016.

45.     BGS has encouraged third-party purchasers, like Alt in this case, to rely on its expertise. BGS markets itself as providing reliable and objective authentication and grading because their business model depends on third party purchasers trusting in BGS' grading.

**The Difference in Value of the Steph Curry Card because it was Trimmed.**

46.     Alt uses industry-best data and tools to determine the value of cards. This process involves analyzing various data points related to the specific card, as well as similar assets, such

---

[34] Beckett 009.
[35] Exhibit 3 to Amended Complaint; Beckett 001-003
[36] Beckett's Response to Interrogatory #7.
[37] Deposition of Jeromy Murray at 13:24-14:3.

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

as high-end Stephen Curry rookie cards and other players in the same set, to assess their performance. Additionally, market trends are considered to evaluate how the player's market has performed within a specific timeframe, from the dates when those data points were sold, to the current appraisal date.

47.    Alt's pricing is centered around this comp selection process to eliminate any potential human bias from the process. The only human element involved in this process is the selection of which data points are used, which in the case of this Stephen Curry card was only using direct sales of the same card as they were readily available 3 times within the previous calendar year.

48.    In August/September 2022, the Steph Curry Card would have been worth $350,000 if it were in the condition that BGS certified and it was not trimmed.

The 2009 Topps Chrome Gold Stephen Curry card was evaluated using 3 direct data points in September 2022. The most crucial data point was the exact card in a minimum gem grade, which sold for $336,000 through the PWCC Premier Auction on August 18th, 2022. This particular card had a subgrade of 9 on corners, unlike the asset being discussed here, which had no 9 subgrades. It has been observed that assets labeled as "true gem" or those without any 9 subgrades tend to trade at a premium compared to assets labeled as "minimum gem." Two other data points were considered: the sale of two other copies of this exact asset for $550,000 on December 20, 2021, and $575,000 on February 3rd, 2022. Both of these sales also took place via the PWCC platform. Internal market trends and ratios were applied to these assets to determine their movement since the sales occurred and in September 2022.

49.     Instead, because the Steph Curry Card was trimmed, it had basically no value to Alt – and Alt could not sell the card – for several reasons:

    a.   First, Alt could not sell the trimmed Steph Curry Card on its marketplace because it would have taken a significant reputational hit for listing a trimmed card for sale.

    b.   Second, since Alt was pursuing this legal claim against Beckett, it had a legal duty to preserve the Steph Curry Card as evidence in this case and thus, could not sell the card even for a massively discounted price.

50.     Since the Steph Curry was trimmed, Alt could have sold the card for about $25,000-$40,000 to a private buyer in August/September 2022.

11/10/2023

_____

Matthew Levine


November 11, 2023

DocuSign Envelope ID: A1B138AD-3A0F-4F2F-A6AC-63913421510C

## Appendix A – Materials Considered

I reviewed and considered the following materials when forming the opinions summarized in this report:

1. Amended Complaint, Exhibits, and website pages linked.
2. Alt's Responses to Beckett's Interrogatories
3. Beckett's Answer to the Amended Complaint
4. Beckett's Objections and Responses to Alt's First Set of Interrogatories
5. Beckett's Website **-** https://www.beckett.com/news/walking-bgs-process/
6. Beckett's Website – https://www.beckett.com/grading
7. Beckett's Website – What is Card Grading?
8. 2018 Version of Beckett's Website – What is Grading?
9. Beckett's Website – Card & Autograph Grading Service
10. Beckett's Website – About Beckett Grading Services
11. Beckett's Website – Frequently Asked Questions
12. Beckett's Website – Beckett Guarantee
13. Beckett's Website – Beckett Gems
14. Goldin Auctions – Beckett Grading Service Review and Price Guide (In-Depth Case Study)
15. Deposition of Jeromy Murray from *Louis Papa v. Panini America, Inc.*, No. DC-18-17902
16. Documents produced by Beckett (Beckett 001-009)
17. Pictures of the Steph Curry Card, including in the BGS Slab, produced by Alt.
18. Goldin Auction's Listing of the Steph Curry Card.
19. Alt's October 2, 2020 Valuation analysis (confidential)
20. Invoice from Goldin Auctions to Alt for Steph Curry Card
21. Intra-Alt Slack communications produced by Alt (some confidential)
22. Jackie Curiel letter to Alt Platform, Inc., dated October 28, 2022
23. Affidavit of Alexander Liriano
24. Affidavit of Jon Euston
25. Videos of Alt cracking the slab and shipping the Steph Curry Card to PSA/BGS in 2022
26. Text messages from Aram Munoz to Darius Sadeghi
27. Slack messages re: Steph Curry Card (confidential)
28. Verification from Beckett Website for Steph Curry Card
29. Email from PSA to Darius Sadeghi

# EXHIBIT 1G

**EXHIBIT**

**10**

M. Levine- Case# 3:22-cv-02867

exhibitsticker.com

Reply/Supplemental Expert Report of

Matthew Levine

In the matter of

*Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P. and Alt Platform, Inc.*

*v.*

*Beckett Collectibles LLC*

January 5, 2024

### Introduction

1.        My name is Matthew Levine. I am currently employed as the Senior Pricing Analyst for Alt Platform, Inc ("Alt"). I previously provided a report in this matter on November 10, 2023, which detailed my qualifications and experience.

### Supplemental Facts/Opinions

2.        In my November 10, 2023 Report, I noted that the batch of sports trading cards Keith Konig submitted to Beckett on October 3, 2016 – which included the Steph Curry Card at issue in this case – contained a concerning number of other cards that Beckett was able to identify as being trimmed. I opined that the number of other trimmed cards should have raised a red flag to Beckett.

3.        Since my November 10, 2023 Report, Beckett has produced business records regarding Keith Koenig's other submissions of sports trading cards to Beckett for grading. Beckett 000010- Beckett 000691 (produced November 16, 2023). These records were not available to me before the deadline for my initial expert report, but I have since reviewed these records.

4.        Well before October 3, 2016, Keith Koenig had a very concerning history of submitting a large volume of trimmed cards to Beckett for grading. He submitted hundreds of trimmed cards to Beckett for grading and a concerning proportion of trimmed cards before October 2016. For example, on April 7, 2016, Mr. Koenig submitted a batch of 142 cards for grading. Beckett 000118-000121. Incredibly, Beckett determined that 87 of those cards had been trimmed and found that another card was of "questionable authenticity." But Beckett continued to accept cards from Keith Koenig and did not appear to apply any level of higher scrutiny or concern as to cards he submitted for grading as of October 2016.

5.        Even more concerning than the high volume of trimmed cards Mr. Koenig was sending to Beckett for grading is the apparent pattern of Mr. Koenig's submissions. Beckett's

1

**54**

records appear to show a pattern of Mr. Koenig's submitting sports trading cards of the same year/series/athlete to Beckett for grading very shortly after Beckett had previously determined that a sports trading card of the same year/series/athlete had been trimmed. In many instances, Mr. Koenig would do so just a few weeks later, or would even send another card of the same year/series/athlete a third time after Beckett determined the card had been trimmed the second time. This pattern strongly implies that Mr. Koenig may have been resubmitting cards back to Beckett after Beckett initially identified the cards as trimmed. Below is a series of non-exhaustive examples of this pattern just for 2016:

| Card | First Submission Date | First Submission Finding | Second Submission Date | Second Submission Finding | Third Submission Date | Third Submission Finding |
|---|---|---|---|---|---|---|
| 1982 Topps Traded – Cal Ripken | 1-15-2016 | Trimmed (Beckett 105) | 4-27-2016 | 6.0 (Beckett 124) | | |
| 1986-87 Fleer - Michael Jordan RC | 1-15-2016 | Trimmed (Beckett 106) | 3-23-2016 | 7.5 (Beckett 119) | | |
| 1986-87 Fleer – Patrick Ewing RC | 2-11-2016 | Trimmed (Beckett 109) | 3-8-2016 | 9.5 (Beckett 114) | | |
| 1981 Topps – Art Monk RC | 2-11-2016 | Trimmed (Beckett 110) | 3-8-2016 | 8.5 (Beckett 114) | | |
| 1984 Topps – John Elway RC | 2-11-2016 | Trimmed (Beckett 110) | 4-13-2016 | 9.0 (Beckett 125) | | |
| 1985 Nike – Michael Jordan | 2-11-2016 | Trimmed (Beckett 111) | 3-23-2016 | Trimmed (Beckett 118) | 6-6-2016 | 9.5 (Beckett 135) |
| 1985 Nike – Michael Jordan | 2-11-2016 | Trimmed (Beckett 111) | 3-23-2016 | Trimmed (Beckett 118) | 6-6-2016 | 9.5 (Beckett 135) |
| 1985 Nike – Dwight Gordon | 2-11-2016 | Trimmed (Beckett 111) | 3-23-2016 | Trimmed (Beckett 118) | 6-6-2016 | 9.5 (Beckett 135) |
| 1976 Topps – Walter Payton RC | 3-23-2016 | Trimmed (Beckett 118) | 4-13-2016 | 8.0 (Beckett 126) | | |
| 1976 Topps – Walter Payton RC | 3-23-2016 | Trimmed (Beckett 118) | 5-13-2016 | 8.5 (Beckett 123) | | |
| 2010 Playoff Contenders - Rob Gronkowski AU/499* RC/white jsy | 3-23-2016 | Trimmed (Beckett 118) | 4-13-2016 | 9.5 (Beckett 125) | | |
| 1997 SP Authentic – Tiki Barber RC | 3-23-2016 | Trimmed (Beckett 118) | 4-13-2016 | 9.0 (Beckett 125) | | |
| 2000 Upper Deck – Tom Brady RC | 3-23-2016 | Trimmed (Beckett 118) | 10-3-2016 | 9.5 (Beckett 170) | | |
| 1997-98 Flair Showcase Row 1 – Tim Duncan | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | 9.5 (Beckett 125) | | |
| 1993 Stadium Club Murphy – Derek Jeter RC | 3-23-2016 | Trimmed (Beckett 119) | 7-6-2016 | 9.0 (Beckett 147) | | |
| 1993 Stadium Club Murphy – Derek Jeter RC | 3-23-2016 | Trimmed (Beckett 119) | 7-6-2016 | 8.0 (Beckett 147) | | |
| 2009-10 Upper Deck – Stephen Curry SP RC | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | 9.5 (Beckett 125) | | |
| 2009-10 Upper Deck – Stephen Curry SP RC | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | 9.5 (Beckett 125) | | |
| 1990 Topps – George Bush PRES | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | 8.5 (Beckett 125) | | |
| 1998-99 SP Authentic – Vince Carter RC | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | Trimmed (Beckett 125) | 8-12-2016 | 9.5 (Beckett 156) |

2

| | | | | | | |
|---|---|---|---|---|---|---|
| 1986-87 Fleer – Isiah Thomas RC | 3-23-2016 | Trimmed (Beckett 119) | 4-13-2016 | Trimmed (Beckett 125) | 6-6-2016 | 9.5 (Beckett 137) |
| 2008-09 Topps Chrome – Russell Westbrook RC | 3-23-2016 | Trimmed (Beckett 120) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 1996-97 Finest - Kobe Bryant B RC | 3-23-2016 | Trimmed (Beckett 120) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 2013-14 Upper Deck – Nathan MacKinnon YG RC | 3-23-2016 | Trimmed (Beckett 120) | 4-13-2016 | 8.0 (Beckett 126) | | |
| 2015 Panini Contenders - Todd Gurley AU RC SP B | 3-23-2016 | Trimmed (Beckett 120) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 2015 Panini Contenders - Marcus Mariota AU RC | 3-23-2016 | Trimmed (Beckett 120) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 2015 Panini Contenders - Marcus Mariota AU RC | 3-23-2016 | Trimmed (Beckett 120) | 6-6-2016 | 10.0 (Beckett 138) | | |
| 2012 Topps Chrome - Andrew Luck RC/passing pose | 3-23-2016 | Trimmed (Beckett 121) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 2006-07 Upper Deck - Evgeni Malkin YG RC | 3-23-2016 | Trimmed (Beckett 121) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 1994 Upper Deck All-Time Heroes Next In Line – Derek Jeter | 3-23-2016 | Trimmed (Beckett 121) | 4-13-2016 | Trimmed (Beckett 125) | 5-13-2016 | Does not meet minimum grade (Beckett 130) |
| 2015 Panini Contenders – Jameis Winston AU RC | 3-23-2016 | Trimmed (Beckett 121) | 4-13-2016 | 9.5 (Beckett 126) | | |
| 2010 Exquisite Collection Diamond Club Signatures – Derek Jeter | 4-13-2016 | Trimmed (Beckett 124) | 5-13-2016 | 9.5 (Beckett 131) | | |
| 2015 Topps Tier One Autographs Bronze Ink – Kris Bryant | 4-13-2016 | Trimmed (Beckett 124) | 5-13-2016 | 9.5 (Beckett 131) | | |
| 2003-04 Topps Pristine Refractors – LeBron James C | 4-13-2016 | Trimmed (Beckett 125) | 6-6-2016 | 9.5 (Beckett 136) | | |
| 2003-04 Topps Chrome Refractors – LeBron James | 4-13-2016 | Trimmed (Beckett 125) | 5-13-2016 | 9.5 (Beckett 131) | | |
| 1986-87 Fleer Stickers – Dominique Wilkins | 4-13-2016 | Trimmed (Beckett 125) | 6-6-2016 | Trimmed (Beckett 137) | 7-6-2016 | 9.0 (Beckett 146) |
| 1986-87 Fleer – Karl Malone RC | 4-13-2016 | Trimmed (Beckett 125) | 5-13-2016 | 9.5 (Beckett 131) | | |
| 9181688 1968 Topps - Rookie Stars/Jerry Koosman RC/Nolan Ryan RC/UER Sensational/is spelled incorrectly | 4-13-2016 | Trimmed (Beckett 126) | 5-13-2016 | 8.5 (Beckett 132) | | |
| 1993-94 Ultra Scoring Kings – Michael Jordan | 5-13-2016 | Trimmed (Beckett 130) | 6-6-2016 | 8.5 (Beckett 137) | | |
| 1996-97 Topps Chrome – Kobe Bryant RC | 6-13-2016 | Trimmed (Beckett 142) | 9-9-2016 | 8.5 (Beckett 166) | | |
| 1993-94 Ultra Scoring Kings – Michael Jordan | 7-6-2016 | Trimmed (Beckett 146) | 8-12-2016 | 9.0 (Beckett 157) | | |
| 1993-94 Ultra Scoring Kings – Michael Jordan | 7-6-2016 | Trimmed (Beckett 146) | 8-12-2016 | 9.0 (Beckett 157) | | |
| 1994 SP - Alex Rodriguez FOIL RC | 8-12-2016 | Trimmed (Beckett 154) | 9-9-2016 | 9.0 (Beckett 165) | | |
| **2009-10 Topps Chrome Refractors Gold – Stephan Curry** | **8-12-2016** | **Trimmed (Beckett 155)** | **9-2-2016** | **Trimmed (Beckett 161)** | **10-3-2016** | **9.5 (Beckett 170)** |
| 2011 Playoff Contenders – Cam Newton AU RC | 8-12-2016 | Trimmed (Beckett 155) | 9-2-2016 | Trimmed (Beckett 161) | 10-3-2016 | 9.0 (Beckett 171) |
| 2007 Topps Chrome White Refractors – Adrian Peterson | 8-12-2016 | Trimmed (Beckett 156) | 3-7-2017 | 8.5 (Beckett 244) | | |
| 1994 SP Holoviews Die Cuts – Michael Jordan | 8-12-2016 | Trimmed (Beckett 157) | 10-3-2016 | 9.0 (Beckett 170) | | |
| 1986 Star Best of the New/Old - Jordan | 8-12-16 | Trimmed (Beckett 154) | 9-2-16 | 9.5 (Beckett 161) | | |
| 1986-87 Fleer Stickers – Michael Jordan | 9-2-2016 | Trimmed (Beckett 161) | 12-23-2016 | 9.0 (Beckett 195) | | |

