## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| ALT SPORTS CARD FUND GP LLC, as the General Partner of Alt Sports Card Fund, L.P., ALT PLATFORM, INC.,<br><br>    Plaintiffs,<br><br>v.<br><br>BECKETT COLLECTIBLES, LLC,<br><br>    Defendant. | No. 3:22-cv-02867-N |

**APPENDIX IN SUPPORT OF BECKETT COLLECTIBLES, LLC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

| Exhibit No. | Document | Appendix Range |
|---|---|---|
| Exhibit 1 | Affidavit of Kevin Isaacson in Support of Defendant Beckett Collectibles, LLC's Brief in Support of Motion for Summary Judgment | 1-3 |
| Exhibit 2 | Excerpts from the Deposition of Ben Leore Avidar | 4-21 |
| Exhibit 3 | Affidavit of Abigail R.S. Campbell in Support of Motion for Summary Judgment | 22-24 |
| Exhibit 3A | Defendant's Amended Responses to Plaintiffs' First Set of Interrogatories | 25-33 |
| Exhibit 3B | Goldin Invoices | 34-36 |
| Exhibit 3C | 8/30/2022 Slack Messages | 37-47 |
| Exhibit 3D | Submission Form | 48-53 |
| Exhibit 3E | 9/20 email | 54-55 |
| Exhibit 3F | 9/20 PSA email | 56-57 |
| Exhibit 3G | 9/22 Email from J. Downer | 58-59 |
| Exhibit 3H | FRB Bank Account Statement | 60-61 |

| Exhibit 3I | Alt Sports Card Fund Operating Agreement | 62-66 |
| Exhibit 3J | Alt Sports Card Fund, L.P. Certificate of Limited Partnership | 67-69 |
| Exhibit 3K | Certificate of incorporation of Alt Platform Inc. | 70-81 |
| Exhibit 3L | Beckett's Terms of Service | 82-97 |
| Exhibit 3M | 9/1 Slack Messages | 98-100 |
| Exhibit 4 | Excerpts from the Deposition of Darius Sadeghi | 101-126 |
| Exhibit 5 | Excerpts from the Deposition of Matthew Levine | 127-137 |
| Exhibit 6 | Excerpts from the Deposition of Jonathan Euston | 138-149 |
| Exhibit 7 | Excerpts from the Deposition of Kaushik Mohan | 150-155 |
| Exhibit 8 | Excerpts from the Deposition of Alexander Liriano | 156-160 |

Dated: March 12, 2024                    Respectfully submitted,

**CONDON TOBIN SLADEK THORNTON NERENBERG PLLC**

*/s/ Abigail R.S. Campbell_____*
Aaron Z. Tobin
Texas State Bar No. 24028045
Kendal B. Reed
Texas State Bar No. 24048755
Abigail R.S. Campbell
Texas State Bar No. 24098959
8080 Park Lane, Suite 700
Dallas, Texas 75231
Telephone: (214) 265-3800
Facsimile: (214) 691-6311
atobin@condontobin.com
kreed@condontobin.com
acampbell@condontobin.com

*Attorneys for Defendant*
*Beckett Collectibles, LLC*

28240855v2 92001.031.00

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 12, 2024, the foregoing was electronically submitted to the clerk of court for the United States District Court for the Northern District of Texas using the Court's electronic filing system and that all counsel of record were served electronically or as authorized by the Federal Rules of Civil Procedure.

*/s/ Abigail R.S. Campbell*
Abigail R.S. Campbell

# EXHIBIT 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ALT SPORTS CARD FUND GP LLC, as the
General Partner of Alt Sports Card Fund,
L.P.; ALT PLATFORM, INC.,

    Plaintiffs,

v.

BECKETT COLLECTIBLES, LLC,

    Defendant.

No. 3:22-cv-02867-N

### AFFIDAVIT OF KEVIN ISAACSON IN SUPPORT OF DEFENDANT BECKETT COLLECTIBLES, LLC'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

STATE OF TEXAS         §
                              §
COUNTY OF DALLAS    §

    BEFORE ME, the undersigned authority, on this day appeared Kevin Isaacson, who being by me duly sworn, upon her oath stated as follows:

    1.    My name is Kevin Isaacson. I am over 18 years of age, of sound mind and am otherwise legally competent to make this affidavit.

    2.    I am currently the Chief Executive Officer of the Beckett Group companies, which includes Beckett Collectibles, LLC ("Beckett"). As part of my role as Chief Executive Officer, I oversee the ongoing operations of all divisions of Beckett. The facts stated in this affidavit are within my personal knowledge, unless stated upon information and belief, and are true and correct.

    3.    Beckett is a grading, authentication, and marketplace business for sports memorabilia. Specifically, Beckett's grading division accepts trading card submissions from customers for Beckett to analyze and assign a grade from 1 to 10.

1

4.    When Beckett grades a trading card, it secures the card in a plastic sleeve sealed on all sides and encapsulates it in a clear, tamper-proof slab.

5.    The Beckett's slabs are completely see-through cases where all aspects of the card are visible.

6.    Though the Beckett slabs are tamper-proof, there is no restriction that prevents an individual from cracking open a previously graded card.

FURTHER, AFFIANT SAYETH NOT.

DATED the 12 day of March, 2024

By: _____

BEFORE ME, the undersigned authority, on this day personally appeared Abigail R.S. Campbell who being by me duly sworn on her oath deposed and said that every statement contained herein is within her personal knowledge and is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME on this 12th day of March, 2024, to certify which witness my hand and official seal.

_____
Notary for the State of Texas

Print Name: Cynthia D. Navarro

My Commission Expires: 12/7/26

CYNTHIA D NAVARRO
Notary ID #10012167
My Commission Expires
December 7, 2026

2

# EXHIBIT 2

BEN L. AVIDAR                                           February 12, 2024
ALT SPORTS CARD FUND vs BECKETT                                    1

```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3

 4
     ALT SPORTS CARD FUND GP, LLC, as  )
 5   the General Partner of Alt Sports )
     Card Fund, L.P., and ALT PLATFORM,)
 6   INC.,                             )
                                       )
 7                     Plaintiff,      )
                                       )
 8            VS                       )No. 3:22-cv-02867-N
                                       )
 9   BECKETT COLLECTIBLES, LLC         )
                                       )
10                     Defendant.      )

11

12          The video teleconference deposition of BEN

13   LEORE AVIDAR, taken pursuant to the Rules of the

14   Supreme Court of the State of Texas pertaining to the

15   taking of depositions for the purpose of discovery,

16   taken before Ms. Vernetta McCree, Notary Public and

17   Certified Shorthand Reporter in the County of Will,

18   State of Illinois, on the 12th day of February, A.D.,

19   2024 at 9:05 a.m.

20

21

22

23

24
```



1      A.      And, venture companies.

2      Q.      Why did you leave there?

3      A.      I started a company.

4      Q.      So, you left to start what company?

5      A.      Lob.com.

6      Q.      And, do you recall what year you started

7   lob.com?

8      A.      2013.

9      Q.      And, you were its CEO until yesterday?

10      A.      Correct.

11      Q.      All right.  So, lob.com has been going on

12   since 2013.  And then, at some point you decided to

13   start ALT Platform, correct?

14      A.      Correct.

15      Q.      And, when did you start and form ALT

16   Platform Inc?

17      A.      2020.

18      Q.      Now, was the fund ALT Sports Card Fund LP

19   started at the same time?

20      A.      No.

21      Q.      So, you started the Platform Inc. first?

22      A.      Correct.

23      Q.      And, when you started what was the

24   business purpose for ALT Platform, Inc.?



1      A.      To create a marketplace for trading cards,

2  to create product, and services, and marketplaces for

3  trading cards.

4      Q.      Prior to starting ALT Platform, Inc., have

5  you ever been employed in any way in the trading card,

6  or collectibles business?

7      A.      No.

8      Q.      Have you ever been employed as a grader at

9  any company for collectibles?

10     A.      No.

11     Q.      At any point in time, has ALT Platform,

12  Inc. offered grading services?

13     A.      No.  Sorry, can you clarify that?

14     Q.      Well, my question was at any time has ALT

15  Platform, Inc. offered grading services, meaning did

16  they provide services where they were grading cards?

17     A.      Can you clarify what you mean by grading

18  cards?  Sending it to a grading company, or grading

19  them on site in our own encapsulation?

20     Q.      I appreciate you asking for that

21  clarification.  I was meaning actually ALT Platform,

22  Inc. employees doing the actual grading?

23     A.      Can you be specific?

24     Q.      Actually sitting down grading a card,



BEN L. AVIDAR                                        February 12, 2024
ALT SPORTS CARD FUND vs BECKETT                                    47

```
 1        A.     N I S H A N T,  G R O V E R.
 2        Q.     Do you have any other interest other than
 3   this carried interest in the ALT Sports Card Fund GP,
 4   LLC?
 5        A.     Not to my knowledge.
 6        Q.     How about, do you have any ownership
 7   interest in ALT Sports Card Fund LP?
 8        A.     Yes.
 9        Q.     And, what's your percentage interest?
10        A.     I don't recall.
11        Q.     You had the initial investment of
12   somewhere between $500,000 and $2 million?
13        A.     If that's what I said, then yes.
14        Q.     Is that true?
15        A.     Yes.
16        Q.     Have you made any other investment into
17   the ALT Sports Card Fund LP other than that initial
18   investment?
19        A.     No.
20        Q.     You said ALT Sports Card -- sorry, strike
21   that -- let me start over.  You said ALT Platform,
22   Inc. was formed in 2020.  When was the fund formed?
23        A.     After that.
24        Q.     Do you recall how long after?
```



1          A.     I do not.

2          Q.     What's the purpose of the fund?

3          A.     To invest in sports cards.

4          Q.     So, when you say invest in sports cards,

5    to actually purchase sports cards?

6          A.     To purchase sports cards, hold them,

7    speculate on them, and to run arbitrage, and different

8    strategies to create profits.

9          Q.     What do you mean when you say to run

10   arbitrage?

11         A.     To take advantage of inefficiencies in the

12   market.

13         Q.     How does one go about taking advantage of

14   inefficiencies in the market?

15         A.     There's a whole bunch of strategies.

16         Q.     Give me an example?

17         A.     There could be asymmetry of information on

18   how much something is worth.

19         Q.     Okay.  So, you look at a card and see a

20   price, say one price, and you believe that it's worth

21   a lot more than that so you buy it, is that one

22   strategy?

23         A.     No, that would be speculation.

24         Q.     Okay.  What's the difference, then?



1      A.      An arbitrage would be you see a card that

2   was sold on one exchange for one price, and being

3   bought on another exchange for a different price.

4   And, knowing that if you buy in one place, and sell at

5   another place that there's a high chance that you can

6   realize a margin.

7      Q.      Oh, I see what you're saying.  Now, the

8   ALT Sports Card Fund LP, as it exists today, that's

9   not how you started though, right?

10     A.      Correct.

11     Q.      How did you start?

12     A.      There were two separate funds.

13     Q.      And, what were those two separate funds?

14     A.      I think the name was ALT Sports Card, ALT

15   Fund I, and ALT Fund II.

16     Q.      And, why were there two separate funds to

17   begin with?

18     A.      We started one fund.  We closed it.  We

19   had more interest, so we opened another fund.  And,

20   instead of managing two separate funds, we combined

21   them so both investors could get a larger, more

22   diversified pool of assets.

23     Q.      When were they combined?

24     A.      In the past three years.



1       A.      Potentially.

2       Q.      Okay, what do you mean potentially?

3       A.      I'd have to ask, I'm not sure.

4       Q.      So, you don't know as you sit here, is

5   that fair to say?

6       A.      Yes.

7       Q.      Who at ALT would know that answer?

8       A.      Nishant.

9       Q.      Have the ALT entities ever been sued, as

10   in being a Defendant in a lawsuit?

11      A.      I don't think so, to the best of my

12   knowledge.

13      Q.      All right.  The ALT Platform, I believe

14   you were telling me before this, is it fair to call it

15   an online marketplace for sports cards?

16      A.      Part of our services, yes.

17      Q.      What other services does ALT Platform

18   provide?

19      A.      Lending.

20      Q.      What else?

21      A.      At the moment, vaulting, lending, and

22   marketplace.

23      Q.      When you say lending, is it just like a

24   bank?



1          A.      Correct, we'll lend you money against

2     collateralized sports cards.

3          Q.      Okay.  They have to be in the vault?

4          A.      Correct.

5          Q.      So, if a customer has certain cards in the

6     vault then they can take out a loan which, against

7     those cards that are in the vault with ALT, is that

8     fair to say?

9          A.      Correct.

10         Q.      The vaulting is just a service provided

11    where you keep certain cards safe for customers?

12         A.      Provide digitalization.

13         Q.      Okay.

14         A.      Storage.

15         Q.      There's a fee for that?

16         A.      It's baked into the rest of the business.

17         Q.      So, there's not like if I just had a card

18    that I wanted to keep safe, and I like the ALT vault,

19    and I liked being able to see the digitalization, and

20    I didn't do anything else, or that I just wanted to

21    store it there, would there be a fee for me to do

22    that?

23         A.      If you just keep it there and did nothing,

24    there would not be a fee.



1    Q.    So, you say it's baked into the, so it's

2    baked into the service for when you actually trade

3    cards then, is that what you're saying?

4    A.    When you take action in any of the other

5    monetization ways, then we make money on vaulting.

6    Q.    Okay.  So, what actions are monetized at

7    ALT?

8    A.    When you trade on the marketplace.

9    Q.    Okay.

10    A.    When you lend, and there's a fee when you

11    take your cards out.

12    Q.    Okay.  So, when I decide I just, I want to

13    get my card back, then there's a fee at that?

14    A.    Correct.

15    Q.    Okay.  But, if it just sits there, and I

16    don't do anything else, I could let it just sit there

17    without a fee?

18    A.    Correct.

19    Q.    Now, the fund, the ALT Sports Card Fund

20    actually purchased cards as investments, is that true?

21    A.    Correct.

22    Q.    And then, will sell them to make a profit,

23    correct?

24    A.    Not necessarily.



BEN L. AVIDAR                                                February 12, 2024
ALT SPORTS CARD FUND vs BECKETT                                            74

```
 1        Q.      Why else would you sell them?
 2        A.      We would not, we might not sell them.
 3        Q.      Oh.  So, it could be an investment you
 4   hold?
 5        A.      Correct.
 6        Q.      Okay.  So, customers of ALT Platform
 7   interact through, how do -- strike that -- let me
 8   start over -- how do customers of ALT Platform
 9   interact with the company?
10        A.      Through a online portal.
11        Q.      Okay.  Is there an app as well?
12        A.      Correct.
13        Q.      Now, as part of that online portal and
14   app, ALT Platforms has terms of service, correct?
15        A.      Sorry, can you rephrase?
16        Q.      The online platform and app have a terms
17   of service?
18        A.      Correct.
19        Q.      Are you familiar with the terms of
20   service?
21        A.      In a vague way.
22                (WHEREUPON, Exhibit No. 2 was marked
23   for Identification)
24        Q.      I'll show you what's been marked as
```



1    Q.    I'm sorry, I didn't hear you over the

2    objection.

3    A.    Not that I can recall.

4    Q.    Okay.  The next one is submission of the

5    Curry card for regrading by PSA and BGS.  What do you

6    understand regrading to mean?

7    A.    Regrading?

8    Q.    Yeah, what does that mean?

9    A.    Potentially cross grading.

10   Q.    Okay.  Is there a difference in your mind

11   between cross grading and regrading?

12   A.    Yes.

13   Q.    What's the difference?

14   A.    Different grading companies have different

15   grading processing.  In some cases I think Beckett

16   allows you to take a card in a slab and get it

17   regraded, and potentially to get the grades bumped up

18   higher without submitting it for grading.  So, it's a

19   re review, but you look at it in a slab.

20   Q.    Okay.  And, that's different from cross

21   grading how?

22   A.    Cross grading is when you send it from one

23   company to another in its slab.

24   Q.    All right, then what do you call it when

BEN L. AVIDAR
ALT SPORTS CARD FUND vs BECKETT

February 12, 2024
232

1    Q.    Okay.  So, the buyer's premium was

2    $116,000?

3    A.    Generally a percentage of the 580.  So,

4    you would do 116 divided by 580 to understand the

5    buyer's premium.  And then, you would apply that

6    buyer's premium to the 140.

7    Q.    Okay.  So, that's how you get to $168,000?

8    A.    You'd have to do the exact math, but

9    that's how I would calculate it.

10    Q.    Okay.  But, there's no invoice, or bank

11    statement, or anything else that shows $168,000 went

12    out, right?

13    A.    It would show it on Goldin's website as

14    the final amount paid.

15    Q.    Okay, did y'all produce a copy of that,

16    Goldin's website?

17    A.    I'm not sure.

18    Q.    Now, further on in this document on page

19    7, Alexander does raise a concern about the card,

20    right?

21    A.    Where?

22    Q.    After you say you need this on camera, so

23    work with Meredith Keller to make sure it gets

24    documented correctly.  Alex responds the centering is



```
 1   my only true concern, correct?
 2        A.     Uh huh.
 3        Q.     Is that yes?
 4        A.     Correct.
 5        Q.     He says it is a 55/45, correct?
 6        A.     Yeah.
 7        Q.     Would he have had to measure to get that
 8   number?
 9        A.     No.
10        Q.     How would you get a 55/45 number, then?
11        A.     Just visually.
12        Q.     You could just look at it, decide one's 55
13   and one's 45?
14        A.     Those aren't numbers, those aren't numbers
15   in centimeters or meters, that's just a terminology
16   used for centering.
17        Q.     Percentage, so it's 5 percent off center?
18        A.     That's basically what he's saying.
19        Q.     You respond everything else you think is
20   good.  He says from what I see from the slab yes,
21   right?
22        A.     Correct, from what he can see through the
23   slab.
24        Q.     When Darius says don't see any white on
```



1    Q.    Do you know how PSA resolved this after

2  Darius elevated it, or escalated it with them?

3    A.    I don't.

4    Q.    So, even though it was PSA's opinion that

5  the Steph Curry card was altered or trimmed, those new

6  scratches were concerning for ALT, right?

7    A.    Yes.

8    Q.    Do you know when the scratches occurred?

9        MR. HAMMERVOLD:  Object.

10   Q.    I'm sorry, I didn't hear you over the

11  objection?

12   A.    I do not.

13   Q.    Do you have any opinion whatsoever of when

14  the scratches occurred?

15   A.    I do not.

16   Q.    Obviously some ALT employees thought it

17  happened at PSA, right?

18   A.    Sorry, rephrase?

19   Q.    Obviously some ALT employees believe it

20  happened at PSA, right?

21   A.    I do believe so, yes.

22   Q.    Did ALT, or anyone at ALT Platform measure

23  the Curry card while it was in the Beckett slab?

24   A.    Not that I recall.



1    Q.    Did anyone at ALT Platform measure the

2    Curry card after it was cracked out of the Beckett

3    slab?

4    A.    Not that I have recall.

5    Q.    Did anyone at amount measure the Curry

6    card when it was returned from PSA?

7    A.    Not that I have recall.

8    Q.    Did anyone at ALT measure the Curry card

9    when it was returned from Beckett?

10    A.    Not that I recall.

11    Q.    How many card does ALT submit for grading

12    on a typical month?

13    A.    I don't know.

14    Q.    How many cards has ALT Platform cracked?

15    A.    I don't know.

16    Q.    Who would know that?

17    A.    John Houston.

18    Q.    How many cards has ALT submitted that have

19    come back as altered, trimmed, or questionable

20    authenticity?

21    A.    I don't know.

22    Q.    Who would know that?

23    A.    John Houston.

24    Q.    ALT is active on social media, correct?



```
1   STATE OF ILLINOIS)

2                    )SS

3   COUNTY OF C O O K)

4

5                      CERTIFICATE

6

7      I, VERNETTA H. MCCREE, a Notary Public within and

8   for the County of Will, State of Illinois, and a

9   Certified Shorthand Reporter of said state, do hereby

10  certify;

11     That previous to the commencement of the

12  examination of the witness, the witness was duly sworn

13  to testify the whole truth concerning the matters

14  herein;

15     That the foregoing deposition transcript was

16  reported stenographically by me, was thereafter

17  reduced to typewriting under my personal direction and

18  constitutes a true record of the testimony given and

19  the proceedings had;

20     That the said deposition was taken before me at

21  the time and place specified;

22     That I am not a relative or employee or attorney

23  or counsel, nor a relative or employee of such

24  attorney or counsel for any of the parties hereto, nor
```



1  interested directly or indirectly in the outcome of

2  this action.

3      IN WITNESS WHEREOF, I do hereunto set my hand of

4  office at Crete, Illinois this 22nd day of February,

5  2024.

6

7

8

9  _____

10  VERNETTA H. MCCREE

11  Notary Public, Will County, Illinois

12  My commission expires 08/15/2026

13

14

15

16

17

18

19

20

21

22

23

24



800.211.DEPO (3376)
EsquireSolutions.com

21

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **ALT SPORTS CARD FUND GP LLC,** | § | |
| **as the General Partner of Alt Sports** | § | |
| **Card Fund, L.P. and ALT** | § | |
| **PLATFORM, INC.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | **Case No. 3:22-CV-02867-N** |
| **v.** | § | |
| | § | |
| **BECKETT COLLECTIBLES, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

**AFFIDAVIT OF ABIGAIL R.S. CAMPBELL IN SUPPORT OF MOTION FOR**
**<u>SUMMARY JUDGMENT</u>**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Abigail R.S. Campbell, who being by me duly sworn, upon her oath stated as follows:

1.    I am an attorney with the law firm of Condon Tobin Sladek Thornton Nerenberg PLLC, attorneys for Defendant Beckett Collectibles, LLC ("Beckett").