3

| | | | | | | |
|---|---|---|---|---|---|---|
| 1986-87 Fleer – Charles Barkley | 9-2-2016 | Trimmed (Beckett 161) | 11-16-2016 | 9.5 (Beckett 188) | | |
| 1996-97 Metal Precious Metal – Kobe Bryant | 9-2-2016 | Trimmed (Beckett 161) | 5-1-2017 | 9.5 (Beckett 299) | | |
| 2014 SP Authentic - Derek Carr JSY AU/350 | 9-2-2016 | Trimmed (Beckett 162) | 10-3-2016 | 10.0 (Beckett 171) | | |
| 2011 Playoff Contenders – J.J. Watt AU RC | 9-9-2016 | Trimmed (Beckett 166) | 8-24-2018 | 9.5 (Beckett 598) | | |
| 1986-87 Fleer – Michael Jordan | 9-9-2016 | Trimmed (Beckett 166) | 10-3-2016 | Trimmed (Beckett 169) | 11-11-2016 | 9.0 (Beckett 183) |
| 2009-10 Topps Chrome Refractors – Stephen Curry | 10-28-2016 | Trimmed (Beckett 175) | 12-23-2016 | Does Not Meet Minimum Grade (Beckett 196) | 1-20-2017 | 9.0 (Beckett 213) |
| 1997 Fleer- David Arias-Ortiz RC | 10-28-2016 | Trimmed (Beckett 176) | 12-23-2016 | 9.5 (Beckett 195) | | |
| 2012 Bowman Chrome Draft Draft Pick Autographs Blue Refractors – Corey Seager | 10-28-2016 | Trimmed (Beckett 176) | 2-16-2017 | Does Not Meet Minimum Grade (Beckett 227) | 3-20-2017 | 10.0 (Beckett 255) |
| 2011 Topps Update Diamond Anniversary – Mike Trout | 11-11-2016 | Trimmed (Beckett 184) | 2-9-2017 7-12-2017 | Does Not Meet Minimum Grade (Beckett 223) (Beckett 361) | 12-5-2017 | 9.5 (Beckett 443) |
| 1985 Star Crunch'n'Munch All-Stars – Michael Jordan | 12-21-2016 | Trimmed (Beckett 191) | 1-6-17 | 9.5 (Beckett 201) | | |
| 1982 Topps Traded – Cal Ripken | 12-23-2016 | Trimmed (Beckett 195) | 1-10-2017 | 8.5 (Beckett 205) | | |

6.      This chart was created by looking for a close-in-time future submission of the same type of card (year/series/athlete) after Beckett had found a previous card submitted by Mr. Koenig was trimmed. For many of the cards in the above chart, there are multiple copies of the card in existence. For example, there are 50 total copies of the 2009-10 Topps Chrome Refractors Gold – Stephan Curry at issue in this case. Based on the information captured by Beckett's records, it is not possible to definitively say that a future submission of a card from the same year/series/athlete is the exact same card previously submitted. However, in aggregate, Beckett's records paint a convincing picture that Mr. Koenig was re-submitting trimmed cards to Beckett until Beckett eventually failed to identify that they had been trimmed and would grade the card.

7.      It does not appear that Beckett had any policies or protocols in place to identify when customers, like Keith Koenig, would re-submit cards for grading that Beckett had previously identified as trimmed. Indeed, Beckett has indicated in its discovery responses in this lawsuit that "Beckett does not have any written policies, procedures, or guidelines for grading sports trading

cards." Defendant's Objections and Responses to Plaintiff's First Requests for Production to Defendant, p. 6.

8.      Beckett's October 2016 evaluation of the Curry Card was part of this pattern.

9.      The Steph Curry Card was a 2009-10 Topps Chrome Refractors Gold card. It was a very rare card, as only fifty such cards were ever made. The card was #26 in the series.

10.     Beckett's records show that Keith Koenig first submitted a 2009-10 Topps Chrome Refractors Gold Steph Curry card on August 12, 2016. Beckett 155. Beckett determined that the card was trimmed. Beckett would have then returned the card to Mr. Koenig ungraded and unslabbed.

11.     Keith Koenig again submitted a 2009-10 Topps Chrome Refractors Gold Steph Curry card on September 2, 2016 and Beckett again determined the card was trimmed. Beckett 161. Beckett would have then returned the card to Mr. Koenig ungraded and unslabbed.

12.     On October 3, 2016, Mr. Koenig again submitted a 2009-10 Topps Chrome Refractors Gold Steph Curry card to Beckett for grading on October 3, 2016. This time, Beckett graded the card as a 9.5 and slabbed the card. Beckett 170. This is the Curry Card that Alt ultimately purchased, which is at issue in this case.

13.     Given the rarity of this card, the fact that only one curry card was submitted each time, and Mr. Koenig's pattern of resubmitting other trimmed cards to Beckett for grading, it is extremely likely that Mr. Koenig submitted the #26 Curry Card *three* times until Beckett finally missed that it had been trimmed and negligently graded the card as being a 9.5.

14.     The fact that Beckett previously determined that the Curry Card had been trimmed on two separate occasions before October 2016 provides further support for my opinion that

5

**58**

Beckett should have been able to determine that the Curry Card was trimmed when it evaluated the same card a third time in October 2016.

15.    Beckett's failure to identify that the Curry Card was trimmed in October 2016 was not just the individual grader's mistake – it was institutional negligence by Beckett. Beckett can and should have had policies, procedures, and processed in place to recognize when someone re-submits a card for grading when Beckett has already determined that the card has been trimmed.

16.    Beckett easily could have done this because – even by October 2016 – Beckett "compile[d] data regarding each item submitted for authentication/grading, including but not limited to data relating to the identity, production, condition and grade of the item." Beckett 000009. Beckett also required each customer to authorize it to "take. . .one ore more digital or other types of photographs, images or reproductions of each such item" submitted for grading. Beckett 000009.

17.    In October 2016, Beckett could have, and should have, recognized that it had previously determined – on *two* prior occasions – as that the Curry Card had been trimmed. The Curry Card was uniquely marked as #26 of 50, so Beckett should have known, or have been able to identify, that it had previously determined – in August 2016 and then again, in September 2016 – that this *very* card had been trimmed.

18.    On July 11, 2019, Beckett's Operations Manager, Joseph Arredondo, sent an internal email that listed several customers that needed to "flagged" when submitting cards to Beckett for grading. Beckett 00843. The short list included Keith Koenig. Beckett may have flagged Mr. Koenig because of his pattern of re-submitting trimmed cards to Beckett for grading. Later that day, Mr. Arrendondo sent a follow-up email indicating: "We are adding Joseph Robertson - we found out that Keith Koenig submits through him sometimes." Beckett 000843.

6

**59**

While Beckett has not yet produced records of cards submitted by Joseph Robertson, I would expect those records to show that Mr. Koenig used Joseph Robertson to re-submit cards for grading after Beckett identified those cards as having been trimmed on one or more previous occasions.

19.     Even after flagging Mr. Koenig in July 2019, Beckett continued to accept sports trading cards from him for grading. *See e.g.*, Beckett 689.

### Defendant's Experts Opinions

20.     Defendant's proposed expert witnesses say that sports trading card grading is "subjective." But this opinion is misleading and inapplicable to the key issue in this case. Sports trading card companies like Beckett have guidelines that provide specific criteria for their grading, defining what a 9.5 or 9.0 looks like. The element of subjectivity only exists at the margins when a card may fall between two grades. For example, when they sought to cross-over the card, Alt had hoped that another grader at PSA might find that the Curry Card merited a 10.0 grade, instead of the 9.5 grade it previously received from Beckett in October 2016. The primary value that a grading company provides to collectors is its objectivity and reliability. For this reason, Beckett markets itself as "the most-recognized name in the industry for our objective grading services." [1] Beckett also claims that it "provides collectors with the finest, most thorough, consistent and accurate grading efforts available in the industry."[2] Beckett has also admitted in this lawsuit that it has the expertise to "consistently and reliably determine when a sports trading card has been altered, including by trimming." Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories, #7.

---

[1] https://www.beckett.com/grading
[2] *See* Beckett's Website; Beckett's Response to Alt's Interrogatory #10; Beckett 009; Beckett's Response to Interrogatory #11.

21.     While there may be a narrow range of subjectivity with respect to whether a sports trading card deserves a slightly higher or lower grade, whether a card has been trimmed is a purely objective determination. A card is objectively and precisely measured and then compared to the expected measurements, based on manufacturer specifications and grading companies experience grading similar cards from the same series. Here, Beckett had already graded and slabbed ten (10) other Steph Curry cards from the same series by August 2016. Beckett 001-002. Since Beckett knew the measurements that the Curry Card should have had, Beckett was able to determine that the Curry Card was trimmed in August 2016 and then again, in September 2016. Beckett 000155, 000161. In 2022, both PSA and Beckett again agreed that the Curry Card had been trimmed. The Beckett's grader's failure to identify that the Curry Card was trimmed in October 2016 was an outlier and negligent mistake, not a subjective disagreement. While Beckett's experts generally suggest that sports trading card grading is subjective, they do not specifically opine that the Beckett's failure to identify that the Curry Card was trimmed in October 2016 was due to a subjective disagreement, rather than some kind of mistake. Beckett has not provided any explanation for why or how it failed to identify that the Curry Card was trimmed in October 2016. *See* Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories, #2.

22.     Defendant's proposed expert witnesses say that a card can measure short for various reasons, including manufacturer defect, but this opinion is a red herring. Regardless of the reason for the Curry Card measuring short, Beckett should have identified that the card measured short in October 2016, just as they eventually did in 2022 (and they did on two previous occasions in 2016). Regardless of the cause of the Steph Curry Card measuring short, Alt relied on Beckett's October 2016 grading of the card to its detriment and suffered a loss.

23.     Defendant's proposed expert witnesses say that "[i]n Plaintiffs own opinion, the Steph Curry Card showed no evidence of alterations or trimming." Alt was unaware that the Steph Curry Card was trimmed, mostly because they had trusted and relied upon Beckett's grading of the card. Alt is not in the business of card grading and did not measure the card itself, or undertake to conduct an expert assessment of whether the card had been trimmed.

24.     Defendant's proposed expert witnesses opine that the Card would have received "much more scrutiny" in 2022 than in 2016 because it was a raw card and grading has "improved" since then. But when Mr. Koening submitted the Steph Curry Card for grading in October 2016, it was also a raw card. Furthermore, Beckett should have evaluated that card with far more scrutinized at that time because Mr. Koenig had a history of submitting hundreds of trimmed cards to Beckett before that time and Beckett had previously determined that the same card had been trimmed on two previous occasions within the past three months. Defendant's proposed experts do not provide any details about how card grading improved from 2016 to 2022, but the technology to measure a sports trading card and to compare that measurement against the specifications for that card existed in 2016. Also, Defendant admitted that it had the expertise to "consistently and reliably determine when a sports trading card has been altered, including by trimming." Defendant's Objections and Responses to Plaintiffs' First Set of Interrogatories, #7.

25.     Defendant's proposed expert witnesses say that you can never know what happened to a card when it is raw, but they simply ignore the evidence and testimony of the individuals who had personal knowledge of its handling after Alt cracked the slab in 2022. While a raw card could theoretically get accidentally scratched or bent, a card cannot be accidentally trimmed. A card can only be trimmed on purpose (and carefully). But it would make absolutely no sense for Alt or anyone else in 2022 to trim the Steph Curry Card.

26.     Defendant's proposed expert witnesses say that Alt intentionally took a known risk when it cracked the Curry Card and sent it to PSA to be crossed-over in 2022. But this is only partially true. The Steph Curry Card was graded a 9.5. Alt did take a calculated risk that PSA could have graded the card 9.0, rather than giving it the same grade (9.5), or a better grade (10.0). Alt employees discussed this risk calculus in a slack conversation that Alt has produced in this case. Leore Avidar estimated the odds of it grading as a 10 at 25%, re-grading as a 9.5 at 50%, and grading as a 9.0 at 25%, and weighed the value-proposition of that gamble based on the value of the card at each grade. When seeking to cross-grade a card, there should be no risk that the card was trimmed because any grading company should have been able to identify whether the card was trimmed in the first instance. Alt's contemporaneous slack conversation shows that Alt did not price in *any* risk that the Steph Curry Card Beckett had graded was actually trimmed.

27.     Defendant's proposed expert witnesses say that Alt could have crossed-over the Curry Card while keeping it in its slab. But this is an irrelevant point because the Steph Curry Card was trimmed and would remain a toxic asset to Alt regardless of whether it remained in the Beckett slab or not. Defendant's proposed expert witnesses appear to be suggesting that Alt could have mitigated its losses by selling the Steph Curry Card after learning it was trimmed if the card was still in the slab. This would not only be unethical, but would expose Alt to reputational harm and likely legal liability.

28.     Steven Bloedow's criticisms of my valuation of the Steph Curry Card are unwarranted and incorrect for several reasons.