2.    I submit this affidavit in support of Beckett's Brief in Support of Motion for Summary Judgment.

3.    Attached hereto are the following exhibits and reports served and produced in this litigation:

| | |
|---|---|
| **A** | Beckett's Amended Responses to Plaintiffs' Interrogatories |
| **B** | Goldin Auctions Invoice |
| **C** | August 30, 2022 Slack Messages |
| **D** | September 2022 PSA Submission Form |

1

| | |
|---|---|
| **E** | September 20, 2022 Email |
| **F** | September 20, 2022 Internal PSA Email |
| **G** | September 22, 2022 Email from J. Downer |
| **H** | First Republic Bank Statement |
| **I** | Alt Sports Card Fund GP Operating Agreement |
| **J** | Alt Sports Card Fund LP Certificate of Limited Partnership |
| **K** | Alt Platform, Inc. Certificate of Incorporation |
| **L** | Beckett Terms of Service |
| **M** | September 1, 2022 Slack Messages |

FURTHER, AFFIANT SAYETH NOT.

DATED the 12th day of March, 2024

By: _A Campbell_

    BEFORE ME, the undersigned authority, on this day personally appeared Abigail R.S. Campbell who being by me duly sworn on her oath deposed and said that every statement contained herein is within her personal knowledge and is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME on this 12th day of March, 2024, to certify which witness my hand and official seal.

_Cynthia Navarro_

Notary for the State of _Texas_

Print Name: _Cynthia D. Navarro_

My Commission Expires: _12/7/26_

CYNTHIA D NAVARRO
Notary ID #10012167
My Commission Expires
December 7, 2026

2

# EXHIBIT 3A

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

ALT SPORTS CARD FUND GP LLC, as the
General Partner of Alt Sports Card Fund,
L.P., ALT PLATFORM, INC.,

    Plaintiffs,

v.

BECKETT COLLECTIBLES, LLC,

    Defendant.

No. 3:22-cv-02867-N

## DEFENDANT'S AMENDED RESPONSES TO
## PLAINTIFFS' FIRST SET OF INTERROGATORIES

**To:**    **Plaintiffs Alt Sports Card Fund GP LLC, as the General Partner of Alt Sports Card Fund, L.P., and Alt Platform, Inc., by and through their attorney of record, Mark Hammervold, Hammervold Law, 155 S. Lawndale Ave., Elmhurst, IL 60126, mark@hammervoldlaw.com.**

    Pursuant to Fed. R. Civ. P. 34, Defendant Beckett Collectibles, LLC, by and through its

undersigned counsel, hereby submits the following Amended Responses to Plaintiff Alt Sports

Card Fund GP, LLC, as the General Partner of Alt Sports Card Fund, L.P., and Alt Platform, Inc.

("Plaintiffs") First Set of Interrogatories.

Dated: November 22, 2023        Respectfully Submitted,

                **CONDON TOBIN SLADEK THORNTON
NERENBERG, PLLC**

                */s/ Abigail R.S. Campbell*
                Aaron Z. Tobin
                State Bar No. 24028045

atobin@condontobin.com
Kendal B. Reed
State Bar No. 24048755
kreed@condontobin.com
Abigail R.S. Campbell
State Bar No. 24098959
acampbell@condontobin.com
8080 Park Lane, Suite 700
Dallas, Texas 75231
*Telephone*: (214) 265-3800
*Facsimile*: (214) 691-6311

**ATTORNEYS FOR DEFENDANT**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of Defendant's Amended Responses to Plaintiff's First Set of Interrogatories has been served upon the following counsel of record on November 22, 2023:

Mark Hammervold, Esq.
Hammervold Law
155 S. Lawndale Ave.
Elmhurst, IL 60126
mark@hammervoldlaw.com

*/s/ Abigail R.S. Campbell*
Abigail R.S. Campbell

## AMENDED RESPONSES

**INTERROGATORY NO. 1:** Who submitted the Steph Curry Card to Beckett for grading in October 2016?

**ANSWER:** Beckett objects to this Interrogatory because it seeks confidential information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 1, Beckett states that the card was originally submitted by Keith Koenig.

**INTERROGATORY NO. 2:** Describe each step of the process Beckett used to take possession of, evaluate, grade, and "slab" the Steph Curry Card in or around October 2016 and Identify who at Beckett was involved in each step.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information that is not relevant to the claims and defenses of the parties and not reasonably calculated to lead to the discovery of admissible evidence. Beckett further objects to this Interrogatory because it is multifarious. In response to Interrogatory No. 2, Beckett states that it received the Steph Curry Card in or around October 2016 after it was submitted by Keith Koenig. The Card was then given to one of BGS's graders to evaluate the physical condition of the card. Based on the grader's opinion, the Card was graded as being 9.5 Gem Mint condition, with 9.5 grades for centering, corners, edges, and surface. The Card was then slabbed in a tamper-proof case with a label reflecting the assigned grades. Beckett operates a "blind" grading process, meaning any number of BGS associates could have been involved in each step.

**INTERROGATORY NO. 3:** Explain the basis for Beckett grading the Steph Curry Card in or around October 2016 as being 9.5 "gem mint" condition, with 9.5 grades for each of centering, corners, edges and surface.

**ANSWER:** Beckett states that in October of 2016 the card at issue met the conditions necessary for such a grade based upon the grader's opinion of the physical condition of the card at the time.

**INTERROGATORY NO. 4:** Describe each step of the process Beckett used to take possession of, evaluate, grade, and slab the Steph Curry Card in or around September 2022, and identify who at Beckett was involved in each step.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. Beckett further objects to this Interrogatory because it is multifarious. In response to Interrogatory No. 4, Beckett states that this interrogatory assumes facts that are not in evidence or true. Further, Beckett states that it received the Steph Curry Card at issue in the normal course of business when Alt resubmitted the card. Beckett received the Card out of its slab, along with the original grading label included in the shipping package. Alt asked BGS to "reslab it" without informing Beckett that the card had been identified as trimmed by PSA. However, it is BGS policy to independently grade any card that is not slabbed. After the grading process was executed, BGS informed Alt that the card had been trimmed and that BGS would not be grading or slabbing it. Beckett operates a "blind" grading process, meaning any number of BGS associates could have been involved in each step.

**INTERROGATORY NO. 5:** What was Beckett's evaluation of the Steph Curry Card in or around September 2022 and how did it make that determination.

**ANSWER:** Beckett objects to this Interrogatory on the basis that it seeks disclosure of Beckett's confidential and proprietary business information. Beckett further objects to this Interrogatory because it seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 5, Beckett's evaluation of the Steph Curry Card in or around September 2022 deemed the card to be altered. Beckett made this

determination because the card measured short and the top edge was inconsistent with the others graded by BGS.

**INTERROGATORY NO. 6:** If you contend that the Steph Curry Card Alt submitted to Beckett for evaluation in September 2022 was a different card than the Steph Curry Card Beckett previously graded in October 2016, explain the basis for that contention.

**ANSWER:** Beckett has not made this contention at this time but reserves the right to do so as discovery progresses in this matter.

**INTERROGATORY NO. 7:** Does Beckett have the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, speculative, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 7, Beckett states that it has the ability to opine on when a sports trading card has been altered but does not have control over a third party's opinion regarding the reliability of Beckett's opinions.

**INTERROGATORY NO. 8:** Does Beckett market itself as having the expertise to consistently and reliably determine when a sports trading card has been altered, including by trimming?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, speculative, and seeks information that is not reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 8, Beckett states that it does not currently have such a marketing campaign.

**INTERROGATORY NO. 9:** Identify the "few instances" where Beckett has failed to recognize that a card graded had been trimmed. *See* Am. Compl. ¶ 39, Ex. 1 at 13:24-14:3.

**ANSWER:** Beckett objects to this Interrogatory because it is overly broad, vague, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 9, Beckett refers Plaintiff to the Deposition testimony that Plaintiff cites in its Amended Complaint.

**INTERROGATORY NO. 10:** What is the purpose of Beckett grading sports trading cards?

**ANSWER:** Beckett objects to this Interrogatory because it is vague, ambiguous, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. In response to Interrogatory No. 10, the purpose of Beckett grading sports trading cards is to provide only its contracted customers with paid for services.

**INTERROGATORY NO. 12:**   Identify any relationship or agreement between Alt and Beckett that you content is relevant to Alt's claims or Beckett's defenses in this case.

**AMENDED RESPONSE:** Beckett objects to this Interrogatory because it is vague, ambiguous, and fails to identify with reasonable particularity the information sought. In response to Interrogatory 12, Beckett states that Alt accessed or used Beckett's website as alleged, and expressly accepted the terms and conditions of the Terms of Service Agreement located at https://www.beckettmedia.com/terms-of-service.

**INTERROGATORY NO. 13:** Identify any employee or agent of Beckett who will offer any testimony as to the value of the Steph Curry Card at any time (anyone other than a retained expert witness). For any such person, summarize the expected opinion testimony and the basis for same.

**ANSWER:** Beckett objects to this Interrogatory because it seeks information protected by the work-product, attorney-client, and consulting expert privileges. In response to Interrogatory No.

13, Beckett will disclose its trial witnesses in accordance with the Federal and Courts' local rules.

**INTERROGATORY NO. 14:** Explain the factual basis for Beckett's statement – posted on Beckett.com/grading – that "Once your card is graded and slabbed, you can trust us to uphold its integrity. Our tamper-proof holders provide peace of mind by guaranteeing evidence of tampering in the case that someone tries to open or damage your item."

**ANSWER:** Beckett objects to this Interrogatory because it is vague and ambiguous. In response to Interrogatory No. 14, Beckett believes that the statement on the website speaks for itself and that when cards are removed from a Beckett slab, the card returns to being classified as a raw card for which Beckett makes no guarantees.

**VERIFICATION**

STATE OF ___Texas___   §
§
COUNTY OF ___Dallas___   §

BEFORE ME, the undersigned authority, on this date, personally appeared, and is personally known to me, Kevin Isaacson, and first being duly sworn according to law, upon her oath deposed and said:

1.      "My name is Kevin Isaacson.  I am over eighteen (18) years of age.  I am fully competent to make this Verification."

2.      "I have reviewed **DEFENDANT'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** and the factual statements contained therein are true and correct."

FURTHER AFFIANT SAYETH NOT.

Signed this __21st__ day of __November__, ~~2020~~ 2023

Print Name: _Kevin Isaacson_

STATE OF ___Texas___   §
§
COUNTY OF ___Dallas___   §

SUBSCRIBED AND SWORN TO BEFORE ME on this __21st__ day of __November__, ~~2020~~ 2023, by _Kevin Isaacson_, to certify which witness my hand and official seal.

_Darla Strittmatter_
Notary Public

DARLA STRITTMATTER
Notary Public, State of Texas
Comm. Expires 07-23-2025
Notary ID 126963384

Page 1 of 1

28145562v1 92001.031.00

33

# EXHIBIT 3B

goldin
auctions

Goldin Auctions
160 E. Ninth Avenue, Suite A
Runnemede, NJ  08078
TEL: 856 767 8550
info@goldinauctions.com

| | |
|---|---|
| Invoice #: | 00750032 |
| Invoice Date: | 02 November 2020 |
| Invoice Due: | 12 November 2020 |
| Tracking #: | |
| Ship Date: | |

**Bill To:**

Leore Avidar
Alt
7118 Long Bridge St
Apt 1402
San Francisco, CA  94158
(415) 596-5947
accounts@onlyalt.com

**Ship To:**

Alt Platform
Alt
7118 Long Bridge St
Apt 1402
San Francisco, CA  94158

### 2020 October Legends Closing Oct 31 & Nov 1

| Lot | Description | Final Bid |
|---|---|---|
| 4 | 68319 - 2011 Bowman Chrome (Superfractors) #175 Mike Trout Rookie Card (#1/1) – PSA GEM MT 10 | $180,000.00 |
| 6 | 67936 - 2003/04 Topps Chrome (Gold Refractors) #111 LeBron James Rookie Card (#37/50) – BGS GEM.. | $260,000.00 |
| 88 | 68595 - 2009/10 Topps Chrome Gold Refractor #101 Stephen Curry Rookie Card (#26/50) – BGS GEM MINT. | $140,000.00 |

Goldin Auctions
160 E. Ninth Avenue, Suite A
Runnemede, NJ  08078
TEL: 856 767 8550
info@goldinauctions.com

| | |
|---|---|
| Invoice #: | 00750032 |
| Invoice Date: | 02 November 2020 |
| Invoice Due: | 12 November 2020 |
| Tracking #: | |
| Ship Date: | |

| | |
|---|---|
| Lot Total(3 Lots) | $580,000.00 |
| Buyers Premium | $133,400.00 |
| Shipping and Handling | $21.10 |
| Tax ID: 206990720-00001 | $0.00 |
| Insurance | $3,000.00 |
| Total | $716,421.10 |
| Total Amount Paid | $0.00 |
| Total Due | $716,421.10 |

Thank you for bidding in our October Legends 2020  Auction and congratulations on your win! Please find your invoice attached.  You may also view your invoice by logging into www.goldinauctions.com and clicking on "my account"

Please note that payment is due 10 days from the date of the invoice. Invoices may be paid via cash, check, credit card, money order, bank check or wire transfer.  The Buyer's Premium will be 20% if payment is made by cashier's check, cash, money order, wire transfer, or check within 10 days of the date of invoice.  The Buyer's Premium will be 23% if payment is made using a credit card and/or is not paid within 10 days of date of invoice. Please note that invoices paid via personal check will be held for 5-8 business days prior to shipping.

Please log into your account and ensure that the shipping address on file is correct once you receive your invoice.

Make checks payable to: Goldin Auctions.  Credit card payments over $7,500 must have prior approval.
To pay with credit card, after you log in click 'pay invoice' and it will allow you to pay with your credit card on file or enter a new credit card. If you wish to send a WIRE, please email see instructions at the bottom of your invoice. Please note, wire transfers less than $1,000.00 will be subject to a $15.00 processing fee.

Look for our Goldin-Sotheby's joint auction opening for bidding on November 20th and our Holiday 2020 Auction opening for bidding on November 23rd, 2020.

We are still accepting consignments for the our End 2020 with a Bang  Auction and Winter 2021 Auction. Please contact us if you have any items you are interested in consigning. If you have premium items you wish to consign we can apply them towards your current invoice as an advance if you wish (this requires advance approval of items and amount).

If you wish to wire your payment please see instructions below:

Bank Name: TD BANK
Bank Address: 101 Springdale Road
Bank City, State, Zip: Cherry Hill, NJ  08003
Swift Address/ ABA #:  031201360
Beneficiary Name: Goldin Auctions LLC
Beneficiary Address:  160 E. Ninth Ave, Suite A
Beneficiary City, State, Zip: Runnemede, NJ  8078
Account #/ IBAN #:  4327996033

Please email Ken@goldinauctions.com and frank.dinote@goldinauctions.com once your wire has been initiated.

THANK YOU FOR YOUR BUSINESS!

SAVE $17,400.00! If you pay in full via wire transfer, cash, check or money order, then your Buyer's Premium will be discounted by 3%. Your order total after the discount is $699,021.10.

# EXHIBIT 3C



2261 Market Street #4019
San Francisco, CA 94114

**Slack Messages**





EXHIBIT

3

D. Sadeghi (Case# 3:22-cv-02867)

38

# ΛLT

2261 Market Street #4019
San Francisco, CA 94114

---

56 replies

**yang**  11 months ago
oh lord

**Alexander Liriano**  11 months ago
@Darius Took a look at the Curry...I don't see how this card would not Gem. I think percentage wise we're looking at an 85% chance it Gems.

**Darius**  11 months ago
Ohhhh boy @Leore Avidar should we send it?!

**Leore Avidar**  11 months ago
@yang do you have the stomach for it? I'm down to try. @Alexander Liriano if we do this I want to video it @Mere Keller

💯 2    😃⁺

**yang**  11 months ago
@Sean Kapul's decision :P

**yang**  11 months ago
This is warehouse right

**Darius**  11 months ago
No this is a fund card

**yang**  11 months ago
Lol, this is about taking risk right

**yang**  11 months ago
Likelihood it won't regrade to a 9.5 is low I'm guessing?

# ΛLT

2261 Market Street #4019
San Francisco, CA 94114

 **yang**  11 months ago
Likelihood it won't regrade to a 9.5 is low I'm guessing?

 **Darius**  11 months ago
I wouldn't say that, Alex says there's basically zero flaws, the likelihood it regrades with the same subgrades might be lower though

 **yang**  11 months ago
hmm

 **yang**  11 months ago
what's the price upside from going from 9.5->10?

 **Darius**  11 months ago
Its very big, 9.5 is like 325k a PSA 10 would be at least double probably closer to 750k

 **Darius**  11 months ago
BGS 9.5 is pop 14 vs pop 2 for psa 10

 **yang**  11 months ago
oh shit

 **yang**  11 months ago
hmm okay, so let's fill this in: EV = p(PSA10)*750k + p(current_grade) * 325k + p(lower_grade) * [VALUE]

 **yang**  11 months ago
i assume this is probably a positive EV play though given the 2x on PSA 10, probably decen

40



2261 Market Street #4019
San Francisco, CA 94114

---

**Thread**  grading-escalation-squad (archived)          ✕

 **yang**  11 months ago
i assume this is probably a positive EV play
though given the 2x on PSA 10, probably decen
tprobability there and current_grade probability
is reasonable also right

 **Alexander Liriano**  11 months ago
I'm all for whatever you guys want to do 

 **Darius**  11 months ago
This is being very conservative based on Alex's
inspection, as well as being conservative on the
regrade prob so I don't think we can lose here

image.png ▾

| Prob | Value | Outcome |
|------|-------|---------|
| 25% | $750,000 | $187,500 |
| 50% | $325,000 | $162,500 |
| 25% | $200,000 | $50,000 |
|  |  | $400,000 |



**yang**  11 months ago
so 23% edge basical~~~~~~~~~~~~~~~~~

👍  📺  🦅  😊➕  🔖  ⋮

**yang**  11 months ago
and we're okay with a 1 in 4 chan~~~    [More actions]
125k for this

**yang**  11 months ago
that's your value at risk

---

**41**



2261 Market Street #4019
San Francisco, CA 94114

**Thread** 🗑 grading-escalation-squad (archived)      ✕


**yang**  11 months ago
that's your value at risk


**yang**  11 months ago
basically flip 2 coins, if u get 2 tails u lose 125k


**Darius**  11 months ago
**@Leore Avidar** is the ultimate decision maker,
our cost basis on the card is so low ($168k) I
think we feel good about the gamble


**yang**  11 months ago
sunk cost


**yang**  11 months ago
your decision profile is basically:
- 23% EV on the action based on above (+75k
  EV)
- 25% chance of -125k (-38%)
if we're willing to take that loss odds, we should
do it


**yang**  11 months ago
that's basically tldr - cost basis is (mostly)
irrelevant in this


**Darius**  11 months ago
Yeah for sure was mainly just saying even in the
worst scenario we still wouldn't be underwater
on this at all. But yeah not to factor into decision
making


**yang**  11 months ago

**42**



2261 Market Street #4019
San Francisco, CA 94114


**yang**  11 months ago
we would have lost 125k 🙂

😂 1


**Leore Avidar**  11 months ago
We are a go here boyz!!!! If it comes back a 9,
send it to BGS 🙂

🚀 4


**yang**  11 months ago
okay, done, this is an EV bet


**Leore Avidar**  11 months ago
its math

❤️ 2


**Leore Avidar**  11 months ago
we've already won in my head since the EV is
positive. We just need to make more bets


**Leore Avidar**  11 months ago
@Alexander Liriano should I crack my lebron
9.5?


**yang**  11 months ago
i mean 1/4 chance of -38% is not insignificant,
but i agree with u that it's generally better to
make the EV bet


**Darius**  11 months ago
LFGGGG 🙏🙏

**43**



2261 Market Street #4019
San Francisco, CA 94114

---

**Thread**  grading-escalation-squad (archived)                              ✕

 **Darius**  11 months ago
LFGGGG 🙏💪

❤️ 2    😊⁺

 **yang**  11 months ago
oh

 **yang**  11 months ago
how much is the grading cost...

 **yang**  11 months ago
we never factored that in

 **Leore Avidar**  11 months ago
@Alexander Liriano I need this on camera so
work with @Mere Keller to make sure it gets
documented correctly

👍 2    😊⁺

 **Alexander Liriano**  11 months ago
The centering is my only true concern. It is
55/45 ..which still gems. Truly up to you
@Leore Avidar

 **Leore Avidar**  11 months ago
everything else you think is good?

 **Alexander Liriano**  11 months ago
From what I see through the slab, yes

 **Darius**  11 months ago
The pics look immaculate too. Don't see any
white on the back

**44**



ΛLT

2261 Market Street #4019
San Francisco, CA 94114



**Darius**  11 months ago
The pics look immaculate too. Don't see any white on the back



**Leore Avidar**  11 months ago
@Darius for the lebron?



**Darius**  11 months ago
Oh sorry I was just talking curry missed your comment about the lebron.



**Sean Kapul**  11 months ago
Just catching up on this. In the outcomes, is the idea that if it comes back a PSA 9, you send it back to BGS to either regain the 9.5 (50%)? And that the 25% of $200k is a BGS 9 outcome value?