29.     First, while Mr. Bloedow claims that my valuation of the Steph Curry Card is overstated, he does not say what its value *actually was* in September 2022.

30.     Second, Mr. Bloedow looks at similar Curry Card sales from 2017 to 2023, but this is unreliable. From 2017 to 2019, the market for this type of card was in its infancy. Those data points have no bearing or relevance to the Steph Curry Card's value as of September 2022 because the market exploded in 2020, with values rising parabolically.

31.     Third, Mr. Bloedow did not consider two sales of similar Curry Cards for $550,000 and $575,000, respectively, that figured into my analysis because – according to Mr. Bloedow – there is no evidence those sales took place. But Mr. Bloedow is wrong. Alt tracks and scrapes all sales data from PWCC's database. While Mr. Bloedow questions whether those sales took place, PWCC publicly posted about, and marketed, those sales on its Instagram page:





32.    Fourth, the most similar datapoint from Mr. Bloedow's report – in time and grade – was an August 18, 2022 sale of a Steph Curry Card that was also graded as a 9.5. That sale was for $336,000, which is very close to the $350,000 valuation from my initial report.

33.    Fifth, Mr. Bloedow says that Alt "missed the peak of the market for its sale" by not selling the card in 2022. But he overlooks that Alt was trying to cross-over and sell the Curry Card at this very time, and was only unable to do so because the card had been trimmed.

34.    Finally, in August and September 2022, both Alt and Beckett contemporaneously valued the card close to or higher than the valuation from my November 10, 2023 Report. When Alt purchased the Steph Curry Card in 2020, it calculated that it would ultimately raise in value to $500,000. Steph Curry 2009 Valuation Analysis. In an August 2022 slack conversation, Leore Avidar then estimated that the card would be worth $325,000 as a 9.5 and $750,000 if it could be cross-graded as a PSA 10. He calculated the overall value of the raw card as $400,000 based on

12

**65**

its expected range of outcomes when graded by PSA. After Beckett received the Steph Curry Card in September 2022, it had to declare its value. Beckett declared that the Steph Curry Card was worth $500,000. Beckett 001098.

**s/Matthew Levine**
January 5, 2023

13

# EXHIBIT 1H



Jackie Curiel <curielj@collectors.com>

---

## Re: Curry Card Surface Issues

1 message

---

**Jackie Curiel** <curielj@collectors.com>                          Tue, Sep 20, 2022 at 8:56 AM
To: David Lin <lind@collectors.com>

Yeah - he's alleging the scratches were made here, but there's not proof of that. Thanks for the insight. That helps.

On Tue, Sep 20, 2022 at 8:52 AM David Lin <lind@collectors.com> wrote:
> Hi Jackie,
>
> I don't recall there being scratches, but that doesn't mean it wasn't there already.  Usually when I go N1 on a card like that, the focus is on the back of that card because it's all black borders and we check the edges.  The front surface would've been the least of our concerns at that point.  Looking at the pic, it looks like some of those scratches could've been factory made.  Also, it doesn't seem fair that he is comparing a flat pic as his "before" to an angled pic as an "after".  Any card that you take a pic head-on will hide minor surface issues.  Let me know if you need any other insight, but I hope he's not trying to get compensation because he found out it's trimmed and has to submit it back to BGS.
>
> thanks,
> David
>
> On Tue, Sep 20, 2022 at 7:08 AM Jackie Curiel <curielj@collectors.com> wrote:
>> Hey DL,
>>
>> Do you recall seeing scratching on the attached card? It came in on 9/1 and you deemed it N1.
>>
>> Jackie
>>
>> ---------- Forwarded message ---------
>> From: **Darius Sadeghi** <darius@onlyalt.com>
>> Date: Wed, Sep 14, 2022 at 4:15 PM
>> Subject: Curry Card Surface Issues
>> To: Jackie Curiel <JCuriel@collectors.com>
>>
>>
>> Hi Jackie,
>>
>> Hope all is well! We received the Curry back this week with considerable surface scratches that were not present on the card when we sent it out a few weeks back. You can zoom into the photos to see that there were no scratches in the before photos, but now there are considerable marks around his face. What can be done in this situation? We understand that your opinion is that the card was trimmed, but it was previously in a BGS 9.5 holder and now we will have a very tough time getting it back in one due to the surface scratches, so there is potentially a lot of dollars at stake here. Please let me know your thoughts, thanks Jackie!
>>
>> Best,
>>
>> Darius

---

**EXHIBIT**

**4**

M. Levine- Case# 3:22-cv-02867

CONFIDENTIAL                                    PSA 011

# EXHIBIT 1I



2261 Market Street #4019
San Francisco, CA 94114

Sep 1, 2022

🔒 grading-escalation-squad ⌄

**Darius** 3:58 PM · September 1st, 2022 ⌄
Hey guys- good and bad news.

Good news- they confirmed the KD RPA PSA 10 is in fact a PSA 10, and added the auto 10 grade, making it a pop 1 PSA 10/10 😎

Unfortunately they said the Curry was noticeably short on the top edge so they were going to slab it authentic altered, but I told them to send it back raw. We will need to hope BGS reslabs it as a 9.5, or even a 9. @Alexander Liriano did we keep the 9.5 BGS label? Might help to send that back with the card.

**Alexander Liriano** 4:00 PM
Yes we have the label
🙌 1

**Darius** 4:03 PM
Phew. Ok so we'll get the card back mid next week and then we can send it straight off to BGS at the end of the week. @Ghazi we will probably want to schedule another Malca for that

**Alexander Liriano** 4:05 PM
There is no way in hell that card was trimmed

**Darius** 4:07 PM
I mean we didn't measure it right... that's probably why it looked so clean. We should def have a measuring tool to use on big cards going forward

**Brendan Kirbach** 4:09 PM
did we (alt) send it to bgs originally? looks like it was graded there september 1, 2020
IMG_4907.png ⌄



↓ Latest messages

🔒 grading-escalation-squad ⌄

**Brendan Kirbach** 4:09 PM · September 1st, 2022 ⌄
did we (alt) send it to bgs originally? looks like it was graded there september 1, 2020
IMG_4907.png ⌄

**Darius** 4:12 PM
na we bought it graded

**Alexander Liriano** 4:15 PM
@Darius I did not measure the card. I did not see any reason to measure it straight out of a BGS slab and was never given any reason to measure while inspecting the edges of the card since there is no evidence of trimming on my end. Honestly shocked.
➕ 1

I will speak with @Brendan Kirbach about sourcing a measuring tool.

**Darius** 4:17 PM
Oh no definitely not saying you should have bro. You did your job wonderfully the point is moved now we know that unfortunately this is something we have to look out for
✔ 4

↓ Latest messages

EXHIBIT

3

M. Levine- Case# 3:22-cv-02867



2261 Market Street #4019
San Francisco, CA 94114



🔒 grading-escalation-squad ⌄

➕ 1    😊

I will speak with @Brendan Kirbach about sourcing a measuring tool.

**Darius**  4:17 PM
Oh no definitely not saying you should have bro. You did your job wonderfully but going forward now we know that unfortunately this is something we have to look out for
✔ 4    😊

**Jon Euston**  5:02 PM
Just curious, do we know how "off" it was? Is this something that we would have definitely caught had it been measured before sending? Like does PSA have certain threshold that it accepts or does it need to be an exact number?

**Kaushik Mohan**  5:14 PM
was added to grading-escalation-squad by Brendan Kirbach.

**Alexander Liriano**  5:29 PM
They use factory specs for measurement based on the set. But it's not a black/white issue. Usually you would notice what some people call "bat ears" around the corners if there is trimming involved. Regardless, BGS would've caught it the first time. There are so many ways to "trim" a card and their speculation is vague from what I'm hearing. Did they detect use of lasers ? Blades ? If so there would've been evidence of trimming on all 4 edges.

September 2nd, 2022

**Darius**  9:28 AM
These guys are so advanced that it's entirely possibly we wouldn't have even been able to tell. I'm not sure how PSA detects it but they have their own standards. We just have to hope BGS wasnt negligent the first time around and this time they catch it, otherwise we are screwed 😬 (edited)

Sep 13, 2022

**71**

# EXHIBIT 1J



Search Marketplace

SUBMIT ITEMS

EXHIBIT

7

M. Levine- Case# 3:22-cv-02867

# PWCC
## SALES HISTORY



**TRANSPARENT COMPS**

The PWCC Sales History includes sales across all markets on the PWCC platform. To provide accurate market information, if a payment is not received for a sale then it is removed from the sales history.

2009 topps chrome stephen curry #101 gold refractor

2009 topps chrome stephen curry #101 gold refractor ✕    Sort: Highest Price ✕    CLEAR ALL

6 RESULTS                                                                                          2,370,240 TOTAL



2009 Topps Chrome Gold Refractor Stephen Curry ROOKIE /50 #101 BGS 9.5 GEM MINT

BGS Population 1 of 13 - Just One Graded Higher

SOLD ON 8/18/2022
PREMIER AUCTION                                                                        $336,000
                                                                                      w/ Buyers Premium

2009 Topps Chrome Gold Refractor Stephen Curry ROOKIE RC /50 #101 BGS 9.5 GEM MT

See Special Bidding Rules - Premier Investment Piece

SOLD ON 1/19/2021
WEEKLY AUCTION                                                                        $167,177
                                                                                      w/ Buyers Premium

2009 Topps Chrome Gold Refractor Stephen Curry ROOKE /50 #101 BGS 9 MINT

SOLD ON 10/20/2022
PREMIER AUCTION                                                                        $138,000
                                                                                      w/ Buyers Premium

**BECKETT 001111**

**73**



2009 Topps Chrome Gold Refractor Stephen Curry ROOKIE /50 #101 BGS 9.5 GEM MINT

 **SOLD ON 1/19/2023**
PREMIER AUCTION                                                                 **$138,000**
                                                                              w/ Buyers Premium



2009 Topps Chrome Gold Refractor Stephen Curry ROOKIE RC /50 #101 PSA 9 (PWCC)

Population 1 of 1 - None Graded Higher

 **SOLD ON 5/18/2016**
WEEKLY AUCTION                                                                  **$5,999**
                                                                              w/ Buyers Premium



2009 Topps Chrome Gold Refractor Stephen Curry ROOKIE RC /50 #101 PSA 8 (PWCC)

Population 1 of 1 - Just Three Graded Higher

 **SOLD ON 4/24/2017**
WEEKLY AUCTION                                                                  **$4,000**
                                                                              w/ Buyers Premium

## SUBMIT TO VAULT

Your digital portfolio contains ultra hi-res images of the front and back of each item and gives you the ability to view, sell, share, and ship your items from any device. Assets are professionally appraised and insured at no additional cost. Each item is then stored in our highly secure, Class III bank vault.

SUBMIT

## SUBMIT TO AUCTION

PWCC manages the largest trading card auction venue in the world, comprising 12 annual auction events that run every month of the year, and we are always accepting submissions. We reach the most bidders, average the highest prices, have the lowest fee schedule, and fully manage your listing, fulfillment, service, and billing.

SUBMIT

**BECKETT 001112**

**74**

# EXHIBIT 2

**In the Matter Of:**

ALT SPORTS CARD V. BECKETT COLL.

3:22-cv-02867-N

---

**DARIUS SADEGHI**

*February 02, 2024*

---



1       A.    I'm in San Francisco.

2       Q.    At what address?

3       A.    2838 Jackson Street.

4       Q.    Is that your residence?

5       A.    Yep.

6       Q.    I'm going to stop the share here on this

7    document.  There we go.

8             All right.  Earlier you said you are

9    currently employed at Alt Platform, Inc.; correct?

10      A.    Yes.

11      Q.    What's your current position?

12      A.    I'm a product manager.

13      Q.    And how long have you been a product

14   manager?

15      A.    About six months.

16      Q.    And what are the duties and

17   responsibilities of a product manager at Alt

18   Platform, Inc.?

19      A.    Yeah, so it's basically working with --

20   working across all the teams, but mainly the

21   engineering team, just to guide our product road

22   map, figure out which features we want to add to

23   our platform, and then once we do implement, making

24   sure that we're properly testing and tracking



DARIUS SADEGHI                                    February 02, 2024
ALT SPORTS CARD V. BECKETT COLL.                                 22

1        A.    So the vault was -- it was in an office,
2    so an office space in San Francisco.
3        Q.    And where was it located in San
4    Francisco?
5        A.    The Financial District.  The address was
6    101 California Street.
7        Q.    101 California Street?
8        A.    Yeah.
9        Q.    Was there a suite number?
10        A.    Yeah.  I don't fully recall the suite
11    number.
12        Q.    How many square feet of office space did
13    the vault occupy?
14        A.    I would guess that it was probably
15    around 5 -- 5 to 6,000 square feet.
16        Q.    And for what period of time was the
17    vault located at 101 California Street?
18        A.    From November of 2021 until April
19    of 2022.  Or sorry, sorry.  That would be November
20    of 2020 until April of 2021.  Yeah.
21        Q.    Okay.  Just so I'm clear, the vault was
22    located at 101 California Street from November
23    of 2020 through April of 2021?
24        A.    Yeah.



1     Q.    And during that period of time, did it
2  occupy the same space or was there additional space
3  added at any time?
4     A.    It was the same space throughout the
5  entire time.
6     Q.    Okay.  And then you said it then moved
7  to where?
8     A.    To New Castle, Delaware.
9     Q.    And that -- and the move happened in
10 April of 2021?
11    A.    Yeah.
12    Q.    And is that currently where the vault is
13 located?
14    A.    Yes.
15    Q.    Did the vault exist prior to November
16 of 2020?
17    A.    I don't believe so, no.
18    Q.    Okay.  And why was the vault moved to
19 New Castle, Delaware?
20    A.    Because it was tax -- it's a tax-free
21 state and because we needed more space.
22    Q.    How much space does the Alt -- does the
23 vault -- sorry.  Let me start over.
24          How much space does the vault currently



1  Exhibit 2, we've been talking about Alt's purchase

2  of the Curry card.  Do you have any other

3  information that we haven't already talked about

4  regarding the purchase of the Curry card?

5       A.    No.

6       Q.    All right.  Now, the next topic that

7  you've been identified as having knowledge is

8  regarding the storage of the Curry card; correct?

9       A.    Yes.

10      Q.    Now, this card was purchased in, you

11  said, October or November of 2020; right?

12      A.    Yes.

13      Q.    And after it was paid for, did Goldin

14  then ship it to the San Francisco address?