**Darius**  11 months ago
Correct



**Sean Kapul**  11 months ago
nice! looks like an amazing spot



**Mere Keller**  11 months ago
@Alexander Liriano i'll message you & loop in jordan for the content capture

 👍 1  😃



**Darius**  11 months ago
Oh wait just before we set this in motion I just thought of one very important thing- I need to check with Jackie to see if they retain grades i

**45**

# ∧LT

2261 Market Street #4019
San Francisco, CA 94114

 **Darius**  11 months ago
Oh wait just before we set this in motion I just thought of one very important thing- I need to check with Jackie to see if they retain grades + serials for cards that are attempted to cross- we tried to cross this card once so if they do keep those grades then they won't grade it since it's already been graded before. Will call Jackie tomorrow to confirm and get back in here

 1   😀+

 **Matt**  11 months ago
@Darius any update on this ^ Alex is ready to go we just discussed in grading meeting. cc; @Ghazi also if we do this would need malca involved. (edited)

 1   👍 2   😀+

 **Brendan Kirbach**  11 months ago
Please keep me updated as well [s]   **More actions**
fill out the form

👍 📺  😀+ 🔖 ⋮

 **Darius**  11 months ago
Will update as soon as I hear back, I've been chasing Jackie from PSA down via email and phone since Thursday to no avail. Hopefully will hear back today

 **Darius**  11 months ago



2261 Market Street #4019
San Francisco, CA 94114



Aug 30, 2022

# EXHIBIT 3D

**This package label includes submission number: 10988862.**

EXHIBIT

5

D. Sadeghi (Case# 3:22-cv-02867



PSA 1 S 25 V          826357



- Cut along the dotted lines.
- Adhere this label to the outside of your package.
- Do not obscure the barcode with packing tape.




# REGULAR CARDS PSA SUBMISSION FORM    PSA COPY #1

FORM NOT VALID AFTER
9/24/2022

_* If you are printing this submission form for a quarterly special, please make sure the package is postmarked by the last day of the calendar quarter._

SUBMISSION #  **10988862**

Submission Date:
8/25/2022

Customer #
1232341

## PACKAGE INFORMATION: (CUSTOMER MUST PROVIDE)

TOTAL NUMBER OF ORDERS INCLUDED IN THIS PACKAGE:

_____

TOTAL NUMBER OF COLLECTIBLES INCLUDED IN THIS PACKAGE (ALL ORDERS):

_____

### RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**
**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**    Pick Up

### PSA USE ONLY                                    V

Order # _____

PKG # _____

Date Received _____

Verified By _____

Code _____

## SUBMISSION SUMMARY - #10988862

### Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

### Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| **Pick Up:** | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXXX6124 |

| LN# | QTY | SPEC# | SPORT | DESCRIPTION | DECLARED VALUE TOTAL |
|---|---|---|---|---|---|
| 1 | 1 | W606000056 | Basketball Cards | 2009 Topps Chrome 101 Stephen Curry Gold Refractor | $249,999.00 |
| | | | | **Grand Total Declared Value** | **$249,999.00** |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

# REGULAR CARDS PSA SUBMISSION FORM    PSA COPY #2

COUPON VALID AFTER
9/24/2022

*\* If you are printing this submission form for a quarterly special, please make sure that the package is postmarked by the last day of the calendar quarter.*

SUBMISSION # **10988862**

‖‖‖‖ ‖ ‖‖ ‖‖‖ ‖ ‖ ‖‖ ‖‖‖ ‖‖ ‖‖ ‖

Submission Date:
8/25/2022

Customer #
1232341

**PACKAGE INFORMATION:** (CUSTOMER MUST PROVIDE)

TOTAL NUMBER OF ORDERS INCLUDED IN THIS PACKAGE:

_____

TOTAL NUMBER OF COLLECTIBLES INCLUDED IN THIS PACKAGE (ALL ORDERS):

_____

## RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**
**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**    Pick Up

## PSA USE ONLY

V

Order # _____

PKG # _____

Date Received _____

Verified By _____

Code _____

## SUBMISSION SUMMARY - #10988862

### Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

### Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| **Pick Up:** | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXXX6124 |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

# REGULAR CARDS PSA SUBMISSION FORM   PSA ITEM LIST

VALID NOT VALID AFTER
9/24/2022

**CUSTOMER #**  1232341  **SUBMISSION #**  10988862

| LN# | QTY | SPEC# | SPORT | DESCRIPTION | DECLARED VALUE TOTAL |
|-----|-----|-------|-------|-------------|----------------------|
| 1 | 1 | W606000056 | Basketball Cards | 2009 Topps Chrome 101 Stephen Curry Gold Refractor | $249,999.00 |
| | | | | **Grand Total Declared Value** | **$249,999.00** |

Case 3:22-cv-02867-N    Document 56    Filed 03/12/24    Page 56 of 163    PageID 672

# REGULAR CARDS PSA SUBMISSION FORM   CUSTOMER COPY

COUPON NOT VALID AFTER
9/24/2022

*  If you are printing this submission form for a quarterly special, please make sure that the package is postmarked by the last day of the calendar quarter.

SUBMISSION # **10988862**

▮▮▮▮▮ ▮ ▮▮ ▮▮▮ ▮▮ ▮▮▮ ▮▮▮ ▮▮▮ ▮

Submission Date:
8/25/2022

Customer #
1232341

---

### RETURN SHIPPING DETAILS

**ALT PLATFORM INC.**

**71 SOUTHGATE BLVD**
**NEW CASTLE, DE 19720 US**
**(416) 904-0765**
**GRADING@ONLYALT.COM**

**Return Carrier:**      Pick Up

---

## SUBMISSION SUMMARY - #10988862

### Order Details

| | |
|---|---|
| **Item Type:** | Regular Cards |
| **Submission Type:** | Grading |
| **Service Level:** | Premium 5 |

### Payment Details

| | | |
|---|---|---|
| **Service Level Fee:** | 1 item × $5,000.00 | $5,000.00 |
| **Pick Up:** | | $0.00 |
| **Estimated Total Charges:** | | **$5,000.00** |

| | |
|---|---|
| **Payment Method:** | Credit Card |
| **Card Type:** | MasterCard |
| **Name on Card:** | Ghazi Abbas |
| **Card Number:** | XXXXXXXXXXXX6124 |

I HAVE READ AND AGREE TO THE PSA GRADING TERMS & CONDITIONS AND I ACCEPT FULL RESPONSIBILITY FOR COMPLETELY AND ACCURATELY FILLING OUT THE SUBMISSION FORM. IF ITEMS ARE SUBMITTED FOR SERVICES FOR WHICH THEY DO NOT QUALIFY, I AUTHORIZE PSA TO CORRECT THE ORDER AND CHARGE ANY ADDITIONAL AUTHENTICATION, GRADING, HANDLING AND SHIPPING FEES THAT MAY APPLY. TURNAROUND TIME DOES NOT BEGIN UNTIL ORDER HAS BEEN ENTERED INTO THE GRADING SYSTEM.

# EXHIBIT 3E



Jackie Curiel <curielj@collectors.com>

## Re: Curry Card Surface Issues
1 message

**Jackie Curiel** <curielj@collectors.com>                                       Tue, Sep 20, 2022 at 8:56 AM
To: David Lin <lind@collectors.com>

Yeah - he's alleging the scratches were made here, but there's not proof of that. Thanks for the insight. That helps.

On Tue, Sep 20, 2022 at 8:52 AM David Lin <lind@collectors.com> wrote:

Hi Jackie,

I don't recall there being scratches, but that doesn't mean it wasn't there already.  Usually when I go N1 on a card like that, the focus is on the back of that card because it's all black borders and we check the edges.  The front surface would've been the least of our concerns at that point.  Looking at the pic, it looks like some of those scratches could've been factory made.  Also, it doesn't seem fair that he is comparing a flat pic as his "before" to an angled pic as an "after".  Any card that you take a pic head-on will hide minor surface issues.  Let me know if you need any other insight, but I hope he's not trying to get compensation because he found out it's trimmed and has to submit it back to BGS.

thanks,
David

On Tue, Sep 20, 2022 at 7:08 AM Jackie Curiel <curielj@collectors.com> wrote:

Hey DL,

Do you recall seeing scratching on the attached card? It came in on 9/1 and you deemed it N1.

Jackie

---------- Forwarded message ---------
From: **Darius Sadeghi** <darius@onlyalt.com>
Date: Wed, Sep 14, 2022 at 4:15 PM
Subject: Curry Card Surface Issues
To: Jackie Curiel <JCuriel@collectors.com>


Hi Jackie,

Hope all is well! We received the Curry back this week with considerable surface scratches that were not present on the card when we sent it out a few weeks back. You can zoom into the photos to see that there were no scratches in the before photos, but now there are considerable marks around his face. What can be done in this situation? We understand that your opinion is that the card was trimmed, but it was previously in a BGS 9.5 holder and now we will have a very tough time getting it back in one due to the surface scratches, so there is potentially a lot of dollars at stake here. Please let me know your thoughts, thanks Jackie!

Best,

Darius

EXHIBIT

4

M. Levine- Case# 3:22-cv-02867

# EXHIBIT 3F

# Collectors

Jackie Curiel <curielj@collectors.com>

---

## Re: Curry Card Surface Issues

1 message

---

**Jackie Curiel** <curielj@collectors.com>                                              Tue, Sep 20, 2022 at 8:56 AM
To: David Lin <lind@collectors.com>

Yeah - he's alleging the scratches were made here, but there's not proof of that. Thanks for the insight. That helps.

On Tue, Sep 20, 2022 at 8:52 AM David Lin <lind@collectors.com> wrote:

Hi Jackie,

I don't recall there being scratches, but that doesn't mean it wasn't there already.  Usually when I go N1 on a card like that, the focus is on the back of that card because it's all black borders and we check the edges.  The front surface would've been the least of our concerns at that point.  Looking at the pic, it looks like some of those scratches could've been factory made.  Also, it doesn't seem fair that he is comparing a flat pic as his "before" to an angled pic as an "after".  Any card that you take a pic head-on will hide minor surface issues.  Let me know if you need any other insight, but I hope he's not trying to get compensation because he found out it's trimmed and has to submit it back to BGS.

thanks,
David

On Tue, Sep 20, 2022 at 7:08 AM Jackie Curiel <curielj@collectors.com> wrote:

Hey DL,

Do you recall seeing scratching on the attached card? It came in on 9/1 and you deemed it N1.

Jackie

---------- Forwarded message ---------
From: **Darius Sadeghi** <darius@onlyalt.com>
Date: Wed, Sep 14, 2022 at 4:15 PM
Subject: Curry Card Surface Issues
To: Jackie Curiel <JCuriel@collectors.com>


Hi Jackie,

Hope all is well! We received the Curry back this week with considerable surface scratches that were not present on the card when we sent it out a few weeks back. You can zoom into the photos to see that there were no scratches in the before photos, but now there are considerable marks around his face. What can be done in this situation? We understand that your opinion is that the card was trimmed, but it was previously in a BGS 9.5 holder and now we will have a very tough time getting it back in one due to the surface scratches, so there is potentially a lot of dollars at stake here. Please let me know your thoughts, thanks Jackie!

Best,

Darius

---

# EXHIBIT 3G

| | |
|---|---|
| **From:** | Josh Downer <josh@alt.xyz> |
| **Sent:** | Thursday, September 22, 2022 7:59 PM |
| **To:** | Jeromy Murray |
| **Cc:** | sroskine@beckett.com; Aram Munoz; Leore Avidar; Darius Sadeghi; Carson Monson |
| **Subject:** | Loss to ALT Due to Inconsistent Ratings |

You don't often get email from josh@alt.xyz. Learn why this is important

Dear Jeremy,

We haven't been introduced. I'm Josh Downer, General Counsel of ALT. ALT's CEO Leore Avidar is copied here.

You may not have been made aware of a discussion taking place right now between our team and ALT's account executive with you, Aram Munoz. **In short, a card was previously rated by BGS and purchased by ALT, that was later returned for a second rating, and was judged to be tampered with**. ALT has clearly documented visuals and concurrent communications showing the processing of the item between ratings, establishing that **if any tampering took place it occured before the original rating**.

ALT believes it is important as a legal matter, and for BGS's integrity in the industry, that BGS makes ALT whole on this card, either by putting the card back in the original rating case or paying ALT the FMV difference.

If you have any questions or concerns with this resolution, I suggest we get on a call (to include Leore and I and you and your General Counsel) to discuss further.

Sincere Regards,
Josh Downer

OTXMZF %X3X T \ SJW
Ljsjwf@Htzsxjq

---

**EXHIBIT**

**15**

Avidar; Case# 5:21-cv-00806

BECKETT 000845

# EXHIBIT 3H

**FIRST REPUBLIC BANK**
It's a privilege to serve you

# BUSINESS ANALYZED CHECKING

**Statement Period:**
**November 01, 2020**
**November 30, 2020**

**Account Number:**
 XXX-XXX3-2610

**At Your Service:**
**24-Hour Automated Banking System**
**(800) 392-1407**

000000-
00507-002

ALT FUND I LP
2261 MARKET STREET
#4019
SAN FRANCISCO, CA 94114

Page 1 of 4

## ACCOUNT SUMMARY

| | | XXX-XXX3-2610 | |
|---|---|---|---|
| Beginning Balance | ▮ | Average Daily Balance | ▮ |
| Total Deposits and Credits | ▮ | Minimum Balance | ▮ |
| Total Withdrawals and Debits | ▮ | Service Charges | $0.00 |
| Total Checks Paid | $0.00 | Interest Paid This Period | $0.00 |
| **Ending Balance** | ▮ | Interest Year to Date | $0.00 |

## ACCOUNT ACTIVITY

| DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| | **Deposits and Credits** | |
| ▮ | ▮ | ▮ |
| | | ▮ |
| | | ▮ |
| | | ▮ |
| | | ▮ |
| | | ▮ |
| | | ▮ |
| | | ▮ |
| | **Withdrawals and Debits** | |
| ▮ | | ▮ |
| 11/05 | DOMESTIC ONLINE WIRE<br>GOLDIN AUCTIONS LLC | $699,021.10- |
| ▮ | | ▮ |



100000

111 PINE STREET, SAN FRANCISCO, CALIFORNIA 94111, TEL (415) 392-1400 OR 1-800-392-1400
24 HOUR AUTOMATED BANKING SYSTEM 1-800-392-1407
WWW.FIRSTREPUBLIC.COM · MEMBER FDIC

61

FRB 308 - 5/10

# EXHIBIT 3I

# OPERATING AGREEMENT

## OF

## ALT SPORTS CARD FUND GP LLC

THIS OPERATING AGREEMENT (this "Agreement") of Alt Sports Card Fund GP LLC, a Delaware limited liability company (the "Company"), is entered into as of June 30, 2022 and shall constitute the "limited liability company agreement" of the Company within the meaning of Section 18-101(9) of the Delaware Limited Liability Company Act, Title 6, Delaware Code, Section 18-101 *et seq.*, as amended (the "Delaware Act").

1.    ***Formation***.

(a)    ***Sole Member***.  Alt Platform Inc. shall be the sole "member" of the Company within the meaning of Section 18-101(13) of the Delaware Act (the "Member").

(b)    ***Formation and Name***.  The Member hereby enters into and forms the Company as a limited liability company in accordance with the Delaware Act.  The name of the Company shall be "Alt Sports Card Fund GP LLC".

(c)    ***Purpose***.  The purpose and scope of the Company shall be to engage in such lawful activities as shall be determined by the Member in its sole and absolute discretion.

(d)    ***Term***.  The term of the Company shall commence as of the date of the filing of the certificate of formation for the Company in accordance with Section 18-201 of the Delaware Act and, unless otherwise specified in a certificate of cancellation filed by the Member in respect of the Company pursuant to Section 18-203 of the Delaware Act, such term shall continue in perpetuity.

(e)    ***Office of Record***.  The Company shall have a single office of record, which initially shall be located at 2261 Market Street #4019, San Francisco, CA 94114, and may thereafter be changed from time to time by the Member.

(f)    ***Delaware Office and Agent***.  The Company shall maintain a Delaware registered office and agent for the service of process as required by the Delaware Act.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

(g)    ***Limited Liability***.  Except as otherwise required by applicable law, the Member shall have no personal liability for the debts and obligations of the Company.

(h)    ***Default Provisions***.  Except as otherwise provided in this Agreement, the default provisions of the Delaware Act shall apply to the Company.

2.     *Capitalization*.  The Member shall have no obligation to make any contributions to the capital of the Company and shall make only such contributions as the Member shall from time to time determine in its sole and absolute discretion.

3.     *Title to Property and Distributions*.  Title to all Company property shall be held in the name of the Company; provided, however, that the Company shall make such distributions of cash or property to the Member as the Member shall from time to time determine in its sole and absolute discretion.

4.     *Allocations*.  Except as otherwise determined by the Member, it is intended that the Company shall be treated as a "disregarded entity" for federal and applicable state income tax purposes.

5.     *Administration*.

(a)     *Power and Authority of the Member*.  The Member shall control the management and operation of the Company in such manner as it shall determine in its sole and absolute discretion. The Member may appoint, remove and replace managers, officers and employees of the Company from time to time in its sole and absolute discretion. Notwithstanding any provision of this Agreement to the contrary, any contract, agreement, deed, lease, note or other document or instrument executed on behalf of the Company by the Member shall be deemed to have been duly authorized and executed by the Company, and third parties shall be entitled to rely upon the Member's power to bind the Company without otherwise ascertaining that the requirements of this Agreement have been satisfied.

(b)     *Services*.  The Member shall have no obligation to provide any services to the Company and shall provide only such services as the Member shall from time to time determine in its sole and absolute discretion.

6.     *Transfers; Admission of Members*.  The Member may transfer all or any portion of its interest in the Company in the Member's sole and absolute discretion. In the event of any such transfer, this Agreement shall be amended to reflect the respective rights and obligations of the Member and the transferee or transferees. No person shall be admitted to the Company as an additional member without the written consent of the Member, which consent may be withheld in the Member's sole and absolute discretion.

7.     *Name and Mark*.  The "Alt Sports Card Fund GP LLC" name and mark are the property of, or are licensed by, the Member or its affiliates.  The Company's authority to use such name and mark may be withdrawn by the Member or its affiliates or its licensors at any time without compensation to the Company.  Following the dissolution and liquidation of the Company, all right, title and interest in and to such name and mark shall be held solely by the Member or its affiliates or its licensors.

8.     *Miscellaneous*.

(a)     *Entire Agreement*.  This Agreement contains the entire understanding and intent of the Member regarding the Company and supersedes any prior written or oral agreement respecting the Company.     There are no representations, agreements, arrangements, or

2

**64**

understandings, oral or written, of the Member relating to the Company that are not fully expressed in this Agreement.

(b)    ***Amendments***.  This Agreement may be amended, in whole or in part, only through a written amendment executed by the Member.

(c)    ***Governing Law***.  The interpretation and enforceability of this Agreement and the rights and liabilities of the Member as such shall be governed by the laws of the State of Delaware, without regard to conflict of law principles, and as such laws are applied in connection with limited liability company operating agreements entered into and wholly performed upon in Delaware by residents of Delaware.  To the extent permitted by the Delaware Act and other applicable law, the provisions of this Agreement shall supersede any contrary provisions of the Delaware Act or other applicable law.

(d)    ***Limitation of Liability; Indemnification***.  To the maximum extent permitted the Delaware Act and other applicable law, the Member: (i) shall not be subject to any fiduciary or other duties in respect of the Company; and (ii) shall not be liable to the Company for any action or omission concerning the Company or otherwise.  The Company shall indemnify the Member to the fullest extent permitted by law.

(e)    ***Miscellaneous***.  In the event that any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severed from the remainder of this Agreement and replaced with a valid and enforceable provision as similar in intent as reasonably possible to the provision so severed and shall not cause the invalidity or unenforceability of the remainder of this Agreement.

[Signature page follows.]

3

IN WITNESS WHEREOF, the Member has executed this Agreement of Alt Sports Card Fund GP LLC as of the date first above written.

Alt Platform Inc.,
a Delaware corporation


By: _____
Name:  Carson Monson
Title:    Authorized Signatory

4

# EXHIBIT 3J

# Delaware

## The First State

*I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF LIMITED PARTNERSHIP OF "ALT SPORTS CARD FUND, L.P.", FILED IN THIS OFFICE ON THE THIRTIETH DAY OF JUNE, A.D. 2022, AT 5:36 O`CLOCK P.M.*



Jeffrey W. Bullock, Secretary of State

6891048  8100
SR# 20230516105

Authentication: 202721689
Date: 02-15-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

**68**

State of Delaware
Secretary of State
Division of Corporations
Delivered  05:36 PM 06/30/2022
FILED   05:36 PM 06/30/2022
SR 20222882148  - File Number  6891048

## CERTIFICATE OF LIMITED PARTNERSHIP

## OF

## ALT SPORTS CARD FUND, L.P

June 30, 2022

The undersigned, as sole general partner and for the purpose of forming a limited partnership under the Delaware Revised Uniform Limited Partnership Act (6 *Del. C.* § 17-101, *et seq.*), hereby certifies as follows:

1. ***Name.*** The name of the limited partnership formed hereby is Alt Sports Card Fund, L.P.

2. ***Registered Office.*** The address of the registered office of the limited partnership is:  c/o Corporation Service Company, 251 Little Falls Drive, City of Wilmington, New Castle County, Delaware 19808.

3. ***Registered Agent.*** The name and address of the registered agent for service of process on the limited partnership in the State of Delaware is: Corporation Service Company, 251 Little Falls Drive, City of Wilmington, New Castle County, Delaware 19808.

4. ***General Partner.*** The name and business address of the sole general partner of the limited partnership is Alt Sports Card Fund GP LLC , 2261 Market Street #4019, San Francisco, CA 94114.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Limited Partnership as of the date first above written.