15      A.    Yes.

16      Q.    How was it shipped?

17      A.    I believe it was, like, FedEx overnight.

18      Q.    And then it would have been received at

19  the location in the mailroom, as you talked about

20  that process; right?

21      A.    Yep.

22      Q.    And who at Alt then received the Curry

23  card and unpackaged it?

24      A.    It would have been either myself or



1      Q.    Turn the dial type deal?  All right.  We

2  talked about before, there's no log or anything

3  there at Alt to know when a card comes in or out of

4  the safe, just when it's actually been sold or --

5      A.    Yeah.

6      Q.    Correct?

7      A.    Yeah, correct.

8      Q.    Okay.  So as you sit here today, you

9  can't tell me, once it was stored there in the

10  California location, how many times it might have

11  come in and out of that safe, can you?

12      A.    No.

13      Q.    So the Curry card, then, given the dates

14  that you've given me, it was then at some point

15  trans -- it was transported as part of the move

16  from the California location to the Delaware

17  location; correct?

18      A.    Yeah.

19      Q.    Is that correct?

20      A.    Yes.

21      Q.    Okay.  And then once it was at the

22  Delaware location, you don't have any other

23  personal knowledge as to how it was stored, do you?

24      A.    I do not.



1  whether it was worth that gamble to go get it cross

2  graded; right?

3      A.    Yes.  Correct.

4      Q.    Okay.  Now, when the card is owned by

5  the fund, and when you say owned by the fund, do

6  you mean Alt Sports Card Fund, LP?

7      A.    Yes.

8      Q.    Okay.  When the card is owned by the

9  fund and a decision is needing to be made to crack

10 it out of the card and have it cross graded, does

11 anyone have to get permission from the fund other

12 than Leore to get it -- to go through that process?

13     A.    No.

14     Q.    Now, you said that this decision was

15 made in August of '22; right?

16     A.    Yes.

17     Q.    With the Curry card at issue here, any

18 time during the previous two years that the fund

19 had owned the card, had it been considered for

20 cross grading?

21     A.    Yes.

22     Q.    When?

23     A.    It was at the National Sports Card

24 Convention in 20 -- I can't remember if it was



1   2021 -- I think it was -- it was 2021, yeah.

2        Q.    2021, you said National Sports Card

3   Convention?

4        A.    Yes.

5        Q.    And where was that at?

6        A.    Chicago.

7        Q.    Describe for me how it was considered at

8   that convention for cross grading.

9        A.    Yeah, so the CEO of PSA basically just

10  took, like, a handful of cards from us.  And there

11  was no paperwork or anything involved.  He just

12  took the cards, they took a look at them, and if

13  any of them would have cross graded, you know, we

14  would have at that point, like, paid the fee to

15  cross grade it and filled out the paperwork.  So it

16  was kind of more like an informal look at a handful

17  of cards.

18       Q.    Okay.  So this was --

19       A.    Still within the case.

20       Q.    I'm sorry?

21       A.    Still -- and they were all still within

22  the case, obviously, so there was no -- no cracking

23  or anything.

24       Q.    Okay.  So this was physically there in



1  Chicago, then?

2       A.    Correct.

3       Q.    Okay.  So in 2021, the Curry card at

4  issue traveled to this convention in Chicago.

5       A.    Correct.

6       Q.    And the PSA CEO, who are you talking

7  about there?

8       A.    Nat Turner.

9       Q.    So Nat Turner was at the convention.  Do

10  y'all have, like, a table at the convention or they

11  do or how does that work?

12       A.    Both.  Yeah, we had our own little

13  section.  They had a big section where they grade

14  cards on site.

15       Q.    So you take a handful of cards to their

16  section and have them look at them?

17       A.    Yeah.

18       Q.    And they looked at a handful of cards,

19  including this one; is that correct?

20       A.    Correct.  Yes.

21       Q.    And was it cross graded then?

22       A.    None of them were cross graded, no.

23       Q.    And why was that?

24       A.    Because PSA didn't -- felt that they met



1   the standard.

2        Q.    What do you mean?

3        A.    Basically for each card, you would give

4   them, like, a minimum grade that you would want the

5   card to cross to, and so if PSA looks at the card

6   and says, okay, we don't think that this card is a

7   10, then they're not going to cross it.  So...

8        Q.    And for this one, because it was already

9   a 9.5, you were asking for it to be, if they could

10  cross grade it at a 10?

11       A.    Correct.

12       Q.    Were you physically there at that time?

13       A.    I was at the show.  I was not there when

14  they inspected the card.

15       Q.    Who was the Alt employee who took it

16  over there to be inspected?

17       A.    So it was myself, but then the cards

18  were passed off and, you know, returned to us a

19  couple of hours later.  So...

20       Q.    They take them back to wherever they

21  have their graders; right?

22       A.    Yeah.  Exactly.

23       Q.    Okay.  But you would have been the

24  person who took this handful of cards, including



1   the Curry card, to the --

2        A.     Correct.

3        Q.     -- PSA table; correct?

4        A.     Yes.

5        Q.     All right.  And so was it Nat Turner who

6   then gave them back to who at Alt?  You?

7        A.     Yes.

8        Q.     And said the Curry card, which was

9   included in these others, wouldn't meet a 10, so

10  they didn't do the grade; is that right?

11       A.     It wouldn't have been that specific.  If

12  he just -- he just handed us back the cards, and so

13  at that point, it was understood that none of them

14  had crossed.

15       Q.     And this was in 2021.  Do you remember

16  when in 2021?

17       A.     End of July.

18       Q.     And at that time, he didn't tell you

19  that the Curry card had been altered or trimmed;

20  correct?

21       A.     Correct.

22       Q.     Did he tell you any of the cards in that

23  group of handful of cards you submitted had been

24  altered or trimmed at that time?



1        A.    Yeah.

2        Q.    And what did she tell you on that call?

3        A.    She told me that the Curry card had been

4    found to be trimmed.

5        Q.    She said trimmed?

6        A.    Yeah.

7        Q.    Did she say how they determined that?

8        A.    She said it like -- I can't remember the

9    exact words, but she said it measured short on the

10   top and on the -- on one of the sides too.

11       Q.    Measured short.  Did she say how short?

12       A.    No.

13       Q.    How did you respond?

14       A.    I mean, I don't know.  I was obviously

15   disappointed, but there's not really much I could

16   do.

17       Q.    So you recall what she told you, but you

18   don't recall what you said back to her?

19       A.    I probably asked her -- I don't

20   remember, no.

21       Q.    Okay.  You don't remember anything that

22   you said to her on that call?

23       A.    No, I don't.

24       Q.    You didn't try to contest it?



1          Who are you referring to there?

2     A.    The trimmers.

3     Q.    That it's entirely possibly we wouldn't

4  have even been able to tell.  I'm not sure how PSA

5  detects it, but they have their own standards.  We

6  just have to hope BGS wasn't negligent the first

7  time around and this time they catch it, otherwise

8  we're screwed.

9          Did I read that correctly?

10    A.    Yes.

11    Q.    And screwed meaning that they wouldn't

12 reslab it; right?

13    A.    Yes.

14    MR. HAMMERVOLD:  Object to form.

15 BY MR. REED:

16    Q.    So you were hoping that BGS would not

17 find a trim and just put it back in a graded slab,

18 hopefully, at least at the 9.5; right?

19    A.    Yes.

20    Q.    All right.  I'm going to -- I'm showing

21 you now Exhibit 8 for your deposition.

22

23

24



1   next week.

2           Now, at any time, did you tell Aram that

3   this card had been submitted to PSA?

4       A.   No, doesn't -- no.

5       Q.   At any time did you tell Aram or anyone

6   else at Beckett that PSA -- excuse me -- that PSA

7   had found that the card had been altered?

8       A.   No.

9       Q.   Did you tell Aram or anyone else at

10  Beckett any time that PSA thought the card had been

11  trimmed?

12      A.   No.

13      Q.   Is there a reason why you didn't?

14      A.   Yeah, I wanted them to come up with

15  their own decision.  The companies have different

16  grading standards.  So...

17      Q.   So you're hoping that they might not

18  find that and put it in a slab case; right?

19      A.   I mean, they had graded it a nine and a

20  half before.  So...

21      Q.   So you're hoping they would do it again;

22  right?

23      A.   Yeah.

24      Q.   And if you told them that PSA had done



1   that, then they might not; right?

2       A.    Yeah.

3       Q.    All right.  Then on the 16th of

4   September, you text:  Hi Aram-any word?

5             And he responds back -- there's the

6   arrow thing.  He says:  The card was deemed altered

7   by our graders.  It measures short on the top edge,

8   is inconsistent with others.

9             Do you see that?

10      A.    Yeah.

11      Q.    And then you respond:  Just very

12  confused how it was deemed altered when we

13  literally just cracked it out of the BSG 9.5 and

14  sent the label with the card.

15            Did I read that correctly?

16      A.    Yeah.

17      Q.    And then Aram's response was:  I would

18  have left it in the holder and reviewed it that

19  way.  After inspecting it, it appears to be

20  tampered with and cannot put a numeric grade on it

21  anymore.

22            Right?

23      A.    Yep.  Yep.

24      Q.    And at that time you didn't tell Aram



1   STATE OF ILLINOIS    )

2                        )  SS:

3   COUNTY OF DUPAGE     )

4            I, ALICE M. SCHWINGER, CSR No. 84-2913,

5   a Certified Shorthand Reporter of the State of

6   Illinois, do hereby certify:

7            That previous to the commencement of the

8   examination of the witness, the witness was duly

9   sworn to testify the whole truth concerning the

10  matters herein;

11           That the foregoing deposition transcript

12  was reported stenographically by me, was thereafter

13  reduced to typewriting under my personal direction

14  and constitutes a true record of the testimony

15  given and the proceedings had;

16           That the said deposition was taken

17  before me at the time and place specified;

18           That I am not a relative or employee or

19  attorney or counsel, nor a relative or employee of

20  such attorney or counsel for any of the parties

21  hereto, nor interested directly or indirectly in

22  the outcome of this action.

23           IN WITNESS WHEREOF, I do hereunto set my

24  hand at Woodridge, Illinois, this 14th day of



1    February, A.D. 2024.

2

3

4

5

6              Certified Shorthand Reporter

7

8

9    ALICE M. SCHWINGER, CSR No. 84-2913

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 3

# In the Matter Of:

## ALT SPORTS CARD vs BECKETT COLLECTIBLES

3:22-cv-02867-N

---

# MATTHEW LEVINE

*February 07, 2024*

---



1  were you hired for and started with Alt as?

2      A.    That was pricing contractor.

3      Q.    Okay.  And pricing contractor started

4  January --

5      A.    2022.

6      Q.    -- 2022.  And then how long were you a

7  pricing contractor?

8      A.    That was a 90-day trial period.  So that

9  was until April of 2022 when I got the position of

10 pricing associate with Alt.

11     Q.    Pricing associate was it in April of

12 2022?

13     A.    Yep.

14     Q.    And how long were you a pricing

15 associate?

16     A.    Roughly one year.

17     Q.    So to roughly April of 2023?

18     A.    Correct.

19     Q.    And then what was the next position that

20 you held?

21     A.    That was the senior pricing analyst

22 position after that through January of 2024.

23     Q.    April of 2023 through January of 2024.

24 Okay.  And that covers all of the various positions



1    of machine learning engineers.

2          Q.    You didn't have a role, did you?

3          A.    I did not.

4          Q.    So that Alt value algorithm is what

5    prices the majority of the cards that are in the

6    Alt vault; is that fair to say?

7          A.    Yes.

8          Q.    And the ones that fall outside of that

9    have to be manually priced?

10         A.    Correct.

11         Q.    And who does that at that time when you

12   were the pricing team?

13         A.    Me and my associates on the expert

14   pricing team.

15         Q.    And is that where you would use the

16   expert pricing retool?

17         A.    Correct.

18         Q.    In the time when you were on the pricing

19   team, how many other employees at Alt vault were on

20   the pricing team?

21         A.    Three, but a confusing question, okay,

22   because two at a time, but we let one go and

23   rehired.  So three people in total, but two at most

24   at any given time.



1  employees?

2      A.    Correct.  And can you define what you

3  mean by grading?

4      Q.    Let me ask you, because you said that

5  part of your business was, and I have it in my

6  notes, but correct me if I got anything wrong here,

7  is that Flawless Card Traders part of that business

8  was you bought and sold collectible cards for a

9  profit, that was one part, and then you also said

10  that you graded cards for a profit?

11      A.    Yeah.  And I just want to clarify.  That

12  means sending the cards to be graded, not me

13  personally grading the cards.

14      Q.    Oh, okay.  That's my -- I apologize.

15  That's my misunderstanding.  Okay.

16          So you would send the cards of Flawless

17  Card Traders to be graded?

18      A.    Correct.  I would purchase the cards

19  unrated, review them, send them to PSA to be

20  graded, return them, and then sell them for profit

21  through the business.

22      Q.    So you never did any actual grading --

23  let me start over.  Strike that.

24          As part of Flawless Card Traders at no



1  time did you actually grade cards for customers?

2      A.   Okay.  I helped my friends send cards to

3  the grading within my personal network, right, but

4  I didn't look at the cards and say this is a 10,

5  here's your 10 back.  No one would have taken that

6  grading reputably.

7           So I facilitated the shipping of the

8  cards for them and reviewing them and telling them

9  you should send this to PSA, you shouldn't send

10  this to PSA, but I didn't physically put a

11  numerical grade on the cards myself.

12      Q.   Okay.  So you weren't looking at the

13  card saying, okay, the corners are an 8, this and

14  this, you know, give it a grade and put it in a

15  package and slap Flawless Card Traders and a grade

16  on it?  You never did that; correct?

17      A.   Correct.

18      Q.   Okay.  And so you would take raw cards,

19  look at them and then decide, hey, we should send

20  this off to PSA or not?

21      A.   Yep.

22      Q.   Okay.  Did you only send cards off to

23  PSA, or did you send them to any other grading

24  services?



1       A.    Yes.

2       Q.    All right.  You have never been employed

3  as a grader by a grading company, have you?

4       A.    I have not.

5       Q.    Have you ever been employed by a grading

6  company?

7       A.    I have not.

8       Q.    Never been employed by PSA?

9       A.    Nope.

10      Q.    Never been employed by Beckett?

11      A.    No grading companies.

12      Q.    All right.  So we were talking about as

13  part of your Flawless Card Traders, you were

14  purchasing and buying those cards and you were

15  sending cards mostly to PSA to be graded.  Were you

16  ever sending cards to be cross graded?