Alt Sports Card Fund GP LLC,
sole general partner of the limited partnership

By: _____

Carson Monson, Authorized Person

**69**

# EXHIBIT 3K

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF INCORPORATION OF "ALT PLATFORM
INC.", FILED IN THIS OFFICE ON THE TWENTY-SIXTH DAY OF MAY,
A.D. 2020, AT 12:11 O`CLOCK P.M.



Jeffrey W. Bullock, Secretary of State

7979546  8100
SR# 20230516203

Authentication: 202714400
Date: 02-14-23

You may verify this certificate online at corp.delaware.gov/authver.shtml

**71**

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:11 PM 05/26/2020
FILED 12:11 PM 05/26/2020
SR 20204590901 - File Number 7979546

# CERTIFICATE OF INCORPORATION
## OF
## ALT PLATFORM INC.

### ARTICLE I

The name of the Company is Alt Platform Inc. (the "**Company**").

### ARTICLE II

The address of the Company's registered office in the State of Delaware is Corporation Trust Center, 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801. The name of the registered agent at such address is The Corporation Trust Company.

### ARTICLE III

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware, as the same exists or as may hereafter be amended from time to time.

### ARTICLE IV

The name and mailing address of the incorporator are as follows:

Monica Devlin
c/o Goodwin Procter LLP
Three Embarcadero Center, 28th floor
San Francisco, CA 94111

### ARTICLE V

A.    Authorization of Stock.  This Company is authorized to issue one class of shares to be designated Common Stock.  The total number of shares of Common Stock the Company has authority to issue is 19,000,000, par value of $0.00001 per share, of which 9,000,000 shares are designated "**Class B Common Stock**," and 10,000,000 are designated as "**Class A Common Stock**."

B.    Rights, Preferences and Restrictions of Common Stock.  The rights, preferences, privileges and restrictions granted to and imposed on the Common Stock are as set forth below in this Article V(B).

1.    Dividend Provisions.  All dividends or distributions shall be distributed among all holders of Common Stock on a pro rata basis in proportion to the number of shares of Class A Common Stock that would be held by each such holder if all shares of Class B Common Stock were converted to Class A Common Stock at the then effective conversion rate.

2.    Liquidation Proceeds.  In the event of any Liquidation Event, the assets of the Company shall be distributed pro rata among the holders of the Common Stock, where each holder of shares of Class B Common Stock shall be treated for this purpose as holding the greatest whole number of shares of Class A Common Stock then issuable upon conversion of all shares of Class B Common Stock held by such holder.

(a)        For purposes of this Section 2, a "**Liquidation Event**" shall include (A) the closing of the sale, transfer or other disposition of all or substantially all of the Company's assets, (B) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of capital stock of the Company immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Company or the surviving or acquiring entity), (C) the closing of the transfer (whether by merger, consolidation or otherwise), in one transaction or a series of related transactions, to a person or group of affiliated persons (other than an underwriter of the Company's securities), of the Company's securities if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of the Company (or the surviving or acquiring entity) or (D) a liquidation, dissolution or winding up of the Company; provided, however, that a transaction shall not constitute a Liquidation Event if (i) its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction or (ii) it is the sale of the Company's equity securities in a bona fide financing transaction that is solely for capital-raising purposes.

(b)        Determination of Value if Proceeds Other than Cash.  In any Liquidation Event, if the proceeds received by the Company or its stockholders are other than cash, its value will be deemed its fair market value.  Any securities shall be valued as follows:

(i)        Securities not subject to investment letter or other similar restrictions on free marketability covered by (ii) below:

(A)        If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the twenty (20) trading-day period ending three (3) trading days prior to the closing of the Liquidation Event;

(B)        If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the twenty (20) trading-day period ending three (3) trading days prior to the closing of the Liquidation Event; and

(C)        If there is no active public market, the value shall be the fair market value thereof, as determined in good faith by the Board of Directors of the Company.

(ii)        The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in (i)(A), (B) or (C) to reflect the approximate fair market value thereof, as determined by the Board of Directors of the Company.

3.        Redemption.  The Common Stock is not redeemable at the option of the holder thereof.

4.        Voting Rights.

(a)        General Voting Rights.  Except as otherwise provided herein or by applicable law, the holders of the Class B Common Stock and the holders of the Class A Common Stock shall at all times vote together as one class on all matters (including the election of directors) submitted to a vote or for the consent of the stockholders of the Company.  Each holder of shares of Class B Common Stock shall be entitled to twenty (20) votes for each share of Class B Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the

**73**

Company. Each holder of shares of Class A Common Stock shall be entitled to one (1) vote for each share of Class A Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the Company.

(b)    Voting for Election of Directors. As long as any shares of Class B Common Stock remain outstanding, the holders of Class B Common Stock, voting as a separate class, shall be entitled to elect one (1) director (the "**Class B Common Director**") at any election of directors.

Notwithstanding the provisions of Section 223(a)(1) and 223(a)(2) of the General Corporation Law, any vacancy, including newly created directorships resulting from any increase in the authorized number of directors or amendment of this Certificate of Incorporation, and vacancies created by removal or resignation of a director, may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced; provided, however, that where such vacancy occurs among the directors elected by the holders of a class or series of stock, the holders of shares of such class or series may override the action of the Board of Directors of the Company to fill such vacancy by (i) voting for their own designee to fill such vacancy at a meeting of this Company's stockholders or (ii) written consent, if the consenting stockholders hold a sufficient number of shares to elect their designee at a meeting of the stockholders. Any director may be removed during his or her term of office, either with or without cause, by, and only by, the affirmative vote of the holders of the shares of the class or series of stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders, and any vacancy thereby created may only be filled by the holders of that class or series of stock represented at the meeting or pursuant to written consent.

5.    Class B Protective Provisions. So long as any shares of Class B Common Stock shall be issued and outstanding, the Company shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of a majority of the outstanding shares of Class B Common Stock voting as a single class:

(a)    amend, alter or repeal any provision of the Certificate of Incorporation or Bylaws (including pursuant to a merger) if such action would adversely alter the rights, preferences, privileges or powers of, or restrictions provided for the benefit of, the Class B Common Stock;

(b)    increase or decrease the authorized number of shares of Class A Common Stock or Class B Common Stock;

(c)    authorize or create (by reclassification, merger or otherwise) or issue or obligate itself to issue any new class or series of equity security (including any security convertible into or exercisable for any equity security) having rights, preferences or privileges with respect to dividends or payments upon liquidation senior to or on a parity with the Common Stock or Preferred Stock or having voting rights more favorable than those granted to the Class A Common Stock, Class B Common Stock or Preferred Stock generally;

(d)    consummate a Liquidation Event;

(e)    change the size of the Board of Directors;

(f)    declare or pay any dividend or other distribution to the stockholders of the Company; or

74

(g)    amend this Section 5.

6.    Subdivision or Combinations.  If the Company in any manner subdivides or combines the outstanding shares of one class of Common Stock, then the outstanding shares of the other class of Common Stock shall be subdivided or combined in the same manner.

7.    Mergers, Consolidation or Other Combination Transactions.  In the event that the Company shall enter into any Liquidation Event or other transaction or series of related transactions in which shares of Common Stock are exchanged for or converted into other stock or securities, or the right to receive cash or any other property, then, and in such event, the shares of Class B Common Stock and Class A Common Stock shall be entitled to be exchanged for or converted into the same kind and amount of stock, securities, cash or any other property, as the case may be, into which or for which each share of the other class of Common Stock is exchanged or converted; provided, however, that if the stock or securities of the resulting entity issued upon such exchange or conversion of the shares of Common Stock outstanding immediately prior to such Liquidation Event or other transaction would represent at least a majority of the voting power of such resulting entity (without giving effect to any differences in the voting rights of the stock or securities of the resulting entity to be received by the holders of shares of Class B Common Stock and the holders of Class A Common Stock), then the holders of shares of Class B Common Stock and the holders of shares of Class A Common Stock shall be entitled to receive stock or securities of the resulting entity issuable upon such exchange or conversion that differ with respect to voting rights in a similar manner to which the shares of Class B Common Stock and Class A Common Stock differ under this Certificate of Incorporation as provided under Section 4 of this Article V(B).

8.    Equal Status.  Except as expressly provided in this Article V, Class B Common Stock and Class A Common Stock shall have the same rights and privileges and rank equally, share ratably and be identical in all respects as to all matters.

9.    Conversion.

(a)    Certain Definitions.  As used in this Section 9, the following terms shall have the following meanings:

(i)    "**Affiliate**" means with respect to any specified person, any other person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified person, including, without limitation, any general partner, managing member, officer, director or manager of such person and any venture capital, private equity, investment advisor or other investment fund now or hereafter existing that is controlled by one or more general partners or managing members of, or is under common investment management (or shares the same management, advisory company or investment advisor) with, such person.

(ii)    "**Class B Common Stockholder**" shall mean any individual that is issued Class B Common Stock by the Company.

(iii)    "**Permitted Entity**" shall mean, with respect to any Class B Common Stockholder, any trust, account, plan, corporation, partnership, or limited liability company specified in Section 9(c) established by or for such Class B Common Stockholder, so long as such entity meets the requirements set forth in Section 9(c).

(iv)    "**Transfer**" shall mean, with respect to a share of Class B Common Stock, any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition

of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law.

(v)     **"Voting Control"** shall mean, with respect to a share of Class B Common Stock, the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Common Stock by proxy, voting agreement or otherwise.

(b)     <u>Optional Conversion</u>. Each share of Class B Common Stock shall be convertible into one (1) fully paid and nonassessable share of Class A Common Stock at the option of the holder thereof at any time upon written notice to the transfer agent of the Company.

(c)     <u>Automatic Conversion upon Transfer</u>. Each share of Class B Common Stock shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class A Common Stock upon the Transfer of such share; provided, however, that a Transfer of Class B Common Stock by a Class B Common Stockholder or such Class B Common Stockholder's Permitted Entities that has received the prior approval of the Board of Directors of the Company shall not trigger such automatic conversion; provided further, however, that a Transfer of Class B Common Stock by a Class B Common Stockholder or such Class B Common Stockholder's Permitted Entities to another Class B Common Stockholder's Permitted Entities (or, in the case of a Class B Common Stockholder's Permitted Entity, to the Class B Common Stockholder) shall not trigger such automatic conversion; provided further, however, that a Transfer by a Class B Common Stockholder to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Common Stockholder and/or any other Permitted Entity by or for such Class B Common Stockholder shall not trigger such automatic conversion:

(i)     a trust for the benefit of such Class B Common Stockholder and for the benefit of no other person, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Common Stockholder and, provided, further, that in the event such Class B Common Stockholder is no longer the exclusive beneficiary of such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

(ii)     a trust for the benefit of persons other than the Class B Common Stockholder, so long as the Class B Common Stockholder has dispositive power (whether exclusive or shared) and Voting Control with respect to the shares of Class B Common Stock held by such trust, provided such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Common Stockholder, and, provided, further, that in the event the Class B Common Stockholder no longer has dispositive power and Voting Control, as set forth above, with respect to the shares of Class B Common Stock held by such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

(iii)     a trust under the terms of which such Class B Common Stockholder has retained a "qualified interest" within the meaning of §2702(b)(1) of the Internal Revenue Code (the **"Code"**) and/or a reversionary interest so long as the Class B Common Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust; provided, however, that in the event the Class B Common Stockholder no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

(iv)    an Individual Retirement Account, as defined in Section 408(a) of the Code, or a pension, profit sharing, stock bonus or other type of plan or trust of which such Class B Common Stockholder is a participant or beneficiary and which satisfies the requirements for qualification under Section 401 of the Code; *provided* that in each case such Class B Common Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held in such account, plan or trust, and *provided, further*, that in the event the Class B Common Stockholder no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such account, plan or trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

(v)    a family member of such Class B Common Stockholder, which shall include with respect to an natural person who is a Class B Common Stockholder, the spouse, domestic partner, parents, grandparents, lineal descendants, siblings and lineal descendants of siblings of such Class B Common Stockholder; and *provided, further*, that lineal descendants shall include adopted persons, but only so long as they are adopted while a minor;

(vi)    a corporation, partnership, or limited liability company in which such Class B Common Stockholder and/or family members of such Class B Common Stockholder directly, or indirectly through one or more Permitted Entities, own shares, partnership interests or membership interests, as applicable, with sufficient Voting Control in the corporation, partnership or limited liability company, as applicable, or otherwise have legally enforceable rights, such that the Class B Common Stockholder and/or family members of such Class B Common Stockholder retain sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such corporation, partnership or limited liability company; provided, however, that in the event the Class B Common Stockholder and/or family members of such Class B Common Stockholder no longer own sufficient shares, partnership interests or membership interests, as applicable, or no longer has sufficient legally enforceable rights to ensure the Class B Common Stockholder and/or family members of such Class B Common Stockholder retain sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such corporation, partnership or limited liability company, as applicable, each share of Class B Common Stock then held by such corporation, partnership or limited liability company, as applicable, shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

(vii)    any transfer or transfers by a Class B Common Stockholder to another Class B Common Stockholder; or

(viii)    an Affiliate of a Class B Common Stockholder, provided that the person or entity holding sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock being Transferred (the **"Controlling Person"**) retains, directly or indirectly, sole dispositive power and exclusive Voting Control with respect to the shares following such Transfer; *provided* that in the event the Controlling Person no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock Transferred to such Affiliate, each such share of Class B Common Stock Transferred to such Affiliate shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock unless such transaction is otherwise approved by the Company.

(d)    Effect of Conversion.  In the event of a conversion of shares of Class B Common Stock to shares of Class A Common Stock pursuant to this Section 9, such conversion shall be deemed to have been made at the time that the Company's transfer agent receives the written notice required pursuant to Section 9(b), the time that the Transfer of such shares occurred or the death of the Class B Common Stockholder, as applicable.  Upon any conversion of Class B Common Stock to Class A Common

Stock, all rights of the holder of such shares of Class B Common Stock shall cease and the person or persons in whose names or names the certificate or certificates representing the shares of Class B Common Stock are to be issued, if any, shall be treated for all purposes as having become the record holder or holders of such number of shares of Class A Common Stock into which such Class B Common Stock were convertible. Shares of Class B Common Stock that are converted into shares of Class A Common Stock as provided in this Section 9 shall be retired and shall not be reissued.

(e)    Reservation of Stock. The Company shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purpose of effecting the conversion of the shares of Class B Common Stock, such number of its shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of Class B Common Stock into shares of Class A Common Stock.

10.    Adjustment in Authorized Class A Common Stock. The number of authorized shares of Class A Common Stock may be increased or decreased (but not below the number of shares of Class A Common Stock then outstanding) by an affirmative vote of the holders of a majority of the voting power of the Company, irrespective of the provisions of Section 242(b)(2) of the General Corporation Law.

11.    Administration. The Company may, from time to time, establish such policies and procedures relating to the conversion of the Class B Common Stock to Class A Common Stock and the general administration of this dual class Common Stock structure, including the issuance of stock certificates with respect thereto, as it may deem necessary or advisable, and may request that holders of shares of Class B Common Stock furnish affidavits or other proof to the Company as it deems necessary to verify the ownership of Class B Common Stock and to confirm that a conversion to Class A Common Stock has not occurred.

## ARTICLE VI

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Company is expressly authorized to make, alter, amend or repeal the bylaws of the Company.

## ARTICLE VII

Elections of directors need not be by written ballot unless otherwise provided in the bylaws of the Company.

## ARTICLE VIII

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board or in the Bylaws of the Corporation.

## ARTICLE IX

To the fullest extent permitted by the General Corporation Law of the State of Delaware, as the same exists or as may hereafter be amended from time to time, a director of the Company shall not be personally liable to the Company or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law of the State of Delaware is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the

Company shall be eliminated or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware, as so amended.

The Company shall indemnify, to the fullest extent permitted by applicable law, any director or officer of the Company who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (a "**Proceeding**") by reason of the fact that he or she is or was a director, officer, employee or agent of the Company or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with any such Proceeding. The Company shall be required to indemnify a person in connection with a Proceeding initiated by such person only if the Proceeding was authorized by the Board of Directors of the Company.

The Company shall have the power to indemnify, to the extent permitted by the General Corporation Law of the State of Delaware, as it presently exists or may hereafter be amended from time to time, any employee or agent of the Company who was or is a party or is threatened to be made a party to any Proceeding by reason of the fact that he or she is or was a director, officer, employee or agent of the Company or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including service with respect to employee benefit plans, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with any such Proceeding.

Neither any amendment nor repeal of this Article, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this Article, shall eliminate or reduce the effect of this Article in respect of any matter occurring, or any cause of action, suit or claim accruing or arising or that, but for this Article, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

## ARTICLE X

Except as provided in Article IX, the Company reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

## ARTICLE XI

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery in the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's certificate of incorporation or bylaws or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction. If any provision or provisions of this Article XI shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason

whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article XI (including, without limitation, each portion of any sentence of this Article XI containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

IN WITNESS WHEREOF, the undersigned, being the incorporator herein before named, has executed, signed, and acknowledged this Certificate of Incorporation this 26th day of May, 2020.

*/s/ Monica Devlin*

Name:  Monica Devlin
Title:    Sole Incorporator

# EXHIBIT 3L

Submit    Logout

## MEMBER TERMS OF SERVICE AGREEMENT

Welcome to the Beckett Collectibles, LLC ("Beckett.com") your in person and online collectibles grading source. Any person who accesses Beckett.com and/or uses the services provided has expressly accepted the terms and conditions of this Terms of Use Agreement ("Agreement") without change. By using the services of Beckett, you (referred to herein as "Member" or "you" or "your") agree to be bound by all terms and conditions of this Agreement and all policies and guidelines incorporated by reference. Other users of Beckett may be referred to as "Users," "members," or "customers."

Beckett Collectibles, LLC (herein "Beckett"), the owner of Beckett.com and other related sites, reserves the right to change any of the terms and conditions contained in this Agreement or any policies or guidelines governing Beckett.com or its services, at any time and at its sole discretion. Beckett reserves the right to make changes without notice. Such changes will be effective upon posting the revised Agreement on Beckett.com. Members are encouraged to review the Agreement from time to time for any possible changes. Members must discontinue use of Beckett.com if they do not agree to any terms of this Agreement.

Beckett allows Members to create personal profiles online in order to reflect their passion for collectibles. The Services offered by Beckett ("Beckett " or "we") include the Beckett Website (the "Website") and any other features, content, or applications offered from time to time by Beckett in connection with the Website, grading, authentication, and/or vaulting services, or any other services or offerings of Beckett which may change from time to time (collectively, the "Services"). Beckett.com is not intended for commercial use. The features and tools are structured and developed for the individual collector and their personal collections. If you wish to utilize the services Beckett has for commercial purpose, such as to start your own collectibles business, please contact ecommerce@beckett.com for further information on becoming a Beckett Marketplace dealer. If Member uses Beckett.com for anything other than personal purposes, Beckett does not guarantee access, functionality, or updating capability, and may revoke access to Beckett.com if Member is using the site or Services for any purpose that might be detrimental to Beckett, Beckett.com, the Services, or other members. Please see Section 21 for further warranty information.

Use of the services provided by Beckett is also governed by our Privacy Policy, which is incorporated into this Agreement by reference.

1. **Eligibility:** Use of and Membership in the Services is void where prohibited. By using the Services, Member represents and warrants that (a) all registration information submitted is truthful and accurate; (b) they will maintain the accuracy of such information; (c) Member is 18 years of age or older; and (d) use of the Services does not violate any applicable law or regulation. All required fields must contain true, accurate, current and complete information. If Beckett believes that untrue, inaccurate, outdated, or incomplete information has been provided, Beckett may immediately, and at their sole discretion, suspend the Member account without notice.

2. All Members are responsible for maintaining and updating their Beckett.com personal contact information, including, but not limited to information in My Account: About Me, Contact Information, and Trade Settings (when applicable). Please review our Privacy Policy for information about how personal information is stored and used

3. **Privacy Policy and Statement:** The Beckett.com Privacy Policy and Statement is available online for review at any time.

**BECKETT 000701**
83

Changes may be made at any time at any time in accordance with the terms of the Privacy Policy and can be found at the link above. Check the Privacy Policy and Statement frequently for changes. Unless otherwise authorized or consented, information regarding other Members or customers that has been obtained through Beckett.com or disclosed by Beckett or its affiliates may not be used except to enter into and complete transactions. The use of such information by Members for purposes of solicitation, advertising, unsolicited e-mail or spamming, harassment, invasion of privacy, or otherwise objectionable conduct is prohibited. Please note that when using trade services on Beckett.com, some personally identifiable information may be displayed and may be viewed by potential buyers, sellers, or traders. This is information that the Member provides at his or her own risk. The Member agrees all necessary information will be provided upon completion of a transaction.

4. **Disclosure of Information:** Beckett reserves the right, but assumes no obligation, to report any activity that it suspects violates any law or regulation to appropriate law enforcement officials, regulators, or other third parties. In order to cooperate with governmental requests, to protect Beckett's systems and customers, or to ensure the integrity and operation of Beckett's business and systems, Beckett may access and disclose any information it considers necessary or appropriate, including, without limitation, Member contact details, IP address and traffic information, usage history and posted content. By use of Beckett's website, the Member agrees to such access and disclosure by Beckett. Any personal information the Member chooses to disclose to another Member is at their sole risk.

5. **Password:** When Members register on Beckett.com, they will also be asked to choose a password. The Member is entirely responsible for maintaining the confidentiality of the password. Member agrees not to use the account, username, or password of another Member at any time or to disclose their password to any third party. Member agrees to notify Beckett immediately if they suspect any unauthorized account use or access to the password. The Member is solely responsible for any and all use of the registered account.

6. **Member Disputes:** Members are solely responsible for their interactions with other Beckett Members. Beckett reserves the right, but has no obligation, to monitor disputes between Members.