17      A.    No.

18      Q.    Do you understand the term cross graded?

19      A.    I do.  Yes and no, because there's

20  multiple uses of the term in the industry, but in

21  general, yes.

22      Q.    What do you understand the term cross

23  grading to mean?

24      A.    Cross grading means that you sent the



1  card in the slab to the other company for them to

2  grade the card with the old slab still intact.

3      Q.    And the idea being trying to get a

4  higher grade than what it's graded in the slab;

5  correct?

6      A.    Correct.

7      Q.    And that's something that you did not do

8  as part of Flawless Card Traders; correct?

9      A.    I did not.

10     Q.    Okay.  Did you ever break cards out of a

11 slab and send into a grader to be graded?

12     A.    I did, yes.

13     Q.    You did that as part of Flawless Card

14 Traders?

15     A.    Yes.

16     Q.    And what's the point in breaking a card

17 out of a slab to be sent in and be graded?

18     A.    Increase value.

19     Q.    Is there a term that you would use for

20 doing something like that as opposed to cross

21 grading?

22     A.    Yeah.  Cracking is the industry jargon

23 for, like, cracking cross versus graded card review

24 is like the industry jargon for when you take the



 1      A.    Frankly, I pay a CPA to do all of it,

 2   and make sure that I'm in a good position because

 3   I'm busy with work, so I don't know what other

 4   documents are available.  He does it for me.  I pay

 5   him for the service, and he tells me that I'm good

 6   to go, and the CPA is my father.  So I trust him

 7   fully.

 8      Q.    So the CPA for Flawless Card Traders is

 9   your father.  And what is his name?

10      A.    Paul Levine.

11      Q.    And does he work for a company or --

12      A.    He does.  Botwinick & Company, LLC.

13      Q.    What is the name?

14      A.    Botwinick.

15      Q.    How do you spell Botwinick?

16      A.    B-o-t-w-i-n-i-c-k & Company, and he is a

17   partner at that firm.

18      Q.    What town is it in?

19      A.    Rochelle Park, New Jersey.

20      Q.    So you don't know if Flawless Card

21   Traders has a profit and loss, income, balance

22   statement, any of those type of documents?

23      A.    If they are required, then we have them,

24   but I can't tell you -- if they are not required,



1   the case.  They are aware that I'm doing the

2   deposition, and I will be potentially sitting on

3   trial.  So they are aware of that, but no specifics

4   in the case.

5        Q.    In formulating your opinions and

6   preparing your report, did you speak to anyone at

7   Alt Platform?

8        MR. HAMMERVOLD:  So I'm going to instruct you

9   not to answer as it relates to communications with

10  me or communications with me and others.

11  BY THE WITNESS:

12       A.    No.

13  BY MR. REED:

14       Q.    The answer is no?

15       A.    No.

16       Q.    Okay.  Were you asked to assume any

17  facts in formulating your opinions in this case?

18       MR. HAMMERVOLD:  Object to form.

19  BY THE WITNESS:

20       A.    Can you explain what you mean by assume?

21  BY MR. REED:

22       Q.    Well, for instance, were you instructed

23  or asked to assume that certain facts were true?

24       MR. HAMMERVOLD:  Object to form.



1      Q.    Okay.  What is the wide range of sports

2  collectibles?

3      A.    Baseball, football, basketball, hockey,

4  soccer, and then I have started to delve into

5  Pokemon and other trading card game asset classes

6  with my expertise there.

7      Q.    Next you say, "In over the past 18

8  months, I have graded over 25,000 unique assets."

9      A.    Yeah.

10     Q.    That doesn't mean that you have actually

11 graded them.  That means that you sent them off to

12 PSA; correct?

13     A.    Correct.  I did make a typo here.  This

14 should say that I have priced over 25,000 unique

15 assets in the past 18 months and not graded.  So I

16 apologize for that.

17     Q.    Okay.  So you haven't actually graded

18 25,000 assets?

19     A.    Correct.  I have priced and reviewed

20 over 25,000 unique assets.

21     Q.    While working at Alt?

22     A.    Correct.

23     Q.    Using the Alt tool that we talked about

24 before?



1          Q.    Is there any publication, journal,

2     professional publication out there which makes a

3     statement that PSA is considered No. 1, Beckett is

4     considered No. 2, and SGC considered No. 3?

5          A.    Not that I'm aware of.  This list was

6     formulated based on a resale value of assets.

7          Q.    Based upon your experience?

8          A.    Correct.

9          Q.    Any documents that you've cited in your

10    Appendix that show this resale value to support

11    this ranking of the various sports grading

12    companies?

13         MR. HAMMERVOLD:  Object to form.

14    BY THE WITNESS:

15         A.    I would have to double-check if any of

16    the documents include that.

17    BY MR. REED:

18         Q.    We have your list here, Appendix A.  Let

19    me know.

20         A.    So none of these documents necessarily

21    reference SGC, but a few of these documents do

22    entail the discussion that PSA is worth quite a bit

23    more than Beckett Gem Mint grade.

24         Q.    Which ones?



1      A.    For example, the Slack messages Re:

2   Steph Curry card, there are multiple points brought

3   up there.  As a PSA slab Gem Mint it'S worth quite

4   a bit more than a Beckett slab Gem Mint.

5      Q.    Which number are you looking at?  I'm

6   sorry.

7      A.    27, for example.

8      Q.    Okay.  And the Slack messages, those are

9   Alt Platform messages?

10      A.    Correct.

11      Q.    Okay.  What else?

12      A.    In the valuation analysis as well, you

13   can -- you will be able to see the difference

14   between the PSA 10 and the Beckett 9.5.  The

15   expected value of the PSA 10 would have been higher

16   than the expected value of the Beckett 9.5.

17      Q.    Which number are you referring to?

18      A.    That would be No. 19, the valuation

19   analysis.

20      Q.    No. 19?

21      A.    Yes.

22      Q.    Now, that's an Alt Platform document;

23   right.

24      A.    Correct.



1        Q.    What else?

2        A.    No other documents here would refer to

3   value difference between PSA and BGS that I'm aware

4   of.

5        Q.    So no documents outside of an Alt

6   Platform document; right?

7        MR. HAMMERVOLD:  Object to form.

8   BY THE WITNESS:

9        A.    That I believe, yes.  Yeah.

10       MR. HAMMERVOLD:  Hey, Kendal, it doesn't have

11  to be this minute, but whenever is a good time, I

12  would like to take another bathroom break if that's

13  okay.

14       MR. REED:  Yeah, we can take one now.  Let's

15  go off the record and come back in five minutes.

16              (WHEREUPON, a recess was had.)

17       MR. REED:  We are back on the record.

18  BY MR. REED:

19       Q.    Do you understand that you are still

20  under oath?

21       A.    Yes.

22       Q.    Okay.  Now, we should have page 3 up

23  here of your first report.  You can see that on

24  your screen?



1      Q.    As part of your process in formulating
2  your opinions in this case, did you speak with
3  anyone at PSA?
4      A.    I have not.
5      Q.    You didn't interview anyone there?
6      A.    I have not.
7      Q.    Do you communicate with anyone at PSA in
8  any other way, by text, e-mail, any type of
9  communication in preparation of your opinions?
10      MR. HAMMERVOLD:  Object to form.
11  BY THE WITNESS:
12      A.    I have not.
13  BY MR. REED:
14      Q.    Did you speak with anyone or communicate
15  with anyone at Beckett in the process of
16  formulating your opinions in this case?
17      A.    No.
18      MR. HAMMERVOLD:  Object to form.
19  BY MR. REED:
20      Q.    Did you communicate with anyone at any
21  other grading company like SGC in formulating your
22  opinions in this case?
23      A.    No.
24      MR. HAMMERVOLD:  Object to form.



1    representation of objective fact."

2              Did I read that correctly?

3         A.    Yes.

4         Q.    To you what's the difference between

5    subjective and objective?

6         A.    Subjective means that it can be argued.

7         Q.    And objective means?

8         A.    It cannot be argued.

9         Q.    Now, the statement here, this first

10   sentence, you don't cite any source for that

11   statement; correct?

12        A.    Correct.

13        Q.    Do you know of any industry publication

14   that states that a determination of a sports

15   trading card as authentic and unaltered is a

16   representation of objective fact?

17        A.    No.  This was formulated by me.  So I

18   don't -- I don't believe that the exact same

19   sentence would show up in a sports card

20   publication.

21        Q.    Do you know of any industry publication

22   who has made maybe not the exact same statement

23   but, in essence, that same opinion?

24        A.    I don't know of one.  I will say that



```
 1  it's probably out there.  This is pretty widely

 2  accepted.

 3       Q.   You didn't cite one or include one in

 4  your report, did you?

 5       A.   This was based on my own personal

 6  expertise in the industry.

 7       Q.   And as you sit here today, you can't

 8  tell me of a single one, can you?

 9       MR. HAMMERVOLD:  Object to form.

10  BY THE WITNESS:

11       A.   Not off of the top of my head, no.

12  BY MR. REED:

13       Q.   You didn't go look for one in preparing

14  your opinion, did you?

15       A.   I did not.

16       Q.   You don't know the legal definition of

17  objective fact, do you?

18       MR. HAMMERVOLD:  Object to form.

19  BY THE WITNESS:

20       A.   I do not.

21  BY MR. REED:

22       Q.   You don't have any legal education?

23       A.   I do not.

24       Q.   Now, you've interned in a legal office;
```



1  the correct length and height, then it's an

2  objective fact that it's been altered.  It's not in

3  the eye of the beholder.

4       Q.    What was your source for that

5  information?

6       A.    Industry knowledge, right.  There is

7  nothing cited there, but it's generally known in

8  the industry that there is a certain dimension for

9  specific sets, and the grading companies have this

10  information.  That's how they do deem certain cards

11  to be altered based on that information.

12       Q.    And how do you know that the grading

13  card companies have this information?

14       A.    Because if they didn't have that

15  information, then they would never be able to deem

16  a card as altered.

17       Q.    So you're assuming that; right?

18       MR. HAMMERVOLD:  Object to form.

19  BY THE WITNESS:

20       A.    Correct.

21  BY MR. REED:

22       Q.    Because you didn't interview anyone at a

23  grading company to determine that, did you?

24       A.    I did not.



1      Q.    You didn't conduct any research with any

2  grading companies to determine that, did you?

3      A.    I did not, but --

4      MR. HAMMERVOLD:  Object to form.

5  BY THE WITNESS:

6      A.    But in my opinion if they didn't have

7  what the dimensions should properly be, then they

8  would never be able to deem the card altered if it

9  were altered.

10  BY MR. REED:

11      Q.    That's your assumption; right?

12      A.    That is my assumption.  Yes.

13      MR. HAMMERVOLD:  Object to form.

14  BY MR. REED:

15      Q.    So in your opinion whether a card is

16  trimmed or altered, that's a black and white issue

17  of fact; right?

18      A.    Correct.

19      Q.    Okay.  What are the dimensions for the

20  Steph Curry card at issue?

21      A.    I don't know off of the top of my head.

22      Q.    Did you -- have you ever known?

23      A.    I don't believe so.

24      Q.    Did you include those in your report?



1   of it?

2         A.    Correct.  Yes.

3         Q.    Now, you had mentioned Darius Sadegjo

4   beforehand.  What is his role at Alt Platform to

5   your knowledge?

6         A.    Darius works in product, and he manages

7   the Fund.

8         Q.    Do you know whether he has any

9   experience in evaluating sports trading cards?

10        A.    Not professionally.

11        Q.    How about Alexander Liriano?  What was

12   his role at Alt?

13        A.    He worked at the vault.  I don't know

14   the official title.

15        Q.    Have you spoken with him at all about

16   this case?

17        A.    No.

18        Q.    Have you communicated with him in any

19   way about this case?

20        A.    No.

21        Q.    To your knowledge is Alexander

22   experienced in evaluating sports trading cards?

23        A.    A hard no.

24        Q.    A hard no?



1      A.    Yeah.

2      Q.    Why did you say a hard no?

3      A.    No, no, no.

4      Q.    Well, you said a hard no.  What did you

5   mean?

6      A.    I wouldn't let him evaluate my sports

7   cards.

8      Q.    Why is that?

9      A.    He doesn't have expertise in the area.

10  Vaulters are not necessarily experts in the field.

11  They are more physical labor.

12     Q.    Is it possible for a grading company to

13  indicate that a card is altered or trimmed when, in

14  fact, it has never been trimmed and came that way

15  from the manufacturer?

16     A.    Yes.

17               (WHEREUPON, a certain document was

18               marked Levine Deposition Exhibit

19               No. 3, for identification, as of

20               2-7-24.)

21  BY MR. REED:

22     Q.    Now, I am showing you what has been

23  marked as Exhibit 3 for your deposition, and it's a

24  little small here.  I will blow it up as I wanted



1  around it.

2      Q.    Now, I think it's obvious that you don't

3  respect Mr. Liriano's opinions on things.  How

4  about Darius Sadeghi, do you respect his opinions

5  on things?

6      MR. HAMMERVOLD:  Objection.

7  BY THE WITNESS:

8      A.    Highly respect.

9  BY MR. REED:

10      Q.    Highly respect?

11      A.    Yes.

12      Q.    And he has been with Alt for quite a

13  while; right?

14      A.    Yeah, he was one of the initial

15  employees.

16      Q.    Longer than you; right?

17      A.    Correct.

18      Q.    And he has experience in the trading

19  card industry?

20      A.    Correct.

21      Q.    What experience?

22      A.    Personal flipping and collecting since

23  2007, I believe, and then also his four years at

24  Alt.



1   on the return is three years; correct?

2       A.    Uh-huh.  Yes.

3       Q.    So October 2nd, 2020, three years would

4   be October 2, 2023; right?

5       A.    Right.

6       Q.    Your report says within three years;

7   right?

8       A.    Yes.

9       Q.    So included with this valuation there is

10  no schedule or formula or indication about how

11  those numbers were arrived at, is there?

12      A.    There is no formula included, no.

13      Q.    Okay.  Did you -- and you have said

14  before in your deposition that you didn't

15  communicate or speak with anyone at Alt about -- I

16  think that you're on mute, sir.

17      A.    Sorry.

18      Q.    That you didn't speak with anyone or

19  talk to anyone or communicate with anyone at Alt in

20  preparing your opinion; right?

21      A.    Correct.

22      Q.    Okay.  And so you didn't do any further

23  investigation into how Alt arrived at these

24  numbers, did you?