7. **Investigation:** Beckett reserves the right, but assumes no obligation, to monitor any activity and content associated with Beckett.com. Beckett may investigate any reported violation of its policies or complaints and take any action that it deems appropriate. Such action may include, but is not limited to, issuing warnings, suspension or termination of Service, denying access and/or removal of any materials from Beckett.com, including listings and bids. Beckett reserves the right and has absolute discretion, to remove, screen or edit any content that violates these provisions or is otherwise objectionable. In the event that the Member suffers damages from this investigation in any way, Member agrees that Beckett shall not be liable to Member for such damages, in any circumstances.

8. **Fees:** Membership on Beckett.com is free. A fee is required to participate in certain services through Beckett.com, including but not limited to Organize, Online Price Guide subscriptions, and selling through the Trade system. Please review the Beckett.com Help Section for information about any applicable fees. All online subscription fees are non-refundable. All fees are in U.S. dollars unless otherwise stated. Fees are subject to change at any time, without notice.  At Beckett's option, Beckett may convert free membership and services to paid services. Please see Beckett.com Help Section often for any updated information. All fees are payable upon demand on a Visa, MasterCard, American Express, or Discover credit or debit card or PayPal. By utilizing services on Beckett.com in which a fee may be charged, Member authorizes Beckett to charge the credit or debit card on file for any fees due. All expired credit cards are subject to bank verification and will be charged accordingly.

9. **Term:** Members may terminate membership at any time, for any reason, by contacting us at customerservice@Beckett.com. Beckett reserves the right, in its sole discretion, to restrict, suspend, or terminate access to all or any part of the Services at any time, for any or no reason, with or without prior notice, and without liability. This Agreement shall remain in full force and

BECKETT 000702
84

effective even after Membership is terminated by either party for any reason.

10. **Termination:** Beckett, in its sole discretion, may terminate this Terms of Service Agreement, access to Beckett.com or its services, any Forum post, or any current sales or orders immediately without notice for any reason.

11. **Grading:**

A. All fees paid to Beckett are NON-REFUNDABLE once the order begins the grading process. If a customer would like their cards returned, ungraded, prior to the grading process being started, there will be a charge of $2 per card plus return shipping and insurance. Please note, cards showing evidence of counterfeiting, tampering, or restoration will be charged the full amount according to the service option selected as the determination to reject an item requires review by Beckett graders and authenticators.

B. Beckett shall have no liability whatsoever to the customer for any damage to any items that Beckett can reasonably demonstrate occurred while not in the custody or control of Beckett. However, if Beckett determines the customer's submission was lost or damaged while in Beckett's possession, customer will be compensated based upon the fair market value of the submission as determined by Beckett's standard procedures which may include filing a claim with our insurance carrier. The owner's declared value is used for determining insurance cost of the return shipment and the maximum amount that can be claimed for damage or loss in shipment for any items. IN NO EVENT SHALL THE TOTAL LIABILITY EXCEED THE DECLARED VALUE OF THE ITEM.

C. Beckett will provide collectors with the finest, most thorough, consistent and accurate authentication efforts available in the industry. Occasionally an item may have a typographical error on the label. Upon receipt from Beckett, customer must inspect all items and report any damage or discrepancy to Beckett within five (5) days of receipt. Customer agrees to return any incorrectly described item to Beckett upon request at any time, and agrees to indemnify and hold harmless Beckett and its affiliates against all losses and/or claims (including attorney's fees) caused by the circulation or sale of a mismarked or inappropriate item or any unauthorized use of a Beckett certificate or label.

D. Beckett will not be responsible for returning items sent with insufficient payment or inadequate contact information, nor will Beckett be required to contact you or retain your items in such circumstances for a period in excess of three (3) months from its initial receipt.

E. Beckett will review any Beckett-Graded item(s) that you feel warrants a different grade. Additionally, we accept crossover submissions on items that have previously been graded by another third-party grading service. State a minimum grade, the lowest grade that you are willing to accept from Beckett, we will review the card in its existing holder and will only remove and encapsulate it in a Beckett holder if it meets or exceeds the minimum grade. On occasion, a flaw may be completely hidden by the existing holder, and once cracked out, the card cannot be crossed, for which Beckett will have no liability whatsoever. If the item doesn't meet the minimum grade, it is returned to you in the original holder. All service fees are charged regardless of your item being crossed-over or receiving a grade bump.

F. In the ordinary course of its operations, Beckett (i) compiles data regarding each item submitted for authentication/grading, including, but not limited to, data relating to the identity, production, condition and grade of the item (the "Data"); and (ii) may take, or have taken, one or more digital or other types of photographs, images or reproductions of each such item (collectively, the "Images"). In consideration for the authentication/grading services being provided by Beckett, Customer, on behalf of itself and any third party for whom Customer may be acting, hereby authorizes Beckett (i) to compile and maintain such Data with respect to each item submitted hereunder for authentication/grading; and (ii) to take, or cause to be taken, one or more Images of each such item, and further agrees that Beckett will be the owner of such Data and all such Images and that Beckett may use and exploit such Data and the Images for commercial and any other purposes, as

**BECKETT 000703**
**85**

Beckett's sole discretion deems appropriate, including, but not limited to, the publication and reproduction or reproduction in or on any media, of such Data and Images. Without limiting the generality of the foregoing, Customer, on behalf of itself and any third party for whom Customer may be acting with respect to this agreement, unconditionally and irrevocably transfers, conveys and assigns to Beckett any and all current and any hereafter acquired rights, title and interests (including, without limitation, rights in copyright, patent, trade secret and trademark) that Customer or any such third party may have in or to the Data and the Images (on whatever media or in whatever form such Images may be reproduced or published).

G. The rights and obligations of both you and Beckett shall be governed by and construed in accordance with the laws of the United States and the State of Texas, excluding its choice of law rules. By your submission of items or memorabilia to Beckett, you hereby (a) agree to all of the terms and conditions of these Submission Instructions, (b) submit yourself to the exclusive venue and jurisdiction of the United States District Court for the Northern District of Texas, Collin Division and/or the District Courts of Collin County, Texas, and (c) expressly waive any venue or jurisdiction to which you may otherwise be entitled by your present or future domicil.

12. **TRADE:**

A. By entering into this Agreement and offering an item for sale or trade, Member agrees to complete the transaction as described by this Agreement. Member acknowledges that by not fulfilling these obligations, the action or inaction may be legally actionable. "Trade" on Beckett.com refers to the opportunity to buy, sell, or trade sports cards or other items with other Beckett.com Members.

B. **Reservation of Rights:**

   i. Beckett reserves the right to immediately halt any transaction, prevent or restrict access to Beckett.com, or take any other action to restrict access to or availability of objectionable material, any inaccurate listing, any inappropriately categorized items, any counterfeit or unlawful items, or any items otherwise prohibited by the policies and guidelines outlined in this Agreement.

   ii. Beckett reserves the right to identify at any time and from time to time particular goods or type of goods as inappropriate for participation on Beckett.com, and Member agrees not to attempt to post any such restricted goods on the site. Identification of inappropriate goods shall be in Beckett's sole discretion.

   iii. No reservation of rights hereunder by Beckett shall imply an obligation on the part of Beckett to exercise such right. Failure to exercise such right at any time shall not be deemed a waiver of Beckett's right to exercise same at a later date.

C. **Trade:** Identified as a transaction in which each Member participating in the trade includes at least one (1) item on their side of the offer. No fees are applied for Trades where only items are included in the transactions. If a dollar amount is added to either side of the trade, a 5% fee will be applied to the dollar value and is paid by the recipient of the money.

D. **Buy/Sell:** Identified as a transaction in which a Member ("seller") offers one (1) or more items in exchange for a specified dollar amount without any additional item(s) from another Member. A 5% fee will be applied to the dollar value of the Total Asking Price and is paid by the seller of the item(s). This fee is non-renewing and applies on a pay-per-use basis.

A valid credit card must be on file to sell on Beckett.com and may be entered through the My Account, Payment Options tab. When utilizing Services on Beckett.com in which a fee may be charged, Member authorizes Beckett to charge the credit or debit card on file for any fees due.Fees are subject to change with or without notice and the most up-to-date fee information is available in the Beckett.com Help Section. All dollar values are listed in U.S. dollars unless otherwise

BECKETT 000704

86

based, Fees will be refunded upon account suspension, Member termination of transactions, or any other terminations of Trade services.

E. **Restrictions:** Beckett offers a vehicle for third-party Members to complete buy, sell, or trade transactions. Beckett is not involved in the actual transaction and is not the agent of and has no authority for either for any purpose. The actual purchase contract is between the buyer and seller. Members are expressly prohibited from listing or describing any item, linking or posting any related materials, or purchasing any item that is or is alleged to be:

   i. an infringement of any third-party intellectual property rights (including copyrights, trademarks, patents, trade secrets), or other proprietary rights (including rights of publicity, privacy, moral rights);

   ii. misappropriated, counterfeited, illegal, stolen, or fraudulent;

   iii. pornographic, derogatory, offensive or insensitive to any user's religious beliefs, national origin, race or gender; or

   iv. not lawful to offer for sale.

   v. It is up to the Member listing the item to accurately describe the item for sale or trade. Beckett cannot and does not know whether any listing is accurate, complete, misleading or deceptive or if the Member will perform as promised. As a Member, use of Beckett.com and the Trade services are at your own risk. Always take due care in entering into any agreement with another Member.

   Beckett recommends the use of an escrow service and delivery confirmation for proof of delivery.

F. **Transactions:** Upon completion of a transaction, whether a trade or a sale transaction type, the Members are obligated to provide the item(s) or payment according to the agreed upon terms. By presenting an offer and completing a transaction, each Member represents and warrants that they have the right and ability to sell or otherwise deliver the item(s), that the item is not otherwise encumbered or claimed, in whole or in part, by another party, and that, to the best of their ability, the listing is accurate, current, and complete and is not misleading or otherwise deceptive. If for any reason an item is no longer available, the seller must notify the buyer and promptly refund or return any payment or item(s) received. All Members agree to binding third-party arbitration or mediation of disputes arising between two or more Members, from the sale of merchandise through a transaction via Beckett.com.

G. **Deliveries and Returns:** Each Member in the transaction is responsible for establishing their own delivery and return policies, and assumes the risk of loss and title for such item(s) upon the delivery of the item(s) to the shipping carrier if an uninsured delivery option is chosen. Each Member agrees to hold Beckett Collectibles, LLC harmless for any loss incurred by any alleged damage or non-delivery of goods.

   A Member who receives and processes payment, whether check, money order, credit card, or other means of payment, is obligated to deliver the merchandise in the advertised grade at the advertised price in a timely manner.

H. **Sales, Use, or Similar Taxes:** It is the seller's responsibility to determine whether sales, use, or similar taxes apply to each transaction. Member agrees to be solely responsible for the collection, reporting, and remittance of the correct tax to the appropriate tax authority. Beckett shall not provide any guidance regarding whether sales, use, or similar taxes apply and is not responsible to calculate, collect, report, or remit any sales, use, or similar taxes arising from any transaction and Member agrees to indemnify and hold Beckett harmless from any claims for such taxes.

12. **FORUMS**

   The Beckett.com forums are a free benefit to members of our site. If you are not a member JOIN HERE!

**BECKETT 000705**
**87**

Using the forums on Beckett.com can be informative, helpful and entertaining. People may receive support, learn about Beckett, learn about the hobby, share their collecting interests, can find trade partners and make new friends around the world. The forums are intended to be a positive and enjoyable experience for everyone. To help make your experience more enjoyable, please read through the following forum guidelines.

A. **General Guidelines**

i. You agree, through your use of this service, that you will not use the Beckett forums to post any material which is knowingly false and/or defamatory, inaccurate, abusive, vulgar, hateful, harassing, obscene, profane, sexually oriented, threatening, invasive of a person's privacy, or otherwise violates any other laws. You agree not to post any copyrighted material unless the copyright is owned by you. Although Beckett DOES NOT and CANNOT review the messages posted and is NOT responsible for the content of any of these messages, we at Beckett reserve the right to delete any post, thread, image, profile, avatar, attachment or signature for any or no reason whatsoever.

ii. Messages posted to Beckett's forums by community members are solely the opinion and responsibility of the person posting the message. Please note that each individual Member is responsible for his or her actions on the forums, and remains solely responsible for the content of their posts.  Member agrees to indemnify and hold harmless, Beckett and its agents, successors and assigns, with respect to any claim based upon transmission of forum posts or messages.

iii. Members may not post, modify, distribute, or reproduce in any way any copyrighted material, trademarks, or other proprietary information belonging to others without obtaining the prior written consent of the owner of such proprietary rights. Beckett may terminate Membership privileges of any Member who infringes on the copyright rights of others upon receipt of prompt notification to Beckett by the copyright owner or the copyright owner's legal agent. Without limiting the foregoing, if a Member believes that work has been copied and posted on the Services in a way that constitutes copyright infringement, they may provide the following information to our Copyright Agent:

a. an electronic or physical signature of the person authorized to act on behalf of the owner of the copyright interest;

b. a description of the copyrighted work that you claim has been infringed;

c. a description of where the material that you claim is infringing is located on the Website;

d. your address, telephone number, and email address;

e. a written statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;

f. a notarized statement by you, made under penalty of perjury, that all information contained in your notice is accurate and that you are the copyright owner or authorized to act on the copyright owner's behalf. Beckett's Copyright Agent for notice of claims of copyright infringement can be reached as follows: Copyright Agent, Beckett Collectibles, LLC, 2700 Summit Ave, Ste 100, Plano, TX 75074.

iv. Any violations of Beckett's policies will result in immediate post removal, written warnings, board sanctions and/or total suspension from the forums. Member posts that are in violation of Beckett's policy will be removed and the member may be suspended without warning.

v. **Violations include, but are not limited to:**

a. Including another individual's contact information and/or e-mail address in a post (this includes phone numbers, physical addresses, IP addresses, e-mail addresses, etc.)

b. Including profanity, vulgarity, hate speech, disruptive or hostile comments, interpersonal disputes, or threats of

violence/harm in a post.

c.  Including material (graphic or text) that is obscene, pornographic, or not suitable for a general audience (including sexual references, alcohol or drug discussions, etc.). This may include but is not limited to foul language, sexual references or images, graphic/violent references or images, and drug/alcohol references or images.

d.  Any actions that interfere with site operations (including spam).

e.  Attempting to impersonate Beckett staff, site moderators, or other Beckett.com Members.

f.  Encouraging others to violate Beckett policies or the Beckett Terms of Service Agreement, including the re-posting of suspended topics or threads or the discussion of warning letters, member violations, banned members, or suspended members.

g.  Advertising merchandise, services or commercial Web sites of any kind or posting advertisements, chain letters, pyramid schemes, or solicitations. Violations will result in immediate suspension.

h.  Posting e-mail or other electronic communications from private parties. This includes private message conversations, text messages, e-mail, etc.

i.  The use of false registration information or creating multiple accounts for use on Beckett's forums may result in permanent suspension of all associated accounts. Only one account is allowed per Member, and all other accounts may be permanently suspended.

j.  Reporters, researchers, and third party representatives emailing any members in their official capacity without prior permission.

k.  Posting any copyrighted items without the permission of the copyright owner. This includes posting information from the Beckett Online Price Guides, Beckett Online Checklists, Beckett Price Guides (Monthlies, Plus', or Annuals) or any other copyrighted material.

vi.  Beckett allows the use of signatures on the forums (limit of 255 characters). Images used in signatures should not contain any inappropriate or offensive content, and are subject to review by site moderators, Beckett staff, or the forum administrators. Inappropriate content may include but is not limited to: foul language, sexual references, graphic/violent images, religious images, and drug/alcohol references. Also, as a courtesy to other users, you must limit your signature text length to a reasonable number of lines (6 or less), or the signature block may be edited by a moderator or site administrator to an appropriate length. If you have an excessively long signature, you may be asked to make an adjustment. If other questionable topics arise, please note that the moderators and administrators will use their best judgment, and act in the best interests of Beckett, and their determinations are final. Links to commercial sites in your signature is a violation of Beckett policy and will result in suspension or termination of your account.

vii.  Posting links that take users outside of the Beckett.com website for commercial purposes is expressly prohibited (unless specifically built into Beckett.com profile pages for example). This includes links to auction sites, marketing sites, MLM sites, and any other retail sites. In addition, threads and posts may not contain links to outside sites, except for the purpose of legitimate hobby discussions, though Beckett and its moderators reserve the right to delete questionable posts at any time. Auction spam may result in suspension from the forums and/or Beckett.com.

viii.  Beckett reserves the right to reveal your identity (or whatever information we know about you) in the event of a complaint or legal action arising from any message posted by you. Please remember that you are responsible for your actions on this site, and you could be held accountable should legal action arise.

ix.  In order to keep the forums safe and friendly for everyone, we have several active moderators and administrators

**BECKETT 000707**

who examine the forums on a daily basis. Most of our moderators have volunteered their time freely, and we appreciate their efforts and hard work. Our moderators work as a team to issue warnings, clean up posts, and issue suspensions, and they work in conjunction with administrators and moderators from Beckett. Please keep all posts clean and friendly, and we can all enjoy the safe environment of a fun forum system. If you wish to communicate with the moderators, they can be reached at [moderator.beckett@gmail.com](mailto:moderator.beckett@gmail.com).If you have other forum concerns, please address them to [customerservice@beckett.com](mailto:customerservice@beckett.com).

x.  All forums on Beckett.com are the property of Beckett Collectibles, LLC. Use of these forums is subject to review by Beckett Collectibles, LLC. Members may be removed without notice for any reason, including, but not limited to, vulgar posting, harassing other members and consistent non-constructive criticism. Beckett and its Services may only be used for lawful purposes and in a lawful manner. You agree to comply with all applicable laws, statutes and regulations regarding use of the Services.

xi.  Beckett reserves the right, but assumes no obligation, to monitor any activity and content associated with Beckett.com. Beckett may investigate any reported violation of its policies or complaints and take any action that it deems appropriate. Such action may include, but is not limited to, issuing warnings, suspension or termination of service, denying access and/or removal of any materials on the site. Beckett reserves the right and has absolute discretion, to remove, screen or edit any content that violates these provisions or is otherwise objectionable.

xii.  Disclosure of Information: Beckett reserves the right to report any activity that it suspects violates any law or regulation to appropriate law enforcement officials, regulators, or other third parties. In order to cooperate with governmental requests, to protect Beckett's systems and customers, or to ensure the integrity and operation of Beckett's business and systems, Beckett may access and disclose any information it considers necessary or appropriate, including, without limitation, user contact details, IP addressing and traffic information, usage history and posted content, and you agree to such access and disclosure by Beckett. Any personal information you choose to disclose to another user is at your sole risk.

B.  **Trading sub-forum Guidelines**

i.  As the name implies, this forum is for "trading" only. Items available for trade must be in your Organize, marked "Trade Away" or "Trade For". All trades must be initiated and completed using the official Beckett Trade system.

ii.  Offering items for sale on the trading sub-forums is strictly forbidden, and can result in a suspension of your account. Repeat offenders are subject to permanent expulsion from the site. You will not be notified of a violation, and your post(s) will be deleted. This includes items posted for sale at a fixed price, for best offer In addition, buys and group buys (splitting cases) are not allowed on the forums. All "buy offers" should be initiated through the Organize feature.

iii.  Beckett cannot help resolve disputes between trading partners. If you wish to engage in trading, it is your responsibility to be comfortable with any and all aspects of the trade. In addition, you remain solely responsible for the content of your forum posts, and you agree to indemnify and hold harmless Beckett, and its agents with respect to any claim arising out of a dispute between trading partners, or based upon transmission of your message(s).

iv.  The trading forums are for trading only, and should not contain any Hobby Talk or Sports Talk posts. Inappropriate posts will be moved to the correct forum or deleted without notice. Violators are subject to suspension or expulsion from the site.

C.  **Box Breaks sub-forum Guidelines**

As the name implies, this forum is a place to post your box breaks for all to see. The format of your box break post is up to

BECKETT 000708

you and we encourage you to include images of your best pulls as well as links to breaks/videos.

**D. Additional Requirements**

    i. In addition to the guidelines stated above, here are a few other requirements to help make your forums experience on Beckett.com a pleasurable one.

    ii. When dealing with fellow users, please treat them as you would wish to be treated. A little common courtesy goes a long way to making friends and keeping the peace.

    iii. Avoid "hot button" topics in your discussions like religion and politics. Our forums are a place for sports card and collectibles enthusiasts to share experiences and engaging in 'hot button" topics can only lead to trouble. Beckett reserves the right to remove "hot button" posts/threads where appropriate.

    iv. Be extremely careful with making allegations relating to such things as users selling or buying fake patches, accusations of card trimming, etc. Please remember that it is against the Terms of Service to publish user information, and doing so (especially in cases like this) can possibly result in legal action against you.

13. Beckett reserves the right to use any submissions, posts, communications or interactions, whether in the form of articles, comments, emails, images, suggested pricing, confirmed sales, checklist information, photos, or other material, without limitation and without further compensation, acknowledgment or payment to the submitter or poster. By submitting or posting any content, Member grants Beckett Collectibles, LLC continuous and non-exclusive permission to use, edit, modify, copy, and create derivative works of the content submitted.

If a registered Member submits unsolicited suggestions or ideas, Member agrees that Beckett shall become the sole owner of such suggestion, idea, and associated intellectual property. Member understands and agrees that no compensation will be provided to them in any manner, and that all claims of compensation are expressly waived by the Member.