1        A.    No.   I simply took the numbers from here

2   as gospel, and put them in my expert report.

3        Q.    Took them as gospel?

4        A.    Yes.

5        Q.    All right.   I'm back to your report

6   here, page 9, paragraph 29.   Do you have that in

7   front of you now?

8        A.    Yes.

9        Q.    You state, "After receiving the Steph

10  Curry card, Alt kept it in its secure vault.   That

11  vault is a highly secured location.   Cards are

12  stored within safes and cabinets inside of the

13  vault, with the high dollar assets, like the Curry

14  Card, secured within a coded safe."

15           Did I read that correctly?

16       A.    Correct.   And, again, I have never

17  visited the vault.   This is what I have gathered

18  through meetings and other conversations in my

19  little over two years at the company.

20       Q.    Okay.   And you cite to Alt's response to

21  Interrogatory No. 1 as your source for that

22  information; right?

23       A.    Yes, yes.

24       Q.    Okay.   And so as part of preparing your



1    Q.    But you know of instances in which you

2    send in another company's slab to PSA, they've said

3    doesn't meet size requirements, and send it back?

4    A.    Correct.  Yes.

5    Q.    Okay.  You state here in paragraph 33

6    that Alt was looking to crossover the Steph Curry

7    card from PGS to PSA because PSA is a more

8    reputable grader and Alt was hoping that PSA might

9    grade the Steph Curry's card condition as a 10.0

10   rather than a 9.5.

11   A.    Uh-huh.

12   Q.    And you cite to intra-Alt Slack

13   communications produced by Alt; correct?

14   A.    Yes.  Those are from the grading

15   escalation squad.  That's where that was stated.

16   Q.    Okay.  And so your basis for this

17   statement as for crossing over and what Alt wanted

18   is all from those Slack communications; is that

19   correct?

20   A.    Yeah, I believe that was a complete

21   enough transcript in those Slack communications of

22   what Alt was trying to achieve here.

23   Q.    Are you aware of those Slack

24   communications saying anything about PSA being a



1   more reputable grader?

2        MR. HAMMERVOLD:  Object to form.

3   BY THE WITNESS:

4        A.    No.  That's a personal opinion, and that

5   is, again, as we went over earlier, stated in

6   resale value.

7   BY MR. REED:

8        Q.    None of which is included in your

9   report?

10       A.    Correct.  Those are pure analysis on my

11  end, which I believe I have more than enough

12  experience to make that statement, and if it wasn't

13  true, Alt would have never gone through with this

14  in the first place.

15       Q.    That's your assumption?

16       A.    Yeah.

17       Q.    On paragraph 34 you talk about Alt

18  cracking the slab and sending it to PSA for

19  grading; correct?

20       A.    Correct.

21       Q.    Do you know how it was cracked?

22       A.    I do not.

23       Q.    Do you know who cracked it?

24       A.    One of Alexander Liriano or John Euston.



1    I don't know which one.

2        Q.    Do you know how it was cut out of the

3    protective sleeve?

4        A.    I read about it, but I don't recall.

5        Q.    And you've never inspected this card at

6    any time; right?

7        A.    I have never held a card in person, no.

8    Only through computer imaging.

9        Q.    Okay.  Now, then we get to here on

10   page 10 your opinion that Beckett's failure to

11   identify the Steph Curry card -- let me start over.

12   Sorry.

13       A.    You're good.

14       Q.    "Beckett's failure to identify the Steph

15   Curry card as trimmed in 2016 was negligent."

16   That's one of your first opinions; right?

17       A.    Yes.

18       Q.    And then you go on to state here, "In

19   October of 2016 when BGS graded the card the card

20   had been trimmed and would have measured short."

21   Okay?

22       A.    That's correct.

23       Q.    How do you know that the card was

24   trimmed at that time, because you didn't see it





1    then; right?

2         A.    I did not.  No.

3         Q.    Okay.  You haven't seen pictures of it

4    from 2016, have you?

5         A.    No.

6         Q.    Have you seen any measurements in

7    documents from 2016 stating what the measurements

8    of the card were in 2016?

9         A.    No.

10        Q.    Okay.  So how can you be absolutely

11   certain that the card was trimmed in 2016?

12        A.    I fail to see the intent of Alt to

13   purchase this card for the high risk price of

14   168,000, and then trim it, which leads me to make

15   that opinion; right?

16             I didn't cite any source there.  That is

17   my opinion that the card would have been trimmed in

18   2016, and that no measurement changes would have

19   occurred between the card being incapsulated by the

20   BGS holder, which, as we mentioned, is tamperproof

21   free, and when the card was sent to PSA in 2022.

22        Q.    Okay.  But when the card is outside of

23   the slab, there is a possibility of it being

24   trimmed at that point; right?



1      A.    Correct.

2      Q.    So you can't know with absolute

3  certainty that it was trimmed in 2016 then, can

4  you?

5      MR. HAMMERVOLD:   Object to form.

6  BY THE WITNESS:

7      A.    With absolute certainty, no, but, again,

8  I don't think that anyone had the intent to

9  purchase a card for $200,000 to trim it.   That

10  would be quite a big risk.

11  BY MR. REED:

12      Q.    That's an assumption that you're making,

13  right, because you can't really know someone's

14  intent, can you?

15      A.    Correct.

16      Q.    Okay.  Now, looking at paragraph 39,

17  it's kind of when you get into this idea I think of

18  what you were just talking about that you state

19  it's implausible and nonsensical that someone would

20  have trimmed a card after it was graded in '16 but

21  before PSA and Beckett confirmed the card was

22  trimmed; right?

23      A.    Right.

24      Q.    And you go through -- let me see.  I'm



1   trimmed; correct?

2        A.    That is correct.  Yes.

3        Q.    Okay.  And you cite a couple of things.

4   You have A through D here as reasons; right?  One

5   being that the card was sealed in the slab with no

6   indication of tampering, and you didn't view the

7   slab prior to it being cracked, did you?

8        A.    Not physically, no.

9        Q.    You viewed it virtually prior to it

10  being cracked?

11       A.    In order to evaluate the assets, you

12  need a virtual imaging of the assets.

13       Q.    So you have seen Alt's pictures of the

14  card?

15       A.    Correct.

16       Q.    Okay.  But its only Alt's pictures of

17  the card.  You haven't seen any other pictures of

18  the card in the slab, have you?

19       A.    No.

20       Q.    Okay.  And you didn't physically inspect

21  the card in the slab prior to it being cracked;

22  right?

23       A.    No.

24       Q.    And then you go on to say in paragraph



1       Q.    You don't remember as you sit here?

2       A.    No.  I don't remember Alex's entire

3    Affidavit.

4       Q.    Or Jon's?

5       A.    Unfortunately not word by word.  I can

6    remember general details, but --

7       Q.    You can't remember whether the cutting

8    of the card out of the sleeve was on video or not?

9       MR. HAMMERVOLD:  Object to form.

10   BY THE WITNESS:

11      A.    I don't remember.  No.

12   BY MR. REED:

13      Q.    And if it's not on video, then you

14   weren't able to view what actually happened when it

15   was cut out of the sleeve, were you?

16      A.    Correct.

17      Q.    Okay.  In paragraph D you say that, "It

18   would also make absolutely no sense for Alt to

19   purchase the Steph Curry card in 9.5 Gem Mint

20   condition for $168,000, only to entirely destroy

21   its value for thereafter trimming it."

22      A.    Right.  That's an opinion.  That's not

23   cited.  That's how I feel.  That wouldn't make

24   sense.



1      A.    Correct.  The definition, yes.

2      Q.    Okay.  You go on to say that, "BGS

3  markets itself as providing reliable and objective

4  authentication and grading because their business

5  model depends on third-party purchasers trusting in

6  BGS's grading."

7           Did I read that correctly?

8      A.    Yes.

9      Q.    And you didn't cite any source for that

10  statement, did you?

11      A.    No.  Nope.  That's my opinion, and if it

12  wasn't true, I feel that BGS would not be in

13  business, right?  The reason that they're in

14  business is because people rely on that expertise

15  and trust in their grading; otherwise, no one would

16  give them business.

17      MR. REED:  Objection.  Nonresponsive.

18  BY MR. REED:

19      Q.    What Beckett or BGS business strategy

20  documents have you seen?

21      MR. HAMMERVOLD:  Object to form.

22  BY THE WITNESS:

23      A.    I don't recall.  Any documents that I

24  have seen would be in my Appendix at the bottom.



1  card and sent it to PSA for grading."

2       A.    Right.

3       Q.    And you cited some affidavits and

4  interrogatory response.  Does that refresh your

5  memory?

6       A.    Yes.  So August 30th is when it was

7  cracked out.

8       Q.    Okay.  So the earliest that it could

9  have been sold if it was sent off to PSA would be

10  sometime in September; correct?

11       A.    Correct.

12       Q.    How long does it normally take Alt to

13  sell a card of this value?

14       A.    That's a great question.  At auction 7

15  to 10 days.  At a fixed price between 2 days and 60

16  days.  So it depends on how they wanted to sell.

17       Q.    So you have a certain amount of

18  assumption that it would have to be sold.  To sell

19  it in September of 2022 would be by auction; right?

20       A.    Correct.  But I will note, sorry, that

21  the card was in very high demand at the time, hence

22  the prices.  So a private sale would have been

23  generally easier on this specific asset in my

24  opinion.



1        Q.    And what is your source for that this

2   card was in high demand in September of 2022?

3        A.    The price appreciation that I've cited

4   in my document.  Usually items go up when they are

5   in high demand.

6        Q.    It's no longer in high demand, is it?

7        MR. HAMMERVOLD:  Object to form.

8   BY THE WITNESS:

9        A.    Not as much.

10  BY MR. REED:

11       Q.    So is it your understanding that Alt's

12  basing its damages calculations based upon your

13  testimony here?

14       A.    I believe that's part of it, yes.

15       Q.    Okay.  And that's based upon what it

16  could have sold the card for in September of 2022;

17  right?

18       A.    Correct.

19       Q.    Let's see how you -- well, tell me how

20  did you come up with that $350,000 number?

21       A.    Yeah, again, like I mentioned in my

22  expert report, there are three direct data points

23  on this card, the most relevant being a Minimum Gem

24  at 336,000 in August 18, 2022, right before Alt



1      A.    Correct.

2      Q.    Is that something that's currently on

3  their Instagram today?

4      A.    It was as of November.  I believe it

5  will still be there.  They have no incentive to

6  take it down.

7      Q.    So how did you go and find it?

8      A.    I don't remember, but I found it, and I

9  included the photos in the additional details.  I

10  think on Alt we have the sales and the dates as

11  private sales.  So I went to their Instagram,

12  because they announce all of the big private sales,

13  and I scrolled down to the dates and then looked

14  there.

15      Q.    So you looked at Alt's internal data to

16  find that; right?

17      MR. HAMMERVOLD:  Object to form.

18  BY THE WITNESS:

19      A.    External.  That data is available to

20  anybody.  It's free data on our website.

21  BY MR. REED:

22      Q.    Where is it at?

23      A.    It's on Alt's website.  If you go to the

24  page for this card, you will see the sales.



1       Q.      Okay.   And so how did Alt come to learn
2   of this PWCC private sale?
3       A.      Uncertain.
4       Q.      And so you looked at Alt's Instagram as
5   well?
6       A.      No.
7       MR. HAMMERVOLD:  Object to form.
8   BY MR. REED:
9       Q.      Sorry.  PWCC's Instagram?
10      A.      Yeah, to confirm.  The links from Alt
11  bring you to the PWCC Instagram post from December
12  of 2021 and February 3rd, 2022.  So that's how I
13  found them on Instagram.
14      Q.      You didn't cite that in this report or
15  include that in your Appendix A, did you?
16      A.      No.
17      MR. HAMMERVOLD:  Object to form.
18  BY MR. REED:
19      Q.      And the third card you say that you
20  looked at was a sale on February 3rd, 2022, for
21  $575,000; correct?
22      A.      Yes.  Correct.
23      Q.      And this was seven months before Alt
24  alleges that it was going to sell the Steph Curry

1   card at issue; right?

2        A.    Yes.

3        Q.    About six months before the other -- the

4   $336,000 sale?

5        A.    Correct.

6        Q.    Okay.  What was the grade on this Steph

7   Curry card?

8        A.    9.5.

9        Q.    Who graded it?

10       A.    Beckett.

11       Q.    What number in the series was it?

12       A.    Uncertain.

13       Q.    You don't know?

14       A.    Nope.  I know none of them were number

15   30 or number 26.

16       Q.    Now, how do you know that it sold on

17   February 3rd for $575,000?

18       A.    The same exact way I know of the

19   previous sale that we just discussed.

20       Q.    So you found it in Alt's data, and then

21   went and looked at PWCC's Instagram account?

22       A.    Yes.  And just to verify, the sale was

23   announced by them, and both of those announcements

24   are included in my other report, the Supplemental



1    A.    I know what it says.  I know that it
2  says private sale.
3    Q.    If you would wait until I finish my
4  question, and then I will do the same on your
5  answers.  Okay?
6    A.    Yeah.
7    Q.    The PWCC Instagram just announces a
8  sale; right?
9    A.    Correct.
10    Q.    It has no information about whether the
11  actual card was paid for as a result, does it?
12    MR. HAMMERVOLD:  Object to form.
13  BY THE WITNESS:
14    A.    Uncertain, yeah, but I believe if they
15  announce a sale, then their reputation is on the
16  line, and so I took them at face value, correct.
17  BY MR. REED:
18    Q.    Did you talk with anyone at PWCC about
19  whether that was correct or not?
20    A.    No.  I haven't talked to anyone about
21  this trial.  So no.
22    Q.    Do you know whether PWCC has a policy on
23  when they report sales that if payment is not
24  received, then they remove the sales from the sales



```
 1  history?
 2       A.    Correct.  They do have that policy.
 3       Q.    Okay.  And so if they have that policy,
 4  then it's safe to assume that sometimes sales are
 5  announced, and then money isn't received and then
 6  they remove it?
 7       A.    No.  That policy is for auction items.
 8  Auction items can go unpaid.  Private sales --
 9  that's not a thing in the private sale market.
10  That would be a private offer.
11       Q.    What authority do you have for that?
12       A.    The word sale.
13       Q.    Just the word sale.  Anything else?
14       A.    Sale means completed in the industry.
15  Private offer would indicate that someone made the
16  offer and that money wasn't completed.
17       Q.    Any authority, any publication that you
18  have to support your statement that sale means
19  completed?
20       MR. HAMMERVOLD:  Object to form.
21  BY THE WITNESS:
22       A.    No.  I don't have any authority.
23  BY MR. REED:
24       Q.    That's just your opinion; right?
```



1        A.    Yeah.

2        MR. HAMMERVOLD:  Object to form.

3              Kendal, when it's a good time, can I

4    take two minutes to go to the bathroom?