14. **Proprietary Rights in Content on Beckett.com:** By displaying or publishing ("posting") any Content, messages, text, files, images, photos, video, sounds, profiles, works of authorship, or any other materials (collectively, "Content") on or through the Services, Member hereby grants to Beckett a non-exclusive, fully-paid and royalty-free, perpetual, irrevocable, worldwide license (with the right to sublicense through unlimited levels of sub licensees) to use, copy, modify, create derivative works of, adapt, translate, publicly perform, publicly display, store, reproduce, transmit, and distribute such Content on and through the Services. This license for any future use will terminate at the time such Content is removed from the Services, provided that any previous or prior use will continue to be licensed in perpetuity pursuant to the terms of the previous sentence. Notwithstanding the foregoing, a back-up or residual copy of the Content posted by Member may remain on the Beckett servers after Member has removed the Content from the Services, and Beckett retains the rights to those copies. Member represents and warrants that:

    A. the Member owns the Content posted by the Member on or through the Services or otherwise has the right to grant the license set forth in this section, and

    B. the posting of Member's Content on or through the Services does not violate the privacy rights, publicity rights, copyrights, contract rights or any other rights of any person. Member agrees to pay for all royalties, fees, and any other monies owing any person by reason of any Content posted by the Member to or through the Services.

The Services contain Content of Beckett ("Beckett Content"). Beckett Content is protected by copyright, trademark, patent, trade secret and other laws, and Beckett owns and retains all rights in the Beckett Content and the Services. Beckett hereby grants the Member a limited, revocable, non-sub-licensable license to reproduce and display the Beckett Content (excluding any software code) solely for Member's personal use in connection with viewing the Website and using the Services.

**BECKETT 000709**

**91**

The Services contain Content of Members and other Beckett licensors. Except for Content posted by the Member, the Member may not copy, modify, translate, publish, broadcast, transmit, distribute, perform, display, or sell any content appearing on or through the Services.

15. **Reservation of Rights:** No reservation of rights hereunder by Beckett shall imply an obligation on the part of Beckett to exercise such right. Failure to exercise such right at any time shall not be deemed a waiver of Beckett's right to exercise same at a later date.

16. **Disclaimers:** Beckett is not responsible for any incorrect or inaccurate Content posted on the Website or in connection with the Services provided, whether caused by Members of the Services or by any of the equipment or programming associated with or utilized in the Services. Profiles created and posted by Members on Beckett may contain links to other websites. Beckett is not responsible for the Content, accuracy or opinions expressed on such websites, and such websites are in no way investigated, monitored or checked for accuracy or completeness by Beckett. Inclusion of any linked, third-party website on Beckett does not imply approval or endorsement of the linked website by Beckett. When Members access these third party sites, they do so at their own risk. Beckett takes no responsibility for collection and dissemination of information by third party websites, third party advertisements which are posted on Beckett.com or through the Services, nor does it take any responsibility for the goods or services provided by its advertisers. Beckett is not responsible for the conduct, whether online or offline, of any User of the Services. Beckett assumes no responsibility for any error, omission, interruption, deletion, defect, delay in operation or transmission, communications line failure, theft or destruction or unauthorized access to, or alteration of any Member communication. Beckett is not responsible for any problems or technical malfunction of any telephone network or lines, computer online systems, servers or providers, computer equipment, software, failure of any email or other services due to technical problems or traffic congestion on the Internet or on any of the Services or combination thereof, including any injury or damage to Members or to any person's computer related to or resulting from participation or downloading materials in connection with the Services. Under no circumstances shall Beckett be responsible for any loss or damage, including personal injury or death, resulting from use of the Services, attendance at a Beckett event, from any Content posted on or through the Services, or from the conduct of any Members of the Services, whether online or offline. The Services are provided "AS-IS" and as available and Beckett expressly disclaims any warranty of suitability, fitness for a particular purpose or non-infringement. Beckett cannot guarantee and does not promise any specific results from use of the Services.

17. **Limitation on Liability:** In no event will Beckett be liable to Member or any third person for any indirect, consequential, exemplary, incidental, special or punitive damages, including also lost profits arising from your use of the Web site or the Service, even if Beckett has been advised of the possibility of such damages. Notwithstanding anything to the contrary contained herein, Beckett's liability to Member for any cause whatsoever, and regardless of the form of the action, will at all times be limited to the amount paid, if any, by Member to Beckett for the Service during the term of membership.

18. **General Release:** Unless otherwise specified, Beckett only facilitates transactions between sellers and buyers of goods posted for sale on Beckett.com. All transactions are strictly between the buyer, seller, or other participant. In the event a dispute arises between one or more Members, each fully and unconditionally releases and agrees to indemnify and hold Beckett (and its agents, employees, officers, and directors) harmless from and against any and all claims, demands, causes of action, or damages of any kind, known or unknown, suspected or unsuspected, disclosed or undisclosed, and whether arising in tort or contract, in connection with such dispute. To the extent Beckett is required to incur time or expense in responding to any discovery request or participating in any dispute between Members, Beckett may invoice the disputing Members for such time and expense, and the Members shall pay such invoice upon receipt.

19. **Disputes:** Unless otherwise specified, Beckett is not involved in the actual transaction between sellers and buyers and is not the

BECKETT 000710
92

agent of either for any purpose. Beckett will not be involved in resolving any disputes between Members relating to or arising out of any transaction. Beckett urges sellers and buyers to cooperate with each other to resolve such disputes.

20. **General Provisions:**

A. **Entire Agreement:** This Agreement, including any terms and conditions, attachments or policies incorporated herein by reference, and the general terms and conditions of the Site, including but not limited to the Privacy Policy and Statement and any amendments or addendums incorporated by reference, constitute the entire agreement of the parties with respect to the subject matter hereof, and supersede and cancel all prior and contemporaneous agreements, claims, representations, and understandings of the parties in connection with the subject matter hereof.

B. **No Agency:** Beckett is not the agent, fiduciary, trustee, or other representative of you or any member. Nothing expressed or mentioned in or implied from this Terms of Service Agreement is intended or shall be construed to give to any person other than the parties hereto any legal or equitable right, remedy, or claim under or in respect to this Terms of Service Agreement. This Terms of Service Agreement and all of the representations, warranties, covenants, conditions, and provisions hereof are intended to be and are for the sole and exclusive benefit of Beckett, you, and relying buyers or sellers.

C. **Severability:** If any provision of this Terms of Service Agreement shall be deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from these terms and conditions and shall not affect the validity and enforceability of any remaining provisions.

D. **No Waiver:** Nothing contained herein shall be construed as a waiver by Beckett of any of our rights or remedies described in this Terms of Service Agreement unless the waiver is in writing and signed by an authorized Beckett agent. No delay or omission by us in exercising our rights or remedies will impair or be construed as a waiver. Any single or partial exercise of a right or remedy will not preclude further exercise of any other right or remedy. Beckett's failure to enforce the strict performance of any provision of this Terms of Service Agreement will not constitute a waiver of Beckett's right to subsequently enforce such provision or any other provisions of this Terms of Service Agreement.

21. **Copyrighted Proprietary Information: Beckett is the owner of** Beckett.com **and all pages therein.** All information contained herein is considered proprietary information and is the product of immeasurable time and skill provided by Beckett and its agents ("Proprietary Information"). By accessing Beckett.com, Member and each User understands that misappropriation of such Proprietary Information would cause irreparable damage to Beckett. As a condition of accessing Beckett.com, Member and each User understands that the materials on this site are confidential, proprietary and protected by United States Copyright Laws, and that any unauthorized reproduction, preparation of derivative works, distribution (whether by sale or other transfer of ownership, or by rental, lease or lending), or other display of the copyrighted work publicly, without the express written consent of Beckett Collectibles, LLC is expressly prohibited, and that any violation could expose the user to both criminal and civil liability. Certain Proprietary Information is not available publicly and constitutes "Confidential Information" of Beckett. Member and all Users are prohibited from sharing such Confidential Information with any third party.

22. **No Warranties:** Beckett.com and all Services available therein are provided on an "as is, where is" basis. Beckett makes no representations or warranties express, implied or otherwise, including but not limited to:

A. Any implied warranties of merchantability, fitness for a particular purpose, title, and non-infringement;

B. Any guaranty or implied warranty that Beckett.com or the Services will meet your requirements, will always be available, accessible, uninterrupted, timely, secure, or operate without error;

C. Any guaranty or implied warranty that the information, content, materials, or products included on the site will be as represented by sellers or traders, available for sale, lawful to sell, or that sellers, buyers, or traders will perform as

BECKETT 000711

D. Any implied warranty arising from the course of dealing or usage of Trade services; and

E. Any obligation, liability, right, claim, or remedy in tort, whether or not arising from the negligence of Beckett to the full extent permissible under applicable law, Beckett disclaims any and all such warranties.

23. **Online App Transactions:** Your chosen terms will automatically renew unless auto-renew is cancelled in your subscription area 24 hours before the end of the current subscription

You can choose a different subscription offering in your device account settings, or tap Cancel Subscription to cancel your subscription. If you cancel, your subscription will stop at the end of the current billing cycle.

24. **SMS Terms.** By providing Beckett with your mobile phone number and opting in to receive text messages, you agree that the number you provide is a valid phone number under your control and you acknowledge that Beckett may contact you via texting your mobile phone. Beckett does not charge for this texting service, but you are responsible for all charges and fees associated with text messaging imposed by your wireless provider. Message and data rates may apply based on your carrier. SMS consent is not a condition of membership. Texts may be sent using an automatic telephone dialing system or other technology. If you have opted in, the texting service provides updates, alerts, information, promotions, and offers from Beckett via text messages through the mobile number you provided. Message frequency varies. You may stop text messages by texting the single keyword command STOP to the number from which you receive our texts. To the extent permitted by applicable law, you agree that Beckett will not be liable for failed, delayed, or misdirected delivery of any information sent through the texting service, any errors in such information, and/or any action you may or may not take in reliance on the information or texting service.

25. **Indemnity/Limitation of Liability:**

A. **Indemnity and Defense:** You agree to indemnify and hold harmless Beckett and its affiliates, (and their respective employees, directors, agents, representatives, successors and assigns) from and against any and all claims, costs, losses, damages, judgments, penalties, interest and expenses (including reasonable attorneys' fees) arising out of any Claim that arises out of or relates to: (i) any actual or alleged breach of your representations, warranties, or obligations set forth in this Agreement; or (ii) your own website or other sales channels, the products you sell or trade, any content you provide, the advertisement, offer, sale, trade, or return of any products you sell or trade, any actual or alleged infringement of any intellectual property or proprietary rights by any products you sell or trade, or content you provide, or Seller Taxes or the collection, payment or failure to collect or pay Seller Taxes. For purposes hereof: "Claim" means any claim, action, audit, investigation, inquiry or other proceeding instituted by a person or entity; and "Seller Taxes" means any and all sales, use, excise, import, export, value added and other taxes and duties assessed, incurred or required to be collected or paid for any reason in connection with any advertisement, offer or sale of products by you on or through Beckett.com, or otherwise in connection with any action, inaction or omission of you or any affiliate of yours, or any of your or their respective employees, agents, contractors or representatives. Beckett may require you to defend Beckett as part of such indemnification, or Beckett may control the defense of any Claim, the cost of which you will reimburse as part of the indemnity.

B. **Limitation of Liability:** In no event shall Beckett be liable for damages of any kind, including but not limited to direct, indirect, incidental, punitive or consequential damages arising out of or in connection with this Terms of Service Agreement, even if Beckett has been advised of the possibility of same.

26. **Applicable Law:** Beckett.com and the Services are arranged, sponsored, or managed by Beckett in the State of Texas, USA. The laws of the State of Texas govern this Terms of Service Agreement and all of its terms and conditions, without giving effect to any principles of conflicts of laws. Member agrees that any action at law or in equity arising out of or relating to these terms

**BECKETT 000712**
94

and conditions shall be filed only in state or federal court located in Dallas County, Texas and Member hereby irrevocably and unconditionally consents and submits to the exclusive jurisdiction of such courts over any suit, action or proceeding arising out of these terms and conditions.

27. **Legal Rights and Remedies.** Member and each User understands and agrees that accessing the website in any way constitutes acceptance of all terms of use as provided herein. Member agrees that the Confidential Information contained on Beckett's websites is the intellectual property and the confidential and proprietary information of Beckett's and is not information which is readily available to or accessible by the public. Member agrees not to use any of the Confidential Information for any commercial purpose whatsoever. Such activities include but are not limited to scrapping, downloading, copying or otherwise misappropriating the data. If any of the terms contained herein are violated, Member agrees that a breach of this Agreement has occurred and Beckett is entitled to all legal remedies, including immediate injunctive relief, attorneys' fees and costs of court.

Please contact us at: customerservice@beckett.com with any questions regarding this Agreement.

# Sign up for Beckett's latest news and exclusive offers

Sign up

Services

Grading

News

Online Price Guide

Marketplace

Authenticate

CBCS

Publications

Vault

Insurance

Browse by

BECKETT 000713 95

Pop Report

Baseball Cards

Basketball Cards

Football Cards

Hockey Cards

Soccer Cards

Gaming Cards

Non-Sports Cards

VHS

Player Directory

Team Directory

Set Directory

Resources

Events

Grading FAQ

VHS FAQ

Advertise with Us

Become a Dealer

Contact

Help

Company

About us

Press Releases

Careers

Legal

Privacy Policy

Terms of Service

Get the app

© 2023 Beckett Collectibles, LLC.

BECKETT 000714
96

Case 3:22-cv-02867-N     Document 50    Filed 03/01/24     Page 100 of 163     PageID 916

All rights reserved.

Disclosure about relationship with EPN. When you click on links to various merchants on this site and make a purchase, this can result in this site earning a commission. Affiliate programs and affiliations include, but are not limited to, the eBay Partner Network.

**BECKETT 000715 97**

# EXHIBIT 3M



2261 Market Street #4019
San Francisco, CA 94114

Sep 1, 2022

🔒 grading-escalation-squad ⌄

**Darius** 3:58 PM
September 1st, 2022 ⌄
Hey guys- good and bad news.

Good news- they confirmed the KD RPA PSA 10 is in fact a PSA 10, and added the auto 10 grade, making it a pop 1 PSA 10/10 😎

Unfortunately they said the Curry was noticeably short on the top edge so they were going to slab it authentic altered, but I told them to send it back raw. We will need to hope BGS reslabs it as a 9.5, or even a 9. @Alexander Liriano did we keep the 9.5 BGS label? Might help to send that back with the card.

**Alexander Liriano** 4:00 PM
Yes we have the label
🙌 1

**Darius** 4:03 PM
Phew. Ok so we'll get the card back mid next week and then we can send it straight off to BGS at the end of the week. @Ghazi we will probably want to schedule another Malca for that

**Alexander Liriano** 4:05 PM
There is no way in hell that card was trimmed

**Darius** 4:07 PM
I mean we didn't measure it right... that's probably why it looked so clean. We should def have a measuring tool to use on big cards going forward

**Brendan Kirbach** 4:09 PM
did we (alt) send it to bgs originally? looks like it was graded there september 1, 2020
IMG_4907.png ⌄



↓ Latest messages

🔒 grading-escalation-squad ⌄

**Brendan Kirbach** 4:09 PM
September 1st, 2022 ⌄
did we (alt) send it to bgs originally? looks like it was graded there september 1, 2020
IMG_4907.png ⌄

**Darius** 4:12 PM
na we bought it graded

**Alexander Liriano** 4:15 PM
@Darius I did not measure the card. I did not see any reason to measure it straight out of a BGS slab and was never given any reason to measure while inspecting the edges of the card since there is no evidence of trimming on my end. Honestly shocked.
➕ 1

I will speak with @Brendan Kirbach about sourcing a measuring tool.

**Darius** 4:17 PM
Oh no definitely not saying you should have bro. You did your job wonderfully... [obscured] ...d now we know that unfortunately this is something we have to look out for
✔ 4

↓ Latest messages

EXHIBIT

3

M. Levine- Case# 3:22-cv-02867

exhibitsticker.com



2261 Market Street #4019
San Francisco, CA 94114

---

🔒 grading-escalation-squad ⌄

+ 1    😀

September 1st, 2022 ⌄

I will speak with @Brendan Kirbach about sourcing a measuring tool.

**Darius** 4:17 PM
Oh no definitely not saying you should have bro. You did your job wonderfully but going forward now we know that unfortunately this is something we have to look out for

✓ 4    😀

**Jon Euston** 5:02 PM
Just curious, do we know how "off" it was? Is this something that we would have definitely caught had it been measured before sending? Like does PSA have certain threshold that it accepts or does it need to be an exact number?

**Kaushik Mohan** 5:14 PM
was added to grading-escalation-squad by Brendan Kirbach.

**Alexander Liriano** 5:29 PM
They use factory specs for measurement based on the set. But it's not a black/white issue. Usually you would notice what some people call "bat ears" around the corners if there is trimming involved. Regardless, BGS would've caught it the first time. There are so many ways to "trim" a card and their speculation is vague from what I'm hearing. Did they detect use of lasers ? Blades ? If so there would've been evidence of trimming on all 4 edges.

September 2nd, 2022 ⌄

**Darius** 9:28 AM
These guys are so advanced that it's entirely possibly we wouldn't have even been able to tell. I'm not sure how PSA detects it but they have their own standards. We just have to hope BGS wasnt negligent the first time around and this time they catch it, otherwise we are screwed 😬 (edited)

Sep 13, 2022

**100**

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 NORTHERN DISTRICT OF TEXAS

 3                     DALLAS DIVISION

 4   ALT SPORTS CARD FUND GP,      )

 5   LLC, as the General           )

 6   Partner of Alt Sports         )

 7   Card Fund, L.P., and ALT      )

 8   PLATFORM, INC.,               )

 9           Plaintiffs,           )

10      -vs-                       ) Case No.

11   BECKETT COLLECTIBLES,         ) 3:22-cv-02867-N

12   LLC,                          )

13           Defendant.            )

14

15        The videotaped videoconference deposition of

16   DARIUS SADEGHI, called for examination, taken

17   pursuant to the Federal Rules of Civil Procedure of

18   the United States District Courts pertaining to the

19   taking of depositions, taken remotely before ALICE

20   M. SCHWINGER, CSR NO. 84-2913, a Certified

21   Shorthand Reporter of the State of Illinois, on the

22   2nd day of February, A.D. 2024, commencing at 10:00

23   a.m. Central Standard Time.

24
```



1       Q.     And during that period of time, did it

2   occupy the same space or was there additional space

3   added at any time?

4       A.     It was the same space throughout the

5   entire time.

6       Q.     Okay.  And then you said it then moved

7   to where?

8       A.     To New Castle, Delaware.

9       Q.     And that -- and the move happened in

10  April of 2021?

11      A.     Yeah.

12      Q.     And is that currently where the vault is

13  located?

14      A.     Yes.

15      Q.     Did the vault exist prior to November

16  of 2020?

17      A.     I don't believe so, no.

18      Q.     Okay.  And why was the vault moved to

19  New Castle, Delaware?

20      A.     Because it was tax -- it's a tax-free

21  state and because we needed more space.

22      Q.     How much space does the Alt -- does the

23  vault -- sorry.  Let me start over.

24             How much space does the vault currently



1        A.    No.

2        Q.    So if an Alt Platform employee doesn't

3    work at the vault, then they work remote.  Is that

4    fair to say?

5        A.    Yes.

6        Q.    Now, is Chris Jackson, he worked there

7    in California with you; right?

8        A.    Mm-hmm.  Yes.

9        Q.    Is he still in California, or did he

10   move to Delaware?

11       A.    He did not move to Delaware, but he

12   lives in Nashville now.

13       Q.    When did he move to Nashville?

14       A.    Probably a little over a year ago.

15       Q.    Do you know why he moved to Nashville?

16       A.    Just personal -- personal reasons.

17       Q.    It wasn't a new Alt location --

18       A.    No, it had nothing to do with work.

19       Q.    Okay.  You mentioned earlier that when

20   everything was getting started here, you were kind

21   of doing both operations manager and fund manager.

22   What were your duties as a fund manager?

23       A.    Yeah, so basically Leore and I would

24   source and identify items that we wanted to



1    a sentence there that says:  These individuals have

2    information about Alt's purchase, storage,

3    submission of the Curry card for regrading by PSA

4    and BGS and Alt's damages.

5          Did I read that correctly?

6    A.    Yeah.

7    Q.    All right.  The first topic there, it

8    talks about Alt's purchase, I'll skip storage,

9    submission, but of the Curry card.

10         Do you see that?

11   A.    Mm-hmm.  Yes.

12   Q.    Okay.  Do you understand that to mean a

13   2009 Topps Chrome Number 101 Stephen Curry Gold

14   Refractor, 26 out of 50 card?

15   A.    Yes.

16   Q.    And if we say "the Curry card" during

17   this deposition, can we agree we're both referring

18   to that same card?

19   A.    Yes.

20   Q.    Now, it says that you have information

21   about the purchase of the card; is that correct?

22   A.    Yes.

23   Q.    Okay.  Now, did Alt Platform, Inc.,

24   purchase the card?



DARIUS SADEGHI                                    February 02, 2024
ALT SPORTS CARD V. BECKETT COLL.                            56

1          A.    Alt fund purchased the card.

2          Q.    So Alt Sports Card Fund GP, LLC, or Alt

3     Sports Card Fund LP?

4          MR. HAMMERVOLD:  Object to form.

5     BY THE WITNESS:

6          A.    Yeah, I'm not sure.

7     BY MR. REED:

8          Q.    Okay.  When was the card purchased?

9          A.    Purchased in 2020.

10         Q.    Who, on behalf of the fund, who was the

11    individual on behalf of the fund that purchased the

12    card?

13         A.    Myself.

14         Q.    Okay.  And it was purchased, do you

15    recall when?

16         A.    I believe it was October or November

17    of 2020.  I can't recall the exact date.

18         Q.    All right.  Tell me how did you come to

19    know that the card was for sale?

20         A.    Well, it was selling on Goldin Auctions,

21    and these auction houses run big auctions at, you

22    know, regular intervals.  So whenever they release

23    a new auction, I would go and just look through the

24    listings.



1    two of us.

2        Q.    Were there any -- how did y'all

3    communicate about these standards?  By text?

4    Slack?

5        A.    Phone.  Phone or in person.

6        Q.    So no texting, no Slack communications,

7    no e-mails regarding these standards; correct?

8        MR. HAMMERVOLD:  Object to form.

9    BY THE WITNESS:

10        A.    I'm not sure.  There could have been,

11    but that wasn't the majority of the communication.

12    BY MR. REED:

13        Q.    Okay.  When you identified the Curry

14    card at the Goldin Auctions, what did you do next?

15        A.    Yeah, so we tried to price out the card

16    by looking at other available comparable

17    transactions.  And that was pretty much it.

18        Q.    Is this something you did?

19        A.    Yeah.

20        Q.    And when you priced out, I think is the

21    term you used, priced out the card by looking at

22    these comparables, did you keep a record of that

23    process?

24        A.    Not the exact, like, methodology I used



1        A.    As far as I know, it's still there.

2        Q.    You still have access to it?

3        A.    Yeah.

4        Q.    So after you shared the thesis with the

5    fund partners on the Slack channel, then what did

6    you do?

7        A.    We tried to purchase the card.  So it

8    was an auction format, so it would have been on the

9    card the date the auction ended.

10       Q.    Okay.  And then you won that auction;

11   right?

12       A.    Yeah.

13       Q.    Do you recall if you paid more or less

14   than what you had set aside for that card?

15       A.     I believe we paid less because generally

16   whenever we value a card, whatever we valued the

17   card at, we would want to purchase it at an edge.

18   So I can't remember what we valued the card at, but

19   I believe we purchased it for 168,000, so I would

20   imagine we valued it somewhere higher than that.

21       Q.    You say "purchased it at an edge."  What

22   does that mean?

23       A.     Like, you would want to get a little bit

24   of margin over the -- what you perceive the value



```
 1   Goldin's?