5        MR. REED:  Let me go through this one more

6    exhibit here.

7        MR. HAMMERVOLD:  Okay.

8                   (WHEREUPON, a certain document was

9                   marked Levine Deposition Exhibit

10                  No. 7, for identification, as of

11                  2-7-24.)

12   BY MR. REED:

13       Q.    I will show you what has been marked as

14   Exhibit 7 for your deposition.  It's Bates labelled

15   Beckett 001111 through 1112.  Have you seen this

16   document before?

17       A.    Sorry.  Where was this document?

18       Q.    Can you not see it, sir?

19       A.    I can.  Where did this come from?  This

20   is from my --

21       Q.    It's labelled Beckett 001111 through

22   001112.  I will represent to you that this is a

23   document that Beckett has produced in this case.

24       A.    Oh, okay.



1  question?

2        A.    Yes.

3        Q.    All right.  Going back to your first

4  report here in paragraph 49 you state that because

5  the Steph Curry card at issue was trimmed, it

6  basically has no value; right?

7        A.    I didn't say no value.

8        Q.    Okay.  Let me see.  "Instead because the

9  Steph Curry card was trimmed, it had basically no

10  value to Alt."

11        A.    Yes.

12        Q.    Okay.  And Alt could not sell the card

13  for several reasons?

14        A.    Yes.

15        Q.    So it had no value to Alt but it did

16  have a value; right?

17        A.    Which I stated below is between 25 and

18  40,000.

19        Q.    To a private buyer?

20        A.    Yes.

21        Q.    Okay.  So is that in August, September

22  of 2022?

23        A.    Correct.

24        Q.    How did you come to arrive at that



1  opinion?

2       A.   Those are my personal expertise and

3  opinion on what an altered version of this asset

4  with the publicity of all of this would sell for.

5  It's very hard to find data on altered and trimmed

6  assets, because they don't sell publicly for

7  obvious reasons.

8       Q.   What data points did you look at?

9       A.   It's very difficult to find data points

10 on altered assets for obvious reasons.

11      Q.   Did you find any?

12      A.   No.  This was an educated guess based on

13 my expertise in the industry.  It's very difficult

14 to find data around trimmed assets.

15      Q.   Okay.  So you guessed.  Did you have any

16 methodology to your guess?

17      MR. HAMMERVOLD:  Object to form.

18 BY THE WITNESS:

19      A.   For that number, no.  It's not a guess.

20 It was an educated guess we will call it based on

21 the limited -- because the data is so limited,

22 that's what's basically essential to do in that

23 situation.

24 BY MR. REED:



1        A.    I believe it was put together in

2    Microsoft Word, maybe Excel.

3        Q.    Did you put it together in Microsoft

4    Word?

5        A.    I don't recall, but this looks like a

6    Microsoft Word chart.

7        Q.    Sitting here today, sir, you can't tell

8    me if you went in and entered this information into

9    a chart form or not?

10       A.    No.

11       Q.    This seems like a lot of work?

12       A.    Yeah.  I don't recall.

13       Q.    And I would think if someone went to

14   this amount of work to prepare a chart, that they

15   would remember it, wouldn't you?

16       A.    I don't believe it was me.  I don't

17   believe that it was me who, like, put the physical

18   chart together.

19       Q.    Do you know who it was?

20       A.    Counsel.  My counsel.

21       Q.    Okay.  This chart was provided to you

22   then?

23       A.    Collaborative, but you asked who put it

24   together.



1        Q.     What did you do to confirm that the

2    information in this chart was correct?

3        A.     Reviewed the invoices.

4        Q.     Invoices like what I just showed you;

5    right?

6        A.     Correct, but there were multiple

7    invoices.  That's why I didn't want to say yes that

8    I've seen an invoice that I hadn't seen previously.

9        Q.     And I don't think that it would be good

10   use of our time to sit here and go through every

11   invoice, but you didn't physically go to each

12   invoice and put it into the chart.  That was done

13   for you.

14            Afterwards did you go to each individual

15   invoice and confirm that each of this information

16   was correct?

17       A.     No.

18       Q.     So you can't know for sure whether the

19   information in this chart is correct or not, then,

20   can you?

21       A.     No.

22       Q.     You're assuming that it is because it

23   was given to you by counsel; right?

24       A.     Yes.



```
 1   BY MR. REED:
 2       Q.    Your chart seems to make the case that
 3   it's the exact same card, but you can't say that
 4   for certain; right?
 5       A.    Correct.
 6       MR. HAMMERVOLD:  Object to form.
 7   BY MR. REED:
 8       Q.    And you did nothing to confirm that the
 9   exact same card like that Topps Traded Cal Ripken
10   1982 was the exact same card submitted on
11   11/15/2016 and 4/27/2016, did you?
12       A.    No.  Unfortunately, like back in 2016
13   there was a lack of technology on Beckett's end.
14   So they don't, like, have records of any of -- like
15   imaging or any records of any of this, so that's --
16       Q.    How do you know that?
17       A.    Because I was in cards in 2016, and
18   Beckett had no records and didn't put serial
19   numbers like their competitors do on the slab.
20       Q.    Have you asked anyone whether they had
21   that?
22       A.    No.
23       Q.    That's just based upon your
24   recollection?
```



1    Q.    All right.  And then the 2009 Topps

2  Chrome Refractor Gold Stephen Curry with a 9.5

3  grade is there on Beckett 170; right?

4    A.    Correct.

5    Q.    There is no indication here that it's

6  the 26 out of 50 card; right?

7    A.    No indication.

8    Q.    And there's a number of other Beckett

9  9.5s out there in the world; right?

10    A.    Yes.

11    Q.    And so there is no definitive way for

12  you to say that is the same card that was submitted

13  on September 2nd or back in August either, is

14  there?

15    MR. HAMMERVOLD:  Object to form.

16  BY THE WITNESS:

17    A.    Not definitively, no.

18  BY MR. REED:

19    Q.    Not definitively?  You're just making

20  that assumption; right?

21    MR. HAMMERVOLD:  Object to form.

22  BY THE WITNESS:

23    A.    Yes.  This is a very rare asset.  For a

24  collector to have three copies would be extremely



1   earlier as not taking the proper steps to ensure

2   something is done correctly.  This is on a larger

3   level.  It's not on the individual level.  The

4   entire company was being negligent in this case

5   with Keith Koenig in my opinion.

6        Q.    You say, "Beckett should have had

7   policies, procedures and processes -- and processed

8   in place to recognize when someone resubmits a card

9   for grading when Beckett has already determined

10  that the card has been trimmed."

11           That's your statement; correct?

12       A.    Correct.

13       Q.    Do you have any source for that opinion?

14       MR. HAMMERVOLD:  Object to form.

15  BY THE WITNESS:

16       A.    Personal opinion as one of the leading

17  graders in the industry they should have procedures

18  in place around this.

19  BY MR. REED:

20       Q.    Your opinion is that Beckett as a

21  leading grader that they should; right?

22       A.    Correct.  One of the leading graders.

23       Q.    And you don't know if PSA does, though?

24       A.    Today, yes.  In 2016 I'm not sure.



1      Q.    Along with the what?

2      A.    The rarity of the asset itself.

3      Q.    Because there's 50 of them?

4      A.    Correct.

5      Q.    Okay.

6      A.    For example, the John Elway card that

7  you mentioned earlier has hundreds of thousands of

8  copies.  So the likelihood of it appearing on

9  multiple rows is greater than a card with only 50

10 copies.

11     Q.    I understand the likelihood would be

12 greater, but to go to extremely likely you're

13 only basing that on the invoices and on no other

14 evidence; correct?

15     MR. HAMMERVOLD:  Object to form.

16 BY THE WITNESS:

17     A.    And the print run of 50.  I want to

18 include that.  When I made that statement, the

19 print run of 50 was included with the invoices.

20 BY MR. REED:

21     Q.    You have no evidence that Mr. Koenig

22 owned one, three or ten of those 50, do you?

23     A.    I do not.

24     MR. HAMMERVOLD:  Object to form.



 1  BY MR. REED:
 2      Q.    You have no evidence of whether
 3  Mr. Koenig submitted cards just for himself or
 4  whether he was a bundler, do you?
 5      A.    I do not.
 6      Q.    Because you testified earlier that you
 7  are a bundler, or you were, that you did do that;
 8  right?
 9      A.    Correct.
10      Q.    Okay.  And so it's possible that
11  Mr. Koenig was a bundler, is it not?
12      A.    Yeah.  It's possible that he was a group
13  submitter, correct.
14      Q.    Sorry.  Group submitter.  Bundler maybe
15  that's my term, but group submitter I will use your
16  term there.
17          So it's possible that he could have been
18  submitting for other collectors that had these same
19  cards; right?
20      A.    Yeah, it's possible that he could have
21  been grading for other collectors, correct.
22      Q.    And so there is a possibility that
23  multiple collectors who like these extremely rare
24  type of cards could have used him to submit these



1   to Beckett; correct?

2        A.    Possible.

3        Q.    Okay.  But there's no document, there's

4   nothing else that I could look at that supports

5   this idea that those were the same -- the same

6   card, the No. 26 card, was submitted three or more

7   times to Beckett, is there?

8        A.    Correct.

9        Q.    Now, it's your opinion that Beckett

10  could have easily had policies in place to

11  determine whether someone was resubmitting a card;

12  right?

13       A.    Yes.

14       Q.    And your support for that is what?

15       A.    Simply put, all they had to do was put

16  on the invoices that the card was No. 26 out of 50,

17  and we wouldn't be in this situation.

18       Q.    Okay.  Anything else?

19       MR. HAMMERVOLD:  Object to form.

20  BY THE WITNESS:

21       A.    Not off of the top of my head.

22  BY MR. REED:

23       Q.    And how would they have done that on the

24  John Elway card, which you said there's thousands



1  BY THE WITNESS:

2      A.   I do not.  I only have the evidence of

3  who submitted the card.

4  BY MR. REED:

5      Q.   No one has admitted to trimming the

6  card; correct?

7      A.   Correct.

8      Q.   No one has testified in a deposition or

9  trial that they trimmed the card; right?

10     A.   Not that I'm aware of.

11     Q.   No one has submitted an affidavit that

12  they trim the card; right?

13     A.   Not that I'm aware of, no.

14     Q.   You don't have any personal knowledge

15  that you viewed someone actually trimming the card?

16     A.   Correct.

17     Q.   You can't say for certain when it was

18  trimmed, can you, if it was?

19     A.   Correct.

20     Q.   Okay.  So your statement here in

21  paragraph 21 that the failure to identify the card

22  as trimmed is based 100 percent upon the assumption

23  that the same card was submitted three times;

24  right?



1          MR. HAMMERVOLD:   Object to form.

2    BY THE WITNESS:

3          A.    Right.

4    BY MR. REED:

5          Q.    And if that assumption is incorrect,

6    then your statement here is incorrect?

7          MR. HAMMERVOLD:   Object to form.

8    BY THE WITNESS:

9          A.    Yes.  If that statement is incorrect,

10   then yes.

11   BY MR. REED:

12         Q.    And you did nothing to verify whether

13   that assumption was correct, did you?

14         MR. HAMMERVOLD:   Object to form.

15   BY THE WITNESS:

16         A.    I didn't know what to do to verify

17   beyond what I shared here, so --

18   BY MR. REED:

19         Q.    So you didn't do anything; right?

20         MR. HAMMERVOLD:   Object to form.

21   BY THE WITNESS:

22         A.    Correct.

23   BY MR. REED:

24         Q.    In paragraph 22 at the end of it you say



1  that, "Alt relied on Beckett's October 2016 grading

2  of the card to its detriment and suffered a loss."

3           Do you see that?

4       A.    What part, sir?  Sorry.

5       Q.    The very last of paragraph 22, the last

6  sentence there.

7       A.    Okay.

8       Q.    I will bring it up here.  Sorry.  It's

9  kind of at the bottom of the page.  There we go.

10 You say, "Regardless of the cause of the Steph

11 Curry card measuring short, Alt relied on Beckett's

12 October 2016 grading of the card to its detriment

13 and suffered a loss."

14      A.    Correct.

15      Q.    What do you mean by relied?

16      A.    When cards are encapsulated in the

17 Beckett holder, it is accepted that they are

18 providing their stamp of authentication on it.  Alt

19 trusted that and relied upon that and Beckett let

20 them down via their negligence and caused Alt to

21 suffer a loss.

22      Q.    Okay.  And by rely, you mean they viewed

23 that label on the card from 2016; right?

24      A.    Yes.  They relied upon that label as a



1    stamp of authentication.

2        Q.    And that's what Alt relied on when they

3    purchased the card in 2020; right?

4        A.    I wasn't at the company in 2020.

5        Q.    That's when you understand that they

6    purchased it; right?

7        A.    I believe that that's what they relied

8    upon, but can't say for certain.

9        Q.    Well, what did you base your statement

10   on here at the end of the paragraph?

11       A.    That typically when people buy cards in

12   Beckett holders, they are relying upon that holder

13   as a source of authentication.  So I assumed that

14   Alt used that holder as their source of

15   authentication.

16       Q.    That's an assumption.  You didn't

17   actually go and verify that, did you?

18       A.    No.

19       Q.    Okay.  You state that Alt is not in the

20   business of card grading; correct?

21       A.    Correct.

22       Q.    And they did not measure the card

23   itself?

24       A.    Correct.



1    Q.    They could have; right?

2    MR. HAMMERVOLD:  Object to form.

3  BY THE WITNESS:

4    A.    They could have in you think that they

5  should have, or they could have in they physically

6  could have?

7  BY MR. REED:

8    Q.    I asked you the question, sir.  Alt

9  could have measured the card; right?

10    A.    So is like do I believe that Alt should

11  have, or could they physically have measured it

12  with a ruler?

13    Q.    I didn't ask you should they have.  I

14  asked you the question --

15    A.    Yes, they physically could have measured

16  the card.

17    Q.    Did you do anything to determine why

18  they did not?

19    A.    Because they put their faith in the

20  Beckett holder that the card was not altered.

21    Q.    Who at Alt had told you that they didn't

22  measure it because they put their faith in Beckett?