 2        MR. HAMMERVOLD:  Object to form.

 3   BY THE WITNESS:

 4        A.    I'm not entirely sure, but I've never

 5   heard of anybody physically inspecting a card

 6   before purchasing it.

 7   BY MR. REED:

 8        Q.    Do you know where Goldin Auctions is

 9   located?

10        A.    Yeah, they're in Runnemede, New Jersey.

11        Q.    Is that where the card was physically

12   before y'all purchased it?

13        A.    Yeah.

14        Q.    And so when you were looking to purchase

15   the Curry card from Goldin Auctions, did you look

16   at digital photos or what did you look at?

17        A.    Yeah.  Yeah, so the listing itself would

18   have had runback photos, and the card was obviously

19   slabbed or conserved in a -- preserved in a Beckett

20   Grading Services case.  So there's obviously, like,

21   a certification number associated with that.  And

22   then a serial number on the card.  So, you know,

23   it's pretty impossible to, like, counterfeit a card

24   or a Beckett Grading seal, or any grading company
```



1        A.      No.

2        Q.      And they didn't at this time; right?

3        A.      No.

4        Q.      Are you aware that they used to?

5        A.      No, I'm not.

6        Q.      You're not as old as me, so.  All right.

7    All right.  So you viewed it online, viewed the

8    pictures of it.  You did your -- I think you said

9    earlier you did your own kind of price analysis of

10   the card; right?

11       A.      Yeah.

12       Q.      And didn't look at the history of the

13   card.  Did you do anything else when making the

14   decision to purchase the card?

15       A.      That's it.

16       Q.      Now, the price analysis, what did you

17   look to to do that process?

18       A.      So you basically look at transactions of

19   the same card, so use those to try to formulate a

20   price.  Mostly public transactions, but in this

21   instance, we had recently purchased the exact same

22   card but a different serial number, same grade, so

23   we did have that to use as a data point.

24               But, yeah, generally, you would just



1  Exhibit 2, we've been talking about Alt's purchase

2  of the Curry card.  Do you have any other

3  information that we haven't already talked about

4  regarding the purchase of the Curry card?

5      A.    No.

6      Q.    All right.  Now, the next topic that

7  you've been identified as having knowledge is

8  regarding the storage of the Curry card; correct?

9      A.    Yes.

10      Q.    Now, this card was purchased in, you

11  said, October or November of 2020; right?

12      A.    Yes.

13      Q.    And after it was paid for, did Goldin

14  then ship it to the San Francisco address?

15      A.    Yes.

16      Q.    How was it shipped?

17      A.    I believe it was, like, FedEx overnight.

18      Q.    And then it would have been received at

19  the location in the mailroom, as you talked about

20  that process; right?

21      A.    Yep.

22      Q.    And who at Alt then received the Curry

23  card and unpackaged it?

24      A.    It would have been either myself or



1    Q.    Turn the dial type deal?  All right.  We

2   talked about before, there's no log or anything

3   there at Alt to know when a card comes in or out of

4   the safe, just when it's actually been sold or --

5    A.    Yeah.

6    Q.    Correct?

7    A.    Yeah, correct.

8    Q.    Okay.  So as you sit here today, you

9   can't tell me, once it was stored there in the

10   California location, how many times it might have

11   come in and out of that safe, can you?

12    A.    No.

13    Q.    So the Curry card, then, given the dates

14   that you've given me, it was then at some point

15   trans -- it was transported as part of the move

16   from the California location to the Delaware

17   location; correct?

18    A.    Yeah.

19    Q.    Is that correct?

20    A.    Yes.

21    Q.    Okay.  And then once it was at the

22   Delaware location, you don't have any other

23   personal knowledge as to how it was stored, do you?

24    A.    I do not.



1  whether it was worth that gamble to go get it cross

2  graded; right?

3       A.    Yes.   Correct.

4       Q.    Okay.   Now, when the card is owned by

5  the fund, and when you say owned by the fund, do

6  you mean Alt Sports Card Fund, LP?

7       A.    Yes.

8       Q.    Okay.   When the card is owned by the

9  fund and a decision is needing to be made to crack

10  it out of the card and have it cross graded, does

11  anyone have to get permission from the fund other

12  than Leore to get it -- to go through that process?

13       A.    No.

14       Q.    Now, you said that this decision was

15  made in August of '22; right?

16       A.    Yes.

17       Q.    With the Curry card at issue here, any

18  time during the previous two years that the fund

19  had owned the card, had it been considered for

20  cross grading?

21       A.    Yes.

22       Q.    When?

23       A.    It was at the National Sports Card

24  Convention in 20 -- I can't remember if it was



1    2021 -- I think it was -- it was 2021, yeah.

2          Q.    2021, you said National Sports Card

3    Convention?

4          A.    Yes.

5          Q.    And where was that at?

6          A.    Chicago.

7          Q.    Describe for me how it was considered at

8    that convention for cross grading.

9          A.    Yeah, so the CEO of PSA basically just

10   took, like, a handful of cards from us.  And there

11   was no paperwork or anything involved.  He just

12   took the cards, they took a look at them, and if

13   any of them would have cross graded, you know, we

14   would have at that point, like, paid the fee to

15   cross grade it and filled out the paperwork.  So it

16   was kind of more like an informal look at a handful

17   of cards.

18         Q.    Okay.  So this was --

19         A.    Still within the case.

20         Q.    I'm sorry?

21         A.    Still -- and they were all still within

22   the case, obviously, so there was no -- no cracking

23   or anything.

24         Q.    Okay.  So this was physically there in



1   Chicago, then?

2       A.    Correct.

3       Q.    Okay.  So in 2021, the Curry card at

4   issue traveled to this convention in Chicago.

5       A.    Correct.

6       Q.    And the PSA CEO, who are you talking

7   about there?

8       A.    Nat Turner.

9       Q.    So Nat Turner was at the convention.  Do

10  y'all have, like, a table at the convention or they

11  do or how does that work?

12      A.    Both.  Yeah, we had our own little

13  section.  They had a big section where they grade

14  cards on site.

15      Q.    So you take a handful of cards to their

16  section and have them look at them?

17      A.    Yeah.

18      Q.    And they looked at a handful of cards,

19  including this one; is that correct?

20      A.    Correct.  Yes.

21      Q.    And was it cross graded then?

22      A.    None of them were cross graded, no.

23      Q.    And why was that?

24      A.    Because PSA didn't -- felt that they met



1    the standard.

2        Q.    What do you mean?

3        A.    Basically for each card, you would give

4    them, like, a minimum grade that you would want the

5    card to cross to, and so if PSA looks at the card

6    and says, okay, we don't think that this card is a

7    10, then they're not going to cross it.  So...

8        Q.    And for this one, because it was already

9    a 9.5, you were asking for it to be, if they could

10   cross grade it at a 10?

11       A.    Correct.

12       Q.    Were you physically there at that time?

13       A.    I was at the show.  I was not there when

14   they inspected the card.

15       Q.    Who was the Alt employee who took it

16   over there to be inspected?

17       A.    So it was myself, but then the cards

18   were passed off and, you know, returned to us a

19   couple of hours later.  So...

20       Q.    They take them back to wherever they

21   have their graders; right?

22       A.    Yeah.  Exactly.

23       Q.    Okay.  But you would have been the

24   person who took this handful of cards, including



1    the Curry card, to the --

2        A.    Correct.

3        Q.    -- PSA table; correct?

4        A.    Yes.

5        Q.    All right.  And so was it Nat Turner who

6    then gave them back to who at Alt?  You?

7        A.    Yes.

8        Q.    And said the Curry card, which was

9    included in these others, wouldn't meet a 10, so

10   they didn't do the grade; is that right?

11       A.    It wouldn't have been that specific.  If

12   he just -- he just handed us back the cards, and so

13   at that point, it was understood that none of them

14   had crossed.

15       Q.    And this was in 2021.  Do you remember

16   when in 2021?

17       A.    End of July.

18       Q.    And at that time, he didn't tell you

19   that the Curry card had been altered or trimmed;

20   correct?

21       A.    Correct.

22       Q.    Did he tell you any of the cards in that

23   group of handful of cards you submitted had been

24   altered or trimmed at that time?



1   y'all were doing, is there?

2       A.    No.

3       Q.    It's very common to try to resubmit to

4   the same or different companies to see if you can

5   get a different grade; right?

6       A.    Yes.

7       Q.    Because different graders might grade it

8   differently; right?

9       A.    Yeah.

10      Q.    Because there's a certain amount of

11  subjectiveness to it; right?

12      A.    Correct.

13      Q.    Leore goes on to say:  We've already won

14  in my head since the EV is positive.  We just need

15  to make more bets.

16            And this was part of that bet; right?

17      A.    Yeah.

18      Q.    And then Leore responds to Alexander

19  Liriano:  Should I crack my Lebron 9.5?

20            Do you know what he was referring to

21  there?

22      A.    Yeah, he was asking about one of his

23  personal cards, see if he should crack that as

24  well, but that doesn't apply here.



DARIUS SADEGHI                                        February 02, 2024
ALT SPORTS CARD V. BECKETT COLL.                                    184

1      A.    Yeah.

2      Q.    And what did she tell you on that call?

3      A.    She told me that the Curry card had been

4  found to be trimmed.

5      Q.    She said trimmed?

6      A.    Yeah.

7      Q.    Did she say how they determined that?

8      A.    She said it like -- I can't remember the

9  exact words, but she said it measured short on the

10  top and on the -- on one of the sides too.

11      Q.    Measured short.  Did she say how short?

12      A.    No.

13      Q.    How did you respond?

14      A.    I mean, I don't know.  I was obviously

15  disappointed, but there's not really much I could

16  do.

17      Q.    So you recall what she told you, but you

18  don't recall what you said back to her?

19      A.    I probably asked her -- I don't

20  remember, no.

21      Q.    Okay.  You don't remember anything that

22  you said to her on that call?

23      A.    No, I don't.

24      Q.    You didn't try to contest it?



 1  Ok, so we'll get the card back mid next week and

 2  then we can send it straight off to BGS at the end

 3  of the week.  @Ghazi we will probably want to

 4  schedule another Malca for that.

 5          And then Alexander responds back:  There

 6  is no way in hell that card was trimmed.

 7          Did I read that correctly?

 8      A.    Yeah.

 9      Q.    And then you respond:  I mean, we didn't

10  measure it right...that's probably why it looked so

11  clean.  We should def have a measuring tool to use

12  on big cards going --

13      A.    Forward.

14      Q.    -- is that forward there that's under

15  the bubble?

16      A.    Yeah.

17      Q.    Okay.  We just can't read that.

18          What did you mean there, we should have

19  a measuring tool?

20      A.    Just that we should try to measure the

21  cards to look for evidence of trimming before we do

22  this again in the future.

23      Q.    All right.  Did you -- are you aware of

24  a tool that you could use to do that?



1        A.    No, just like a -- you know, yardstick

2    or whatever, something with measurements on it.

3        Q.    Just to make sure you could measure it

4    before you send it in?

5        A.    Yeah.

6        Q.    Before you decided to crack it?

7        A.    Yeah.

8        Q.    That way you could better assess the

9    risk; right?

10        A.    Yeah.

11        Q.    So when it was in the slab, Alt didn't

12    measure the Steph Curry card, did it?

13        A.    No.

14        Q.    Okay.  So you have no records of the

15    measurement at any time when it was in Alt's

16    possession prior to breaking it out of the slab, do

17    you?

18        A.    No.

19        MR. HAMMERVOLD:  Object to form.

20    BY MR. REED:

21        Q.    I'm sorry.  I didn't hear your answer

22    over the objection.

23        A.    No.

24        Q.    And you're not aware of anyone at Alt



1          Who are you referring to there?

2      A.    The trimmers.

3      Q.    That it's entirely possibly we wouldn't

4  have even been able to tell.  I'm not sure how PSA

5  detects it, but they have their own standards.  We

6  just have to hope BGS wasn't negligent the first

7  time around and this time they catch it, otherwise

8  we're screwed.

9          Did I read that correctly?

10     A.    Yes.

11     Q.    And screwed meaning that they wouldn't

12  reslab it; right?

13     A.    Yes.

14     MR. HAMMERVOLD:  Object to form.

15  BY MR. REED:

16     Q.    So you were hoping that BGS would not

17  find a trim and just put it back in a graded slab,

18  hopefully, at least at the 9.5; right?

19     A.    Yes.

20     Q.    All right.  I'm going to -- I'm showing

21  you now Exhibit 8 for your deposition.

22

23

24



1   next week.

2          Now, at any time, did you tell Aram that

3   this card had been submitted to PSA?

4      A.    No, doesn't -- no.

5      Q.    At any time did you tell Aram or anyone

6   else at Beckett that PSA -- excuse me -- that PSA

7   had found that the card had been altered?

8      A.    No.

9      Q.    Did you tell Aram or anyone else at

10  Beckett any time that PSA thought the card had been

11  trimmed?

12     A.    No.

13     Q.    Is there a reason why you didn't?

14     A.    Yeah, I wanted them to come up with

15  their own decision.  The companies have different

16  grading standards.  So...

17     Q.    So you're hoping that they might not

18  find that and put it in a slab case; right?

19     A.    I mean, they had graded it a nine and a

20  half before.  So...

21     Q.    So you're hoping they would do it again;

22  right?

23     A.    Yeah.

24     Q.    And if you told them that PSA had done



1  that, then they might not; right?

2      A.    Yeah.

3      Q.    All right.  Then on the 16th of

4  September, you text:  Hi Aram-any word?

5            And he responds back -- there's the

6  arrow thing.  He says:  The card was deemed altered

7  by our graders.  It measures short on the top edge,

8  is inconsistent with others.

9            Do you see that?

10     A.    Yeah.

11     Q.    And then you respond:  Just very

12  confused how it was deemed altered when we

13  literally just cracked it out of the BSG 9.5 and

14  sent the label with the card.

15           Did I read that correctly?

16     A.    Yeah.

17     Q.    And then Aram's response was:  I would

18  have left it in the holder and reviewed it that

19  way.  After inspecting it, it appears to be

20  tampered with and cannot put a numeric grade on it

21  anymore.

22           Right?

23     A.    Yep.  Yep.

24     Q.    And at that time you didn't tell Aram



```
 1   STATE OF ILLINOIS     )

 2                         )  SS:

 3   COUNTY OF DUPAGE      )

 4             I, ALICE M. SCHWINGER, CSR No. 84-2913,

 5   a Certified Shorthand Reporter of the State of

 6   Illinois, do hereby certify:

 7             That previous to the commencement of the

 8   examination of the witness, the witness was duly

 9   sworn to testify the whole truth concerning the

10   matters herein;

11             That the foregoing deposition transcript

12   was reported stenographically by me, was thereafter

13   reduced to typewriting under my personal direction

14   and constitutes a true record of the testimony

15   given and the proceedings had;

16             That the said deposition was taken

17   before me at the time and place specified;

18             That I am not a relative or employee or

19   attorney or counsel, nor a relative or employee of

20   such attorney or counsel for any of the parties

21   hereto, nor interested directly or indirectly in

22   the outcome of this action.