23    A.    No one told me that.  It's inferred in

24  the conversations.



1        Q.    So you assumed that; right?

2        A.    Yeah, I inferred that.

3        Q.    Okay.  But you didn't do anything to ask

4    anyone as to why --

5        A.    As I mentioned -- sorry.

6        Q.    -- did you?

7        A.    Sorry.  As I mentioned, I spoke with no

8    one internally about the case.

9        Q.    Okay.  Now, in paragraph 25 here you

10   take issue with the defendant's expert opinion that

11   you can never know what happened to a card when

12   it's raw.

13       A.    Uh-huh.

14       Q.    According to you, the defendant's expert

15   ignored the evidence and testimony of the

16   individuals who had personal knowledge of its

17   handling after Alt cracked the slab in 2022;

18   correct?

19       A.    Yes.

20       Q.    How do you know that the defendant's

21   expert ignored what you call the evidence and

22   testimony?

23       A.    Because had he not, he wouldn't have

24   made that statement.



1  come back as trimmed, but you didn't trim it;

2  right?

3       A.    Correct.

4       Q.    And you have had cards come back as

5  trimmed that you didn't believe were trimmed;

6  right?

7       A.    Again, I don't know the specifications.

8  We have been over this.  I don't measure my cards.

9  I am not a card trimmer.  Card trimmers would

10  understand if the card is trimmed or not.

11  Collectors do not understand if the card is trimmed

12  or not.

13            So Keith Koenig understands if the card

14  is trimmed or not.  Matt Levine doesn't.  Matt

15  Levine's naked eye cannot --

16       Q.    You're assuming that Keith Koenig is a

17  card trimmer, but there has been no finding in a

18  court of law that he is, is there?

19       A.    No.  No.

20       Q.    He has never admitted that as far as you

21  know?

22       A.    No.

23       Q.    Okay.  So you're just making that

24  assumption; right?



1        MR. HAMMERVOLD:  Object to form.

2   BY THE WITNESS:

3        A.    I'm making the assumption that Keith

4   Koenig is a card trimmer, yes.

5   BY MR. REED:

6        Q.    Okay.  Now, you've criticized

7   defendant's expert for listing Curry card sales

8   from 2017 to 2023, because you claim that the Steph

9   Curry card market from 2017 to 2019 was in it's

10  infancy; correct?

11       A.    Yes.  That's not a claim.  The card sold

12  for $7,000 in 2017.

13       Q.    And that's because the market exploded

14  in 2020 with rising values; right?

15       A.    Right.

16       Q.    And that's your opinion; right?

17       A.    That's not an opinion.  The card sold

18  for $7,000 in 2017 and $500,000 in 2022.  So that's

19  not an opinion.  Those are facts.

20       Q.    And now it's coming back down to earth,

21  though; right?

22       A.    A little bit, but not where it was in

23  2017, right.

24       Q.    And it's your opinion that defendant's



1       A.    I said the word record breaking sale is
2   stated, and you said that it doesn't state that.
3   I'm not sure what you're looking at, but I see
4   record breaking sale.
5       Q.    Well, it doesn't say that sale means
6   money completed; right?
7       A.    What's the legal definition of sale,
8   Kendal?
9       Q.    I'm not here for questions.  Do you
10  understand what the legal definition of sale is?
11      A.    I used my definition of sale.
12      Q.    Do you know whether PWCC on their
13  Instagram account used the legal definition of
14  sale?
15      A.    Maybe.  I will ask them.
16      Q.    You didn't beforehand, did you?
17      A.    No.
18      Q.    You didn't do anything to confirm
19  whether the sale actually funded, did you?
20      MR. HAMMERVOLD:  Object to form.
21  BY THE WITNESS:
22      A.    No.
23  BY MR. REED:
24      Q.    And, in fact, when we looked at PWCC's



1  own website, they state that they don't include in

2  their history sales that don't fund; right?

3       A.   I'm not sure if that relates to private

4  sales.  As I mentioned, that sales history is from

5  their auction earlier.  I don't know if that

6  relates to their private sale network.

7       Q.   So Alt does nothing in its data to

8  confirm whether the sales actually closed; right?

9       A.   Not for private sales, no.

10       Q.   It just scrapes the information from

11  Instagram; right?

12       A.   No.  That's not what happens.  This is

13  submitted to Alt as a sale.  They don't scrape

14  anything from Instagram.

15       Q.   Who submitted it?

16       A.   I'm not sure.  Probably the company.

17       Q.   You didn't do anything to verify that,

18  did you?

19       A.   I assume if Alt included it, it was

20  submitted directly by PWCC, but that's an

21  assumption.

22       Q.   You did nothing to confirm that, did

23  you?

24       A.   I did not.  I spoke with no one



1  STATE OF ILLINOIS    )

2                       )  SS:

3  COUNTY OF DU PAGE    )

4

5          I, NANCY A. GUIDOLIN, CSR No. 84-2531, a

6  Notary Public within and for the County of DuPage,

7  State of Illinois, and a Certified Shorthand

8  Reporter of said state, do hereby certify:

9          That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13          That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18          That the said deposition was taken

19  before me at the time and place specified;

20          That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in

24  the outcome of this action.



1            IN WITNESS WHEREOF, I do hereunto set my

2    hand of office at Chicago, Illinois, this 20th day

3    of February, 2024.

4

5

6

7                        *Nancy A. Guidolin*

8                    Notary Public,

9                    DuPage County, Illinois.

10

11

12   NANCY A. GUIDOLIN, CSR No. 84-2531

13

14

15

16

17

18

19

20

21

22

23

24



800.211.DEPO (3376)
EsquireSolutions.com

154

# EXHIBIT 4

```
 1            IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF TEXAS

 3                    DALLAS DIVISION

 4   ALT SPORTS CARD FUND GP,     )

 5   LLC, as the General          )

 6   Partner of Alt Sports        )

 7   Card Fund, L.P., and ALT     ) Civil Action No.

 8   PLATFORM, INC.,              ) 3:22-cv-02867-N

 9                  Plaintiffs,   )

10        -vs-                    )

11   BECKETT COLLECTIBLES,        )

12   LLC,                         )

13                  Defendant.    )

14        The videotaped deposition of JONATHAN E.

15   EUSTON, via Zoom, called for examination, taken

16   pursuant to the Federal Rules of Civil Procedure of

17   the United States District Courts pertaining to the

18   taking of depositions, taken before NANCY A.

19   GUIDOLIN, CSR No. 84-2531, a Notary Public within

20   and for the County of DuPage, State of Illinois,

21   and a Certified Shorthand Reporter of said state,

22   at New Castle, Delaware, on the 6th day of

23   February, 2024, commencing at 10:00 a.m. eastern

24   time.
```



1   700 to a thousand isn't actually accurate for the

2   last two years, but the amount of cards that we

3   cracked is probably around 50.

4        Q.    Okay.  You said there is a spreadsheet

5   that you could look at to see what has been

6   submitted?

7        A.    Correct.  Yeah, we keep track of all

8   cards that we sent.

9        Q.    And what's the name of that spreadsheet?

10       A.    It's called Grading Submissions

11  Spreadsheet.

12       Q.    So when you submit a card for grading,

13  you input that information onto that spreadsheet?

14       A.    Correct.

15       Q.    Now, inside the slab is the card just

16  inside of the slab, or does it have additional

17  protections?

18       A.    With Beckett typically there is a

19  protective plastic seal that the card is encased in

20  within the slab.

21       Q.    Like a plastic sleeve or something?

22       A.    Yeah.  Yeah, the sleeve we refer to

23  cards being in are called penny sleeves, but it's

24  essentially just a small plastic, flexible sleeve



1   that the card sits in.  The Beckett one is enclosed

2   on all four sides.

3       Q.    Okay.  So in a Beckett slab we have a

4   card that's enclosed in this plastic sleeve or

5   something that's completely closed, and then that's

6   enclosed inside of the slab; correct?

7       A.    The hard plastic slab, correct.

8       Q.    Okay.  And so to get that card out, you

9   have to crack that hard plastic slab first;

10  correct?

11      A.    Correct.

12      Q.    And then cut the sleeve open to get the

13  card out; right?

14      A.    Correct.

15      Q.    Okay.  And that's something that exactly

16  what Alt Platform did regarding the Curry card

17  here; correct?

18      A.    Correct.

19      Q.    So it cracked the tamper proof slab, and

20  did that how?

21      A.    With a pair of cutting pliers and then

22  pried it with a flathead screwdriver.

23      Q.    Okay.  So you had to cut the hard

24  plastic with some pliers and then pry it open with



1  not.

2      Q.    Okay.  Now, the removal of the Steph

3  Curry card from the plastic sleeve was not recorded

4  or captured on video; correct?

5      A.    Not that I'm aware of.

6      Q.    You haven't seen a video, have you?

7      A.    I have not seen a video.

8      Q.    You all could have videoed it if you

9  wanted to; right?

10     A.    Correct.

11     Q.    Now, you state here, "The card did not

12 sustain any damage and was not tampered with at any

13 point during this process."

14           Did I read that correctly?

15     A.    You did.

16     Q.    Now, that's something that you can't

17 know for sure because you were not over there and

18 viewing it when it was cut from the sleeve, did

19 you?

20     A.    I didn't witness the cut.

21     Q.    Okay.  So you don't know if it sustained

22 any damage over there because you didn't witness

23 that; right?

24     A.    When it was returned to me for packing,



1    months ago" next to his name; right?

2         A.    Uh-huh.  Correct.

3         Q.    It says, "The old label is in there,

4    too, right?"  And you respond, "Yes, sir."

5              Do you know what he's referring to

6    there?

7         A.    He is referring to the label that was

8    included in the Beckett slab when it was cracked.

9    So the original Beckett slab has a label on it.  We

10   included the label with the Curry card when we sent

11   it back to Beckett.

12        Q.    Okay.  So this is the label that was

13   part of the Beckett slab?

14        A.    Correct.

15        Q.    That wasn't sent to PSA, was it?

16        A.    It was not.

17        Q.    Okay.  And so when he was asking is it

18   in there, too, right, is he referring to you sent

19   it to Beckett when you submitted it to Beckett

20   following the PSA submission?

21        A.    That's right.

22        Q.    All right.  And so you sent back the raw

23   card with the old label; is that correct?

24        A.    That's right.



1    Q.    And how was it packaged in here?  Was it

2  in a penny sleeve again?

3    A.    It was still in a penny sleeve and top

4  loader.

5    Q.    And a top loader with the old label?

6    A.    Correct.

7    Q.    Now, you sent back the old label because

8  you were wanting Beckett to re-slab the Curry card

9  with that label; correct?

10    A.    Maybe not with that label, but to retain

11  the original grade.

12    Q.    Okay.  So you wanted them to put it back

13  in a slab with a 9.5 grade; right?

14    MR. HAMMERVOLD:  Object to form.

15  BY THE WITNESS:

16    A.    Correct.

17  BY MR. REED:

18    Q.    Okay.

19    A.    That was what they believed was the best

20  thing to do.

21    Q.    When you say "they," who you are

22  referring to?

23    A.    Darius, Leore.

24    Q.    They told you to do it?



```
1   STATE OF ILLINOIS    )

2                        )  SS:

3   COUNTY OF DU PAGE    )

4

5              I, NANCY A. GUIDOLIN, CSR No. 84-2531, a

6   Notary Public within and for the County of DuPage,

7   State of Illinois, and a Certified Shorthand

8   Reporter of said state, do hereby certify:

9              That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13             That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18             That the said deposition was taken

19  before me at the time and place specified;

20             That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in

24  the outcome of this action.
```



1          IN WITNESS WHEREOF, I do hereunto set my

2    hand of office at Chicago, Illinois, this 17th day

3    of February, 2024.

4

5

6

7

8                    Notary Public,

9                    DuPage County, Illinois.

10

11

12   NANCY A. GUIDOLIN, CSR No. 84-2531

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 5

1                IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
2                         DALLAS DIVISION

3   -------------------------------------------------

4   ALT SPORTS CARD FUND GP, LLC, as the
    General Partner of Alt Sports Card Fund, L.P.,
5   and ALT PLATFORM, INC.,

6               Plaintiffs,
                                        Civil Action No.
7       v.                              3:22-cv-02867-N

8   BECKETT COLLECTIBLES, LLC,

9               Defendant.

10  -------------------------------------------------

11

12               REMOTE VIDEOTAPED DEPOSITION

13                          OF

14               ALEXANDER LIRIANO

15               FEBRUARY 26, 2024

16

17

18

19

20

21

22

23

24  Job No. J10954090
    Stenographically Reported by:
25  Amy Larson, RPR, CSR, CCR



1        not like it's air-sealed tight like, you

2        know, like, compressed into the card.  No.

3               Like, there's like -- it's a very

4        small room, but, like, there's enough for a

5        scissor to fit there, there's enough for,

6        like, I would say two tips of a ballpoint pen

7        could fit in between the card and where the

8        plastic is.  So you can look at it that way.

9               But what I did, was I take the

10       thinnest object and the most sharp object to

11       get it done, right?  You want to avoid

12       anything to happen to the card.  So what you

13       do is -- well, what I did is I took a blade

14       that I did the rest of the Beckett cracks

15       that I've done before, just precisely went

16       down, opened it, done, handed it off to Jon.

17   Q.  What kind of blade did you use?

18   A.  It was like a Uline -- like a -- just a razor

19       blade, your typical box cutter.  Like, that

20       blade, but it was like -- how do I -- you

21       know the ones that just like pop up with

22       your -- like, you could just like prop them

23       up with your finger.  It's not like a long --

24       like an elongated blade.  It's like -- it's

25       maybe like this size, (indicating).



1                    REPORTER'S CERTIFICATE

2            Be it known that I took the foregoing

3    remote deposition of Alexander Liriano, on

4    February 26, 2024;

5            That I was then and there a Registered

6    Professional Reporter and a Notary Public,

7    and that by virtue thereof, I was duly authorized

8    to administer an oath;

9            That the witness was by me first duly

10   sworn to testify to the truth, the whole truth and

11   nothing but the truth relative to said cause;

12           That the foregoing transcript is a true

13   and correct transcript of my stenographic notes in

14   said matter;

15           That the witness waived the right to read

16   and sign the transcript;

17           That I am not related to any of the

18   parties hereto, nor interested in the outcome of

19   the action;

20       WITNESS MY HAND AND SEAL this 7th day of

21   February, 2024.    _____
                        Amy L. Larson, RPR
22                      My Commission Expires 01/31/25

23

24

25