23             IN WITNESS WHEREOF, I do hereunto set my

24   hand at Woodridge, Illinois, this 14th day of
```



1   February, A.D. 2024.

2

3

4

5

6                        Certified Shorthand Reporter

7

8

9   ALICE M. SCHWINGER, CSR No. 84-2913

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 5

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF TEXAS

3                        DALLAS DIVISION

4    ALT SPORTS CARD FUND GP,      )

5    LLC, as the General           )

6    Partner of Alt Sports         )

7    Card Fund, L.P., and ALT      ) Civil Action No.

8    PLATFORM, INC.,               ) 3:22-cv-02867-N

9                  Plaintiffs,     )

10        -vs-                     )

11   BECKETT COLLECTIBLES,         )

12   LLC,                          )

13                  Defendant.     )

14        The deposition of MATTHEW LEVINE, via Zoom,

15   called for examination, taken pursuant to the

16   Federal Rules of Civil Procedure of the United

17   States District Courts pertaining to the taking of

18   depositions, taken before NANCY A. GUIDOLIN, CSR

19   No. 84-2531, a Notary Public within and for the

20   County of DuPage, State of Illinois, and a

21   Certified Shorthand Reporter of said state, at

22   Easton, Pennsylvania, on the 7th day of

23   February, 2024, commencing at 9:00 a.m. central

24   time.



1        A.    Yes.

2        Q.    All right.  You have never been employed

3   as a grader by a grading company, have you?

4        A.    I have not.

5        Q.    Have you ever been employed by a grading

6   company?

7        A.    I have not.

8        Q.    Never been employed by PSA?

9        A.    Nope.

10       Q.    Never been employed by Beckett?

11       A.    No grading companies.

12       Q.    All right.  So we were talking about as

13  part of your Flawless Card Traders, you were

14  purchasing and buying those cards and you were

15  sending cards mostly to PSA to be graded.  Were you

16  ever sending cards to be cross graded?

17       A.    No.

18       Q.    Do you understand the term cross graded?

19       A.    I do.  Yes and no, because there's

20  multiple uses of the term in the industry, but in

21  general, yes.

22       Q.    What do you understand the term cross

23  grading to mean?

24       A.    Cross grading means that you sent the



1  card in the slab to the other company for them to

2  grade the card with the old slab still intact.

3      Q.    And the idea being trying to get a

4  higher grade than what it's graded in the slab;

5  correct?

6      A.    Correct.

7      Q.    And that's something that you did not do

8  as part of Flawless Card Traders; correct?

9      A.    I did not.

10     Q.    Okay.  Did you ever break cards out of a

11 slab and send into a grader to be graded?

12     A.    I did, yes.

13     Q.    You did that as part of Flawless Card

14 Traders?

15     A.    Yes.

16     Q.    And what's the point in breaking a card

17 out of a slab to be sent in and be graded?

18     A.    Increase value.

19     Q.    Is there a term that you would use for

20 doing something like that as opposed to cross

21 grading?

22     A.    Yeah.  Cracking is the industry jargon

23 for, like, cracking cross versus graded card review

24 is like the industry jargon for when you take the



1    of it?

2         A.    Correct.  Yes.

3         Q.    Now, you had mentioned Darius Sadegjo

4    beforehand.  What is his role at Alt Platform to

5    your knowledge?

6         A.    Darius works in product, and he manages

7    the Fund.

8         Q.    Do you know whether he has any

9    experience in evaluating sports trading cards?

10        A.    Not professionally.

11        Q.    How about Alexander Liriano?  What was

12   his role at Alt?

13        A.    He worked at the vault.  I don't know

14   the official title.

15        Q.    Have you spoken with him at all about

16   this case?

17        A.    No.

18        Q.    Have you communicated with him in any

19   way about this case?

20        A.    No.

21        Q.    To your knowledge is Alexander

22   experienced in evaluating sports trading cards?

23        A.    A hard no.

24        Q.    A hard no?



1        A.    Yeah.

2        Q.    Why did you say a hard no?

3        A.    No, no, no.

4        Q.    Well, you said a hard no.  What did you

5   mean?

6        A.    I wouldn't let him evaluate my sports

7   cards.

8        Q.    Why is that?

9        A.    He doesn't have expertise in the area.

10  Vaulters are not necessarily experts in the field.

11  They are more physical labor.

12       Q.    Is it possible for a grading company to

13  indicate that a card is altered or trimmed when, in

14  fact, it has never been trimmed and came that way

15  from the manufacturer?

16       A.    Yes.

17                    (WHEREUPON, a certain document was

18                    marked Levine Deposition Exhibit

19                    No. 3, for identification, as of

20                    2-7-24.)

21  BY MR. REED:

22       Q.    Now, I am showing you what has been

23  marked as Exhibit 3 for your deposition, and it's a

24  little small here.  I will blow it up as I wanted



 1        Q.    Okay.  Does that refresh your memory as
 2   to which edge was out of specification?
 3        A.    Yeah.
 4        Q.    And Alex is asking whether they kept the
 5   label so Alt could send it back to Beckett with the
 6   label; right?
 7        A.    Yeah, with the hope that they would put
 8   it back in the holder.
 9        Q.    Okay.  That's what they were trying to
10   do; right?
11        A.    Yeah.
12        Q.    And at some point Jon asked down here,
13   "Just curious, do we know how off it was?  Is this
14   something that we would definitely have caught had
15   it been measured before sending?  Like does PSA
16   have certain threshold that it accepts or does it
17   need to be an exact number?"
18             Do you see that?
19        A.    I do.
20        Q.    And Alex responds back, "They use
21   factory specs for measurement based on the set, but
22   it's not a black and white issue.  Usually you
23   would notice with some people call bat ears."
24             What are bat ears?



1      A.    They are just little indents that make

2   it look like the card has been cut by somebody.

3   They are little indents on the corners.

4      Q.    Okay.  And then it goes on to say,

5   "There are so many ways to trim a card, and their

6   speculation is vague from what I'm hearing.  Did

7   they detect use of lasers?"

8            Are you familiar with the use of lasers?

9      A.    No.  Honestly, lasers, blades, a lot of

10  this stuff he's just trying to sound smart in my

11  opinion.

12     Q.    You don't think that he's smart?

13     A.    Below average.  I'm not -- sorry.  To

14  answer the question, I'm not aware that they used

15  lasers to detect trimming.  I don't believe that to

16  be the case.

17     Q.    Do you know if people use lasers to try

18  to trim cards?

19     A.    Yes.

20     Q.    And is there a way to detect if the

21  laser -- if lasers had been used to trim cards?

22     A.    Unaware, and I believe if the grading

23  companies did have a way, they wouldn't mention

24  anything, because then people would find new ways



1   around it.

2        Q.    Now, I think it's obvious that you don't

3   respect Mr. Liriano's opinions on things.  How

4   about Darius Sadeghi, do you respect his opinions

5   on things?

6        MR. HAMMERVOLD:  Objection.

7   BY THE WITNESS:

8        A.    Highly respect.

9   BY MR. REED:

10        Q.    Highly respect?

11        A.    Yes.

12        Q.    And he has been with Alt for quite a

13   while; right?

14        A.    Yeah, he was one of the initial

15   employees.

16        Q.    Longer than you; right?

17        A.    Correct.

18        Q.    And he has experience in the trading

19   card industry?

20        A.    Correct.

21        Q.    What experience?

22        A.    Personal flipping and collecting since

23   2007, I believe, and then also his four years at

24   Alt.



MATTHEW LEVINE                                          February 07, 2024
ALT SPORTS CARD vs BECKETT COLLECTIBLES                            317

1   STATE OF ILLINOIS    )

2                        )  SS:

3   COUNTY OF DU PAGE    )

4

5              I, NANCY A. GUIDOLIN, CSR No. 84-2531, a

6   Notary Public within and for the County of DuPage,

7   State of Illinois, and a Certified Shorthand

8   Reporter of said state, do hereby certify:

9              That previous to the commencement of the

10  examination of the witness, the witness was duly

11  sworn to testify the whole truth concerning the

12  matters herein;

13             That the foregoing deposition transcript

14  was reported stenographically by me, was thereafter

15  reduced to typewriting under my personal direction

16  and constitutes a true record of the testimony

17  given and the proceedings had;

18             That the said deposition was taken

19  before me at the time and place specified;

20             That I am not a relative or employee or

21  attorney or counsel, nor a relative or employee of

22  such attorney or counsel for any of the parties

23  hereto, nor interested directly or indirectly in

24  the outcome of this action.



1             IN WITNESS WHEREOF, I do hereunto set my

2     hand of office at Chicago, Illinois, this 20th day

3     of February, 2024.

4

5

6

7                     *Nancy A. Guidolin*

8                     Notary Public,

9                     DuPage County, Illinois.

10

11

12    NANCY A. GUIDOLIN, CSR No. 84-2531

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 6

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF TEXAS

3                       DALLAS DIVISION

4    ALT SPORTS CARD FUND GP,      )

5    LLC, as the General           )

6    Partner of Alt Sports         )

7    Card Fund, L.P., and ALT      ) Civil Action No.

8    PLATFORM, INC.,               ) 3:22-cv-02867-N

9                    Plaintiffs,   )

10         -vs-                     )

11   BECKETT COLLECTIBLES,         )

12   LLC,                          )

13                    Defendant.    )

14         The videotaped deposition of JONATHAN E.

15   EUSTON, via Zoom, called for examination, taken

16   pursuant to the Federal Rules of Civil Procedure of

17   the United States District Courts pertaining to the

18   taking of depositions, taken before NANCY A.

19   GUIDOLIN, CSR No. 84-2531, a Notary Public within

20   and for the County of DuPage, State of Illinois,

21   and a Certified Shorthand Reporter of said state,

22   at New Castle, Delaware, on the 6th day of

23   February, 2024, commencing at 10:00 a.m. eastern

24   time.



 1   700 to a thousand isn't actually accurate for the

 2   last two years, but the amount of cards that we

 3   cracked is probably around 50.

 4        Q.    Okay.  You said there is a spreadsheet

 5   that you could look at to see what has been

 6   submitted?

 7        A.    Correct.  Yeah, we keep track of all

 8   cards that we sent.

 9        Q.    And what's the name of that spreadsheet?

10        A.    It's called Grading Submissions

11   Spreadsheet.

12        Q.    So when you submit a card for grading,

13   you input that information onto that spreadsheet?

14        A.    Correct.

15        Q.    Now, inside the slab is the card just

16   inside of the slab, or does it have additional

17   protections?

18        A.    With Beckett typically there is a

19   protective plastic seal that the card is encased in

20   within the slab.

21        Q.    Like a plastic sleeve or something?

22        A.    Yeah.  Yeah, the sleeve we refer to

23   cards being in are called penny sleeves, but it's

24   essentially just a small plastic, flexible sleeve



1   that the card sits in.  The Beckett one is enclosed

2   on all four sides.

3        Q.    Okay.  So in a Beckett slab we have a

4   card that's enclosed in this plastic sleeve or

5   something that's completely closed, and then that's

6   enclosed inside of the slab; correct?

7        A.    The hard plastic slab, correct.

8        Q.    Okay.  And so to get that card out, you

9   have to crack that hard plastic slab first;

10  correct?

11       A.    Correct.

12       Q.    And then cut the sleeve open to get the

13  card out; right?

14       A.    Correct.

15       Q.    Okay.  And that's something that exactly

16  what Alt Platform did regarding the Curry card

17  here; correct?

18       A.    Correct.

19       Q.    So it cracked the tamper proof slab, and

20  did that how?

21       A.    With a pair of cutting pliers and then

22  pried it with a flathead screwdriver.

23       Q.    Okay.  So you had to cut the hard

24  plastic with some pliers and then pry it open with



JONATHAN E. EUSTON                                    February 06, 2024
ALT SPORTS CARD FUND vs BECKETT COLLECTIBLES                        92

```
 1   think that we can, but we got to crack it to make

 2   sure, or no, we don't think that we can, and so

 3   we're going to send it back to you?

 4        A.    They typically don't provide any

 5   communication whether or not they are or not going

 6   to cross it over, and they typically don't give us

 7   that information, but they charge us the full price

 8   of the grading cost quote, unquote, whether or not

 9   it crosses over or it doesn't cross over.

10        Q.    And so you'll get it back if they don't,

11   and what's the communication that you get from PSA

12   if it doesn't cross over?

13        A.    It gets sent back to us, and we

14   basically lose out on the grading fee.

15        Q.    But how do they communicate that they

16   didn't cross it over?

17        A.    In this particular situation they may

18   have sent an e-mail and had e-mail communications

19   with somebody at Alt.

20        Q.    I'm talking not -- I'm not talking --

21   let's talk generally in your experience, not

22   specifically on the Curry card.

23        A.    Sure.

24        Q.    Generally if you are sending something
```



1  in to cross over and it's in a graded case or

2  graded slab at that point, you're sending it to

3  cross over and you have a minimum grade that you

4  want it to hit.

5       A.   Yep.

6       Q.   And PSA decides that they can't cross it

7  over.  It doesn't hit the minimum grade.  What's

8  the communication that Alt Platform receives

9  normally as a result?

10      A.   We don't.  We -- the card gets shipped

11 back to us in the same -- the original case that it

12 was shipped to them in, and we receive the card.

13      Q.   And that's the end of it?

14      A.   That's the end of it.  They don't give

15 clarification --

16      Q.   They don't say no minimal grade met or

17 not graded or --

18      A.   They put -- they put a little -- I guess

19 we can call it a note with the card when it ships

20 back stating -- I think just the abbreviation would

21 be MG for no minimum grade.

22      Q.   Now, you can generally --

23      A.   So it wasn't met.

24      Q.   -- follow-up with PSA and figure out



```
 1   not.
 2        Q.    Okay.  Now, the removal of the Steph
 3   Curry card from the plastic sleeve was not recorded
 4   or captured on video; correct?
 5        A.    Not that I'm aware of.
 6        Q.    You haven't seen a video, have you?
 7        A.    I have not seen a video.
 8        Q.    You all could have videoed it if you
 9   wanted to; right?
10        A.    Correct.
11        Q.    Now, you state here, "The card did not
12   sustain any damage and was not tampered with at any
13   point during this process."
14              Did I read that correctly?
15        A.    You did.
16        Q.    Now, that's something that you can't
17   know for sure because you were not over there and
18   viewing it when it was cut from the sleeve, did
19   you?
20        A.    I didn't witness the cut.
21        Q.    Okay.  So you don't know if it sustained
22   any damage over there because you didn't witness
23   that; right?
24        A.    When it was returned to me for packing,
```



1    BY THE WITNESS:

2         A.    It probably would have been flagged.

3    BY MR. REED:

4         Q.    Okay.  Now, since the Curry card wasn't

5    in your physical possession during the time that it

6    was at PSA, you can't know what happened to it when

7    it was there; right?

8         A.    We don't know what happened to it when

9    it was at PSA.

10        Q.    All right.  And you don't know if the --

11   you can't know whether the scratches occurred there

12   or not, can you?

13        A.    Correct.  I do not know.

14        Q.    All right.  Now, your testimony before

15   is that you got this back and then you packaged it

16   up and sent it back to Beckett; right?

17        A.    Correct.

18        Q.    All right.  Now, on this Exhibit 6 here

19   it's a little confusing to me, because we have what

20   looks to be a number of different threads or

21   communications going on here; you know, starting

22   with this first top one here from Alex, and then on

23   the right we have an archived thread for the same

24   group that starts with Brendan and has a bunch of



1   months ago" next to his name; right?

2       A.    Uh-huh.   Correct.

3       Q.    It says, "The old label is in there,

4   too, right?"  And you respond, "Yes, sir."

5             Do you know what he's referring to

6   there?

7       A.    He is referring to the label that was

8   included in the Beckett slab when it was cracked.

9   So the original Beckett slab has a label on it.  We

10  included the label with the Curry card when we sent

11  it back to Beckett.

12      Q.    Okay.  So this is the label that was

13  part of the Beckett slab?

14      A.    Correct.

15      Q.    That wasn't sent to PSA, was it?

16      A.    It was not.

17      Q.    Okay.  And so when he was asking is it

18  in there, too, right, is he referring to you sent

19  it to Beckett when you submitted it to Beckett

20  following the PSA submission?

21      A.    That's right.

22      Q.    All right.  And so you sent back the raw

23  card with the old label; is that correct?

24      A.    That's right.



1    Q.    And how was it packaged in here?  Was it

2    in a penny sleeve again?

3    A.    It was still in a penny sleeve and top

4    loader.

5    Q.    And a top loader with the old label?

6    A.    Correct.

7    Q.    Now, you sent back the old label because

8    you were wanting Beckett to re-slab the Curry card

9    with that label; correct?

10    A.    Maybe not with that label, but to retain

11    the original grade.

12    Q.    Okay.  So you wanted them to put it back

13    in a slab with a 9.5 grade; right?

14    MR. HAMMERVOLD:  Object to form.

15    BY THE WITNESS:

16    A.    Correct.

17    BY MR. REED:

18    Q.    Okay.

19    A.    That was what they believed was the best

20    thing to do.

21    Q.    When you say "they," who you are

22    referring to?

23    A.    Darius, Leore.

24    Q.    They told you to do it?



JONATHAN E. EUSTON                                    February 06, 2024
ALT SPORTS CARD FUND vs BECKETT COLLECTIBLES                          177

```
 1   STATE OF ILLINOIS    )

 2                        )  SS:

 3   COUNTY OF DU PAGE    )

 4

 5              I, NANCY A. GUIDOLIN, CSR No. 84-2531, a

 6   Notary Public within and for the County of DuPage,

 7   State of Illinois, and a Certified Shorthand

 8   Reporter of said state, do hereby certify:

 9              That previous to the commencement of the

10   examination of the witness, the witness was duly

11   sworn to testify the whole truth concerning the

12   matters herein;

13              That the foregoing deposition transcript

14   was reported stenographically by me, was thereafter

15   reduced to typewriting under my personal direction

16   and constitutes a true record of the testimony

17   given and the proceedings had;

18              That the said deposition was taken

19   before me at the time and place specified;

20              That I am not a relative or employee or

21   attorney or counsel, nor a relative or employee of

22   such attorney or counsel for any of the parties

23   hereto, nor interested directly or indirectly in

24   the outcome of this action.
```



1        IN WITNESS WHEREOF, I do hereunto set my

2   hand of office at Chicago, Illinois, this 17th day

3   of February, 2024.

4

5

6                    _Nancy A. Guidolin_

7

8                         Notary Public,

9                         DuPage County, Illinois.

10

11

12   NANCY A. GUIDOLIN, CSR No. 84-2531

13

14

15

16

17

18

19

20

21

22

23

24



# EXHIBIT 7

**In the Matter Of:**

ALT SPORTS CARD FUND V. BECKETT

3:22-cv-02867-N

---

# KAUSHIK MOHAN

*February 28, 2024*

---



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
*EsquireSolutions.com*

1          THE WITNESS:  You mean Beckett, right?

2    BY MS. CAMPBELL:

3      Q.  No.  I mean -- so in this sentence you're saying

4    grading -- you're just talking about the grading of

5    sports trading cards.  And so I'm trying to get at the

6    general opinion here.

7      A.  Yes, the general opinion is there will be

8    communication from Alt to the grading companies.  That's

9    it.

10     Q.  Okay.  And that would be like PSA, like Beckett?

11     A.  Yes.

12     Q.  Do you know if those communications were produced

13   in this litigation?

14         MR. HAMMERVOLD:  Object to the form.

15         THE WITNESS:  I do not know.

16   BY MS. CAMPBELL:

17     Q.  So the purpose of having a trading card graded is

18   to get a reliable objective and expert opinion of a

19   card's authenticity and condition; is that right?

20     A.  Yes.

21     Q.  That's where the grade comes in, right?

22     A.  Yes.

23     Q.  On here you say expert assessment.  You see that?

24     A.  Yes.

25     Q.  Would you agree that assessment is a synonym for



```
 1   opinion?
 2          MR. HAMMERVOLD:  Object to form.
 3          THE WITNESS:  Yes.
 4   BY MS. CAMPBELL:
 5      Q.  And sports trading cards can be submitted to
 6   different trading companies; is that right?
 7      A.  Correct.
 8      Q.  The same trading card can be submitted to
 9   different companies?
10      A.  They can be, yes.
11      Q.  So one card can be submitted to Beckett to get a
12   grade and then submitted to PSA to get a different grade;
13   is that right?
14          MR. HAMMERVOLD:  Object to form.
15          THE WITNESS:  At different times, yes.  Not at
16   the exact same time.
17   BY MS. CAMPBELL:
18      Q.  So someone can submit a raw card and say if it's
19   not going to get a nine, send it back to me.  Do you
20   recall when we talked about that?
21      A.  Yes.
22      Q.  So someone can do that and say if you're not
23   going to give it a nine, send it back to me.  Beckett
24   says, no, not a nine, send it back to me.  That person
25   can then send the card to PSA to get graded?
```



 1  don't know what's going to happen when a card is raw.

 2  But all I'm just trying to state that it is intentional

 3  to be trimmed.  It's not an accident.  I think that's

 4  what I'm trying to get across here.

 5      Q.  Okay.  But it's impossible to know if the card --

 6  if a raw card is not in your possession what happens to

 7  it; is that fair?

 8      A.  That's fair.

 9          MR. HAMMERVOLD:  Abigail, do you know about how

10  much time we have left?

11          MS. CAMPBELL:  I don't.  I don't have that much

12  more left though.

13          MR. HAMMERVOLD:  I'm about to switch to my phone

14  because I have to get my two kids.  Go ahead, though.

15  BY MS. CAMPBELL:

16      Q.  Mr. Mohan, I'm going to show you what has been

17  marked as Exhibit 14 for your deposition.  We see here at

18  the top that this is an email from Josh Downer, correct?

19      A.  Yes.

20

21          (Defense Exhibit Number 14 was marked for

22          identification.)

23

24  BY MS. CAMPBELL:

25      Q.  And we identified earlier that that was general



```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF VENTURA        ) ss.

 3

 4                    CERTIFICATE OF REPORTER

 5

 6            I, Lisa Lemus, CSR No. 11484, a Certified

 7   Shorthand Reporter, hereby certify that the witness in

 8   the foregoing remote videoconference deposition was by me

 9   duly sworn to tell the truth, the whole truth, and

10   nothing but the truth in the within-entitled cause;

11            That said deposition was taken in shorthand

12   by me, a disinterested person, at the time and place

13   wherein stated, and that the testimony of the said

14   witness was thereafter reduced to typewriting, by

15   computer, under my direction and supervision;

16            I further certify that I am not of counsel

17   or attorney for either or any of the parties to the said

18   deposition, nor in any way interested in the event of

19   this cause, and that I am not related to any of the

20   parties hereto.

21

22            Dated this 7th day of March, 2024.

23

24   _____

25   LISA LEMUS, CSR No. 11484
     Certified Shorthand Reporter
```



# EXHIBIT 8

**In the Matter Of:**

ALT SPORTS CARD vs BECKETT COLLECTIBLES

3:22-cv-02867-N

**ALEXANDER LIRIANO**

*February 26, 2024*



800.211.DEPO (3376)
*EsquireSolutions.com*

1    not like it's air-sealed tight like, you

2    know, like, compressed into the card.  No.

3              Like, there's like -- it's a very

4    small room, but, like, there's enough for a

5    scissor to fit there, there's enough for,

6    like, I would say two tips of a ballpoint pen

7    could fit in between the card and where the

8    plastic is.  So you can look at it that way.

9              But what I did, was I take the

10    thinnest object and the most sharp object to

11    get it done, right?  You want to avoid

12    anything to happen to the card.  So what you

13    do is -- well, what I did is I took a blade

14    that I did the rest of the Beckett cracks

15    that I've done before, just precisely went

16    down, opened it, done, handed it off to Jon.

17  Q.  What kind of blade did you use?

18  A.  It was like a Uline -- like a -- just a razor

19    blade, your typical box cutter.  Like, that

20    blade, but it was like -- how do I -- you

21    know the ones that just like pop up with

22    your -- like, you could just like prop them

23    up with your finger.  It's not like a long --

24    like an elongated blade.  It's like -- it's

25    maybe like this size, (indicating).



1   back a 9.  You know what I mean?

2           So, look, I didn't want to show that

3   I was scared to crack it.  I didn't want to

4   show that, you know, there was any pressure

5   on me.  But I literally -- I said, look,

6   there's an 85 percent chance that it could

7   get that higher grade.  Like, if -- what is

8   that, 15 percent off?

9           Like that's -- I'm just -- I docked

10  it basically by centering left to right,

11  centering top to bottom, and the left corner

12  being rounded, a little bit like -- like --

13  not fraying, if you will, but like when --

14  when it -- when a corner is dull and not

15  super sharp, it looks more rounded than, you

16  know, like -- like -- like an L shape would,

17  right?  So that's -- that's probably what I

18  did, dock the 5 percent on each thing.

19          But I didn't -- I didn't think it

20  needed to be cracked.  Like, sure, a PSA 10

21  holds more value than a BGS 9.5, but it's

22  still a Mint, a Gem Mint Plus.  Like, that

23  means that every category got a 9.5, surface

24  9.5, edges 9.5, centering 9.5, corners 9.5.

25  It didn't get all 10's, but it's still a true



```
 1              REPORTER'S CERTIFICATE

 2              Be it known that I took the foregoing

 3    remote deposition of Alexander Liriano, on

 4    February 26, 2024;

 5              That I was then and there a Registered

 6    Professional Reporter and a Notary Public,

 7    and that by virtue thereof, I was duly authorized

 8    to administer an oath;

 9              That the witness was by me first duly

10    sworn to testify to the truth, the whole truth and

11    nothing but the truth relative to said cause;

12              That the foregoing transcript is a true

13    and correct transcript of my stenographic notes in

14    said matter;

15              That the witness waived the right to read

16    and sign the transcript;

17              That I am not related to any of the

18    parties hereto, nor interested in the outcome of

19    the action;

20       WITNESS MY HAND AND SEAL this 7th day of

21    February, 2024.   _____
                        Amy L. Larson, RPR
22                      My Commission Expires 01/31/25

23

24

25
```

